1  Travis Wall (SBN 191662)
   Travis.Wall@kennedyslaw.com
2  KENNEDYS CMK LLP
   455 Market Street, Suite 1900
3  San Francisco, CA 94105
   Telephone:  415-323-4487
4  Facsimile:   415-323-4445

5  Attorneys for Plaintiff
   OLD REPUBLIC UNION INSURANCE COMPANY
6

7

8              **UNITED STATES DISTRICT COURT FOR THE**

9                **CENTRAL DISTRICT OF CALIFORNIA**

10

11 OLD REPUBLIC UNION INSURANCE          Case No. 2:24-cv-9759
   COMPANY, an Illinois Corporation,
12
            Plaintiff,
13
                                         **COMPLAINT FOR**
        vs.                              **DECLARATORY RELIEF,**
14                                       **REIMBURSEMENT AND**
   LIVEONE, INC., a California           **RESCISSION**
   Corporation,
15
            Defendant.
16

17

18

19

20

21

22

23

24

25

26

27

28

                        COMPLAINT FOR DECLARATORY RELIEF AND RESCISSION
                        Case No. 2:24-cv-9759

As and for its complaint, Plaintiff Old Republic Union Insurance Company ("Old Republic") alleges as follows:

### PARTIES, JURISDICTION AND VENUE

1.      Plaintiff Old Republic is an Illinois corporation with its principal place of business in Chicago, Illinois. Therefore, Old Republic is a citizen of Illinois.

2.      Defendant LiveOne, Inc. ("LiveOne") is a California corporation with its principal place of business in Beverly Hills, California. Therefore, LiveOne is a citizen of California.

### NATURE OF THE ACTION

3.      This is an action for declaratory relief and rescission under California Civil Code section 1689(b)(7), California Insurance Code sections 331 and 359, 28 U.S.C. §§ 2201 and 2202, and Federal Rule of Civil Procedure 57.

4.      Old Republic issued a commercial general liability insurance policy to LiveOne for the policy period of January 29, 2024 to January 29, 2025. Old Republic seeks a declaration that there is no coverage under the policy in connection with the following action pending in the Superior Court of California for the County of Los Angeles, West District captioned: *Michael Kibler and Ann Kibler v. LiveOne, Inc., et al.,* Case No. 24SMCV02209 (the "underlying action"). The underlying action has not yet been resolved.

5.      In the alternative, Old Republic seeks a judgment declaring that the policy is rescinded due to material misrepresentations and omissions on the application and that, for that reason, Old Republic has no duty to defend or indemnify LiveOne.

### JURISDICTION AND VENUE

6.      Jurisdiction exists under 28 U.S.C. §1332 because there is diversity of citizenship between Old Republic and LiveOne, and the amount in controversy exceeds $75,000, exclusive of interest and costs. The underlying lawsuit is a nuisance action in which the damages demanded exceed $75,000, and the limits of the policy at issue exceed $75,000.

7.     The Court has the authority to grant the relief requested pursuant to California Civil Code section 1689(b)(7) and California Insurance Code sections 331 and 359, which govern the rescission of insurance policies, and under 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure because this action seeks adjudication of an actual, ripe and justiciable controversy that has arisen between the parties.

8.     Venue is proper in this Court pursuant to 28 U.S.C. §1391 because LiveOne has its principal address within this judicial district and the underlying action was filed in this judicial district.

## FACTUAL BACKGROUND

### A.    The Underlying Action

9.     The plaintiffs in the underlying action are Michael Kibler and Ann Kibler.

10.     The underlying action concerns a property, 516 N. Beverly Drive, Beverly Hills, California, which is located in a neighborhood that is zoned for residential single-family homes. First Amended Complaint ¶ 1. The underlying first amended complaint is attached hereto at **Exhibit 1.**

11.     According to the first amended complaint, plaintiffs and their young children have resided next door to the property for approximately 13 years. *Id*. ¶ 31. In 2021, the property was sold to certain defendants in the underlying action. *Id*. ¶ 33.

12.     Those defendants allegedly "renovated the residence to create a business center for lease to entertainment companies, including by installing a music and podcast studio, and providing event space for music, entertainment, and social media production and events, including events for social media influencers." *Id*. ¶ 35.

13.     On or around December 8, 2021, those defendants leased the property to an entertainment company known as The Revels Group LLC which further renovated the residence by installing a nightclub-quality sound system in the backyard of the property and installing professional recording equipment in the guest house behind the home that had been converted into a recording studio. *Id*. ¶ 36, 39.

14.     During their tenancy, The Revels Group hosted large-scale company-sponsored music industry entertainment events and all-night recording sessions in the studio behind the home on a nearly weekly basis, and it allegedly was "obvious" that The Revels Group "was operating a music business and recording studio" at the property. *Id.* ¶ 40-41.

15.     The complaint alleges that, on or around November 21, 2022, the City of Beverly Hills completed its zoning enforcement investigation of the use of the property by issuing a Final Notice of Violations, which asserted that the various activities carried out by The Revel Group were in violation of the Beverly Hills Municipal Code. *Id.* ¶ 47-48.

16.     The City of Beverly Hills ordered The Revel Group to, among other things, "permanently terminate all operations," "[r]emove all personal property from the dwelling, garage, and guesthouse… [used] in connection with its business activities," including but not limited to "all musical instruments (including keyboards) speakers, monitors, printers, computers, desks, work stations, partitions, [and] recording equipment," and "immediately terminate all street parking." *Id.* ¶ 50.

17.     As a result of those orders, The Revel Group moved out of the premises. *Id.* ¶ 51.

18.     The underlying complaint alleges that, in or around March 2023, LiveOne began renting the property and continued "the exact same pattern of illegal commercial activity." *Id.* ¶ 53. Specifically, LiveOne referred to the property on social media as "The LiveOne House" or its "Beverly Hills Studio" where LiveOne "hosts music industry events, holds meetings, and records podcasts, among other commercial activity." *Id.* ¶ 79.

19.     After one music industry event, "crowds of people continued to linger on and around the property for hours into the night, making noise, causing traffic congestion, and leaving garbage—empty beer and wine bottles, cups, paper plates,

COMPLAINT FOR DECLARATORY RELIEF AND RESCISSION
Case No. 2:24-cv-9759

1    cigarette butts—on the street, neighboring yards and sidewalks of the neighborhood
2    around the Kibler Family Home." *Id*. ¶ 96.

3        20.    The underlying complaint asserts that the evidence that LiveOne, Inc., like
4    The Revels Groups LLC, was "openly and illegally operating a music entertainment
5    business out of The LiveOne House at 516 N. Beverly Drive in a R-1 residential zone
6    is overwhelming." *Id*. ¶ 200.

7        21.    The underlying plaintiffs allege that, as a result of the LiveOne house, they
8    are "plagued with . . . heavy traffic and parking overflow, scores of business visitors,
9    vendors, artists, and others coming an going from the LiveOne House at all hours of the
10    day and night, as well as large music industry events." *Id*. ¶ 204.

11        22.    On the basis of those allegations, the underlying plaintiffs have asserted
12    causes of action against LiveOne for Violation of Municipal Zoning Laws, Public
13    Nuisance, Private Nuisance, and Intentional Infliction of Emotional Distress.

14    **B.    The Old Republic Policy**

15        23.    Old Republic issued a commercial general liability ("CGL") policy to
16    LiveOne, policy number ORB-PK-23-A01924-00, in effect from January 29, 2024 to
17    January 29, 2025, and having limits of $1,000,000 per occurrence and $2,000,000 in
18    the aggregate. The policy is attached hereto at **Exhibit 2.**

19        24.    By endorsement, the policy is subject to a combined bodily injury and
20    property damage deductible of $500 per occurrence.

21        25.    The policy describes LiveOne's business as "Recording Studio."

22        26.    CGL policies typically provide coverage for "bodily injury" and "property
23    damage" under Coverage Part A, and "personally and advertising injury" under
24    Coverage Part B. The policy does not provide coverage for "personal and advertising
25    injury," because that coverage was deleted by endorsement. Therefore, only the "bodily
26    injury" and "property damage" coverage potentially applies.

27        27.    The insuring agreement for Coverage Part A states in relevant part:

28

## SECTION I – COVERAGES

## COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY

## 1. Insuring Agreement

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result[.]

\*\*\*

b. This insurance applies to "bodily injury" and "property damage" caused by an "occurrence" that takes place in the "coverage territory" only if:

(1) The "bodily injury" or "property damage":

(a) Occurs on the premises show in in the Schedule or the grounds and structures appurtenant to those premises; or

(b) Arises out of the project or operation shown in the Schedule;

(2) The "bodily injury" or "property damage" occurs during the policy period; and

(3) Prior to the policy period, no insured listed under Paragraph 1. of Section II – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy perior, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or

COMPLAINT FOR DECLARATORY RELIEF AND RESCISSION
Case No. 2:24-cv-9759

"property damage" during or after the policy period will be deemed to have been known prior to the policy period.

*Amended by endorsement (CG 21 44 04 17 – Limitation of Coverage to Designated Premises, Project or Operation)*

\*\*\*

d. "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph 1. of Section II – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

**(1)** Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

**(2)** Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage;" or

**(3)** Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

28.    The policy defines "bodily injury" as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time."

29.    The policy defines "property damage" as "physical injury to tangible property, including all resulting loss of use of that property."

30.    "Property damage" also includes the "[l]oss of use of tangible property that is not physically injured."

31.    The policy defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

## C.    The Application for the Policy

32.    In applying for the policy, LiveOne completed an insurance application and questionnaire.

33.    LiveOne described the property as "Business Personal Property" and

COMPLAINT FOR DECLARATORY RELIEF AND RESCISSION
Case No. 2:24-cv-9759

contains the following "Description of Primary Operations" at the property: "Office/studio space with separate living space for approx. 5 individuals. There is also a pool. We will be hosting small events on location occasionally also."

34.    LiveOne's broker represented that "[LiveOne] will be using the house as a home/office space for LiveOne Corp and creative space for podcast studios/recording studios."

35.    Although LiveOne represented that it would use the property as an office and "creative space" and host "small" events, unbeknownst to Old Republic, LiveOne actually planned to use the property to host large-scale, company-sponsored music industry events.

**D.    The Insurance Claim**

36.    LiveOne tendered the defense of the underlying action to Old Republic.

37.    In a reservation of rights letter, Old Republic agreed to defend LiveOne in the underlying action under a reservation of rights.

38.    Old Republic's reservation of rights included, without limitation, the right to deny coverage on the ground that the policy does not provide coverage for the underlying action, the right to rescind the policy due to material misrepresentations and concealments on the application, and the right to seek reimbursement of defense and indemnity payments made on LiveOne's behalf.

**FIRST CLAIM FOR RELIEF**
**(Declaratory Relief as to Coverage)**

39.    Old Republic re-alleges as though set forth herein the allegations of Paragraphs 1 through 38 inclusive.

40.    Old Republic seeks a judicial declaration with respect to its obligations under the policy in connection with the underlying action.

41.    An actual controversy exists between Old Republic and LiveOne regarding the existence of coverage for the underlying action.  Old Republic contends that there

COMPLAINT FOR DECLARATORY RELIEF AND RESCISSION
Case No. 2:24-cv-9759

is no coverage for the underlying action under the policy, whereas LiveOne maintains that there is coverage or a potential for coverage.

42.    Old Republic disputes that the underlying first amended complaint alleges potential "bodily injury."  The underlying complaint alleges only emotional distress, which does not qualify as "bodily injury" as that term is defined in the policy.

43.    The underlying first amended complaint likewise does not allege "property damage" as that term is defined in the policy because there was no physical injury to tangible property or loss of use of the property within the meaning of the policy.

44.    The policy only covers damages from an "occurrence," which is defined in relevant part as an "accident." The underlying first amended complaint alleges disturbances from all night recording sessions and large scale music industry events hosted at a home on a residential street.  The fact that such events might cause noise or disturb neighbors is not an unexpected happening or event. Therefore, any resulting harm from those activities was not the result of an "occurrence."

45.    Old Republic requests a judicial determination as to the rights and duties of each party under the policy with respect to the underlying action. Specifically, Old Republic seeks a determination that there is not, and never was, a potential for coverage for the claims alleged against LiveOne, and that Old Republic has no duty to defend or indemnify LiveOne in connection with the lawsuit.

## SECOND CLAIM FOR RELIEF
### (Reimbursement)

46.    Old Republic re-alleges as though set forth herein the allegations of Paragraphs 1 to 45.

47.    Old Republic is defending LiveOne in the underlying action under a reservation of rights, including the right to seek reimbursement of any or all defense or indemnity payments made on LiveOne's behalf.

COMPLAINT FOR DECLARATORY RELIEF AND RESCISSION
Case No. 2:24-cv-9759

48.     Old Republic made defense payments on LiveOne's behalf in connection with the underlying action and will incur additional defense expenses defending the lawsuit.

49.     Because there is no coverage or potential for coverage for the underlying action, Old Republic is entitled to recover all defense and indemnity payments it made and in the future will make on LiveOne's behalf.

### THIRD CLAIM FOR RELIEF
**(Rescission)**

50.     Old Republic re-alleges as though set forth herein the allegations of Paragraphs 1 through 49 inclusive.

51.     If for any reason Old Republic is not entitled to a judicial declaration that there is no coverage for the underlying action under the policy, Old Republic seeks to rescind the policy.

52.     In applying for the policy, LiveOne misrepresented the nature of its business and concealed material information about its enterprise. On its application for insurance, LiveOne indicated that the property would be used as a creative space or recording studio and occasionally host "small" events. LiveOne instead used the property for large-scale music industry events and parties.

53.     The misrepresentations and concealments were material. If LiveOne had accurately described the nature of its business, Old Republic would not have issued the policy, or would have issued a policy with different terms or for a higher premium.

54.     Due to LiveOne's material misrepresentations and concealments, Old Republic is entitled to rescind the policy.

55.     Old Republic has provided written notice to LiveOne that it would seek to rescind the policy. Further, service of this complaint provides notice of Old Republic's intention to seek rescission.

COMPLAINT FOR DECLARATORY RELIEF AND RESCISSION
Case No. 2:24-cv-9759

56.     Old Republic is entitled to a declaration that the policy is rescinded and void ab initio pursuant to Civil Code section 1689(b)(7), California Insurance Code sections 331 and 359, and 28 U.S.C. § 2201 et seq.

57.     Upon such declaration, Old Republic stands ready to return all premiums received in connection with the policy.

58.     Old Republic seeks a judicial determination that the policy is rescinded and, to the extent practicable, a judgment returning the parties to the situation that existed prior to the issuance of the policy.

### **PRAYER**

WHEREFORE, Old Republic prays for relief as follows:

1.     That the Court declare and adjudge that there is no coverage, or potential for coverage, for the underlying action under the policy because the underlying first amended complaint does not allege any "bodily injury" or "property damage" caused by an "occurrence."

2.     That the Court declare and adjudge that Old Republic has no duty under the policy to defend or indemnify LiveOne in connection with the underlying action.

3.     For reimbursement of all defense and indemnity payments made on LiveOne's behalf, in amount to be proven at trial.

4.     If for any reason Old Republic is not entitled to a judicial declaration about its obligations under the policy in connection with the underlying action, that the Court declare that the policy is rescinded and null and void from inception and declare and adjudge that, to the extent practicable, that the parties are to be returned to the situation that existed prior to the issuance of the policy;

5.     For prejudgment interest;

6.     For costs of suit herein; and

That the Court grant such other and further relief as the Court deems just and proper.

COMPLAINT FOR DECLARATORY RELIEF AND RESCISSION
Case No. 2:24-cv-9759

1   DATED:  November 12, 2024            KENNEDYS CMK LLP

2                                    By: */s/ Travis Wall*
3                                        TRAVIS WALL
                                         Attorney for Plaintiff
4                                        OLD REPUBLIC UNION INSURANCE
                                         COMPANY
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR DECLARATORY RELIEF AND RESCISSION
Case No. 2:24-cv-9759

EXHIBIT 1

KIBLER FOWLER & CAVE LLP
John D. Fowler (SBN 271827)
jfowler@kfc.law
Matthew J. Cave (SBN 280704)
mcave@kfc.law
Zien Halwani (SBN 322040)
zhalwani@kfc.law
Charles Cardinal (SBN 322991)
ccardinal@kfc.law
11100 Santa Monica Blvd., Suite 360
Los Angeles, California 90025
Telephone:    (310) 409-0400
Facsimile:    (310) 409-0401

*Attorneys for Plaintiffs*
*Michael Kibler and Ann Kibler*

**FILED**
Superior Court of California
County of Los Angeles

**07/29/2024**

David W. Slayton, Executive Officer / Clerk of Court

By: _____ A. Hamilton _____ Deputy

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF LOS ANGELES, WEST DISTRICT

| | |
|---|---|
| MICHAEL KIBLER, an individual, and ANN KIBLER, an individual, and as Trustees of the Kibler Family Trust,<br><br>Plaintiffs,<br><br>v.<br><br>LIVEONE, INC. a California corporation, PODCASTONE, INC., a Delaware corporation, ROBERT ELLIN, an individual, JOSHUA HALLBAUER, an individual, AIDAN CROTINGER, an individual, SPLITMIND LLC, a California limited liability company, SIAMAK KHAKSHOOY, an individual, TANAZ KOSHKI, an individual, and DOES 1-10, and ABC CORPS. 1-10, inclusive,<br><br>Defendants. | CASE NO. 24SMCV02209<br><br>**VERIFIED FIRST AMENDED COMPLAINT FOR:**<br><br>**(1) VIOLATION OF BEVERLY HILLS MUNICIPAL ZONING LAWS**<br>**(2) PUBLIC NUISANCE**<br>**(3) PRIVATE NUISANCE**<br>**(4) INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**<br>**(5) AIDING AND ABETTING TORT**<br><br><br>**JURY TRIAL DEMANDED** |

Electronically Received 07/29/2024 03:08 PM

Kibler Fowler & Cave LLP
11100 Santa Monica Boulevard
Suite 360
Los Angeles, California 90025

Plaintiffs Michael Kibler and Ann Kibler (collectively, "Plaintiffs" or the "Kibler Family"), for their verified First Amended Complaint, allege as follows:

## INTRODUCTION

1.    This case is about a publicly traded music entertainment company called LiveOne, Inc. that, together with its subsidiaries PodcastOne, Inc. and Splitmind LLC (collectively, "LiveOne") is openly and illegally operating a commercial office, business event center, professional podcast interview studio, and music recording studio that it refers to on social media platforms as "The LiveOne House" or its "Beverly Hills Studio" at 516 N. Beverly Drive, in the middle of a residential community of families in the heart of Beverly Hills.

2.    LiveOne also is now a deadbeat squatter, having defaulted on the lease and refused to vacate the premises even though the lease expired on July 17. Through its counsel, LiveOne has told the owner of the residence, its landlord, that it will not pay rent or vacate its commercial offices because it has invested $300,000 to convert the residence into a commercial office, professional recording studio and corporate event space.

3.    LiveOne's illegal commercial operations in a Beverly Hills residential community also coincides with the "spin-out" of its podcast division as a separate publicly traded company, PodcastOne, Inc. PodcastOne, Inc. has been listed on the NASDAQ since September 2023 (approximately two months after LiveOne, Inc. began in Beverly Hills) and markets, among other things, a rent-a-podcast studio business out of the residence. LiveOne Inc's operations in Beverly Hills also come after its acquisition of Aidan Crotinger's Splitmind LLC, who it then enlisted to be a sham lessee of the residence as it established its commercial operations there.

4.    LiveOne, Inc.'s and its subsidiaries' PodcastOne, Inc.'s and Splitmind LLC's commercial operations intentionally, knowingly, and criminally violate the Beverly Hills Municipal Code Section 10-3-4303, entitled "Home Occupation Requirements," as well as other municipal code sections and California law.

5.    And, what's worse, this is not the first time that the owners of the residential property from which LiveOne currently operates have profited by leasing the premises to a music entertainment company for commercial operations. In or around December 2021, the property

1  owners, Siamak Khakshooy and Tanaz Koshki, leased the same residence to another music

2  company called The Revels Group LLC. Beverly Hills zoning officials found The Revels Group

3  LLC to have created a nuisance in violation of City zoning ordinances by running its music

4  entertainment business in a residential neighborhood, and eventually forced the company out of

5  the residence. But the owners then turned around and knowingly leased the property to another

6  music entertainment company just months later.

7        6.      For over two years, the Kibler Family and other residents in the neighborhood have

8  been dealing with noise at all hours of the day and night, increased foot and car traffic associated

9  with commercial operations, and parking overflow, among other disturbances, from the day-to-day

10  commercial activities at the residence. They also have been tormented with large-scale music

11  industry events thrown first by The Revels Group LLC and now LiveOne and PodcastOne most

12  recently. For example, on February 3, 2024, LiveOne hosted a red-carpet pre-Grammy party to

13  celebrate a LiveOne artist who was nominated for a Grammy award. The Beverly Hills Police

14  Department eventually shut this event down following multiple complaints from residents.

15        7.      While the City of Beverly Hills initiated an investigation that led to The Revels

16  Group LLC's ouster from the residential property in 2023, LiveOne quickly took its place and

17  commenced its commercial operations there, which continue through today.

18        8.      To be clear, LiveOne, assisted by its lawyers and real estate broker, as well as the

19  property owners, intentionally and maliciously created a sham residential lease for 516 N. Beverly

20  Drive in the name of LiveOne employee Aidan Crotinger, intending all along that LiveOne would

21  illegally use the property as its business headquarters, offices, recording studio and corporate

22  event space. Discovery and investigation to date shows that throughout the negotiation of the

23  lease, LiveOne and its CEO, Robert Ellin, were recognized by all involved as the true parties in

24  interest to the lease and that LiveOne would operate out of the residence. For example, LiveOne

25  (i) through its CEO and with assistance from its corporate counsel in New York negotiated all of

26  the lease terms; (ii) paid the security deposit, three months upfront rent and monthly lease

27  payments from its business bank account (until it defaulted on the lease in June); (iii) paid for all

28  utilities for the property, which were in the company's name, again through its business bank

Kibler Fowler & Cave LLP
11100 Santa Monica Boulevard
Suite 360
Los Angeles, California 90025
KF&C

1    account; (iv) purchased millions of dollars of *commercial* general liability insurance for the

2    property, with LiveOne, Inc. as the named insured, where the policy designated 516 N. Beverly as

3    LiveOne's business address and described the residence as a "recording studio"; (v) described the

4    residence in its application for insurance as LiveOne's "office/studio space"; and (vi) proceeded to

5    operate its business from the 516 N. Beverly Drive property for more than a year as of the filing of

6    this pleading by, among other things, recording podcasts in the recording studio, holding business

7    meetings, operating lodging for business guests, including recording artists and podcast hosts and

8    their guests, and hosting music and podcast industry events.

9        9.    And lest there be any doubt that LiveOne has turned 516 N. Beverly Drive into its

10   business headquarters, LiveOne—a California based company publicly claiming to be based in

11   Los Angeles—*has no other offices or business locations in the state of California*. To cover up its

12   illegal operations at 516 N. Beverly Dr., LiveOne falsely tells the investing public in filings with

13   the Securities Exchange Commission that its "principal executive offices" are located at "269 S.

14   Beverly Drive, Suite 1450" in Beverly Hills, when the truth is that the 269 S. Beverly Drive

15   address is a "Beverly Hills Postal Palace" (a mail drop) where LiveOne has no offices, much less

16   "principal executive" ones, and where there are no "suites" of offices. "Suite #1450" doesn't exist.

17       10.   Remarkably, LiveOne's counsel in this action has advised LiveOne (in

18   communications CEO Ellin later shared with LiveOne's landlord before tasking the landlord to

19   call the Kiblers to try to convince them they were mistaken about the business operations next

20   door to their family home) to lie about its use of the residence as a business but only "[a]ssuming

21   there is no public or official statement or record by LiveOne that the house is its corporate office."

22   LiveOne's counsel advised that so long as there was no "official statement" or public "record" of

23   LiveOne's illegal commercial use of the residence, CEO Ellin could take the (manifestly false)

24   "position that the house is not being used as LiveOne's business office, and it is in fact being used

25   as a residence."[1]   In other words, counsel advised Ellin that he could lie. That absurd pretense that

26

27   _____

     [1] Attached as **Exhibit A** is a text message from Ellin to the owners forwarding the verbatim

28   statements of his counsel.

Kibler Fowler & Cave LLP

KFᵃC

11100 Santa Monica Boulevard
Suite 360
Los Angeles, California 90025

Kibler Fowler & Cave LLP
11100 Santa Monica Boulevard
Suite 360
Los Angeles, California 90025

counsel Teri Pham fed CEO Ellin and that Ellin then fed to the owners on or about May 16, 2024 cannot survive contact with reality and, in fact, directly contradicts overwhelming documentary evidence, some of which is set forth in detail below and attached to this pleading. Ms. Pham, confident there was no public "record" or "official" statement about LiveOne's illegal operations, then called the Kiblers' counsel, repeated the lie about LiveOne's illegal commercial operations, and then threatened the Kiblers' reputation in the community by insinuating racial animus in an attempt to scare the family into abandoning this lawsuit. The scare tactic failed.

11. LiveOne (and sham "lessee" resident Crotinger) have now defaulted on the lease, which has expired, have refused to allow the owners or Beverly Hills zoning authorities to inspect the premises, and have refused to leave the premises even though the lease term has expired, causing the owners to commence a separate unlawful detainer proceeding against them (*Khakshooy v. Crotinger*, 24-SMCV-3329, Superior Court of California, Los Angeles County, Western District).

12. The Kibler Family brings this Complaint to put a stop to LiveOne, Inc., PodcastOne, Inc., Splitmind LLC, Robert Ellin, Joshua Hallbauer, Aidan Crotinger, Siamak Khakshooy, and Tanaz Koshki's open violations of municipal zoning laws and California law, and to redress the extreme distress they have caused all residents in the neighborhood, especially the Kibler Family next door.

## THE PARTIES

13. Plaintiff Michael Kibler is an individual, who is, and at all relevant times was, a resident of the City of Beverly Hills, Los Angeles County, California.

14. Plaintiff Ann Kibler is an individual, who is, and at all relevant times was, a resident of the City of Beverly Hills, Los Angeles County, California.

15. Defendant LiveOne, Inc. is a publicly traded Delaware corporation (NASDAQ: LVO), with its principal place of business in Los Angeles County, California.

16. Defendant PodcastOne, Inc. is a publicly traded Delaware corporation (NASDAQ: PODC), with its principal place of business in Los Angeles County, California.

17. Defendant Robert Ellin is an individual, who upon information and belief is, and at

1    all relevant times was, a resident of Los Angeles County, California. According to LiveOne, Inc.'s

2    2023 California Statement of Information, Ellin is LiveOne, Inc.'s Board Chair and Chief

3    Executive Officer.

4    18.    Defendant Joshua Hallbauer is an individual, who upon information and belief is,

5    and at all relevant times may be a resident either of the state of Florida or Los Angeles County.

6    Hallbauer is the head of LiveOne, Inc.'s Music Publishing Division.

7    19.    On February 3, 2024, Hallbauer stated to the Beverly Hills Police Department that

8    he resided at 516 N. Beverly Drive (the Beverly Hills residence where LiveOne, Inc. conducts

9    commercial operations). Upon information and belief, that representation to law enforcement was

10    a lie. Hallbauer has a Florida driver's license registered to a house in Boca Raton, Florida. Phone

11    numbers associated with Hallbauer are connected to a house on Austin Avenue in Simi Valley in

12    Los Angeles County, where he receives mail and which may be the home of his parents, Alayne

13    and David Hallbauer, who lease at least one car he drives. Hallbauer may reside with Passung

14    Bhutia on Rosilla Place in the Hollywood Hills neighborhood of Los Angeles.

15    20.    No public records tie Hallbauer to 516 N. Beverly Drive, and surveillance of the

16    house shows that while dozens, sometimes hundreds, of people visit the premises in any given

17    week, Hallbauer is rarely seen there. Discovery and further investigation will reveal where

18    Hallbauer actually lives.

19    21.    Defendant Aidan Crotinger is an individual, who upon information and belief is,

20    and at all relevant times was, a resident of Los Angeles County, California. Crotinger is the Chief

21    Executive Officer of Splitmind LLC, a LiveOne affiliate, and the sham lessee on a residential

22    lease of 516 N. Beverly Drive.

23    22.    Defendant Splitmind LLC is a California limited liability company, with its

24    principal place of business in Los Angeles County, California.

25    23.    Defendant Siamak Khakshooy is an individual, who is, and at all relevant times

26    was, a resident of Los Angeles County, California.

27    24.    Defendant Tanaz Koshki is an individual, who is, and at all relevant times was, a

28    resident of Los Angeles County, California.

Kibler Fowler & Cave LLP
11100 Santa Monica Boulevard
Suite 360
Los Angeles, California 90025

25.     Plaintiffs are ignorant of the names of the defendants sued herein as DOES 1-10 and ABC CORPS. 1-10 and will amend their Complaint to reflect those defendants' true names if and when that information is discovered.

## JURISDICTION AND VENUE

26.     This Court has jurisdiction over LiveOne, Inc. because its principal place of business is in California and it regularly and routinely conducts business in California, including at 516 N. Beverly Drive. This Court has jurisdiction over PodcastOne, Inc. because its principal place of business is in California and it regularly and routinely conducts business in California, including at 516 N. Beverly Drive. This Court has jurisdiction over Robert Ellin because he is, upon information and belief, a resident of California and regularly and routinely conducts business in California, including at 516 N. Beverly Drive. This Court has jurisdiction over Joshua Hallbauer because he regularly and routinely conducts business in California, including at 516 N. Beverly Drive. This Court has jurisdiction over Aidan Crotinger because he regularly and routinely conducts business in California, including at 516 N. Beverly Drive. This Court has jurisdiction over Splitmind LLC because its principal place of business is in California and it regularly and routinely conducts business in California, including at 516 N. Beverly Drive.

27.     This Court has jurisdiction over Siamak Khakshooy and Tanaz Koshki because they are residents of California and regularly and routinely conduct business in California.

28.     Venue is proper in Los Angeles County because the acts giving rise to liability occurred in this county. Specifically, venue is proper in the West District Beverly Hills courthouse because the acts giving rise to liability occurred in the City of Beverly Hills.

## FACTUAL ALLEGATIONS

### *The Kibler Family*

29.     Michael and Ann Kibler are a married couple with school-aged children and are long-time residents of Beverly Hills, where they have been active members of the community for nearly 20 years.

30.     Professionally, Mr. Kibler is the Managing Partner of his Los Angeles-headquartered law firm Kibler Fowler & Cave LLP, where he practices commercial litigation.

Kibler Fowler & Cave LLP
11100 Santa Monica Boulevard
Suite 360
Los Angeles, California 90025

1    Prior to co-founding Kibler Fowler & Cave LLP, he was a litigation Partner at Simpson Thacher

2    & Bartlett LLP in New York and Los Angeles.

3         31.    The Kibler Family resides at 514 N. Beverly Drive, Beverly Hills, CA 90210 (the

4    "Kibler Family Home"), next door to 516 N. Beverly Drive, where LiveOne conducts commercial

5    operations. Michael, Ann, and their young children have lived at the Kibler Family Home for

6    approximately 13 years.

7         32.    The Kibler Family Home and its neighboring houses are in a residential single-

8    family home zoning area of Beverly Hills, also known as an "R-1" zone, in a neighborhood

9    commonly referred to as the Flats of Beverly Hills or simply The Flats. Accordingly, the Kibler

10    Family is among the class of persons—residents of R-1 zoning divisions—for which the municipal

11    ordinances at issue in this case were intended to provide special protection.

12   ***Defendants Siamak Khakshooy and Tanaz Koshki Purchase 516 N. Beverly Drive as an
      Investment Property and Convert the House for Lease to Entertainment Companies***

13

14         33.    In 2021, the long-time resident of 516 N. Beverly Drive, the Kibler Family's next-

15    door neighbor to the north for many years, died. His family subsequently sold the home to

16    Defendants Siamak Khakshooy and Tanaz Koshki who, upon information and belief, purchased

17    the home as an investment property.

18         34.    Khakshooy and Koshki are, among other things, real estate investors. Upon

19    information and belief, Khakshooy and Koshki own (at least) the following 14 investment

20    properties in southern California:

21              a.    683 S June St., Los Angeles, CA 90005

22              b.    4201 W Century Blvd., Inglewood, CA 90304

23              c.    232 N Plymouth Blvd., Los Angeles, CA 90004

24              d.    817 S Bedford St. Apt. 2, Los Angeles, CA 90035

25              e.    1115 S Elm Dr. Apt. 513, Los Angeles, CA 90035

26              f.    126 N Wetherly Dr., Beverly Hills, CA 90211

27              g.    3451 W Century Blvd. Ste. B1, Inglewood, CA 90303

28              h.    516 N Beverly Dr., Beverly Hills, CA 90210

Kibler Fowler & Cave LLP
11100 Santa Monica Boulevard
Suite 360
Los Angeles, California 90025

1        i.      125 E Fairview Blvd., Inglewood, CA 90302

2        j.      5731 Lexington Ave., Los Angeles, CA 90038

3        k.     5954 Guthrie Ave., Los Angeles, CA 90034

4        l.      5958 Guthrie Ave., Los Angeles, CA 90034

5        m.    4846 Van Nuys Blvd., Sherman Oaks, CA 91403

6        n.     2091 Jupiter Ave., Thermal, CA 92274

35.    Upon information and belief, after purchasing the 516 N. Beverly Drive property, Khakshooy and Koshki renovated the residence to create a business center for lease to entertainment companies, including by installing a music and podcast studio, and providing event space for music, entertainment, and social media production and events, including events for social media influencers. Upon information and belief, Khakshooy and Koshki then marketed the property for commercial and business use to entertainment companies.

***The Revels Group LLC Occupies 516 N. Beverly Drive and Illegally Operates a Music Business***

36.    On or around December 8, 2021, Khakshooy and Koshki leased 516 N. Beverly Drive to an entertainment company known as The Revels Group LLC.

37.    The Revels Group LLC holds itself out to the public as a "full-service artist management, record label, publishing, creative production, and tour management" company. Its website further states: "Established in 2012, The Revels Group LLC is a multi-faceted creative company that has grown into an entertainment and media powerhouse." "Out of their creative compound based in Los Angeles, they represent incredible talent including signing multi-platinum hip-hop artist G-Eazy." The Revels Group LLC's artists also include Jenevieve, Victony, Southside, Ruby Red, Gibson Hazard, Ben10K, Krooked Kings, and others.

38.    Upon information and belief, during The Revels Group LLC's occupancy of 516 N. Beverly Drive, it described the home to the public and recording artists as its "creative compound" where recording artists could come to the Flats of Beverly Hills to record music in the professional recording studio behind the house, conduct photoshoots and interviews, create social media content for publication, and throw all-night music industry events hosted by professional DJs.

39.    Upon information and belief, The Revels Group LLC immediately further

Kibler Fowler & Cave LLP
11100 Santa Monica Boulevard
Suite 360
Los Angeles, California 90025

9

1   renovated the residence by installing a nightclub-quality sound system in the backyard of the

2   property and installing professional recording equipment in the guest house behind the home that

3   the owners had converted into a recording studio.

4        40.    Upon leasing the property, The Revels Group LLC almost immediately began

5   hosting large-scale company-sponsored music industry entertainment events and holding all-night

6   recording sessions in the studio behind the home on a nearly weekly basis.

7        41.    The fact that The Revels Group LLC was operating a music business and recording

8   studio at 516 N. Beverly Drive was obvious. Among other things, the Kibler Family received mail

9   and deliveries addressed to the "Revels Group LLC, 516 N. Beverly Dr."

10       42.    Further, on a regular basis, different cars would pull into and park in the driveway

11  of the Kibler Family Home and the occupants, visitors of The Revels Group LLC studio, would

12  walk up to their front door and attempt to gain entry into the Kibler Family Home, often without

13  knocking. Invariably, when confronted, these strangers would say they were looking for The

14  Revels Group for a recording studio session.

15       43.    What's more, on a near daily basis, the cars and Ubers/Lyfts dropping people at

16  The Revels Group LLC's "creative compound" at 516 N. Beverly would block the Kibler

17  Family's driveway, preventing egress and ingress, park on the sidewalk, illegally park in the back

18  alley behind the residence, and park in front of the fire hydrant between the houses, creating

19  dangerous conditions, nuisance, and annoyance.

20       44.    The Kibler Family eventually hired private investigators to conduct surveillance of

21  The Revels Group LLC's operations on three random days in the summer of 2022 (June 21 from

22  10:00 a.m. to 4:00 p.m., June 28 from 7:00 a.m. to 1:00 p.m., and July 2 from 7:00 a.m. to 1:00

23  p.m.), which revealed numerous people entering and exiting the residence throughout the day and

24  night, demonstrating patterns of an office and commercial event center rather than the patterns of a

25  residential single-family home.

26       45.    For example, on June 21, 2022, the surveillance team observed the following

27  indications of commercial activity at the residence:

28       • 10:00 a.m.: surveillance begins.

Kibler Fowler & Cave LLP
11100 Santa Monica Boulevard
Suite 360
Los Angeles, California 90025

- 10:48 a.m.: unknown person leaves the residence.
- 11:03 a.m.: man is dropped off from an Uber/Lyft silver Chevy Sedan wearing a blue sweatshirt reading "UNF#CK THE MUSIC INDUSTRY."
- 11:08 a.m.: woman arrives in black Kia Optima.
- 11:14 a.m.: man arrives in silver Lexus SUV.
- 11:17 a.m.: woman is dropped off in silver unknown vehicle a few houses away and walks to 516 N. Beverly Drive.
- 11:20 a.m.: man in blue sweatshirt exits the house and greets the man who arrived in Lexus SUV. They both then enter the house.
- 11:24 a.m.: woman is dropped off in Uber/Lyft black Toyota Camry. She exits the car with a small dog and enters the house.
- 11:47 a.m.: man is dropped off in Uber/Lyft Toyota RAV4.
- 11:53 a.m.: man who arrived in the Lexus SUV exits the house and drives away.
- 12:19 p.m.: man exits the house, remains outside for a few minutes, then walks away.
- 12:24 p.m.: same man who left at 12:19 p.m. returns to the house.
- 12:26 p.m.: man arrives in silver Honda Pilot.
- 12:52 p.m.: same woman who arrived at 11:08 a.m. leaves in Kia Optima. Two men arrive on foot.
- 1:02 p.m.: man is dropped in Uber/Lyft red Tesla.
- 1:05 p.m.: two men exited the house and enter a black Mercedes.
- 1:10 p.m.: man arrives on foot.
- 1:27 p.m.: man departs in white BMW.
- 1:32 p.m.: man exits the house and remains outside.
- 1:34 p.m.: man exits the house to greet another man who arrives on foot.
- 1:36 p.m.: man exits the house and leaves on foot.
- 1:39 p.m.: man exits the house, goes to white Nissan, then goes back inside.
- 1:41 p.m.: woman exits the house, walks out of view, then returns on foot.

VERIFIED FIRST AMENDED COMPLAINT

- 1:47 p.m.: man exits the house and drives away in black Hyundai.
- 1:52 p.m.: person arrives in white Toyota Prius.
- 1:53 p.m.: same man who left at 1:36 p.m. returns on foot.
- 2:09 p.m.: man arrives in silver Toyota Prius.
- 2:36 p.m.: two men exit house and leave in black Audi SUV.
- 2:45 p.m.: two women arrive in silver Toyota Camry.
- 2:53 p.m.: one of the women who arrived at 2:45 p.m. exits the house and leaves in Toyota Camry.
- 3:01 p.m.: man exits the house and leaves on foot.
- 3:05 p.m.: Uber/Lyft Toyota Camry arrives, parks outside the front of the house, and waits.
- 3:08 p.m.: two women and a man exit the house. The two women get into the Uber/Lyft Toyota Camry and leave. The man returns to the house.
- 3:31 p.m.: man exits the house on foot.
- 3:41 p.m.: same man who exited the house at 3:31 p.m. returns on foot.
- 3:52 p.m.: man and woman both arrive on foot.
- 4:00 p.m.: surveillance ends.

46.     The surveillance team observed similar patterns of individuals entering and exiting the residence on June 28 and July 2, 2022. The commercial patterns of activity that the surveillance team documented were consistent with the patterns that the Kibler Family observed daily. These activities are obviously highly irregular for a residential single-family home in a neighborhood zoned R-1, but were consistent with the patterns that the Kibler Family observed almost every day at 516 N. Beverly Drive during The Revels Group LLC's occupancy and, as discussed in detail below, later when LiveOne commenced commercial operations at the property.

### The City of Beverly Hills Investigates The Revels Group LLC

47.     In or around September 2022, the City of Beverly Hills initiated a zoning enforcement investigation of The Revels Group LLC's use of 516 N. Beverly Drive—City Case No. CP2201811.

Kibler Fowler & Cave LLP
11100 Santa Monica Boulevard
Suite 360
Los Angeles, California 90025

48.     On or around November 21, 2022, Beverly Hills Code Enforcement Attorney, Prosecutor Steven H. Rosenblit, issued a Final Notice of Violations to The Revels Group LLC. The Notice provided, in detail, the various illegal activities carried out by The Revels Group LLC in violation of Beverly Hills Municipal Code ("BHMC").

49.     The Notice reads, in relevant part (footnotes omitted):

*"The City makes the following determinations concerning The Revels Group LLC (hereafter, 'REVELS') by reason of your wrongful actions as follows:*

*A.     REVELS' home occupation in the dwelling is, based on a consensual October 22, 2022, inspection by Code Enforcement Officer Dorian Cedars and Mr. Davis' statements to him, not compliant with the BHMC.*

*(i)     <u>Partial Inspection Observations</u>: The rooms were relatively sparse with hardly any furniture. Several rooms had speakers and recording equipment in them. One room had a couch and a desk, the next was just almost like a hallway with various recording industry memorabilia on the walls and shelves. Another room was another recording room with keyboards and speakers and desks. The upstairs area in the main house was entirely office space, with desks and couches and work stations and tables.*

*(ii)     <u>Occupants</u>: The only full time occupant of the property is, according to Mr. Davis, Charlie, who sleeps in the guesthouse.*

*B.     Cause exists to believe REVELS' employees (which number six according to its business application to the city) are parking on the street. That is a violation of the BHMC.*

*(i)     REVELS has repeatedly obtained daytime parking exemptions (that allow parking on the street) for five vehicles from the Beverly Hills Police Traffic Bureau (see Appendix 1 for recent exemptions). REVELS has obtained a substantial number of such exemptions since it began business operations at this property.*

*(ii)     Photos of vehicles bearing daytime parking exemptions, which are reportedly parked on the street most days between the hours of 10:00 a.m. and 6:00 p.m., are set forth in Appendix 2.*

KF&C

**Kibler Fowler & Cave** LLP
11100 Santa Monica Boulevard
Suite 360
Los Angeles, California 90025

1        *C.      On November 14, 2022 at approximately 8:20 p.m. a courier, who was*

2  *delivering a passport to REVELS, reportedly went instead to a nearby resident's house and*

3  *disturbed the resident. The courier, who was blasting loud music from his car, parked in*

4  *the resident's driveway, and knocked on the resident's front door. The incident resulted in*

5  *a violation of the BHMC.*

6        *D.      REVELS' operations are, in violation of BHMC Section 10-3-4303 G.*

7  *[General Nuisance], materially or unreasonably degrading the quality of life of adjacent*

8  *neighbors and have disturbed another person's quiet enjoyment of his or her property as a*

9  *result of traffic, parking and noise.*

10       *(i)    An example of reported impacts in support of that determination:*

11     •     *An October 21, 2022 recording session of two day and nights in duration*

12  *disturbed nearby residents. There was traffic (including from Ubers) with persons who*

13  *reportedly were in and out of the property all day and night. Cars were blocking a*

14  *driveway and parked on the sidewalk. Persons leaving the property made noise that*

15  *awakened nearby sleeping residents.*

16        *E.      In addition to violating the BHMC as discussed above, you are not abiding*

17  *by the Home Occupations Affidavit that Jamil Davis executed under penalty of perjury on*

18  *October 26, 2022."*

19      50.     Due to these findings, the City of Beverly Hills demanded that The Revels Group

20  LLC abide by the Beverly Hills Municipal Code (and pay City business taxes it had been

21  evading). The City of Beverly Hills ordered The Revels Group LLC to, among other things,

22  "permanently terminate all operations," "[re]move all personal property from the dwelling, garage,

23  and guesthouse … [used] in connection with its business activities" including but not limited to

24  "all musical instruments (including keyboards) speakers, monitors, printers, computers, desks,

25  work stations, partitions, [and] recording equipment," and "immediately terminate all street

26  parking."

27      51.     Following these orders from the City of Beverly Hills, The Revels Group LLC

28  eventually did not renew its lease with Khakshoxy and Koshki at 516 N. Beverly Drive and moved

K F & C

Kibler Fowler & Cave LLP

11100 Santa Monica Boulevard
Suite 360
Los Angeles, California 90025

VERIFIED FIRST AMENDED COMPLAINT

1  out.

2       52.    The residence was quiet from approximately December 2022 to March 2023. But

3  peace in the neighborhood—and for the Kibler Family—was short lived.

4  ***LiveOne Executives Negotiate a Lease for 516 N. Beverly Drive, Install Crotinger as the Sham***

5  ***Lessee and Move Into the Residence with the Intent to Operate a Music Entertainment***

6  ***and Podcast Business***

7       53.    Upon information and belief, Khakshooy and Koshki immediately began marketing

8  the investment property to entertainment companies again and eventually found LiveOne to

9  replace The Revels Group LLC. Only approximately three months after the City of Beverly Hills

10  forced The Revels Group LLC out, LiveOne moved in with a clear intention to violate municipal

11  zoning laws and other state law. And the *exact same* pattern of illegal commercial activity

12  described above resumed, albeit through a different cast of characters.

13       54.    LiveOne, Inc. is a publicly traded music entertainment company (NASDAQ: LVO)

14  incorporated in Delaware that advertises itself as a "global digital media company dedicated to

15  music and live entertainment."

16       55.    In or around April 2023, LiveOne, Inc.'s executives CEO Robert Ellin, CFO Aaron

17  Sullivan, and Head of Music Publishing Joshua Hallbauer began negotiating the lease of 516 N.

18  Beverly Drive with the specific intention of leasing the property for LiveOne's business purposes.

19  On or about April 20, 2023, Ellin and Crotinger submitted personal applications for lease of the

20  residential property as well as personal credit reports.

21       56.    In connection with the lease negotiations, LiveOne also provided its corporate

22  formation documents, financial and banking statements and other company records to the landlord

23  owners through its real estate broker.

24       57.    At the same time, LiveOne, Inc. continued plans to "spin-out" its podcast division,

25  PodcastOne, into a separate publicly traded corporation, issuing a press release on the topic in

26  March 2023. "We are excited about the planned spin-out of PodcastOne as it will be the only pure

27  play publicly traded podcast company," said Ellin at the time. As set forth below, the company's

28  spun-out podcast division, also led by Ellin, later began operating out of 516 N. Beverly Drive,

Kibler Fowler & Cave LLP
11100 Santa Monica Boulevard
Suite 360
Los Angeles, California 90025
KF&C

1    including from the podcast studio the company had built in the guest house behind the residence.

2    58.    Although the sham lease agreement ultimately purported to provide for residential

3    occupancy by Crotinger, from the outset the residence always was intended to be the center of

4    LiveOne's business operations, by all concerned. It also was apparently designed to further

5    LiveOne, Inc's "spin-out" of PodcastOne. Indeed, Defendants always knew that 516 N. Beverly

6    Drive would be used as an office, recording studio and corporate event space by LiveOne and

7    PodcastOne and that this use would be a violation of the law.

8    59.    On June 23, 2023, as lease negotiations between LiveOne and the owners were

9    being finalized, LiveOne head of music publishing Hallbauer texted owner Khashkooy, on a text

10   chat that included CEO Ellin (but notably not the planned sham lessee Crotinger) seeking to

11   schedule a walk-through of the residence with other LiveOne employees including its Chief

12   Financial Officer Aaron Sullivan for later that day, inquiring, "[a]nyone there now? Like to take

13   my head production/cfo now??"  Khashkooy replied, "Give me a call," and then followed-up that

14   "[c]oast is clear" for LiveOne executives Hallbauer, Sullivan and "production head" to do a final

15   walkthrough at approximately 4:00 p.m. on June 23.

16   60.    In the lease negotiations between the owner Khashkooy and LiveOne, Inc.

17   executives, which almost never included sham lessee Crotinger, LiveOne executives (CEO Ellin

18   and CFO Sullivan) sought to modify the subject lease agreement apparently so that its terms

19   would permit LiveOne to operate as a business from 516 N. Beverly Drive, despite the residential

20   property being in an R-1 zone and everyone knowing that such commercial operations in a

21   residential zoned area would be illegal.

22   61.    For example, LiveOne executives sought to strike the word "personal" from a

23   description of the occupancy as the "personal residence of [Crotinger]" in recognition that the

24   company would occupy and operate out of the residence, although Crotinger may live on the

25   business premises. They also sought to include the phrase "[lessee] plus such number of his guests

26   as he reasonably deems appropriate," to address the fact that LiveOne employees, business

27   visitors, vendors, podcast interviewers and guests, and music industry invitees to corporate events

28   that would take place at the residence, would bring dozens if not hundreds of people to the

16

residence each week. And they sought to strike a section requiring owner's consent for overnight guests. Attached hereto as **Exhibit B** is a true and correct copy of this email communication. LiveOne even sought to include itself as a named tenant in the lease so that, as far as the landlord was concerned, it could not be evicted from the residence for conducting its planned illegal commercial operations. However, the owners' real estate agent advised against this, stating, "[T]hey want to add the company name as a tenant. I think the Company name should be added as a SECOND guarantor not as a tenant." Attached hereto as **Exhibit C** is a true and correct copy of this email communication.

62.    The owners, Khakshooy and Koshki, were fully aware of LiveOne's intentions to operate out of the residence. At first, Khakshooy approved LiveOne's above-mentioned requests to strike "personal," add the phrase regarding permitted guests and to strike the language related to guest approval. But, on or about July 10, 2023, he backtracked stating, "Let's changed [sic] everything but [striking] the personal." In response, the owners' real estate agent became upset, stating, "Please see below the language that you APPROVED on July 10 which was Monday. I really expect an apology at this point, Siamak." Attached hereto as **Exhibits B and D** are true and correct copies of these email communication.

63.    By July 2023, LiveOne, including Ellin, had discussed with the owners that LiveOne, Inc. would guarantee the lease with Crotinger acting as a sham lessee. LiveOne sent the owners two months of *company* bank statements, bylaws, 2022 corporate tax returns and other corporate documents, on or about June 27, 2023, to support its credit worthiness as a guarantor. But according to the owners' real estate agent, LiveOne, Inc. later "reneged" on such guarantees, on or about July 5, 2023. Eventually, Ellin (the CEO of LiveOne, Inc.) signed a personal guarantee of the sham residential lease to Crotinger.

64.    In text messages to the owners on or about July 5, 2023, LiveOne CEO Ellin, apparently upset about a delay in signing the company's lease, said, "I agreed 3 months and 2 months security your agent should be fired." He added later, "This is not fair." The parties ultimately settled on this arrangement with LiveOne (not sham lessee Crotinger) paying the owners $100,000 representing three months' rent and two months' security deposit.

KF&C

**Kibler Fowler & Cave** LLP

11100 Santa Monica Boulevard
Suite 360
Los Angeles, California 90025

VERIFIED FIRST AMENDED COMPLAINT

65.     Before the sham lease agreement was finalized in Crotinger's name but without his involvement in the negotiations and without his agreement to pay any money for the lease, on or about July 7, 2024, LiveOne's real estate agent, attempting to cover up LiveOne's illegal plans, asked Crotinger to fill out a phony lease application and to list individuals who would be staying at the residence as part of that application. In response to this request, Crotinger wrote via text message, "Okay, I texted Rob [Ellin] we shouldn't list kids and should treat them more like guests coming and going." Upon information and belief, "kids" refers to LiveOne artists, contractors and employees who worked from 516 N. Beverly Drive.

66.     On July 14, 2023, Crotinger signed the sham lease agreement.

67.     On July 17, 2023, LiveOne's real estate agent wrote to Crotinger via text message, "According to [LiveOne head of music publishing] Josh [Hallbauer], [LiveOne CEO] Rob [Ellin] wanted to review the lease before the owner signs. He hasn't done so[,] so I'm still holding on to the lease … If you don't mind checking in with them [Halbauer and Ellin] that would be great!" In response, Crotinger said, "Rob [Ellin] texted me and said he hasn't seen anything." The real estate agent responded, "What?!" Attached hereto as **Exhibit E** (pp. 5-6) is a true and correct copy of these communications.

68.     In reality, documents obtained so far show that CEO Ellin had seen the sham lease but was holding up execution to extract a concession from the owners. Specially, Ellin wanted the owners to admit in writing that they knew the company would illegally operate its business from the residential property governed by the sham residential lease. Four days earlier, on July 13, 2023, the owners' real estate agent wrote to the owners via email, "So apparently the tenant is not signing the lease documents until and unless they get an email from Siamak [Khakshooy] saying *he knows they are doing business there*. Just fyi…" (emphasis added). Attached hereto as **Exhibit F** is a true and correct copy of this email communication.

69.     On July 18, 2023, the owners acknowledged the intended illegal use of the property and signed the sham residential lease agreement.

70.     After the lease was fully executed, LiveOne continued to pay the rent and utilities on the residence. In January 2024, LiveOne requested a W9 from the owners in connection with

Kibler Fowler & Cave LLP
11100 Santa Monica Boulevard
Suite 360
Los Angeles, California 90025

VERIFIED FIRST AMENDED COMPLAINT

1  the rent payments, which, upon information and belief, under the Internal Revenue Code would

2  enable the company to deduct the hundreds of thousands of dollars it invested in its new offices,

3  recording studio and corporate event space as a business expense rather than characterizing it as

4  income to the sham residential tenant Crotinger and thereby the company could evade the its

5  obligation to pay state and federal payroll taxes and Crotinger could evade paying income tax for

6  the company paying "his" rent and utilities.

7      71.    According to statements by LiveOne's litigation counsel Teri Pham to the owners

8  in July 2024, LiveOne subsequently invested approximately $300,000 in renovations to further

9  transition 516 N. Beverly Drive from residential use to commercial use. Attached hereto as

10  **Exhibits G and H** are a true and correct copy of a letter from the owners to Teri Pham, Counsel

11  for LiveOne, Inc., regarding this investment and a text message from the owners to Crotinger's

12  counsel memorializing the statement by LiveOne's counsel along with Crotinger's refusal to allow

13  the owners and Beverly Hills zoning authorities inspect the premises for illegal use.

14      72.    Defendants, including CEO Ellin, premeditatedly violated Beverly Hills' zoning

15  laws with a conscious disregard for the Kibler Family's rights and with the intent to unjustly profit

16  at their expense. For example, on July 5, 2023, LiveOne corporate counsel in New York, Foley

17  Schecter Ablovatskiy LLP Partner Sasha Ablovatskiy, wrote to Ellin after reviewing the lease (a

18  communication LiveOne later shared with a broker), "The lease says that the premises are to be

19  used solely as personal residence of [Crotinger]. Not sure if you need to or would like to clarify

20  that it will be used for any *other business purposes* to avoid any confusion or future problems with

21  the landlord." (emphasis added). In response, Ellin wrote, "Problem[.] we must have proper

22  language not to get tossed out … Living and Working."  Mr. Ablovatskiy also advised Ellin to

23  purchase general *commercial* liability insurance "for the premises and any business to be operated

24  theron[.]" Ellin, knowing LiveOne intended to use the residence as its corporate offices and

25  recoding studio, responded by saying, "[W]e need to asap … Need to be fully protected." Attached

26  hereto as **Exhibit I** are true and correct copies of email communications reflecting these

27  discussions.

28      73.    LiveOne, Inc. ultimately took the Foley partner's advice, purchasing and paying

Kibler Fowler & Cave LLP
11100 Santa Monica Boulevard
Suite 360
Los Angeles, California 90025

premiums on millions of dollars of *general commercial liability insurance* for itself (Old Republic Policy No. ORB-PK-23-A01924-00), listing 516 N. Beverly Drive as a covered premise. LiveOne, Inc.'s CGL Policy Declarations page describes the residential property with the following business description: "Recording Studio." The policy also lists Slacker, Inc., PodcastOne, Inc., LiveXLive Corp, "Splitminds LLC [sic]" and Drumify LLC as additional insureds and apparently insures audio/video equipment at the residential property. Attached hereto as **Exhibit J** are true and correct copies of excerpts of LiveOne's Old Republic Insurance policy.

74.      In its email application for this commercial general liability policy, LiveOne described the residential property as follows: "Office/studio space with separate living space for approx 5 individuals. There is also a pool. We will be hosting small events on location occasionally also." In other words, LiveOne admitted that 516 N. Beverly Drive was the company's "office," would be used as a professional "recording studio," and that it would host corporate events at the residence. LiveOne also stated in this email application that "[t]he primary resident will be Aidan Crotinger -while other people will be staying for long periods of time (month at a time plus) there will be no other official residents. On a daily basis the property will be Aidan's primary home/*office space for LiveOne corp* and creative space for podcast studios/recording studios." (emphasis added). LiveOne also stated that it would be leasing out the residential property for "studio time to other major labels and Lu koshers [sic] when they need studios." Finally, LiveOne stated it would be, "charging people who are staying at the residents [sic] when they need somewhere to sleep." Attached hereto as **Exhibits K and L** is a true and correct copy of an insurance letter reflecting this information and an email from LiveOne to the insurance company requesting the policy, *i.e.* its email application.

75.      That Ellin, Hallbauer, and Crotinger authorized, and directed LiveOne's intentional violations of Beverly Hills zoning laws and other torts is beyond any legitimate dispute. It is also clear that Ellin, Hallbauer, and Crotinger conceived, orchestrated, and implemented LiveOne, Inc.'s plan to commercially operate from 516 N. Beverly Drive as a business in violation of Beverly Hills zoning laws, as described below, and to commit other torts under California law. They also directed and authorized other LiveOne, Inc. employees, including CFO Sullivan, to

Kibler Fowler & Cave LLP
11100 Santa Monica Boulevard
Suite 360
Los Angeles, California 90025

engage in illegal conduct.

76.    After LiveOne moved into 516 N. Beverly Drive, LiveOne completed its "spin-out" of PodcastOne. This new publicly traded company, which made its debut on the NASDAQ in September 2023, would be called Courtside Group, Inc. or PodcastOne, Inc. Upon information and belief, Ellin and Hallbauer did this as part of their plan to profit from the Kibler Family's pain and suffering.

77.    Upon information and belief, Ellin, Hallbauer, and Crotinger knew that operating businesses from 516 N. Beverly Drive (coupled with the podcast division "spin-out") would be highly profitable to LiveOne and would profit them individually as shareholders of the company and as officers of the company through incentive bonuses, among other things. Ellin, Hallbauer, and Crotinger knew and were aware, or should have known and should have been aware, of each wrongful act taken by LiveOne as described in this First Amended Complaint and could have stopped such acts.

78.    Before PodcastOne, Inc.'s debut on the NASDAQ, in August 2023 or mere weeks after LiveOne settled at 516 N. Beverly Drive, Billboard reported that LiveOne, Inc. would "issue a dividend of about 19% of PodcastOne shares to its shareholders and retain the remaining roughly 81% of the outstanding shares." Billboard added that, "LiveOne CEO Robert Ellin said he expects PodcastOne stock will be priced between $8 — the minimum price for Nasdaq-listed stocks — and $12 per share. It also reported that, "A third-party valuation of PodcastOne in February [2023] put the company at between $230 million and $274 million."

### *LiveOne Operates a Music/Podcast Company at 516 N. Beverly Drive*

79.    To the Kibler Family's severe detriment, since July 2023, LiveOne has occupied 516 N. Beverly Drive and thereafter began referring to the house on social media as "The LiveOne House" or its "Beverly Hills Studio" where it hosts music industry events, holds meetings, and records podcasts, among other commercial activity. It has operated its music and entertainment company from the self-styled LiveOne House for the last year, by engaging in recording studio activities, hosting a pre-Grammy night party on February 3, 2024, and holding other music entertainment events, recording podcasts under the auspices of its "LVO Podcasts" division where

Kibler Fowler & Cave LLP
11100 Santa Monica Boulevard
Suite 360
Los Angeles, California 90025

1  professional interview hosts interview recording artists and others, and has conducted other

2  disruptive commercial activities related to its entertainment business, including photoshoots and

3  regular music industry meetings, on a near daily basis.

4         80.    Upon information and belief, this commercial activity has all occurred with

5  knowledge and approval of serial violators of the Beverly Hills zoning laws, Khakshooy and

6  Koshki. In fact, after the owners negotiated lease terms with LiveOne senior executives, including

7  CEO Ellin, then signed the sham lease with Crotinger, and performed some agreed upgrades to the

8  property requested by Ellin and Halbauer (not sham tenant Crotinger), owner Khakshooy texted

9  LiveOne head of music publishing Hallbauer, "Don't forget to invite me to the big party brother."

10  LiveOne's Hallbauer replied "[o]f course Grammy season is coming." Attached hereto as **Exhibit**

11  **M** is a true and correct copy of these text message communication. As set forth in detail below,

12  LiveOne in fact hosted a "big party," attended by hundreds of guests from the music entertainment

13  industry complete with a red carpet the night before the 2024 Grammy Awards in February that

14  required multiple units of the Beverly Hills Police Department to break up.

15         81.    As was the case during The Revels Group LLC's illegal commercial operations in

16  the residential neighborhood, the Kibler Family Home is often mistaken for The LiveOne House

17  by the many daily business visitors to the house. LiveOne employees and company officers,

18  including on at least one occasion LiveOne, Inc.'s board member, Corporate Secretary and Chief

19  Financial Officer Aaron Sullivan, also regularly appear and conduct business at The LiveOne

20  House at 516 N. Beverly Drive.

21         82.    In 2023, the Kibler Family began observing the *exact same conduct* associated with

22  The Revels Group LLC's commercial activity: heavy commercial vehicle and foot traffic, people

23  coming and going all day and night, large events, and at night when the rest of the residential

24  neighborhood was quiet and the homes darkened, the driveway of The LiveOne House and the

25  street near the house would be filled with cars, with every light inside and outside the house on all

26  night and into the early morning

27         83.    The Kibler Family also observed large quantities of trash overflowing from the

28  City trash and recycling bins in the alley behind The LiveOne House following LiveOne, Inc.

Kibler Fowler & Cave LLP
11100 Santa Monica Boulevard
Suite 360
Los Angeles, California 90025

1  events and recording sessions. This was a repeated occurrence that would peak after LiveOne,

2  Inc.'s parties and other events at The LiveOne House.

3       84.    On January 16, 2024, LiveOne hosted a music entertainment industry event. On

4  that night, N. Beverly Drive was packed with cars near The LiveOne House, often blocking egress

5  and ingress to the Kibler Family's driveway, and many different people were entering and exiting

6  The LiveOne House throughout the evening.

7       85.    On January 23, 2024, large crowds were again observed gathering at The LiveOne

8  House.

9       86.    On January 31, 2024, LiveOne hosted another large event at The LiveOne House,

10  with loud noise and aggravating lights emanating from the residence.

11  *LiveOne Hosts Its Pre-Grammy Music Industry Red Carpet Event; Hallbauer Falsely Tells the*

12  *Beverly Hills Police The LiveOne House Is His Personal Residence*

13       87.    On February 3, 2024 (the day before the 2024 Grammy Awards), LiveOne hosted a

14  large-scale (*i.e.*, the "big party") red carpet pre-Grammy party at The LiveOne House, featuring,

15  among other things, a red carpet, professional photoshoots and videography, and live music

16  performances hosted by a professional DJ.

17       88.    According to several of The LiveOne House guests who were lined up in front of

18  the Kibler Family Home and stood in their driveway before walking the red carpet that LiveOne

19  had constructed in front of the residence, LiveOne threw this event for LiveOne affiliated artist

20  Victoria Monét who had received a Grammy-nomination (and would go on to win the Grammy for

21  Best New Artist the next night).

22       89.    Leading up to the February 3 LiveOne pre-Grammy corporate event, the Kibler

23  Family observed heavier than usual foot traffic into The LiveOne House, saw and heard

24  construction of what they later learned was a professional outdoor sound system, stage, and

25  photoshoot area for LiveOne's large pre-Grammy event that was attended by what appeared to be

26  more than 200 invited guests from the music industry.

27       90.    In the afternoon of February 3, LiveOne began conducting loud soundchecks that

28  could be heard throughout the neighborhood, and of course throughout every room of the Kibler

Kibler Fowler & Cave LLP
11100 Santa Monica Boulevard
Suite 360
Los Angeles, California 90025
KF&C

23
VERIFIED FIRST AMENDED COMPLAINT

1    Family Home.

2        91.    Early in the evening of February 3, scores of people began to arrive at the LiveOne

3    pre-Grammy event. Heavy car and pedestrian traffic filled the neighborhood, causing significant

4    disruption and noise.

5        92.    By 8:00 p.m., on February 3, 2024, a long line had formed, spilling out of The

6    LiveOne House as invited guests lined up for photoshoots and interviews on the LiveOne red

7    carpet area that had been constructed in the driveway of The LiveOne House less than 30 feet

8    from the Kibler Family Home. LiveOne's guests wandered onto the property of the Kibler Family

9    Home as they milled about the red carpet area.

10        93.    On this night, the Kibler Family confirmed that the company masquerading as their

11    next-door neighbor was LiveOne, a publicly traded music entertainment company and its

12    subsidiaries. They learned this directly from the mouths of the pre-Grammy party guests lined up

13    on the sidewalk in front of the Kibler Family Home, who were happy to openly talk about the

14    company—its history, its principals, its affiliated artists, and the reason for the pre-Grammy

15    event—to Mr. Kibler when he inquired.

16        94.    In response to neighborhood complaints, the Beverly Hills Police Department

17    responded to the scene at least three times that evening, diverting scarce law enforcement

18    resources from more important duties of protecting the citizens of Beverly Hills. According to

19    City records, the Beverly Hills Police received several calls related to the pre-Grammy party. The

20    calls ranged from complaints about "an unruly gathering" and "disturbing the peace" to noise and

21    parking issues. The Kibler Family, living next door, experienced all of this firsthand.

22        95.    On the third intervention by law enforcement that night, three Beverly Hills Police

23    Department cars responded with their emergency lights on. By then dozens of people were

24    loitering outside The LiveOne House, and in front of and on the property of the Kibler Family

25    Home, and scores more partied in The LiveOne House and backyard. After the police arrived, a

26    City zoning enforcement officer arrived on the scene to observe the extent of LiveOne's zoning

27    violations and to speak to the Beverly Hills Police Department.

28        96.    After observing the size of the event, and hearing from the street the loud music

Kibler Fowler & Cave LLP
11100 Santa Monica Boulevard
Suite 360
Los Angeles, California 90025
KF&C

24

VERIFIED FIRST AMENDED COMPLAINT

1   blaring from the professional sound stage and concert-quality music equipment LiveOne had

2   installed in the back of The LiveOne House, the police shut the party down and began dispersing

3   the crowd. But crowds of people continued to linger on and around the property for hours into the

4   night, making noise, causing traffic congestion, and leaving garbage—empty beer and wine

5   bottles, cups, paper plates, cigarette butts—on the street, neighboring yards and sidewalks of the

6   neighborhood around the Kibler Family Home.

7       97.    At the scene, Beverly Hills Police Sargeant Yashimoto interviewed Hallbauer,

8   who, upon information and belief, lied to her by claiming to be the "resident" of The LiveOne

9   House who was hosting a private event.

10      98.    Later, and contrary to what Mr. Halbauer told the police, LiveOne posted video

11  clips on its corporate social media platforms showing scenes from the night in and around The

12  LiveOne House and the red carpet in front, boasting about the success of the "*LiveOne pre-*

13  *Grammy event*" at The LiveOne House.

14  ***Further Evidence of LiveOne's Illegal Commercial Operations at The LiveOne House***

15      99.    On February 15, 2024, LiveOne hosted another large music industry event at The

16  LiveOne House when visitors blocked the driveway shared with the Kibler Family Home, along

17  with the public sidewalk and fire hydrant. The Beverly Hills Police Department again had to be

18  called to the scene, and required the LiveOne employees and visitors to move their cars.

19      100.   In mid-March, when the Kibler Family was away on vacation, a man, who was

20  unknown to the Kibler Family, walked up to the front door of the Kibler Family Home in the

21  middle of the day and tried to gain entry into their home by turning the doorknob and pushing hard

22  on the door. He then stepped back, appeared to be texting on his cell phone, and then again tried to

23  gain entry into their home. The Kibler Family's housekeeper who observed this incident, opened a

24  window and asked what he wanted. The man replied, "Alan said I could come in." When the

25  housekeeper said no one named Alan lives there, the man left and walked to The LiveOne House,

26  where presumably LiveOne, Inc.'s "Alan" was waiting for him. Upon information and belief, the

27  housekeeper likely misheard the man trying to gain entry to the Kiblers' home and instead

28  referenced LiveOne CFO Aaron Sullivan, who has been spotted at the house by surveillance.

KFᴬC
Kibler Fowler & Cave ʟʟᴘ
11100 Santa Monica Boulevard
Suite 360
Los Angeles, California 90025

101.    Faced again with the repeated nightmare of a music entertainment company operating next door to their family home, the Kibler Family again hired a private investigator to conduct visual, video, and photographic surveillance of LiveOne's operations on three random days in the spring of 2024 (March 27 from 1:00 p.m. to 7:00 p.m., April 1 from 1:30 p.m. to 7:00 p.m., and April 6 from 2:00 p.m. to 8:00 p.m.), and to perform background investigations of the illegal operators.

102.    Just like the surveillance conducted during The Revels Group LLC's illegal commercial operations, this surveillance confirmed dozens of different people and cars entering and exiting the residence all day and into the night each week, and the use of the home as a commercial office, event center and recording studio, rather than a residence.

103.    For example, on March 27, 2024, the following activities were observed:

104.    At 1:02 p.m., two vehicles were observed parked at The LiveOne House. A 2018 Toyota HR, California license 8ECG159, registered to Sandra P. Selva and Luise E. Varga was observed parked in the driveway. A 2023 Honda Civic, California license 9GIR369, registered to Aidan Jonathan Crotinger, was observed parked on the property but not visible from the street.

105.    At 1:38 p.m., a man in a black suit was dropped off at The LiveOne House. Another man, holding professional video equipment, greeted him and began filming his entrance into The LiveOne House. The man in the black suit was instructed to reenter his 2020 GMC SUV and exit again so that his entrance could be filmed. As the man walked toward The LiveOne House, the professional videographer walked backward filming him. They both then entered the property.

106.    At 1:43 p.m., another man exited The LiveOne House and dropped trash into the street. After dropping the trash in the street, this man drove off in a silver Toyota with what appeared to be a Florida license plate.

107.    At the same time, another man exited The LiveOne House. He was wearing a cap and crew shirt that said, "Live Well & Thrive Podcast." He stood outside talking on the phone. Subsequently, a woman exited The LiveOne House with a dog and walked to a silver Ford Escape, California license 6TFE498, registered to Gabriella Racquel Rapp, and another man exited the

VERIFIED FIRST AMENDED COMPLAINT

property and walked to a white Tesla and placed a paper on the dashboard. Finally, the two men and the woman waited outside until a woman, who appeared to be Chelsea Briggs, one of the professional hosts of a LiveOne music industry podcast, arrived at The LiveOne House at 1:48 p.m. The woman appearing to be Ms. Briggs arrived in a 2019 Jaguar, California license 8JVU532, registered to Leila Marcela Ciancaglini. Upon Ms. Briggs' arrival, she was greeted by the two men and the woman with the dog; they all then went inside The LiveOne House.

108.    At 2:06 p.m., another woman with a young man with long black hair arrived in a black 2019 BMW, California license 8NEM117, registered to Kathy G. Macias or Linda G. Platzer and entered The LiveOne House.

109.    At 2:24 p.m., a man wearing a yellow T-shirt and baggy pants, walked out of The LiveOne House, and left on foot.

110.    At 2:29 p.m., the woman appearing to be Ms. Briggs exited then got into her Jaguar and drove away.

111.    At 2:33 p.m., a man carrying a guitar and backpack exited The LiveOne House and was picked up by a gray 2023 Tesla, California license 9JAF992, registered to Leon A. Nicoghossian/Aram L. Nicoghossian. Before leaving The LiveOne House, the man with the guitar ran back into the house to retrieve something and then put an object in the Tesla's trunk and left.

112.    At 2:36 p.m., three men arrived at The LiveOne House and walked away from the property on foot.

113.    At 2:43 p.m., the man in the yellow shirt that left on foot earlier returned with food. At 3:06 p.m., the three men that arrived earlier returned with food.

114.    At 3:07 p.m., the man who arrived with the video camera left The LiveOne House.

115.    At 3:09 p.m., a man arrived at The LiveOne House in a burgundy 2008 Mazda, California license 9JMD739, registered to William T Binderup/Ana Aviles and walked inside The LiveOne House.

116.    At 3:19 p.m., the man who placed the paper on the Tesla dashboard exited the property and waited for the man who arrived in a black Mercedes, California license JST BE U, registered to Sebastian M. Siegel. The two then greeted each other and entered The LiveOne

Kibler Fowler & Cave LLP
11100 Santa Monica Boulevard
Suite 360
Los Angeles, California 90025

House.

117.    At 3:43 p.m., two men with a small girl arrived in a 2023 Tesla, California license 9EKD197, registered to Laurett Karenina Rivera/Ryan James Carhart and parked in The LiveOne House driveway, blocking the sidewalk. When they opened their trunk, it revealed a kids backpack and pink suitcase. The three then walked into The LiveOne House. Two minutes later, one of the men walked out and left in the Tesla.

118.    At 3:51 p.m., UPS arrived at The LiveOne House and delivered a box to someone on the other side of the property's gate.

119.    At 3:53 p.m., two minutes later, a man and a child drove away in a black Subaru without a front license plate at a high rate of speed.

120.    At 4:00 p.m., a man drove away in a Toyota C-HR, license 8ECG159, that was parked on the property.

121.    At 4:05 p.m., the man who arrived in the Mazda left.

122.    At 4:07 p.m., the man who arrived earlier at 1:43 p.m. drove off in the black Mercedes with the custom JST BE U license.

123.    At 4:13 p.m., the man who arrived at 2:06 p.m. exited and moved a BMW, California license 8NEM117.

124.    At 4:14 p.m., the woman with the dog, exited and drove away in the Ford Escape.

125.    At 4:15 p.m., the man who moved the BMW reparked it and returned to the property.

126.    At 4:34 p.m., the man who left at 4:00 p.m. returned.

127.    At 4:50 p.m., the man wearing the "Live Well & Thrive Podcast" exited The LiveOne House with a woman and man that arrived earlier. After a brief conversation, the woman and man left in the BMW, the man wearing the podcast shirt left in Mercedes-Benz of Beverly Hills loaner vehicle.

128.    At 4:55 p.m., two men were picked by a Chevrolet SUV, California license 9GGX914, registered to Hertz Vehicles LLC and drove off.

129.    When the surveillance team ended their surveillance at 7:00 p.m. on March 27,

Kibler Fowler & Cave LLP
11100 Santa Monica Boulevard
Suite 360
Los Angeles, California 90025

VERIFIED FIRST AMENDED COMPLAINT

2024, the Honda Civic and Toyota C-HR were still parked in The LiveOne House driveway.

130.    On April 1, 2024, the surveillance team observed the following activities at The LiveOne House:

131.    At 2:00 p.m., three vehicles were observed on The LiveOne House property: a black 2016 BMW, California license 8HAR799, registered to Alayne Hallbauer as a lessee, which was parked on the property; a second vehicle that was parked in a way that the surveillance team could not make out its make model and license plate; and the Honda Civic from March 27. The following two vehicles were observed parked on the street outside The LiveOne House: a Ford Edge, California license 9EOB311, registered to P V Holding Corp.; and a black 2024 Nissan Sentra, California license 9LDD624, registered to UMI Asset LLC.

132.    At 3:09 p.m., a man exited The LiveOne House and drove off on a motorcycle parked behind the Ford Edge.

133.    At 3:22 p.m., two men arrived in a Nissan Titan, California license 8A29997, registered to Wawanesa General Insurance, C/O IAA 135 and they immediately went to the back of The LiveOne House.

134.    At 3:26 p.m., two older woman and younger woman with a dog exited The LiveOne House and left in the Ford Edge observed earlier. At the same time, a young woman with black hair, exited The LiveOne House and left in the Nissan Sentra.

135.    At 3:28 p.m., the young woman with black hair returned carrying a plastic bag after relocating her Nissan Sentra.

136.    At 3:29 p.m., an unknown person drove off in the black BMW observed earlier.

137.    At 3:50 p.m., a water delivery man arrived at The LiveOne House and exited with a cart containing 10 empty 5-gallon water jugs—50 gallons of water. Mr. Mikaili, a LiveOne employee (and not Crotinger), is listed as a customer for the company that delivers this commercial volume of water to The LiveOne House on a regular basis. Attached hereto as **Exhibit N** is a true and correct copy of business records from the company reflecting this. According to his LinkedIn profile, Mikaili is LiveOne's on-site office manager responsible for business operations at the company's only office—516 N. Beverly Drive.

138.    At 4:40 p.m., the woman with black hair walked away from The LiveOne House toward Santa Monica Blvd.

139.    At 4:15 p.m., a young man with a backpack exited The LiveOne House and drove away in a 2020 Honda, California license 8NZF020, registered to LiveOne office manager Joshua Alex Mikaili, which was parked in the street. Mr. Mikaili is regularly seen at The LiveOne House.

140.    At 4:21 p.m., the young woman with black hair, returned, with a paper bag containing food.

141.    At 4:55 p.m., the same young woman left in the Nissan Sentra observed earlier that day.

142.    At 5:08 p.m., a young man exited The LiveOne House and waited outside until he accepted food being delivered by someone driving a gray Honda Accord, California license 8URJ954, registered to Irma Ruiz. The young man then went back to The LiveOne House.

143.    At 6:13 p.m., a man with long hair and a trench coat exited The LiveOne House and stood outside waiting until he was picked up by a black Subaru, California license 9FIC407, registered to Hertz Vehicles, LLC.

144.    At 6:45 p.m., the woman seen leaving in the Ford Edge returned to pick up an unknown person who exited The LiveOne House.

145.    At 7:07 p.m., a man arrived in a red Toyota Prius, California license 6KZE645, registered to Carlos Soto. The man made a delivery and drove off.

146.    At 7:09 p.m., a man left The LiveOne House on foot.

147.    On April 6, 2024, at 2:00 p.m., two vehicles were observed at The LiveOne House, a black Honda Civic, California license 9FOY137, registered to Calvin Joe Dickinson, which was parked at the north gate of the property; and the same Honda Civic from March 27.

148.    At 2:48 p.m., a man wearing a T-shirt and blue shorts exited The LiveOne House and walked across the street to a Toyota 4Runner, California license, 5EAX164, registered to Jason William Fowler. This man returned to The LiveOne House immediately thereafter.

149.    At 2:52 p.m., a young man exited The LiveOne House and walked away.

150.    At 3:00 p.m., the same man that was carrying the guitar around The LiveOne

Kibler Fowler & Cave LLP

KF&C

11100 Santa Monica Boulevard
Suite 360
Los Angeles, California 90025

House on March 27, exited the property and walked away on foot.

151.    At 3:19 p.m., the young man returned carrying a paper bag.

152.    At 6:19 p.m., the man with the blue shorts exited The LiveOne House with tools and put them in the Toyota 4Runner. He returned to The LiveOne House and exited with more tools, placing them in the 4Runner. Subsequently, he left in the truck and later returned to The LiveOne House.

153.    At 6:45 p.m., the same man in blue shorts exited The LiveOne House.

154.    At 7:42 p.m., an unknown person was dropped off by a Ford Mustang, California license 9ELD009, registered to FlexDrive Services, LLC.

155.    On April 9, 2024, the surveillance team observed the following vehicles at The LiveOne House: a black Dodge Challenger, California license 8EYA293, registered to Matthew W. Garcia; a gray Nissan Sentra, California license 7SVA860, registered to Aaron Sullivan; a gray 2023 Tesla, California license 9EKD197, previously seen on March 27, and registered to Laurett Karenina Rivera and Brian James Carhart; and a red 2017 Mazda, California license 8AKH912, registered to Steven Thompson Miller or Alicia Miller.

156.    Sullivan—driver of the Nissan Sentra—is a LiveOne, Inc. board member, Corporate Secretary and Chief Financial Officer of the company who was involved directly in lease negotiations for the property.

157.     As recently as the evening of Saturday, April 27, 2024, LiveOne hosted another music industry event. The Kibler Family observed a professional videographer staging and then filming a guest walking in front of their home and into The LiveOne House. The driveway and street around The LiveOne House again filled with the cars of attendees. A white Porche 911 Turbo S with Washington plate number AZL3011 parked directly in front of the fire hydrant between the Kibler Family Home and The LiveOne House and remained there for hours into the night while its occupants attended the event, thereby creating a dangerous condition in the neighborhood of family homes, and was ticketed by Beverly Hills parking enforcement.

### *The LiveOne/PodcastOne Recording Studio*

158.    LiveOne, through its "LVO Podcast" division, and PodcastOne also film and record

Kibler Fowler & Cave LLP
11100 Santa Monica Boulevard
Suite 360
Los Angeles, California 90025
KF&C

1  regular podcasts and interviews from the professional recording studio behind The LiveOne

2  House. Clips of these podcasts are published, among other places, on LiveOne's Instagram page,

3  which has approximately 97,500 followers.

4       159.    These podcasts are hosted at The LiveOne House by professional media hosts and

5  social media influencers Chelsea Briggs, Racquel Goldy, and, upon information and belief,

6  someone who goes by the name "Radio Raymond T."

7       160.    Chelsea Briggs, according to her Instagram account, is a Digital Producer,

8  Television and Radio Host, and On-Air Correspondent for LiveOne. Ms. Briggs' IMDb page

9  similarly describes her as an entertainment host and producer.

10       161.    Racquel Goldy, according to her Instagram account, is LiveOne's "K-POP Global

11  & EDM Countdown Host." Ms. Goldy's website similarly describes herself as "a radio and TV

12  host and trusted social media influencer and personality."

13       162.    Radio Raymond T, according to his Instagram page, is a DJ and media personality.

14       163.    LiveOne openly admit on their social media accounts that they run music industry

15  commercial operations at The LiveOne House. For example, on or around March 11, 2024,

16  LiveOne posted on its TikTok account: "Host @Racquel Goldy got the chance to sit down with

17  DJs/Producers/Singers/Songwriters @Z3LLA. The duo have been taking the electronic music

18  scene by storm" with a video of two women being interviewed by Ms. Goldy in the LiveOne

19  podcast studio at The LiveOne House. The video begins with Ms. Goldy saying: "*At The LiveOne*

20  *House*..."

21       164.    On or around November 30, 2023, LiveOne posted on their X (formerly known as

22  Twitter) account: "It happened! @p1h_official *made it to the LiveOne House in LA.* They sat

23  down w/host @chelsea_briggs & K-POP Global host @racquelgoldy to talk all about their new

24  single + more! They answered your fan questions too. Stay tuned for the interview coming soon.

25  #p1ece #p1harmony" with two images of Ms. Briggs and Ms. Goldy sitting alongside what

26  appears to be the K-Pop band P1 Harmony.

27       165.    On or around January 15, 2024, the account @alisonballmedia (which belongs to

28  President of TuneGo Music Technology, and the former VP of A&R at Warner Brothers Records,

Kibler Fowler & Cave LLP
11100 Santa Monica Boulevard
Suite 360
Los Angeles, California 90025

VERIFIED FIRST AMENDED COMPLAINT

1    Alison Ball) posted on Instagram: "Shoutout to @radioRaymondt and his @LiveOne crew *for*

2    *hosting us in their Beverly Hills studio*" with a picture of four individuals in what appears to be the

3    LiveOne podcast studio at The LiveOne House—it clearly appears to be the same studio featured

4    in the video in which Ms. Goldy states she's "*at The LiveOne House*."

5        166.    On or around February 7, 2024, LiveOne's Instagram account posted: "In case you

6    missed our Grammys Pre-show, @chelsea_briggs + @radioraymondt + @racquelgoldy talk all

7    about the impact Taylor [Swift] has had us the world in 2023 and into 2024. And btw it's Swiftie

8    Bowl not Super Bowl according to Raymond" with a video of Ms. Briggs, Ms. Goldy, and Mr.

9    Raymond T in what appears to be the LiveOne podcast studio at The LiveOne House—it also

10   clearly appears to be the same studio featured in the video in which Ms. Goldy states she's "*at The*

11   *LiveOne House*."

12       167.    Upon information and belief, LiveOne accelerated their production of LiveOne

13   podcasts at The LiveOne House studios in late 2023/early 2024.

14       168.    LiveOne's Ms. Briggs and Ms. Goldy have conducted no fewer than five

15   interviews at The LiveOne House. LiveOne then published clips of the interviews on various

16   LiveOne social media platforms. For example, recent podcast interviews and videos recorded in

17   the "Beverly Hills studio" at The LiveOne House include the following (dates are approximate):

18       169.    On or around December 4, 2023, LiveOne posted on its TikTok account: "It

19   happened! @P1Harmony hung out with us *at our new LiveOne House* in Los Angeles! You can

20   watch Part ONE of the interview now at LiveOne.com or in the LiveOne App. Full interview + fan

21   questions video coming soon! #p1harmony #p1ece #livezonedaily #celebrityinterview #kpop"

22   with a video of Ms. Briggs and Ms. Goldy doing a synchronized dance with what appears to be the

23   K-Pop band P1 Harmony in the outside patio area of The LiveOne House.

24       170.    In Ms. Goldy's interview of K-Pop band, P1 Harmony, she asks each of the band

25   members what their favorite K-Pop songs are. She then tells another band member that she thinks

26   he is a "deep thinker." When that member agrees, another says he has "goosebumps."

27       171.    On or around February 29, 2024, LiveOne posted a video of their pre-Grammy

28   party. In the video, multiple people partying at and entering The LiveOne House, and stopping for

KF&C

Kibler Fowler & Cave LLP

11100 Santa Monica Boulevard
Suite 360
Los Angeles, California 90025

33

photoshoots on the red carpet in the driveway are shown. The video ends with Ms. Briggs stating all of it was filmed at "*LiveOne's pre-Grammy party*."

172.    On or around March 11, 2024, Australian pop singer Luke Harrison posted on his Instagram account: "@liveone talking what it's like being an AUSTRALIAN artist in AMERICA…I can't wait to show u guys more of this interview!!…#podcast…#beverlyhills" with a video of Ms. Briggs interviewing him in what appears to be The LiveOne House.

173.    On or around March 18, 2024, Ms. Briggs interviewed recording artist Caity Baser at The LiveOne House studio.

174.    On or around March 22, 2024, Ms. Briggs interviewed music duo AR/CO at The LiveOne House. In a video clip posted on LiveOne's Instagram page, she asks the duo, "When you work together in the studio, what is your vibe?"

175.    On Thursday, March 28, 2024, LiveOne hosted another large music industry event related to its LVO Podcast division. In fact, LiveOne even mounted a large green neon "LVO Podcast" sign at the front of The LiveOne House for this event, which was observable from the street. Hallbauer rented a U-Haul truck that was used at The LiveOne House in preparation for this large event. Attached hereto as **Exhibit O** is a true and correct copy of U-Haul records reflecting Hallbauer's rental of the truck and a photograph of the truck at The Live One House on this date.

176.    At approximately 6:00 p.m. the evening of this music industry "LVO Podcast" event, a middle-aged man in a blue shirt exited a white Tesla and approached the Kibler Family Home while Mr. Kibler was retrieving his mail upon arriving home from work. Mr. Kibler asked this man if he was "looking for LiveOne." The man answered yes, and Mr. Kibler directed him to The LiveOne House. The man thanked Mr. Kibler then walked into the LVO Podcast event.

177.    Over the course of the evening, a large number of rideshare vehicles began to arrive. In the end, more than 100 people arrived at The LiveOne House on that Thursday evening. A Crave Private Dining catering truck and U-Haul rented by LiveOne's Hallbauer were also observed on the property bringing food and party equipment to the event. After the event, a large amount of trash spewed out of trash bins in the alley behind the Kibler Family Home.

178.    At the LVO Podcast event, the following vehicles, among many others, were

1  observed: a 2022 Tesla, California license 8ZHE967, registered to Elizabeth Q. Iacuzzi as a lessee;

2  a U-Haul truck, Arizona License AG 29277; a 2022 black Telsa parked partially in the red in zone

3  in front of a fire hydrant, California license 9DXK252, registered to Maile Moore as a lessee; a

4  silver Nissan Sentra, Idaho license 1A105NF, registered to EAN Holdings, LLC, 14002 E. 21st

5  St., Ste. 1500, Tulsa, OK 74134; a 2020 white Subaru Outback, California license 8NBE775,

6  registered to Atsuko Miura, which was parked in the driveway of The LiveOne House; and a black

7  2017 Kisa, California license 8AOC225, registered to Mare Everrett Drohan.

8       179.    On or about March 28, 2024, Ms. Goldy interviewed music duo Z3ella Music at

9  The LiveOne House studio. In a video clip posted on LiveOne's Instagram page, Ms. Goldy asks

10  Z3ella, "What was the moment you made this decision … we need to be this artist project

11  together?"

12       180.    On or around, April 1, 2024, Ms. Briggs interviewed recording artist Valé at The

13  LiveOne House studio.

14       181.    On or around April 10, 2024, Ms. Briggs interviewed recording artist Maris at The

15  LiveOne House studio.

16       182.    Recently, the defendants also have been hosting several podcasts with internet

17  personality Radio Raymond or Raymond T at The LiveOne House. Mr. Raymond T is a self-

18  styled "Vibe Creator" and associates himself with LiveOne on his Instagram page. His LinkedIn

19  profile lists experience with LiveXLive Media, Inc. (which is LiveOne, Inc's former name) and

20  Slacker since January 2018 as a Curator / On-Line Radio Host.

21       183.    Mr. Raymond T discusses music and sports in podcasts recorded at The LiveOne

22  House studio. In multiple videos posted on his Instagram account in February 2024 he appears to

23  be at The LiveOne House studio—it appears to be the same studio featured in the video in which

24  Ms. Goldy states she's "*at The LiveOne House.*"

25       184.    PodcastOne, through its PodcastOne Pro division that it publicly says is "[b]ased in

26  Beverly Hills" offers "production professionals" a host of services at its professional podcast

27  studio, identified on its website as located at "516 N. Beverly Drive, Beverly Hills." The

28  PodcastOne Pro website contains numerous photographs and video clips from interviews

Kibler Fowler & Cave LLP
11100 Santa Monica Boulevard
Suite 360
Los Angeles, California 90025

VERIFIED FIRST AMENDED COMPLAINT

conducted in the professional recording studio LiveOne constructed at 516 N. Beverly Drive and in its guest house. Among the services PodcastOne offers at its "Beverly Hills Studio" at 516 N. Beverly Drive are on-site "In-Studio Audio," "In-Studio Video," "Podcast Hosting," podcast "Guest Booking," along with other professional graphics, artistic and technical and production support to "brands, professionals, or hobbyists" in the entertainment and podcast industry.

### *LiveOne, Inc.'s and PodcastOne, Inc.'s Misrepresentations to Investors*

185.     To attempt to mask its illegal commercial operations at 516 N. Beverly Drive, LiveOne, Inc. and PodcastOne, Inc. misrepresent to the investing public, including in their most recent Form 10-K, that their "[a]ddress of principal executive offices" is "269 S. Beverly Dr., Suite #1450, Beverly Hills, California." But the only business at that address is a mail-drop called the "Beverly Hills Postal Palace." Contrary to LiveOne, Inc.'s and PodcastOne, Inc.'s false securities filing, they maintain no "offices" at that address, much less "principal executive" ones. And "Suite #1450" does not exist. In fact, when LiveOne, Inc. sought commercial general liability insurance from Old Republic Insurance Company to cover its commercial office operations and recording studio it admitted that its offices were at 516 N. Beverly Drive. And when its insurer denied LiveOne coverage under the policy for this action, it addressed the denial letter to LiveOne CFO and Corporate Secretary Aaron Sullivan at "516 N. Beverly Dr."

186.     LiveOne, Inc. and PodcastOne, Inc. also misrepresent to the investing public that its Corporate Code of Ethics "embodies the Company's commitment to conduct business *in accordance with applicable law and the highest ethical standards.*" The Code says it "applies to all employees (including all officers), consultants and directors." LiveOne, Inc. and PodcastOne, Inc. tell the investing public, including its shareholders, that its "[e]thical business practices entail *a clear understanding of right and wrong*, and a motivation on the part of our directors and employees to act at all times in a manner of which they and the Company can be proud" and that "[t]his means adhering to not only the letter but also the spirit *of all applicable laws and regulations.*"

187.     The reality is quite different. Evidence already collected, which will be further explored with additional discovery and then presented at trial, shows that LiveOne, Inc. and

Kibler Fowler & Cave LLP
11100 Santa Monica Boulevard
Suite 360
Los Angeles, California 90025

VERIFIED FIRST AMENDED COMPLAINT

1  PodcastOne, Inc. actually is a company that will illegally operate its music entertainment business

2  in a residential neighborhood of families to increase its own short-term profits. And, far from

3  "understanding right from wrong," when confronted with its illegal conduct, at least one of its

4  senior executives will lie to law enforcement to cover up the company's wrongdoing.

5  *Events Following the Initiation of This Action*

6      188.    The Kiblers filed the Verified Complaint on May 10, 2024.

7      189.    On or about May 16, 2024, Ellin sent a text message to the owners and Hallbauer

8  (but not sham tenant Crotinger), forwarding, verbatim, statements made by Ms. Pham, Counsel for

9  LiveOne, Inc. This message reflects the plan Ms. Pham initially hatched to lie about LiveOne,

10  Inc's use of the residence as long as there was no "public information specifically identifying [The

11  LiveOne House] as LiveOne's office." Attached hereto as **Exhibit A** is a true and correct copy of

12  this text message in its entirety. The message states, in part:

13      Rob, following up on our discussion regarding the neighbor dispute … Based on our

14      preliminary research, *it does not appear that there is any public information specifically*

15      *identifying the house as LiveOne's office.* However, we need your office to verify.

16      *Assuming there is no public or official statement or record by LiveOne that the house is its*

17      *corporate office*, as we discussed, *I would take the position that the house is not being used*

18      *as LiveOne's business office, and it is in fact being used as a residence.* I will need the

19      names of all residents. … In the meantime, please let me know the status on checking on

20      the insurance.

21      190.    The LiveOne House is identified publicly as the office location of PodcastOne, Inc.

22  division PodcastOne Pro. Attached hereto as **Exhibit P** is a true and correct copy of PodcastOne

23  Pro's website downloaded on July 25, 2024.

24      191.    LiveOne did file a claim with Old Republic Insurance Company related to the

25  allegations in this First Amended Complaint, seeking coverage, defense and indemnity for

26  settlement or judgment, as Ms. Pham's text message suggests. But, as explained below, this claim

27  was denied for lack of coverage and apparent insurance fraud in LiveOne's application for

28  insurance where it failed to disclose it intended to illegally operate from a residential zoning area.

Kibler Fowler & Cave LLP
11100 Santa Monica Boulevard
Suite 360
Los Angeles, California 90025

192.     On June 25, 2024, Old Republic through its claims administrator Raphael & Associates denied LiveOne, Inc's claim via a letter addressed to LiveOne, Inc. CFO Sullivan at "516 N. Beverly Drive, Beverly Hills, CA 90210." Old Republic denied LiveOne, Inc's claim on the ground that there is "no coverage" but also stated there were grounds for "at a minimum, rescinding the CGL Policy" outright. Citing the CGL policy's insurance fraud provision, Raphael & Associates detailed "LiveOne's application submitted in connection with the CGL policy." In this application, as Raphael & Associates stated in its June 25, 2024, LiveOne, Inc. "describes the [516 N. Beverly Drive] as "Business Personal Property" and [the application] contains the following "Description of Primary Operations" at the Property: "Office/studio space with separate living space for approx 5 individuals. There is also a pool. We will be hosting small events on location occasionally also." After repeating the descriptions of the residential property found in LiveOne's insurance application, Raphael & Associates suggested that those descriptions were fraudulent and grounds to rescind the CGL policy outright. It appears that LiveOne, Inc. never disclosed to its insurance company that it was operating a business in a residential zoned neighborhood.

193.     After this case was initiated, LiveOne, Ellin, Hallbauer and Crotinger also ceased making lease payments to the owners. LiveOne made the last lease payment on May 6, 2024—four days before this case was initiated.

194.     As a result, on or about June 18, 2024, the owners posted a 3-Day Notice to Pay Rent or Quit on The LiveOne House.

195.     On or about July 8, 2024, the owners initiated an unlawful retainer action against sham lessee Crotinger in Los Angeles Superior Court, Case No. 24SMCV03329.

196.     On July 17, 2024, the Crotinger's sham lease agreement expired but LiveOne, Ellin, Hallbauer, Crotinger and other LiveOne employees and/or contractors refused to vacate the residential property. LiveOne's counsel Teri Pham told the owners that LiveOne would remain in the residence and continue to operate its business there, but would not pay rent because it had invested $300,000 in its offices and recording studio in the residence.

197.     When the owners attempted to retrieve the keys and conduct a walkthrough of the

Kibler Fowler & Cave LLP
11100 Santa Monica Boulevard
Suite 360
Los Angeles, California 90025

1  residential property on the same day, they were denied access in "the presence of approximately

2  20 unidentified individuals," which included "LiveOne, Inc. representatives."

3       198.    According to those representatives, LiveOne, Ellin, Hallbauer and Crotinger are

4  refusing to pay rent or vacate the residential property because they "believe attorney fees related to

5  the [to this] case justify withholding of the outstanding rent." This argument is without legal merit.

6       199.    On the same day, the owners gave sham lessee Crotinger 24-hour notice to enter

7  the residential property. However, they were subsequently denied such access. Crotinger has also

8  ignored a Demand for Inspection validly served by the Kibler Family for a July 24, 2024

9  inspection pursuant to CCP § 2031.010 (d).

10                                  *       *       *

11      200.    The evidence that LiveOne, Inc. and its subsidiaries PodcastOne, Inc. and

12  Splitmind LLC, like The Revels Group LLC before them, are openly and illegally operating a

13  music entertainment business out of The LiveOne House at 516 N. Beverly Drive in a R-1

14  residential zone is overwhelming.

15      201.    LiveOne, Inc. has no legitimate place of business in California other than 516 N.

16  Beverly Drive, The LiveOne House. The company deceptively lists 269 S. Beverly Dr., Suite

17  1450, Beverly Hills, CA as its "principal executive offices" in its SEC Form 10-K filings.

18  However, after attempting to serve LiveOne, Inc. at 269 S. Beverly Dr., the Kibler Family learned

19  that the location is actually a mail drop at the Beverly Hills Postal Palace, with no actual offices,

20  and "Suite 1450" does not even exist. After the Kibler Family served LiveOne, Inc. at the LiveOne

21  House (via its process server), it learned that the foyer entryway/entrance hall of the residential

22  property has a reception desk, a neon LiveOne logo and a Slacker Radio logo displayed on a

23  mounted big screen television.

24      202.    Contrary to its false disclosures to the SEC and the investing public, LiveOne, Inc.

25  admits in verified interrogatory responses that it does not conduct board meetings or business

26  meetings at 269 S. Beverly Dr. and has no other physical office or business location aside from

27  516 N. Beverly Dr. This false address in its public filings is, upon information and belief, an

28  attempt to disguise its illegal operations at 516 N. Beverly Dr.

Kibler Fowler & Cave LLP
11100 Santa Monica Boulevard
Suite 360
Los Angeles, California 90025

203.   PodcastOne, Inc. lists 516 N. Beverly Drive as its office on its PodcastOne Pro website, but also falsely tells the SEC and investing public that its "principal executive offices" are at the Beverly Hills Postal Palace. Splitmind LLC CEO Aidan Crotinger operates his company from 516 N. Beverly Drive.

204.   As explained above, the Kibler Family and their neighbors are plagued with LiveOne, Inc., PodcastOne, Inc. and Splitmind LLC's recording studio sessions in The LiveOne House's recording studio, heavy traffic and parking overflow, scores of business visitors, vendors, artists, and others coming and going from The LiveOne House at all hours of the day and night, as well as large music industry events.

205.   After the Kiblers filed the initial complaint, LiveOne's litigation counsel Teri Pham called the Kibler's counsel on May 24, 2024 at approximately 5:00 p.m. After falsely stating that LiveOne did not operate from 516 N. Beverly Drive and that the only resident of the home was a young musician who occasionally had artist friends to the house for "jam sessions" and that LiveOne only ever hosted one business event at the house (all of which was provably false), Ms. Pham issued an extortionate threat to attempt to scare the Kiblers into backing down or else face reputational harm: Ms. Pham said that the Kiblers' lawsuit would not reflect well on the family, who appeared to be affluent white citizens of Beverly Hills, because they will be seen as trying to evict "young Black artists who are just trying to make it." Not only was Ms. Pham's threat, which falsely implied racial animus, insulting but it also was equally absurd because, according to publicly available photographs and videos, the investigatory work the Kiblers commissioned before filing suit and the Kiblers' own daily observations, each one of the individual defendants who operate LiveOne's business at the residence and who the Kiblers seek to remove—Defendant and sham lessee Crotinger, Defendant and LiveOne CEO Ellin and Defendant and LiveOne head of music publishing Hallbauer—is a white man, and most of them are not young. Ms. Pham's scare tactic failed.

206.   By now, the owners of The LiveOne House, Khakshooy and Koshki, are serial violators of the Beverly Hills zoning laws. Documentary evidence uncovered to date shows they absolutely knew they rented the investment property to two successive businesses, sought to be

Kibler Fowler & Cave LLP

11100 Santa Monica Boulevard
Suite 360
Los Angeles, California 90025

1   invited to red-carpet entertainment events the tenants would host at the residence, and certainly

2   knew or at least should have known that these businesses would engage in illegal commercial

3   operations out of the property and thereby create a nuisance.

4       207.    The relief sought below is necessary to finally put a stop to this illegal, outrageous,

5   and brazen conduct.

6                               **FIRST CAUSE OF ACTION**

7                       **VIOLATION OF MUNICIPAL ZONING LAWS**

8   (*Plaintiffs against LiveOne, Inc., PodcastOne, Inc., Splitmind, LLC, Ellin, Hallbauer, Crotinger*

9                               *Khakshooy, and Koshki*)

10      208.    All previous allegations are realleged and incorporated herein by reference.

11      209.    As described herein, Defendants violated the City of Beverly Hills zoning laws as

12  codified in BHMC Section 10-3-4303, which is entitled "Home Occupation Requirements," and

13  other sections. These violations include but are not limited to the following provisions of BHMC

14  Section 10-3-4303:

15          a.    "A. Operators. The operator of the home occupation shall be a resident of

16  the dwelling in which the home occupation is located."

17          b.    "B. Use Of The Residential Site: All home occupations in a single

18  residential dwelling unit, individually and in the aggregate, shall be conducted in a manner that is

19  incidental to the residential use of said dwelling unit and does not change the principal character or

20  use of the dwelling."

21          c.    "C. Appearance Of Residential Site: No sign identifying or related to the

22  home occupation shall be placed in a residential zone, including, without limitation, in the public

23  right of way. All home occupations shall be conducted in a manner that is consistent with the

24  residential character of the site and is not visually apparent from outside the site or from the public

25  right of way."

26          d.    "F. Deliveries. No deliveries … to … the site shall materially or

27  unreasonably disturb any person's quiet enjoyment of his or her property at any time …"

28          e.    "E. Vehicular Use. Vehicles associated with the home occupation, including

Kibler Fowler & Cave LLP
11100 Santa Monica Boulevard
Suite 360
Los Angeles, California 90025
KF&C

41
VERIFIED FIRST AMENDED COMPLAINT

1    any vehicle operated by an employee, consultant to, or client of the home occupation, shall at all

2    times be lawfully parked off street when the vehicle's operator is at the site. Said off street parking

3    shall be in addition to any parking required for the residential use of the property and no parked

4    cars associated with the home occupation use shall displace or impede the use of such required

5    parking spaces."

6          e.    "G. General Nuisance: No home occupation may be operated in a manner

7    that materially alters the residential character of the adjacent neighborhood or materially or

8    unreasonably degrades the quality of life of adjacent neighbors or disturbs another person's quiet

9    enjoyment of his or her property as a result of traffic, parking, noise, vibration, odor, generation of

10   refuse, glare, electronic interference, safety, hazardous waste, visual impact, or any other reason.

11   All home occupations shall comply with all provisions of title 5, chapter 1, article 1 of this code,

12   regarding general noise regulations."

13       210.    Defendants have violated these zoning laws since about July 2023 and continue to

14   violate these zoning laws. The Kibler Family is among the class of persons – residents of R-1

15   zoning divisions – for which these municipal ordinances were intended to provide special

16   protection.

17       211.    The Kibler Family has suffered injuries and continues to suffer injuries different

18   (and greater) from those suffered by property owners generally, *i.e.*, they have suffered special

19   damages, as a result of Defendants' violations/unlawful conduct, which include the daily operation

20   of a global media company (*see, e.g.,* ¶¶ 75-82, 95-153) and podcast studio next door (*see, e.g.,* ¶¶

21   154-179) and regularly hosting large corporate events like the February 3, 2024 pre-Grammy party

22   (*see, e.g.,* ¶¶ 83-94). These damages are special in part because The LiveOne House shares a

23   driveway with the Kibler Family home, because The LiveOne House's backyard (and recording

24   studio) abuts the Kibler Family home, and because the two properties are architecturally similar,

25   which causes business visitors of 516 N. Beverly to repeatedly attempt entry into the Kibler

26   Family Home.

27       212.    As direct and proximate result of Defendants' violation of these zoning laws, the

28   Kibler Family seeks general and compensatory damages in an amount that is in excess of the

Kibler Fowler & Cave LLP
11100 Santa Monica Boulevard
Suite 360
Los Angeles, California 90025

1    minimum jurisdiction, but not less than $10,000 per day of the illegal use of the house, and

2    injunctive relief. *See Nestle v. City of Santa Monica* (1972) 6 Cal.3d 920, 939-940 ("a private

3    person who suffers identifiable harm by reason of a violation of a municipal zoning law may sue

4    the violator for compensatory damages and may also seek injunctive relief when applicable").

5         213.    Defendants' intentional misconduct was carried out with a conscious disregard for

6    the Kibler Family's rights, with the intent to vex, annoy, and/or harass them and to unjustly profit

7    at their expense. Such misconduct was unauthorized and constitutes fraud, oppression, and/or

8    malice under California Civil Code § 3294, entitling the Kibler Family to an award of punitive

9    damages in an amount appropriate to punish and/or set an example of the offending party in an

10   amount to be determined at trial.

11                          **SECOND CAUSE OF ACTION**

12           **PUBLIC NUISANCE – CIVIL CODE § 3479 and BHMC § 10-3-4303**

13   (***Plaintiffs against LiveOne, Inc., PodcastOne, Inc., Splitmind, LLC, Ellin, Hallbauer, Crotinger***

14                          ***Khakshooy, and Koshki***)

15        214.    All previous allegations are realleged and incorporated herein by reference.

16        215.    Civil Code § 3479 defines a "nuisance" as: [a]nything which is injurious to health,

17   including, but not limited to, the illegal sale of controlled substances, or is indecent or offensive to

18   the senses, or an obstruction to the free use of property, so as to interfere with the comfortable

19   enjoyment of life or property, or unlawfully obstructs the free passage or use, in the customary

20   manner, of any navigable lake, or river, bay, stream, canal, or basin, or any public park, square,

21   street, or highway..."

22        216.    As described herein, Defendants, by acting or failing to act, created a condition or

23   permitted a condition to exist that was harmful to health, was indecent or offensive to the senses,

24   was an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of

25   life or property, unlawfully obstructed the free passage or use, in the customary manner, of any

26   navigable lake, or river, bay, stream, canal, or basin, or any public park, square, street, or highway,

27   or was a fire hazard.

28        217.    This condition affected a substantial number of people at the same time.

Kibler Fowler & Cave LLP

11100 Santa Monica Boulevard
Suite 360
Los Angeles, California 90025

218. An ordinary person would be reasonably annoyed or disturbed by the condition.

219. The seriousness of the harm outweighs the social utility of Defendants' conduct.

220. The Kibler Family did not consent to Defendants' conduct.

221. The Kibler Family suffered harm and is continuing to suffer harm that was different from the type of harm suffered by the general public.

222. Defendants' conduct was a substantial factor in causing the Kibler Family harm.

223. As direct and proximate result of Defendants' conduct, the Kibler Family seeks general and compensatory damages in an amount that is in excess of the minimum jurisdiction of this Court, but not less than $10,000 per day of the illegal use of the house, and injunctive relief.

224. Defendants' intentional misconduct was carried out with a conscious disregard for the Kibler Family's rights, with the intent to vex, annoy, and/or harass them and to unjustly profit at their expense. Such misconduct was unauthorized and constitutes fraud, oppression, and/or malice under California Civil Code § 3294, entitling the Kibler Family to an award of punitive damages in an amount appropriate to punish and/or set an example of the offending party in an amount to be determined at trial.

## THIRD CAUSE OF ACTION

### PRIVATE NUISANCE – CIVIL CODE § 3501, *ET SEQ.*

### (*Plaintiffs against LiveOne, Inc., PodcastOne, Inc., Splitmind, LLC, Ellin, Hallbauer, Crotinger Khakshooy, and Koshki*)

225. All previous allegations are realleged and incorporated herein by reference.

226. The Kibler Family owns a home adjoining The LiveOne House.

227. As described herein, Defendants by acting or failing to act, created a condition or permitted a condition to exist that was harmful to health, was indecent or offensive to the senses, was an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, unlawfully obstructed the free passage or use, in the customary manner, of any navigable lake, or river, bay, stream, canal, or basin, or any public park, square, street, or highway, or was a fire hazard.

228. Defendants' conduct in acting or failing to act was intentional and unreasonable or

Kibler Fowler & Cave LLP
11100 Santa Monica Boulevard
Suite 360
Los Angeles, California 90025

1   unintentional but negligent or reckless.

2      229.    This condition substantially interfered with the Kibler Family's use or enjoyment of

3   their adjoining home.

4      230.    An ordinary person would be reasonably annoyed or disturbed by the condition.

5      231.    The seriousness of the harm outweighs the social utility of Defendants' conduct.

6      232.    The Kibler Family did not consent to Defendants' conduct.

7      233.    The Kibler Family suffered harm and continues to suffer harm.

8      234.    Defendants' conduct was a substantial factor in causing the Kibler Family harm.

9      235.    The seriousness of the harm outweighs the social utility of Defendants' conduct.

10     236.    As direct and proximate result of Defendants' conduct, the Kibler Family seeks

11  general and compensatory damages in an amount that is in excess of the minimum jurisdiction of

12  this Court, but not less than $10,000 per day of the illegal use of the house, and injunctive relief.

13     237.    Defendants' intentional misconduct was carried out with a conscious disregard for

14  the Kibler Family's rights, with the intent to vex, annoy, and/or harass them and to unjustly profit

15  at their expense. Such misconduct was unauthorized and constitutes fraud, oppression, and/or

16  malice under California Civil Code § 3294, entitling the Kibler Family to an award of punitive

17  damages in an amount appropriate to punish and/or set an example of the offending party in an

18  amount to be determined at trial.

19                        **FOURTH CAUSE OF ACTION**

20              **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

21  (***Plaintiffs against LiveOne, Inc., PodcastOne, Inc., Splitmind, LLC, Ellin, Hallbauer, Crotinger***

22                    ***Khakshooy, and Koshki***)

23     238.    All previous allegations are realleged and incorporated herein by reference.

24     239.    As described herein, Defendants' conduct was outrageous.

25     240.    Defendants intended to cause the Kibler Family emotional distress or Defendants

26  acted with reckless disregard of the probability that the Kibler Family would suffer emotional

27  distress, knowing that the Kibler Family was present when the conduct occurred.

28     241.    The Kibler Family suffered severe emotional distress.

Kibler Fowler & Cave LLP

KF&C

11100 Santa Monica Boulevard
Suite 360
Los Angeles, California 90025

242.    Defendants' conduct was a substantial factor in causing the Kibler Family's severe emotional distress.

243.    As direct and proximate result of Defendants' conduct, the Kibler Family seeks general and compensatory damages in an amount that is in excess of the minimum jurisdiction of this Court, but not less than $10,000 per day of the illegal use of the house, and injunctive relief.

244.    Defendants' intentional misconduct was carried out with a conscious disregard for the Kibler Family's rights, with the intent to vex, annoy, and/or harass them and to unjustly profit at their expense. Such misconduct was unauthorized and constitutes fraud, oppression, and/or malice under California Civil Code § 3294, entitling the Kibler Family to an award of punitive damages in an amount appropriate to punish and/or set an example of the offending party in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION

### AIDING AND ABETTING A TORT

**(*Plaintiffs against Ellin, Hallbauer, Crotinger Khakshooy, and Koshki*)**

245.    All previous allegations are realleged and incorporated herein by reference.

246.    The Kibler Family claims that they were harmed by Defendants' violation of municipal zoning laws, public nuisance, private nuisance, and intentional infliction of emotional distress.

247.    Defendants Ellin, Hallbauer, Khakshooy, and Koshki knew that violations of municipal zoning laws, a public nuisance, a private nuisance, and intentional infliction of emotional distress were going to be committed and were committed by Defendant LiveOne, Inc.

248.    Defendants Ellin, Hallbauer, Khakshooy, and Koshki gave substantial assistance or encouragement to LiveOne, Inc.

249.    Defendants Ellin, Hallbauer, Khakshooy, and Koshki conduct was a substantial factor in causing harm to the Kibler Family.

250.    Defendant Hallbauer is a high level employee of LiveOne, Inc. who claims to live at The LiveOne House, and upon information and belief, he participated in the wrongful and intentional acts alleged above or authorized or directed these wrongful and intentional acts.

46
VERIFIED FIRST AMENDED COMPLAINT

251.    Defendant Ellin is the Chief Executive Officer of Live One, Inc. and upon information and belief, he participated in the wrongful and intentional acts alleged above or authorized or directed these wrongful and intentional acts.

252.    As direct and proximate result of Defendants Ellin, Hallbauer, Khakshooy, and Koshki's conduct, the Kibler Family seeks general and compensatory damages in an amount that is in excess of the minimum jurisdiction of this Court, but not less than $10,000 per day of the illegal use of the house, punitive damages, and injunctive relief.

253.    Defendants Ellin, Hallbauer, Khakshooy, and Koshki's intentional misconduct was carried out with a conscious disregard for the Kibler Family's rights, with the intent to vex, annoy, and/or harass them and to unjustly profit at their expense. Such misconduct was unauthorized and constitutes fraud, oppression, and/or malice under California Civil Code § 3294, entitling the Kibler Family to an award of punitive damages in an amount appropriate to punish and/or set an example of the offending party in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, the Kibler Family prays for judgment against Defendants, and each of them, as follows:

(a)    Compensatory and general damages, including, but not limited to no less than $10,000 per day for each and every day that businesses have operated from 516 N. Beverly Drive;

(b)    Preliminary and permanent injunction to cease all of LiveOne, Inc.'s business operations at 516 N. Beverly Drive;

(c)    Preliminary and permanent injunction against the owners of 516 N. Beverly Drive to cease leasing the property to commercial enterprises;

(d)    Pre- and post-judgment interest;

(e)    Punitive damages;

(f)    Attorneys' fees pursuant to *Friends of Spring Street v. Nevada City* (2019) 33 Cal.App.5th 1092, 1111 and governing law;

(g)    Costs of this action; and

(h)    Any other and further relief that the Court deems just and proper.

VERIFIED FIRST AMENDED COMPLAINT

Dated:  July 29, 2024                    KIBLER FOWLER & CAVE LLP

By: _____
        JOHN D. FOWLER
        MATTHEW J. CAVE
        ZIEN HALWANI
        CHARLES CARDINAL
        *Attorneys for Plaintiffs*
        *Michael Kibler and Ann Kibler*

Kibler Fowler & Cave LLP
11100 Santa Monica Boulevard
Suite 360
Los Angeles, California 90025

1

## **DEMAND FOR JURY TRIAL**

2   The Kibler Family hereby demands a trial by jury on all issues so triable.

3

Dated:  July 29, 2024                    KIBLER FOWLER & CAVE LLP

4

5

6   By: _____

7   JOHN D. FOWLER
    MATTHEW J. CAVE

8   ZIEN HALWANI
    CHARLES CARDINAL

9   *Attorneys for Plaintiffs*
    *Michael Kibler and Ann Kibler*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

49

## **<u>VERIFICATION</u>**

I have read the foregoing VERIFIED FIRST AMENDED COMPLAINT and know its contents.

I am a party to this action. The matters stated in the foregoing document are true of my own knowledge to the best of my ability except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on July 29, 2024, at Los Angeles, California.


Michael Kibler
_____

Signature
_____


Ann Kibler
_____
Ann Kibler (Jul 29, 2024 16:51 EDT)

Signature
_____

# EXHIBIT A

Robert Beverly Tentant Bh

Let's talk
This morning c

iMessage

Morning I be by house soon

Text Message

Robert Beverly Tentant Bh

Rob, following up on our discussion regarding the neighbor dispute, attached are the BH ordinances at issue. We are also looking into zoning laws and will update further. I still need a copy of the HOA rules.

Based on our preliminary research, it does not appear that there is any public information specifically identifying the house as LiveOne's office. However, we need your office to verify. Assuming there is no public or official statement or record by LiveOne that the house is its corporate office, as we discussed, I would take the position that the house is not being used as LiveOne's business office, and it is in fact being used as a residence. I will need the names of all residents. I suggest that I call the neighbor/Kibler and offer a neighborly compromise along the lines we discussed last week, ie. that the residents will keep the visitors and noise level down. If he is

iMessage



to verify. Assuming there is no public or official statement or record by LiveOne that the house is its corporate office, as we discussed, I would take the position that the house is not being used as LiveOne's business office, and it is in fact being used as a residence. I will need the names of all residents. I suggest that I call the neighbor/Kibler and offer a neighborly compromise along the lines we discussed last week, ie. that the residents will keep the visitors and noise level down. If he is unwilling, we can decide how to proceed. I would like to set up a call with the landlord and their counsel so that we are on the same page before I call. For now, we will bill our time to the General LiveOne file so that you do not have to provide an additional retainer payment. If we can reach a settlement agreement before we have to file a formal appearance, we do not have to open a new matter. If we do have to open a new matter, I will need a full litigation retainer.

In the meantime, please let me know the status on checking on the insurance. How was the property listed/identified in the insurance application?

iMessage

# EXHIBIT B



**T K <tkoshki@gmail.com>**

---

**516 BEVERLY**
8 messages

---

**Elena K. Safaei** <elena@goldenrealestategroup.com>                          Sat, Jul 8, 2023 at 7:49 PM
To: T K <tkoshki@gmail.com>, Siamak Khakshooy <817bedford@gmail.com>

Tanaz and Siamak:


Hope you are doing well!


Below is the summary from tenant's broker, please confirm that this is the agreement, Shabbat Shalom!


     1.     Per Rob, LL agreed to apply the three months of upfront rent to first month, November and finally to March 2024 PLEASE CONFIRM

     2.     LL will not re-plaster pool, Rob is ok with that.

     3.     In addition to replacing ovens, LL will replace stove top. Pls add this to the addendum. PLEASE CONFIRM

     4.     1B: strike the word "personal" as well as add the following language after Aidens name:

"Aidan plus such number of his guests as he reasonably deems appropriate" Please also strike

The section where it says guest are not permitted to stay w/o owners consent.  THERE IS NO WAY FOR ME TO STRIKE ANYTHING AS IT IS A CAR FORM…  RIGHT NOW IT SAYS THAT THE PREMISES ARE FOR "PERSONAL RESIDENCE OF AIDEN".  SHE WANTS TO STRIKE "PERSONAL" AND LEAVING ONLY "RESIDENCE". PLEASE CONFIRM

5      Section 6: Grace period to 7 days LATE CHARGES ARE 5 DAYS BUT THEY WANT TO BE LATE BY 7 DAYS BEFORE A LATE FEE IS

CHARGED. PLEASE CONFIRM



Best Regards,



Elena K. Safaei

President

Golden Real Estate Group

Real Estate Advisory Services


**1100 Glendon Avenue, 17th Floor**

**Los Angeles, California 90024**

(310) 378-7888 / Mobile

Email:  Elena@GoldenRealEstateGroup.com


www.GoldenRealEstateGroup.com

<u>**OPPORTUNITIES.  DELIVERED.**</u>


"The best investment on earth, is earth." –Louis J. Glickman


This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain information that is confidential and protected by law from unauthorized disclosure. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

---

**Tanaz Khakshooy** <tkoshki@gmail.com>                                  Sun, Jul 9, 2023 at 9:36 AM

To: "Elena K. Safaei" <elena@goldenrealestategroup.com>, Siamak Khakshooy <817bedford@gmail.com>

Morning!!!

Happy Sunday!

I suggest NOT striking personal and keeping it only his name,

Striking

"The section where it says guest are not permitted to stay w/o owners consent."

Is fine.

That is enough to allow him to bring any guests but the name should be personal residence of Adian only.

What do you guys think?

On Jul 8, 2023, at 7:49 PM, Elena K. Safaei <elena@goldenrealestategroup.com> wrote:

[Quoted text hidden]

---

**Elena K. Safaei** <elena@goldenrealestategroup.com>                                   Sun, Jul 9, 2023 at 9:58 AM
To: Tanaz Khakshooy <tkoshki@gmail.com>, Siamak Khakshooy <817bedford@gmail.com>

Hi Tanaz!  Good morning!

I agree- "personal". Shall not be stricken (especially after issues with BH).

Regarding the guests, now it says by default that anyone who stays longer than 14 days – the landlord need to know about it.  I think maybe we can say longer than 30 days?  (there is an option to put any number of days).

Most importantly, the pre-paid rent – if we apply to November and march (instead of the last two months of the term), then we will only be left with Security deposit.

## Have a blessed Sunday! ⬛ ⬛

[Quoted text hidden]

---

**Siamak Khakshooy** <817bedford@gmail.com>                    Mon, Jul 10, 2023 at 3:16 PM
To: "Elena K. Safaei" <elena@goldenrealestategroup.com>
Cc: Tanaz Khakshooy <tkoshki@gmail.com>

Hello how are you. How's leases looking. Let's changed everything but the personal. Thanks

Sent from my iPhone

On Jul 9, 2023, at 9:58 AM, Elena K. Safaei <elena@goldenrealestategroup.com> wrote:

[Quoted text hidden]

---

**Elena K. Safaei** <elena@goldenrealestategroup.com>                    Mon, Jul 10, 2023 at 5:36 PM
To: Siamak Khakshooy <817bedford@gmail.com>
Cc: Tanaz Khakshooy <tkoshki@gmail.com>

## Siamak:

## Ok got it!

[Quoted text hidden]

---

**Elena K. Safaei** <elena@goldenrealestategroup.com>                    Sat, Jul 15, 2023 at 10:33 AM
To: Siamak Khakshooy <817bedford@gmail.com>, T K <tkoshki@gmail.com>

### Saturday July 8  YOU REPLIED ON JULY 10

**From:** Siamak Khakshooy <817bedford@gmail.com>
**Date:** Monday, July 10, 2023 at 3:16 PM
**To:** Elena K. Safaei <elena@goldenrealestategroup.com>
**Cc:** Tanaz Khakshooy <tkoshki@gmail.com>
**Subject:** Re: 516 BEVERLY

Hello how are you. How's leases looking. ## Let's changed everything but the personal. Thanks

Sent from my iPhone

[Quoted text hidden]

---

**Siamak Khakshooy** <817bedford@gmail.com>                              Sat, Jul 15, 2023 at 10:51 AM
To: "Elena K. Safaei" <elena@goldenrealestategroup.com>
Cc: T K <tkoshki@gmail.com>

I don't see any fool executed lease on this email, please show me when you emailed me the executed lease prior me receiving it on the doc you sign for me to sign

Sent from my iPhone

On Jul 15, 2023, at 10:33 AM, Elena K. Safaei <elena@goldenrealestategroup.com> wrote:

[Quoted text hidden]

---

**Elena K. Safaei** <elena@goldenrealestategroup.com>                    Sat, Jul 15, 2023 at 11:01 AM
To: T K <tkoshki@gmail.com>, Siamak Khakshooy <817bedford@gmail.com>

Please see below the language that you APPROVED on July 10 which was Monday.   I really expect an apology at this point, Siamak.

---

**From:** Elena K. Safaei <elena@goldenrealestategroup.com>
**Date:** Saturday, July 8, 2023 at 7:49 PM
**To:** T K <tkoshki@gmail.com>, Siamak Khakshooy <817bedford@gmail.com>
**Subject:** 516 BEVERLY

[Quoted text hidden]

# EXHIBIT C

 Gmail

T K <tkoshki@gmail.com>

**Update**
2 messages

Elena K. Safaei <elena@goldenrealestategroup.com>                    Tue, Jun 27, 2023 at 11:23 PM
To: T K <tkoshki@gmail.com>, Siamak Khakshooy <817bedford@gmail.com>, Javad Safaei
<javad@goldenrealestategroup.com>

Dear Tanaz and Siamak:

I sent the lease documents, with Addendum, Guaranty and disclosures.

The broker asked for Option Periods- do you want to give the right? Do you want to keep the rent the same or have an increase?

Please also confirm you will be replacing the ovens.

Finally, they want to add company name as tenant. I think the Company name should be added as SECOND guarantor not as tenant.

Please confirm and have a good night!

Best Regards,

Elena K. Safaei

President

Golden Real Estate Group

Real Estate Advisory Services


**1100 Glendon Avenue, 17th Floor**

**Los Angeles, California 90024**

(310) 378-7888 / Mobile

Email:  Elena@GoldenRealEstateGroup.com


www.GoldenRealEstateGroup.com

<u>**OPPORTUNITIES.  DELIVERED.**</u>


"The best investment on earth, is earth." –Louis J. Glickman


This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain information that is confidential and protected by law from unauthorized disclosure. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

---

**Siamak Khakshooy** <817bedford@gmail.com>                          Wed, Jun 28, 2023 at 8:11 AM
To: "Elena K. Safaei" <elena@goldenrealestategroup.com>
Cc: T K <tkoshki@gmail.com>, Javad Safaei <javad@goldenrealestategroup.com>

Morning let's about this items.  Thanks

Sent from my iPhone

On Jun 27, 2023, at 11:23 PM, Elena K. Safaei <elena@goldenrealestategroup.com> wrote:

[Quoted text hidden]

# EXHIBIT D

 Gmail

T K <tkoshki@gmail.com>

---

**516 BEVERLY**

**Elena K. Safaei** <elena@goldenrealestategroup.com>                    Sat, Jul 15, 2023 at 11:01 AM
To: T K <tkoshki@gmail.com>, Siamak Khakshooy <817bedford@gmail.com>

Please see below the language that you APPROVED on July 10 which was Monday.   I really expect an apology at this point, Siamak.

---

**F**rom: Elena K. Safaei <elena@goldenrealestategroup.com>
**Date:** Saturday, July 8, 2023 at 7:49 PM
**To:** T K <tkoshki@gmail.com>, Siamak Khakshooy <817bedford@gmail.com>
**Subject:** 516 BEVERLY

Tanaz and Siamak:

Hope you are doing well!

Below is the summary from tenant's broker, please confirm that this is the agreement, Shabbat Shalom!

1.     Per Rob, LL agreed to apply the three months of upfront rent to first month, November and finally to March 2024 PLEASE CONFIRM

2.     LL will not re-plaster pool, Rob is ok with that.

3.     In addition to replacing ovens, LL will replace stove top. Pls add this to the addendum. PLEASE CONFIRM

4.     1B: strike the word "personal" **as well as add the following language after Aidens**

name:

# "Aidan plus such number of his guests as he reasonably deems appropriate" Please also strike

The section where it says guest are not permitted to stay w/o owners consent.  THERE IS NO WAY FOR ME TO STRIKE ANYTHING AS IT IS A CAR FORM…  RIGHT NOW IT SAYS THAT THE PREMISES ARE FOR "PERSONAL RESIDENCE OF AIDEN".  SHE WANTS TO STRIKE "PERSONAL" AND LEAVING ONLY "RESIDENCE". PLEASE CONFIRM

5      Section 6: Grace period to 7 days LATE CHARGES ARE 5 DAYS BUT THEY WANT TO BE LATE BY 7 DAYS BEFORE A LATE FEE IS CHARGED. PLEASE CONFIRM

Best Regards,

Elena K. Safaei

President

Golden Real Estate Group

Real Estate Advisory Services

**1100 Glendon Avenue, 17th Floor**

**Los Angeles, California 90024**

(310) 378-7888 / Mobile

Email:  Elena@GoldenRealEstateGroup.com

www.GoldenRealEstateGroup.com

## OPPORTUNITIES.  DELIVERED.

"The best investment on earth, is earth." –Louis J. Glickman

This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain information that is confidential and protected by law from unauthorized disclosure. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

# EXHIBIT E

**From:** **Jennifer Perez** estates.jennifer@gmail.com 📎
**Subject:** Text Messages RE: 516 N Beverly
**Date:** July 16, 2024 at 5:08 PM
**To:** Kristin (Attorney) Regan kregan@theagencyre.com
**Cc:** j.perez@theagencyre.com



## THE AGENCY
Redefining Real Estate

JENNIFER PEREZ
Agent
m: 818 299 3880 | DRE: 02125070
TheAgencyRE.com

IG: Realtor_JenniferPerez

Begin forwarded message:

**From:** Jennifer Perez <estates.jennifer@gmail.com>
**Subject: Texts**
**Date:** July 16, 2024 at 4:53:40 PM PDT
**To:** Jennifer Perez <estates.jennifer@gmail.com>





Here's an older one

iMessage

4:30

Aiden

FILE_1708.pdf
PDF Document
· 1.1 MB

Don't worry I'm driving too

Utah mountains just hit different lol

Jul 7, 2023 at 11:25 AM

Ive been summoned to check the status

Text Message
Jul 7, 2023 at 12:35 PM

Ive been summoned to check the status

iMessage
Jul 7, 2023 at 2:02 PM

I just text her for an update. She hasn't emailed me since

Thank you

iMessage

4:30



AC

Aiden >

iMessage
Jul 7, 2023 at 2:02 PM

I just text her for an update. She hasn't emailed me since

Thank you

Jul 7, 2023 at 4:21 PM

Can you fill this out pls

**RentSpree Application Web**
apply.link

Sure

For 516?

Yes, pls just to be safe

Okay. I texted Rob we shouldn't list kids and should treat them more like guests coming and going

I'm fresh so I don't understand all of this yet but doesn't make sense to me

iMessage

4:30

AC

Aiden >

Great! It's more of a formality that landlords put in the contract to list anyone on the contract who is staying there more than x amount of days. But how you explained it makes sense as to why they should not be listed. He's being very, very



cautious.

2 Replies

I'm gonna cut my trip short and head back to LA tomorrow.

Why?

In the meantime, can you pls fill out the application with what we discussed

Great! It's more of a formality that landlords put in the contract to list anyone on the contract who is staying there more...

2 Replies

iMessage

4:30

Aiden >

He's probably been screwed many times over

Can't blame him I guess

I'm out in the middle of nowhere and it's very difficult for me to work on this. I'm literally at a gas station using their wifi. Once I leave I'm off the grid. Which I'm about to leave

It's ok, it's hot as shit out here. I've seen enough lol

:/

Well go enjoy the rest of your time

IMG 1335 MO





4:31

‹ 3    AC    Aiden ›    📹

If you don't mind checking in with them that would be great! I've asked a few times already.

I had it listed for you to move in tomorrow. Not sure if that's going to happen at this point.

1 Reply

Yeah just texted Rob and josh

If you don't mind checking in with them that would be great! I've asked a few times already.

Ha of course. It's certainly time

Jul 17, 2023 at 7:14 PM

Rob texted me and said he hasn't seen anything

What?! Lol

Josh told me to send it to him

iMessage

---

4:31

‹ 3    AC    Aiden ›    📹

What?! Lol

Josh told me to send it to him



personally and he would send it to rob

Updated_516-
LEASE_FINAL.
pdf
PDF Document
- 4.2 MB

Keep me posted...

They're at big dinner meeting

Sigh

Jul 19, 2023 at 10:05 AM

Thanks for chiming in... had no idea Aaron had been asking for approval.

All good. If you ever need me to push just call me

iMessage

4:31

AC
Aiden

I'm like a gnat for them rn

Lol, someone needs to be. I want to get you in asap!

I'm very appreciative

Aaron added to chat

I would follow up there

Mon, Sep 18 at 11:55 PM

LLQ! Hope you are well ❤️







THE AGENCY
Redefining Real Estate

JENNIFER PEREZ
Agent
m: 818 299 3880 | DRE: 02125070
TheAgencyRE.com

IG: Realtor_JenniferPerez

# EXHIBIT F

 Gmail

**T K <tkoshki@gmail.com>**

## Update 516Beverly

**Elena K. Safaei** <elena@goldenrealestategroup.com>                   Thu, Jul 13, 2023 at 6:06 PM
To: T K <tkoshki@gmail.com>, Siamak Khakshooy <817bedford@gmail.com>

Dear Tanaz and Siamak!!!!

So apparently the tenant is not signing the lease documents until and unless they get an email from Siamak saying he knows they are doing business there.  Just fyi...

Best Regards,

Elena K. Safaei

President

Golden Real Estate Group

Real Estate Advisory Services

**1100 Glendon Avenue, 17th Floor**

**Los Angeles, California 90024**

(310) 378-7888 / Mobile

Email:  Elena@GoldenRealEstateGroup.com

www.GoldenRealEstateGroup.com

**OPPORTUNITIES.  DELIVERED.**

"The best investment on earth, is earth." –Louis J. Glickman

This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain information that is confidential and protected by law from unauthorized disclosure. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

# EXHIBIT G

July 17, 2025

<u>Sent via Email</u>

Dear Ms. Pham,

This letter is a follow up to our conversation yesterday and recent developments concerning the Property at 516 Beverly Dr. Beverly Hills, CA 90210 ("Property") and your client, LiveOne Inc., which Mr. Crotinger, our tenant, is affiliated with.

I understand Mr. Crotinger and/or  employees and/or officers and/or directors of LiveOne Inc. claim to have made "improvements" totaling "$300,000" to the Property. Please note, these alterations were undertaken without prior written consent, a clear violation of the lease agreement and California law. Request is made that all further modifications to the Property cease immediately. We have posted a  24 hour notice to enter the dwelling to confirm the condition  and occupancy of the Property.

Additionally, the lease agreement for the Property expired at or around 11:59 PM today. Despite the lease expiration, it has come to our attention that Mr. Crotinginger and occupants which I am informed include employees and/or officers and/or directors of LiveOne Inc., remain in possession of the Property. As you know, this constitutes a material violation of the lease and is considered unlawful detainer.

Furthermore, there is outstanding rent of approximately two months and holdover rent continues to accrue. Please be aware that an unlawful detainer action has been initiated against Mr. Crotinger and any occupants. We understand Mr. Crotinger and/or officers and/or directors and/or employees of LiveOne Inc., believe attorney fees related to the "*Kibler v. LiveOne Inc. et al*" case justify withholding of the outstanding rent. However, this action is not valid under California law.

My previous attempt to retrieve keys and conduct a walkthrough was unsuccessful due to the presence of approximately 20 unidentified individuals and the refusal of LiveOne Inc. representatives to vacate or comply with move-out procedures, citing attorney fees as justification for non-payment of rent.

In the spirit of avoiding further legal complication, we urge Mr. Crotinger and any occupants including those individuals associated with LiveOne Inc. to vacate the Property immediately, in compliance with both the expired lease and the served three-day notice.Vacating the Property promptly will allow for a swift resolution. Of course, all outstanding rent remains due and payable.

If Mr. Crotinger retains separate legal counsel, we kindly request their contact information for further communication.

Nothing in this letter should be construed as a waiver  of any of my rights, claims, or defenses which are expressly reserved herein.

Sincerely,

Siamak

# EXHIBIT H

10:24



Hello david pleasure speaking to you. These are 24 hour notices sent by email and posted on door as requested. Upon arrival with city Beverly Hills code enforcement was denied entry. We have been told by Live one counsel  Ms. Pham that there has been $ 300,000 alterations  made to my house. Also Two months of nonpayment and  lease expired on 7/17/2024 and not renewed. It is a clear unlawful detainer at this point. Question is when are they vacating my house? Let's talk when you get back on Monday. Thank you
Dr. Siamak Khakshooy

Sunday 3:06 PM



iMessage

# EXHIBIT I

**From:** **Jennifer Perez** estates.jennifer@gmail.com
**Subject:** Fwd: DRAFT Lease: 516 N Beverly Dr.
**Date:** July 16, 2024 at 4:59 PM
**To:** Kristin (Attorney) Regan  kregan@theagencyre.com



THE **AGENCY**
Redefining Real Estate

JENNIFER PEREZ
Agent
**m:** 818 299 3880 **DRE:** 02125070
TheAgencyRE.com

IG: Realtor_JenniferPerez

Begin forwarded message:

**From:** Himothy Jones  <  halfway@splitmind.co  >
**Subject:**   Fwd: DRAFT Lease: 516 N Beverly Dr.
**Date:**  July 5, 2023 at 2  :37:43 PM PDT
**To:**  Jennifer Perez <  estates.jennifer@gmail.com  >

---------- Forwarded message ---------
From: **Robert Ellin** <rob@liveone.com>
Date: Wed, Jul 5, 2023 at 2:28 PM
Subject: Re: DRAFT Lease: 516 N Beverly Dr.
To: Sasha Ablovatskiy <sablovatskiy@foleyshechter.com>
CC: Josh Hallbauer <jhallbauer@liveone.com>, Aaron Sullivan <aaron@livexlive.com>, Aiden Crotinger <halfway@splitmind.co>

Sent from my iPhone

> On Jul 5, 2023, at 3:22 PM, Sasha Ablovatskiy <sablovatskiy@foleyshechter.com> wrote:

Rob - resending, please see below.

Thanks

On Wed, Jul 5, 2023 at 3:02 PM Sasha Ablovatskiy <sablovatskiy@foleyshechter.com> wrote:
  Rob and everyone -

  Removing Jennifer for a second so you can discuss internally.  Please see below and attached my comments and questions on the lease to make sure that you revise the lease as needed.

  1. The lease does not reflect any of the improvements and fixes that you are requesting.  So you have 2 options here, (i) request for Jennifer to revise the lease to include a rider with all the fixes and condition all of the payments on these being completed, or (ii) if you know the lessor well, request for these orally to be done in good faith.

Need asap

  2. The lease says that the premises are to be used solely as personal residence of Aidan. Not sure if you need to or would like to clarify that it will be used for any other business purposes to avoid any confusion or future problems with the landlord.

Problem must have proper language not to get tossed out

Living and working

  3. Any guests (anyone other than Aidan) is not permitted to stay more than 5 days without landlord's approval during the term of the lease.

No
Kids staying monthly

  4. 1 year lease at $20k per month. Just wanted to confirm that this is what you agreed to.
Yes
  5. Total upfront that is due is $100k, (i) 20k rent for 1st month, (ii) $40k security deposit, and (iii) $40k for the last 2 months.

Never agreed last 2 months ( first 3 months )
  6. Late fee is 10%. Grace period is 3 calendar days.
7 days ?
  7. We agree to pay for wifi, alarm, insurance, cable. How much is insurance? Could be material

7. We agree to pay for wifi, alarm, insurance, cable. How much is insurance? Could be matchil.

He pays Pool gardener etc

Gas electric ??

Insurance not sure what normal ?

8. Have we obtained our own renter's insurance and general liability insurance for the premises and any business to be operated thereon? We should imo and it is required (renter's insurance) by the lease.

No we need to asap
Need to be protected fully

Thanks,
Sasha

On Wed, Jul 5, 2023 at 2:34 PM Josh Hallbauer <jhallbauer@liveone.com> wrote:
Fabio requested the oven be replaced and the stove - I have looked into the stove and it should not be a problem. The one he wants is under 1k

Regards,

Josh

On Jul 5, 2023, at 11:15 AM, Robert Ellin <rob@liveone.com> wrote:

Josh ask fabio asap
Let's not spend 300 k a year usuable house for everything we need

Sent from my iPhone

On Jul 5, 2023, at 12:12 PM, Jennifer Perez <estates.jennifer@gmail.com> wrote:

The home will be thoroughly cleaned prior to you moving in. I was told by the listing agent, that the home is being turned over this week; patching up walls, painting, fixing anything that wasn't working, etc... can you please elaborate what Fabio meant that the kitchen in not usable? Things weren't working or it's just not to his standard? The ovens will be replaced.

As for the pool being re-plastered , I'll follow up on this. When we were originally going to move forward, the owner was working on getting different bids to see what that would entail/cost, but he wasn't opposed to fixing it.

Lastly, when you officially move in, I have a document (attached below) that I will ask Aiden to fill out. We can list any damages or take notes on the state of the home. This will be helpful when it comes to moving out  and your security deposit. We can reference back to show landlord items that were preexisting.

THE **AGENCY**
Redefining Real Estate

JENNIFER PEREZ
Agent
**m:** 818 299 3880 **DRE:** 02125070
TheAgencyRE.com

IG: Realtor_JenniferPerez

<move_in_inspection__1222_ts02713.pdf>

On Jul 4, 2023, at 11:09 PM, Robert Ellin <rob@liveone.com> wrote:

Pool need to repainted
Kitchen according  to fabio not usuable ( he said told he stove oven etc
Power wash all brick
Full cleaning house
Painting ??
What eise ?,

Sent from my iPhone

On Jul 4, 2023, at 10:45 PM, Josh Hallbauer <jhallbauer@liveone.com> wrote:

Per Jennifer - We are supposed to do a walkthrough to make sure everything is in working order.

At the walkthrough if something is not functioning or working it is meant to be fixed. It isn't legal to have a fridge that doesn't work or a pool that does not heat.

Jennifer is this something we can add inside of this contract?

On Jul 4, 2023, at 6:27 PM, Robert Ellin <rob@liveone.com> wrote:

Did we get new lease ?
Neither Liveone or myself gauranteeing

But we are paying 3 months upfront
2 months securities

Josh I cannot ark again for list items to fix ? Including pool kitchen etc

Sent from my iPhone

On Jul 4, 2023, at 4:08 PM, Sasha Ablovatskiy <sablovatskiy@foleyshechter.com> wrote:

Understood Rob.

@Jennifer - can you please let us know? I see there was a guaranty by Rob circulated in your June 28th email, so just wanted to confirm that it is no longer applicable.

Thanks,
Sasha

On Tue, Jul 4, 2023 at 6:02 PM Robert Ellin <rob@liveone.com> wrote:
Rob not gaurantee now or ever better not be in this lease ??

Sent from my iPhone

On Jul 4, 2023, at 3:59 PM, Sasha Ablovatskiy <sablovatskiy@foleyshechter.com> wrote:

Hi Rob - will do.

Hi Jennifer - it is nice to e-meet you. Besides the lease and Rob's guaranty, are there any other documents related to this lease?

Thanks,
Sasha

On Tue, Jul 4, 2023, at 5:06 PM Robert Ellin <rob@liveone.com> wrote:
Sasha please review tomm ?
Thx

Sent from my iPhone

On Jul 4, 2023, at 2:45 PM, Jennifer Perez <estates.jennifer@gmail.com> wrote:

Hi everyone, happy 4th!

Attached please see Lease Agreement to reflect the updated terms where you will now pay two months security deposit and three months of rent upfront and LVO is no longer listed as guarantor. If all looks good, I will DocuSign it over to Aiden for signatures. Rob, I only need you to sign off on the commission from.

Although the rental officially starts on 7/15, they are allowing you early access to the home. We will need to provide them with renters insurance in the amount of $2,000,000 and naming the landlord as an additional insured as well as a cashiers check as specified in section 46.

Let me know if you have any specific questions or concerns. I'm available all day.

Jennifer

THE **AGENCY**
Redefining Real Estate

JENNIFER PEREZ
Agent
m: 818 299 3880 DRE: 02125070
TheAgencyRE.com

IG: Realtor_JenniferPerez

<516-LEASE_FINAL.pdf>

On Jul 4, 2023, at 12:47 AM, Robert Ellin <rob@liveone.com> wrote:

Never received copy of lease ??
Where the old one we mark it up and get back to Sammie immediatly .
No excuses

Need list of items to fix in house

I wil have keys from Sammie Wednesday.

Sent from my iPhone

On Jun 28, 2023, at 9:26 PM, Jennifer Perez <estates.jennifer@gmail.com> wrote:

Hi guys!

Attached please find a draft version of the lease. Review carefully and let me know if you have any revisions.

A few things to highlight:
- Aiden is the sole tenant
- Rob is the guarantor
- Although 7/15 is your official move-in, they are granting you permission to early access at no additional charge
- Language was added to allow you to extend for an additional year and at the same rate
- Ovens will be replaced at owners expense

Please let me know if you have any specific questions or concerns. If all looks good, I'll DocuSign it over for signatures. You will need renters insurance and a cashiers check by Friday to be granted early access. I'll send you more info on this once we have a signed lease.

Thank you,
Jennifer

## THE **AGENCY**
Redefining Real Estate

JENNIFER PEREZ
Agent
**m:** 818 299 3880 **DRE:** 02125070
TheAgencyRE.com

IG: Realtor_JenniferPerez

<LEASE_516 N Beverly_Crotinger_LVO.pdf>

*This message may contain information that is confidential or legally privileged. If you are not the intended recipient, please advise the sender immediately and delete this message. Any disclosure, copying, distribution or action taken or omitted to be taken by an unintended recipient in reliance on this message is strictly prohibited and may be unlawful.*

<GUARANTY OF LEASE-06-26-23.pdf>

*This message may contain information that is confidential or legally privileged. If you are not the intended recipient, please advise the sender immediately and delete this message. Any disclosure, copying, distribution or action taken or omitted to be taken by an unintended recipient in reliance on this message is strictly prohibited and may be unlawful.*

*This message may contain information that is confidential or legally privileged. If you are not the intended recipient, please advise the sender immediately and delete this message. Any disclosure, copying, distribution or action taken or omitted to be taken by an unintended recipient in reliance on this message is*

*omitted to be taken by an unintended recipient in reliance on this message is strictly prohibited and may be unlawful.*

*This message may contain information that is confidential or legally privileged. If you are not the intended recipient, please advise the sender immediately and delete this message. Any disclosure, copying, distribution or action taken or omitted to be taken by an unintended recipient in reliance on this message is strictly prohibited and may be unlawful.*

*This message may contain information that is confidential or legally privileged. If you are not the intended recipient, please advise the sender immediately and delete this message. Any disclosure, copying, distribution or action taken or omitted to be taken by an unintended recipient in reliance on this message is strictly prohibited and may be unlawful.*

*This message may contain information that is confidential or legally privileged. If you are not the intended recipient, please advise the sender immediately and delete this message. Any disclosure, copying, distribution or action taken or omitted to be taken by an unintended recipient in reliance on this message is strictly prohibited and may be unlawful.*

*This message may contain information that is confidential or legally privileged. If you are not the intended recipient, please advise the sender immediately and delete this message. Any disclosure, copying, distribution or action taken or omitted to be taken by an unintended recipient in reliance on this message is strictly prohibited and may be unlawful.*

*This message may contain information that is confidential or legally privileged. If you are not the intended recipient, please advise the sender immediately and delete this message. Any disclosure, copying, distribution or action taken or omitted to be taken by an unintended recipient in reliance on this message is strictly prohibited and may be unlawful.*

*This message may contain information that is confidential or legally privileged. If you are not the intended recipient, please advise the sender immediately and delete this message. Any disclosure, copying, distribution or action taken or omitted to be taken by an unintended recipient in reliance on this message is strictly prohibited and may be unlawful.*

# EXHIBIT J

Policy Number:   ORB-PK-23-A01924-00
Insured Name:    LiveOne Inc

| | |
|---|---:|
| Policy Premium | $7,494.00 |
| Surplus Lines Tax | $229.32 |
| SFCA | $13.76 |
| CBFCA | $250.00 |
| CIFCA | $150.00 |
| | $0.00 |
| | $0.00 |
| Total | **$8,137.08** |



**OLD REPUBLIC UNION INSURANCE COMPANY**

307 N. Michigan Avenue, Chicago, Illinois 60601 | T: 312.346.8100

# Commercial Policy



INSURANCE IS PROVIDED BY
THE COMPANY DESIGNATED ON THE DECLARATION PAGE

**IN WITNESS WHEREOF,** we have caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless countersigned by our authorized representative.

**OLD REPUBLIC UNION INSURANCE COMPANY**
307 N. Michigan Avenue
Chicago, Illinois 60601

A Stock Company

This Policy is Non-participating With Regard to Paying Dividends to Policyholders.

*Secretary*

*President*

# OLD REPUBLIC UNION INSURANCE COMPANY

## OLD REPUBLIC UNION INSURANCE COMPANY

### 307 N. MICHIGAN AVENUE, CHICAGO, ILLINOIS 60601

## COMMERCIAL LINES POLICY - COMMON POLICY DECLARATIONS

**POLICY NUMBER:  ORB-PK-23-A01924-00**

**POLICY PERIOD:  FROM: 01-29-2024 TO: 01-29-2025**

(AT 12:01 A.M. STANDARD TIME AT YOUR MAILING ADDRESS SHOWN BELOW)

**INSURED NAME AND MAILING ADDRESS**

NAMED INSURED: LiveOne Inc

MAILING ADDRESS: 269 S. Beverly Dr, PO Box 14500

Beverly Hills, CA 90212

BUSINESS DESCRIPTION:  Recording Studio

FORMS OF BUSINESS:  ☒Corporation  ☐Limited Liability Corp (LLC) ☐Individual  ☐ Partnership ☐Public Entity ☐ Organization  Joint Venture ☐ Other:

☐ Auditable ☒ Non-Auditable      Tax State: CA

**PRODUCER NAME AND MAILING ADDRESS**

AGENT NAME: RT Specialty Hunt Valley Binding

MAILING ADDRESS: 10150 York RoadFifth Floor

Hunt Valley MD 21030

Notice to Policyholder: This contract is issued, pursuant to Section 445 of the Illinois Insurance Code, by a company not authorized and licensed to transact business in Illinois and as such is not covered by the Illinois Insurance Guaranty Fund.

IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.  THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH A PREMIUM IS INDICATED.  WHERE NO PREMIUM IS SHOWN, THERE IS NO COVERAGE.THIS PREMIUM MAY BE SUBJECT TO ADJUSTMENT.

|  | Premium |
|---|---|
| GENERAL LIABILITY COVERAGE PART | $6,914.00 |
| PROPERTY COVERAGE PART | $362.00 |
| TERRORISM RISK INSURANCE | $218.00 |
| **TOTAL ADVANCE PREMIUM (**M | |
| SUI | |

**NO FLAT CANCELLATIONS** - FORMS AND ENDORSE
SEE SCHEDULES OF FO

Countersigned:  Chicago, IL          By: _____

Countersigned Date: _____     Countersignature or Authorized Representative whichever is applicable.

THIS COMMON POLICY DECLARATION AND THE SUPPLEMENTAL DECLARATION(S), TOGETHER WITH THE COMMON POLICY CONDITIONS, COVERAGE PART(S), COVERAGE FORM(S) AND FORMS AND ENDORSEMENTS, IF ANY, COMPLETE THE ABOVE NUMBERED POLICY.

# OLD REPUBLIC EXCESS & SURPLUS

## SCHEDULE OF FORMS & ENDORSEMENTS

**NAMED INSURED**:  LiveOne Inc

**POLICY NUMBER:**   ORB-PK-23-A01924-00         **POLICY PERIOD: FROM:**   01-29-2024  **TO:** 01-29-2025

(AT 12:01 A.M. STANDARD TIME AT YOUR MAILING ADDRESS)

### LIST OF FORMS & ENDORSEMENTS ATTACHED TO THIS POLICY

#### INTERLINE FORMS

| Form Number | Edition Date | Form Title |
|---|---|---|
| ORESJ01 | 11 21 | POLICY JACKET |
| ORUSL0080 | 04 21 | CA SURPLUS LINES NOTICE (POLICYHOLDERS) |
| ORUSL0134 | 04 21 | CALIFORNIA SURPLUS LINES NOTICE |
| ORESCD01 | | COMMERCIAL LINES POLICY - COMMON POLICY DECLARATIONS |
| ORESS001 | | SCHEDULE OF FORMS & ENDORSEMENTS |
| IL0017 | 11 98 | COMMON POLICY CONDITIONS |
| IL0021 | 09 08 | NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT (BROAD FORM) |
| IL0985 | 12 20 | DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT |
| ILN001 | 09 03 | FRAUD STATEMENT |
| ILP001 | 01 04 | U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL  (OFAC)  ADVISORY NOTICE TO POLICYHOLDERS |
| ORESCM001 | 12 22 | MINIMUM EARNED PREMIUM ENDORSEMENT |
| ORESCM002 | 12 22 | MINIMUM AND DEPOSIT PREMIUM ENDORSEMENT |
| IL0102 | 02 20 | CALIFORNIA CHANGES - ACTUAL CASH VALUE |
| IL0935 | 07 02 | EXCLUSION OF CERTAIN COMPUTER-RELATED LOSSES |
| IL0952 | 01 15 | CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM |
| ORESSL | 04 21 | SERVICE OF SUIT ENDORSEMENT |
| ORESC01 | 12 22 | CLAIM NOTICE |

#### GENERAL LIABILITY FORMS

| Form Number | Edition Date | Form Title |
|---|---|---|
| CG3234 | 01 05 | CALIFORNIA CHANGES |
| ORESGLD01 | | COMMERCIAL GENERAL LIABILITY COVERAGE PART DECLARATION PAGE |
| CG0001 | 04 13 | COMMERCIAL GENERAL LIABILITY COVERAGE FORM |
| CG0300 | 01 96 | DEDUCTIBLE LIABILITY INSURANCE |
| DCTSCHEDULEFOR CG03000196 | | DCT SCHEDULE FOR CG 03 00 01 96 |
| CG2101 | 12 19 | EXCLUSION - ATHLETIC OR SPORTS PARTICIPANTS |
| CG2107 | 05 14 | EXCLUSION - ACCESS OR DISCLOSURE OF CONFIDENTIAL OR PERSONAL INFORMATION AND DATA-RELATED LIABILITY - LIMITED BODILY INJURY EXCEPTION NOT INCLUDED |
| CG2132 | 05 09 | COMMUNICABLE DISEASE EXCLUSION |
| CG2138 | 11 85 | EXCLUSION - PERSONAL AND ADVERTISING INJURY |
| CG2144 | 04 17 | LIMITATION OF COVERAGE TO DESIGNATED PREMISES, PROJECT OR OPERATION |

| | | |
|---|---|---|
| CG2147 | 12 07 | EMPLOYMENT-RELATED PRACTICES EXCLUSION |
| CG2149 | 09 99 | TOTAL POLLUTION EXCLUSION ENDORSEMENT |
| CG2167 | 12 04 | FUNGI OR BACTERIA EXCLUSION |
| CG2170 | 01 15 | CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM |
| CG2186 | 12 04 | EXCLUSION - EXTERIOR INSULATION AND FINISH SYSTEMS |
| CG2230 | 07 98 | EXCLUSION - CORPORAL PUNISHMENT |
| CG2426 | 04 13 | AMENDMENT OF INSURED CONTRACT DEFINITION |
| CG4010 | 12 19 | EXCLUSION - CROSS SUITS LIABILITY |
| CG4014 | 12 20 | CANNABIS EXCLUSION |
| ORESCG002 | 12 22 | ANIMAL LIABILITY EXCLUSION |
| ORESCG003 | 12 22 | ASBESTOS OR ASBESTOS-RELATED DUST, LEAD, AND SILICA OR SILICA-RELATED DUST EXCLUSION |
| ORESCG004 | 12 22 | BED BUGS EXCLUSION |
| ORESCG005 | 12 22 | BODY OF WATER EXCLUSION |
| ORESCG007 | 12 22 | DISCRIMINATION EXCLUSION |
| ORESCG011 | 05 23 | SEXUAL ABUSE OR SEXUAL MOLESTATION EXCLUSION |
| ORESCG012 | 12 22 | SNOW OR ICE REMOVAL EXCLUSION |
| ORESCG013 | 12 22 | SWIMMING POOL EXCLUSION |
| ORESCG014 | 12 22 | TANNING DEVICES EXCLUSION |
| ORESCG016 | 08 23 | TRAMPOLINE EXCLUSION |
| ORESCG017 | 12 22 | PUNITIVE DAMAGES EXCLUSION |
| ORESCG019 | 12 22 | INDEPENDENT CONTRACTORS/SUBCONTRACTORS EXCLUSION |
| ORESCG020 | 12 22 | INJURY TO EMPLOYEES, WORKERS, OR INDEPENDENT CONTRACTORS/SUBCONTRACTORS EXCLUSION |
| ORESCG022 | 12 22 | PROFESSIONAL SERVICES EXCLUSION |
| ORESCG025 | 12 22 | TOTAL LIQUOR LIABILITY EXCLUSION |
| ORESCG028 | 12 22 | DESCRIBED RECREATIONAL HAZARDS EXCLUSION |
| ORESCG029 | 05 23 | ASSAULT OR BATTERY EXCLUSION |
| ORESCG031 | 12 22 | CLASSIFICATION LIMITATION |
| ORESCG033 | 12 22 | CONSTRUCTION OPERATIONS OR CONSTRUCTION RELATED OPERATIONS EXCLUSION WITH MAINTENANCE EXCEPTION |
| ORESCG047 | 12 22 | HABITABILITY EXCLUSION |
| ORESCG061 | 12 22 | RESIDENTIAL CONDOMINIUM CONVERSION EXCLUSION |
| ORESCG063 | 12 22 | CONTAMINATED DRYWALL EXCLUSION |
| ORESCG064 | 12 22 | AIRCRAFT PRODUCTS AND GROUNDING EXCLUSION |
| ORESCG065 | 08 23 | SUBSIDENCE EXCLUSION |
| ORESCG066 | 12 22 | FRACKING EXCLUSION |
| ORESCG069 | 12 22 | ELECTROMAGNETIC FIELD EXCLUSION |
| ORESCG041 | 04 23 | CYBER INCIDENT EXCLUSION |

## PROPERTY FORMS

| Form Number | Edition Date | Form Title |
|---|---|---|
| ORESCPD01 | | COMMERCIAL PROPERTY COVERAGE PART DECLARATION PAGE |
| CP0010 | 10 12 | BUILDING AND PERSONAL PROPERTY  COVERAGE FORM |
| CP0090 | 07 88 | COMMERCIAL PROPERTY CONDITIONS |
| CP0140 | 07 06 | EXCLUSION OF LOSS DUE TO VIRUS OR BACTERIA |
| CP0411 | 09 17 | PROTECTIVE SAFEGUARDS |
| CP1010 | 10 12 | CAUSES OF LOSS - BASIC FORM |
| CP1075 | 12 20 | CYBER INCIDENT EXCLUSION |
| ORESEBDEC01 | 12 22 | COMMERCIAL PROPERTY COVERAGE PART EQUIPMENT BREAKDOWN COVERAGE SCHEDULE |
| ORESEB001 | 03 23 | EQUIPMENT BREAKDOWN COVERAGE (INCLUDING ELECTRONIC |



## COMMERCIAL GENERAL LIABILITY COVERAGE PART
## DECLARATION PAGE

**NAMED INSURED**: LiveOne Inc                    ☐Extension of Declarations is attached
**POLICY NUMBER: ORB-PK-23-A01924-00**       **POLICY PERIOD:  FROM:  01-29-2024 TO: 01-29-2025**
                                             (AT 12:01 A.M. STANDARD TIME AT YOUR MAILING ADDRESS SHOWN BELOW)

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

**LIMITS OF INSURANCE:**

| | |
|---|---|
| General Aggregate Limit (Other Than Products/Completed Operations) | $2,000,000 |
| Products/Completed Operations Aggregate Limit | $2,000,000 |
| Personal and Advertising Injury | $0 Any One Person or Organization |
| Each Occurrence Limit | $1,000,000 |
| Damage to Premises Rented to You Limit | $100,000 Any One Premises |
| Medical Expense Limit | $5,000 Any One Person |

**DEDUCTIBLES:**

| | **DEDUCTIBLE** |
|---|---|
| Combined Bodily Injury and Property Damage Deductible | $500 Per Occurrence |

**RETROACTIVE DATE (CG 00 02 ONLY):**

| |
|---|
| This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" which occurs before the Retroactive Date, if any, shown here:   NONE |

**BUSINESS DESCRIPTION AND LOCATION OF PREMISES:**
Additional locations (if any) will be shown on form ORES GLDE-01, Commercial General Liability Coverage Part Declarations Extensions

| BUSINESS DESCRIPTION: Recording Studio | ☐Location address is same as mailing address. |
|---|---|
| **Prem.1** | **516 N Beverly Dr, PO Box 14500, Beverly Hills, CA 90210** |

| CLASS CODE | CLASS DESCRIPTION | BASIS | EXPOSURE | RATE | | ADVANCE PREMIUM |
|---|---|---|---|---|---|---|
| | | | | **Premises** | **Products** | |
| 60010 | Apartment Buildings | Units | 1 | 1,031.803 | INCL | $1,032.00 |
| 47103 | Recording Studios | Area | 5,969 | 859.841 | INCL | $5,132.00 |
| 48925-01 | Swimming Pools - Dwellings | Units | 1 | 750.000 | INCL | $750.00 |

| POLICY IS AUDITABLE: ☐APPLICABLE | TOTAL PREMIUM FOR THIS COVERAGE PART | $6,914.00 |
|---|---|---|
| LOCATION OF JOB SITE (IF Designated Projects are to be Scheduled): | | |

**GENERAL LIABILITY COVERAGES AND LIMITATION:**

| ADDITIONAL FORM | LIMIT OF INSURANCE | DEDUCTIBLE | PREMIUM |
|---|---|---|---|
| Limitation Of Coverage To Designated Premises Project or Operation | | | $0 |
| Exclusion - Personal and Advertising Injury Endorsement | | | $0 |

**GENERAL LIABILITY TOTAL PREMIUM:**

| Minimum Earned Premium 25% | TOTAL PREMIUM | $6,914.00 |
|---|---|---|
| (Minimum & Deposit) | TRIA PREMIUM | $207.00 |
| | TOTAL PREMIUM WITH TRIA | $7,121.00 |

**SCHEDULE OF FORMS & ENDORSEMENTS:**
Forms and Endorsements applying to this Coverage Part and made part of this policy at time of issue are listed under Schedule of Forms and Endorsements – Form ORES S-001

THESE DECLARATIONS ARE PART OF THE POLICY DECLARATIONS CONTAINING THE NAME OF THE INSURED AND THE POLICY PERIOD.

POLICY NUMBER:   ORB-PK-23-A01924-00

**COMMERCIAL GENERAL LIABILITY**
**DCT SCHEDULE FOR CG 03 00 01 96**

# DEDUCTIBLE LIABILITY INSURANCE

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**SCHEDULE**

**Coverage**  Policywide

| | **Amount and Basis of Deductible** | | | |
|---|---|---|---|---|
| | **PER CLAIM** | or | **PER OCCURRENCE** | |
| | Premises | Products | Premises | Products |

| | Premises | Products |
|---|---|---|
| Bodily Injury Liability/Property Damage | BI    $500 PD Combined | BI Combined PD Combined |

Class Code(s) With Deductible

Location 1  [60010] Apartment Buildings

Location 1  [47103] Recording Studios

Location 1  [48925-01] Swimming Pools - Dwellings



# OLD REPUBLIC UNION INSURANCE COMPANY

## COMMERCIAL PROPERTY COVERAGE PART
## DECLARATION PAGE

**NAMED INSURED:** LiveOne Inc                               ☐ Extension of Declarations is attached
**POLICY NUMBER: ORB-PK-23-A01924-00**          **POLICY PERIOD:  FROM: 01-29-2024 TO: 01-29-2025**

(AT 12:01 A.M. STANDARD TIME AT YOUR MAILING ADDRESS SHOWN BELOW)

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF
THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

**SCHEDULE OF LOCATIONS:** Additional locations (if any) will be shown on form ORES CPDE-01, Commercial Property Coverage Part Declarations Extensions.

| Prem.1 | Bldg.1 | 516 N Beverly Dr, PO Box 14500, Beverly Hills,CA 90210 | Const:Frame | PC: 4 |
|---|---|---|---|---|

**BUILDING LEVEL COVERAGES:**

| Coverage | Premium |
|---|---|
| Equipment Breakdown | $11.00 |

**PERSONAL PROPERTY**

| Coverage | Cause of Loss | Valuation | Limit | Co-Insurance | Rate | Premium |
|---|---|---|---|---|---|---|
| Personal Property | Basic | Replacement Cost | $100,000 | 80% | 0.351 | $351.00 |

**DEDUCTIBLES:**

| Prem. # | Building # | AOP | Theft | Water | Vandalism | Minimum Wind Or Hail | Named Storm | Sprinkler |
|---|---|---|---|---|---|---|---|---|
| 1 | 1 | $1,000 | | | | | | |

**WARRANTIES:**

| Operational Smoke Detectors | P-9 |
|---|---|

**PROPERTY TOTAL PREMIUM:**

| Minimum Earned Premium 25% | TOTAL PREMIUM | $362.00 |
|---|---|---|
| | TRIA PREMIUM | $11.00 |
| | TOTAL PREMIUM WITH TRIA | $373.00 |

**SCHEDULE OF FORMS & ENDORSEMENTS:**
Forms and Endorsements applying to this Coverage Part and made part of this policy at time of issue are listed under Schedule of Forms and Endorsements – Form ORES S-001

THESE DECLARATIONS ARE PART OF THE POLICY DECLARATIONS CONTAINING THE NAME OF THE INSURED AND THE POLICY PERIOD.

## COMMERCIAL PROPERTY COVERAGE PART
## EQUIPMENT BREAKDOWN COVERAGE SCHEDULE

*Equipment Breakdown is subject to the Limits of Insurance shown in the Declarations except as specifically shown below.*

*These coverages apply to all locations covered on the policy, unless otherwise specified.*

|              Coverages              |                Limits                |
|-------------------------------------|--------------------------------------|

**Coverages** | **Limits**
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| Coverages | Limits |
|---|---|
| Equipment Breakdown Limit | Follows Property Limit |
| Business Income | Follows Property Limit |
| Extra Expense | Follows Property Limit |
| Data Restoration | $25,000 |
| Expediting Expenses | $25,000 |
| Future Loss Avoidance | $10,000 or 10% of our Eligible Payment, whichever is less |
| Green | $25,000 |
| Hazardous Substances | $25,000 |
| Mobile Robots | $50,000 |
| Off Premises Equipment Breakdown | Follows Property Limit |
| Public Relations | $25,000 |
| Resultant Damage to Animals | $25,000 |

Service Interruption – Coverage Options (check one)

    [X ]  Follows Applicable Coverage Limit
    [ ] $_____ Applies only to Business Income and Extra Expense coverages. Data Restoration and Spoilage and Consequential Damage are subject to the applicable sublimits shown in the Equipment Breakdown Coverage endorsement or "schedule".

Spoilage and Consequential Damage           $

    Refrigerant Contamination – Coverage Options (check one)
    [ ]  Included in Spoilage and Consequential Damage Limit
    [X ] $100,000

### Deductibles
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Combined, All Coverages                 Follows AOP

Direct Coverages

ORES EBDEC-01 12 22   © 2021, The Hartford Steam Boiler Inspection and Insurance Company.   Page **1** of 1
All rights reserved.

| | |
|---|---|
| Indirect Coverages | $ |
| | *or* _____ *hrs.* |
| | *or* _____ *times ADV* |
| | |
| Spoilage and Consequential Damage | $ |
| | *or* ____% *of loss,* $ ____ *minimum* |

**Other Conditions**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

━ ━ ━ ━ ━ ━ ━ ━ ━ ━ ━ ━ ━ ━ ━ ━ ━ ━ ━ ━ ━ ━ ━ ━

**POLICY NUMBER:** ORB-PK-23-A01924-00

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# ADDITIONAL NAMED INSURED(S)

Named Insured:  LiveOne Inc

The named insured is hereby amended to include the following:

Slacker Inc.
PodcastOne, Inc
LiveXLive, Corp.
Splitminds LLC
Drumify LLC

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

MANUS-01                                                        Page **1** of **1**

# EXHIBIT K



June 25, 2024

**<u>VIA EMAIL & REGISTERED MAIL</u>**

Aaron Sullivan, CFO
LiveOne Inc.
516 N. Beverly Drive
Beverly Hills, CA 90210

|  |  |  |
|---|---|---|
| Re: | *Michael Kibler and Ann Kibler v. LiveOne Inc., et al.* | |
| | Insurer: | Old Republic Insurance Company |
| | Claim No.: | 1.73398 |
| | Policy No.: | ORB-PK-23-A01924-00 |
| | Policy Type: | Commercial General Liability ("CGL") |
| | Policy Period: | 01/29/2024 – 01/29/2025 |

Dear Mr. Sullivan and LiveOne Inc.:

Old Republic Union Insurance Company, Old Republic Excess & Surplus as administrator for Old Republic Union Insurance Company ("Old Republic") is in receipt of the notice submitted by LiveOne requesting defense and indemnification for the complaint ("Complaint") filed by Plaintiffs Michael Kibler and Ann Kibler ("Plaintiffs") on or about May 10, 2024, in connection with the lawsuit styled *Michael Kibler and Ann Kibler v. LiveOne, Inc., et al.* in the Los Angeles County Superior Court, Case No. 24SMCV02209 (the "Underlying Action").

Based upon a review of the information received, Old Republic has determined that there is no potential for coverage under the above-referenced CGL Policy with respect to the claims asserted in the Underlying Action. As explained more fully below, the Complaint does not allege "bodily injury" or "property damage" caused by an "occurrence," as required by the CGL Policy. Additionally, the CGL Policy contains various exclusions that apply to further bar coverage under the CGL Policy. For these reasons, Old Republic declines LiveOne's request.

The grounds for Old Republic's denial of coverage are set out to inform you of Old Republic's present coverage position. The specific enumeration of the CGL Policy's provisions is not intended by Old Republic as a waiver of any other defenses, terms, conditions, or provisions pursuant to the CGL Policy. Old Republic reserves its right to invoke any other coverage defenses, terms, conditions, or provisions that may prove to be available under the CGL Policy. Old Republic further reserves the right to supplement, amend, or change its coverage position based on any additional information or amended pleadings.

Aaron Sullivan, CFO
LiveOne Inc.
June 25, 2024
Page 2


I.      **FACTUAL BACKGROUND AND ALLEGATIONS**

          This letter will refer to certain allegations asserted by Plaintiffs in the Complaint. Old Republic recognizes those allegations are unsubstantiated at this time, and nothing in this letter is intended to suggest or imply that they have any legal or factual merit.

          Plaintiffs filed suit against LiveOne, Inc. ("LiveOne"), which Plaintiffs allege advertises itself as a "global digital media company dedicated to music and live entertainment," Robert Ellin ("Ellin"), who Plaintiffs allege is LiveOne's Board Chair and Chief Executive Officer, and Joshua Hallbauer ("Hallbauer"), who Plaintiffs allege is head of LiveOne's Music Publishing Division (collectively, "the LiveOne Defendants"), as well as Siamak Khakshooy and Tanaz Koshki (collectively, "the Owners"), who Plaintiffs allege are owners of 516 N. Beverly Drive in Beverly Hills, California ("the Property").

          Plaintiffs allege causes of action for: (1)Violation of Municipal Zoning Laws; (2) Public Nuisance in Violation of Civil Code section 3479 and Beverly Hills Municipal Code section 10-3-4303; (3) Private Nuisance in Violation of Civil Code section 3501 *et seq*.; (4) Intentional Infliction of Emotional Distress; and (5) Aiding and Abetting a Tort (against the individual defendants only).

          According to the Complaint, the neighborhood in which the Property is located is zoned for residential single-family homes (Complaint, ¶ 22.) Plaintiffs and their young children have resided next-door to the Property for approximately 13 years. (*Id*., ¶ 21) In 2021, the long-time resident of the Property died, and it was subsequently sold to the Owners. (*Id*., ¶ 23.) The Owners "renovated the residence to create a business center for lease to entertainment companies, including installing a music and podcast studio, and providing event space for music, entertainment, and social media production and events, including events for social media influencers." (*Id*., ¶ 25.) On or around December 8, 2021, the Owners leased the Property to an entertainment company known as The Revels Group LLC whose website states that they represent incredible talent including signing multi-platinum hip-hop artist G-Eazy, as well as other artists. (*Id*., ¶¶ 26, 27.) The Revels Group further renovated the residence by installing a nightclub-quality sound system in the backyard of the property and installing professional recording equipment in the guest house behind the home that the Owners had converted into a recording studio. (*Id*., ¶ 29.) During their tenancy, The Revels Group hosted large-scale company-sponsored music industry entertainment events and all-night recording sessions in the studio behind the home on a nearly weekly basis, and it was "obvious" that The Revels Group "was operating a music business and recording studio" at the Property. (*Id*., ¶¶ 30, 31.)

Aaron Sullivan, CFO
LiveOne Inc.
June 25, 2024
Page 3

   The Complaint further alleges that on or around November 21, 2022, the City of Beverly Hills completed its zoning enforcement investigation of The Revel Group's use of 516 N. Beverly Drive by issuing a Final Notice of Violations that provided, in detail, the various illegal activities carried out by The Revel Group in violation of the Beverly Hills Municipal Code. (*Id*., ¶¶ 37, 38.) Based on these findings the City of Beverly Hills ordered The Revel Group to, among other things, "permanently terminate all operations," "[re]move all personal property from the dwelling, garage, and guesthouse . . . [used] in connection with its business activities," including but not limited to "all musical instruments (including keyboards) speakers, monitors, printers, computers, desks, work stations, partitions, [and] recording equipment," and "immediately terminate all street parking." (*Id*., ¶40.) As a result of these orders from the City of Beverly Hills, The Revel Group moved out. (*Id*., ¶ 41.)

   The Complaint further alleges that in or around March 2023, LiveOne began renting the Property where "the *exact same* pattern of illegal commercial activity described above resumed, albeit through a different cast of characters." (*Id*., ¶ 43 (emphasis in original).) Specifically, LiveOne referred to the Property on social media as "The LiveOne House" or its "Beverly Hills Studio" where LiveOne "hosts music industry events, holds meetings, and records podcasts, among other commercial activity." (*Id*., ¶ 48.) After LiveOne rented the Property, Plaintiffs "began observing the *exact same conduct* associated with The Revels Group LLC's commercial activity: heavy commercial vehicle and foot traffic, people coming and going all day and night, large events, and at night when the rest of the residential neighborhood was quiet and the homes darkened, the driveway of The LiveOne House and the street near the house would be filled with cars, with every light inside and outside the house on all night and into the early morning. (*Id*., ¶ 51 (emphasis in original).) As an example, on February 3, 2024, LiveOne hosted a pre-Grammy party at the Property, which was ultimately shut down by the Beverly Hills Police Department. (*Id*., ¶¶ 56-65.) Plaintiffs allege on information and belief that on that night, Hallbauer lied to Beverly Hills Sergeant Yashimoto when he told her that he was the "resident" of the Property and that he was hosting a private party. (*Id*., ¶ 66.)

   The Complaint further alleges on information and belief that Ellin and Hallbauer "participated, authorized, and directed" the alleged "intentional violations of Beverly Hills zoning laws and other torts," and they "conceived, orchestrated, and implemented LiveOne Inc.'s plan to operate from 516 N. Beverly Drive as a business in violation of Beverly Hills zoning laws . . . and to commit other torts," as well as "directed and authorized other LiveOne, Inc. employees to engage in illegal conduct." (*Id*., ¶ 46.)

   The Complaint concludes that "[e]ven before party and non-party discovery has begun, the evidence that LiveOne, Inc., like The Revels Group LLC before them, is openly and

WHERE YOU NEED US, **WHEN YOU NEED US**

Aaron Sullivan, CFO
LiveOne Inc.
June 25, 2024
Page 4

illegally operating a music entertainment business out of The LiveOne House at 516 N. Beverly Drive in a R-1 residential zone is overwhelming." (*Id.*, ¶ 155.) As a result, Plaintiffs and their neighbors "are plagued with recording studio sessions in The LiveOne House's recording studio, heavy traffic and parking overflow, scores of business visitors, vendors, artists, and others coming and going from The LiveOne House at all hours of the day and night, as well as large music industry events." (*Id.*, ¶ 156.)

Plaintiffs are seeking compensatory and general damages, including, but not limited to, no less than $10,000 per day for each and every day that businesses have operated from the Property, an injunction to cease all of LiveOne's business operations at the Property, an injunction against the Owners to cease leasing the property to commercial enterprises, interest, attorneys' fees, costs, and punitive damages.

## II.     THE CGL POLICY

Old Republic issued Commercial General Liability ("CGL") Policy No. ORB-PK-23-A01924-00 to the named insured LiveOne Inc. with an effective date of January 29, 2024 to January 29, 2025 (the "CGL Policy"). The CGL Policy includes general liability coverage with an applicable limit of $1,000,000 per occurrence, a general aggregate limit of $2,000,000, and a products-completed operations aggregate limit of $2,000,000. The CGL Policy contains a combined bodily injury and property damage deductible of $500 per occurrence. The CGL Policy Declarations Page lists the Property as a covered premise and contains the following Business Description: "Recording Studio."

## III.    COVERAGE EVALUATION

### A.     Insuring Agreement

Insuring Agreement A of the Policy provides, in relevant part:

**SECTION I - COVERAGES**

**COVERAGE A - BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

**1.     Insuring Agreement**

Aaron Sullivan, CFO
LiveOne Inc.
June 25, 2024
Page 5

**a.**      We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result[.]

       *\*\*\**

**b.**[1]      This insurance applies to "bodily injury" and "property damage" caused by an "occurrence" that takes place in the "coverage territory" only if:

     **(1)**      The "bodily injury" or "property damage":

         (a) Occurs on the premises shown in the Schedule or the grounds and structures appurtenant to those premises; or

         (b) Arises out of the project or operation shown in the Schedule;

     **(2)**      The "bodily injury" or "property damage" occurs during the policy period; and

     **(3)**      Prior to the policy period, no insured listed under Paragraph **1.** of Section **II** – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or

---

[1] Amended by endorsement (CG 21 44 04 17 – LIMITATION OF COVERAGE TO DESIGNATED PREMISES, PROJECT OR OPERATION)

Aaron Sullivan, CFO
LiveOne Inc.
June 25, 2024
Page 6

authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

\*\*\*

**d.**  "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1**. of Section **II** – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

**(1)**  Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

**(2)**  Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage;" or

**(3)**  Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

## SECTION II – WHO IS AN INSURED

1. If you are designated in the Declarations as:

\*\*\*

An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

Aaron Sullivan, CFO
LiveOne Inc.
June 25, 2024
Page 7

The Complaint does not allege bodily injury, which is defined in the CGL Policy as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time." The emotional distress alleged by Plaintiffs does not qualify as "bodily injury" under the CGL Policy.

The Complaint does not allege "property damage." The CGL Policy defines "property damage" as: "Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the 'occurrence' that caused it."

The Complaint also does not allege an "occurrence." The CGL Policy defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." No allegation in the Complaint can conceivably be construed as an "accident."

Although the Complaint does not allege "bodily injury," "property damage," or an "occurrence," the CGL Policy does not provide coverage, separately and independently, for the damages Plaintiffs allegedly incurred from 2021 through January 29, 2024, which is the policy inception date for the CGL Policy.

Additionally, to the extent a listed insured or authorized "employee" knew prior to the policy inception date (January 29, 2024) of the existence of the alleged damages, which was not timely reported to Old Republic, there is, separately and independently, no coverage under the CGL Policy.

Although there is no coverage for the Underlying Action under the CGL Policy, as discussed above, to the extent that Hallbauer is not an executive officer or director of LiveOne, he would not qualify as an insured under the CGL Policy and, to the extent that the alleged conduct by Ellin and Hallbauer does not fall within their duties as officers or directors of LiveOne, they would not qualify as insureds under the CGL Policy.

**B.**    **Applicable Exclusions**

The CGL Policy contains several exclusions which explicitly bar coverage for the Underlying Action.

**a.**    **Expected Or Intended Injury**

Aaron Sullivan, CFO
LiveOne Inc.
June 25, 2024
Page 8

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

The Complaint alleges on information and belief that Ellin and Hallbauer "participated, authorized, and directed" the alleged "intentional violations of Beverly Hills zoning laws and other torts," and they "conceived, orchestrated, and implemented LiveOne Inc.'s plan to operate from 516 N. Beverly Drive as a business in violation of Beverly Hills zoning laws . . . and to commit other torts," as well as "directed and authorized other LiveOne, Inc. employees to engage in illegal conduct." (*Id*., ¶ 46.) Although no "bodily injury" or "property damage" has been alleged, coverage is barred under the CGL Policy to the extent Plaintiffs' damages were expected or intended by LiveOne

Additionally, the Complaint asserts a cause of action for Intentional Infliction of Emotional Distress and alleges that the LiveOne Defendants acted with oppression, fraud, and malice, which supports an award of punitive damages. Old Republic expressly reserves its right to rely on California *Insurance Code* § 533 as an additional basis to deny coverage, in whole or in part. Section 533 states that "[a]n insurer is not liable for a loss caused by the willful act of the insured[.]" *Ins. Code* § 533. Thus, to the extent the damages are awarded on the basis of willful conduct, such damages would not be covered under the CGL Policy because they are not insurable under California law. This includes, but is not limited to, any award of punitive damages, which must be based upon a willful act.

### EXCLUSION – PERSONAL AND ADVERTISING INJURY

Coverage B (Section I) does not apply and none of the references to it in the Coverage Part apply.

Although no personal and advertising injury has been alleged in the Complaint, there would be no coverage for such claims under the CGL Policy pursuant to this exclusion by endorsement.

### PUNITIVE OR EXEMPLARY DAMAGES EXCLUSION

This insurance does not apply to:

**Punitive Or Exemplary Damages**

Aaron Sullivan, CFO
LiveOne Inc.
June 25, 2024
Page 9

Damages, claims, or "suits" for "punitive or exemplary damages". If a "suit" is brought against any insured for a claim falling within coverage provided under this policy seeking both compensatory and "punitive or exemplary damages", we shall have the duty to defend such "suit", however, we shall not have an obligation to pay for any costs, interest, or damages attributed to "punitive or exemplary damages".

"Punitive damages or exemplary damages" means those damages imposed to punish a wrongdoer and to deter others from similar conduct, including, but not limited to, fines, penalties, or liquidated damages, or any damages awarded pursuant to statute in the form of double, treble, or other multiple damages in excess of compensatory damages.

As discussed above, any punitive or exemplary damages awarded are uninsurable under the CGL Policy pursuant to *Insurance Code* § 533. Such damages are also barred under the CGL Policy pursuant to this exclusion by endorsement.

### INDEPENDENT CONTRACTORS OR SUBCONTRACTORS

### EXCLUSION

This insurance does not apply to:

**Independent Contractors/Subcontractors**

"Bodily injury", "property damage", or "personal or advertising injury" arising out of work or operations performed by any independent contractors or subcontractors for you or any insured.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured.

Although there is no coverage for the Underlying Action under the CGL Policy, as discussed above, to the extent that any alleged damages arise out of work or operations performed by any independent contractors or subcontractors, coverage is further barred under this exclusion by endorsement.

### TOTAL LIQUOR LIABILITY EXCLUSION

Aaron Sullivan, CFO
LiveOne Inc.
June 25, 2024
Page 10

This insurance does not apply to:

**LIQUOR LIABILITY**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

**(1)** Causing or contributing to the intoxication of any person;

**(2)** The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol;

or

**(3)** Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in:

> **(a)** The supervision, hiring, employment, training or monitoring of others by that insured; or
>
> **(b)** Providing or failing to provide transportation with respect to any person that may be under the influence of alcohol;

if the "occurrence" which caused the "bodily injury" or "property damage", involved that which is described in Paragraph **(1)**, **(2)** or **(3)** above.

Although there is no coverage for the Underlying Action under the CGL Policy, as discussed above, to the extent that any insured may be held liable for the alleged damages by reason of "[c]ausing or contributing to the intoxication of any person," the "furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol," or "[a]ny statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages," coverage is further barred under this exclusion by endorsement.

**DESCRIBED HAZARDS EXCLUSION**

This insurance does not apply to:

Aaron Sullivan, CFO
LiveOne Inc.
June 25, 2024
Page 11

**Described Hazards**

"Bodily injury", "property damage", or "personal and advertising injury" arising out of any:

1. Dunk tanks or splash tower water dunk games;
**2.** Rock climbing walls or structures, rope climbing, zip lining;
**3.** Ski or tram lifts;
**4.** Inflatables, mechanical or non-mechanical amusement devices;
**5.** Obstacle courses;
**6.** Carnivals, circuses with animals, or petting zoos;
**7.** Animal rides, equestrians, rider of saddle animals, or horse drawn hayrides;
**8.** Diving boards, scuba diving, snorkeling, water surfing, skiing or tubing;
**9.** White water rafting, parasailing, or jet skiing;
**10.** Snow tubing, skiing, or snowboarding;
**11.** Archery, axe throwing or paint balling;
**12.** Skateboarding, roller or ice skating;
**13.** Sky diving, bungee jumping, or aerial events;
**14.** Helicopters, airplanes, jet suits, or balloon rides;
**15.** All-terrain vehicles, snowmobiles, motor vehicle races or competitions;
**16.** Heavy metal, hard rock, rap or hip-hop concerts; or
**17.** Contests involving alcohol drinking or eating.

This exclusion applies even if claims allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by any insured.

Although there is no coverage for the Underlying Action under the CGL Policy, as discussed above, to the extent that any alleged damages arise out of any "[h]eavy metal, hard rock, rap or hip-hop concerts" or "[c]ontests involving alcohol drinking or eating," coverage is further barred under this exclusion by endorsement.

**CLASSIFICATION LIMITATION**

Coverage under this policy is specifically limited to those operations described by the classification(s) listed in the Commercial General Liability Coverage Part Declarations. This policy does not apply to any operations

Aaron Sullivan, CFO
LiveOne Inc.
June 25, 2024
Page 12

not specifically listed in the Commercial General Liability Coverage Part Declarations or added by endorsement.

Although there is no coverage for the Underlying Action under the CGL Policy, as discussed above, to the extent that any alleged damages arise out of any operations not specifically listed in the CGL Policy Declarations or added by endorsement (*i.e.*, operations other than "Recording Studio"), coverage is further barred under this exclusion by endorsement.

**HABITABILITY EXCLUSION**

This insurance does not apply to:

**Habitability**

**1.** "Bodily injury", "property damage", or "personal and advertising injury" arising out violation(s) of any law involving or related to "habitability", including, but not limited to, claims arising out of the alleged or actual violation or breach of any of the following:

> **a.** Civil Codes;

> **b.** Health and Safety Codes;

> **c.** Housing and Urban Development laws, ordinances, or statutes;

> **d.** Rent stabilization laws, measures, ordinances, or statutes;

> **e.** Federal, State, or local Section 8 (government subsidized housing) programs;

> **f.** Americans with Disabilities Act;

> **g.** Administrative rules or regulations or orders pertaining to any of the foregoing, including, but not limited to those promulgated by local municipalities;

> **h.** Common law or statutory law; or

Aaron Sullivan, CFO
LiveOne Inc.
June 25, 2024
Page 13

> **i.** A lease, rental agreement, contract, warranty or covenant, whether written or oral, involving any duty to maintain "habitability" of any premises.

**2.** Failure to respond to or comply with any federal, state, municipal, or local order or directive to correct conditions at or near premises in violation of any of Paragraph **1.** above.

This exclusion applies:

> **1.** To any obligation to share damages with or indemnify or repay someone else who must pay damages because of "property damage" or injury arising from any matter to which this exclusion applies; and

> **2.** Even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured.

**B.** We shall have no duty to defend any claims, proceedings, or "suits" in any way arising out of coverage excluded by this endorsement.

**C.** The following definition is added to the **Definitions** Section:

"Habitability" means a room, dwelling, or premises designed, constructed, controlled, managed, operated or maintained by any insured in a safe living environment and fit for occupancy by human beings in a sanitary, habitable or tenantable condition.

Although there is no coverage for the Underlying Action under the CGL Policy, as discussed above, to the extent that any alleged damages arise out of any violation of the above-referenced laws, coverage is further barred under this exclusion by endorsement.

**C.**      **Insurance Application**

LiveOne's application submitted in connection with the CGL Policy describes the Property as "Business Personal Property" and contains the following "Description of Primary Operations" at the Property: "Office/studio space with separate living space for approx 5 individuals. There is also a pool. We will be hosting small events on location occasionally also."



Aaron Sullivan, CFO
LiveOne Inc.
June 25, 2024
Page 14

       The application contains the following Fraud Statement, which is identical to the Fraud Statement contained in the CGL Policy: "Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison."

       Although there is no coverage for the Underlying Action under the CGL Policy, as discussed above, to the extent LiveOne did not disclose in its application for insurance that it planned to use a home zoned for residential use for commercial purposes and/or did not disclose the full extent of its planned commercial use, such material concealment may be grounds for, at a minimum, rescinding the CGL Policy.

## IV.  **CONCLUSION**

       Based on the information currently provided to Old Republic, the CGL Policy does not provide coverage for the Underlying Action. As such, Old Republic will not be able to provide a defense for the Underlying Action or provide indemnity coverage for any settlement or judgement in the Underlying Action.

       Nothing contained in this letter should be deemed a waiver of the terms or conditions of the CGL Policy. Old Republic reserves the right to rely upon any terms or conditions of the CGL Policy or any other ground, which may be found to limit or preclude coverage. Old Republic's determination is based on the facts that have been made available to it to date. Old Republic reserves the right to modify its coverage determination under the CGL Policy if any information is developed that warrants the modification.

       The foregoing analysis is based upon review of the allegations and other documents that have been made available to Old Republic. Should you have any additional information that you wish to provide or are aware of any other facts or circumstances that you believe may warrant a further evaluation of coverage, please forward such materials to my attention.

       If you believe Old Republic's coverage position is incorrect, you may also contact the California Department of Insurance:

          California Department of Insurance
          Consumer Communications Bureau
          300 South Spring Street, South Tower

Aaron Sullivan, CFO
LiveOne Inc.
June 25, 2024
Page 15

Los Angeles, CA  90013

(800) 927-HELP or

(213) 897-8921

If you have any questions or wish to discuss Old Republic's position further, please do not hesitate to contact me.

Sincerely,

# Christina Rauch

Christina Rauch
General Liability Examiner
**RAPHAEL & ASSOCIATES**
crauch@raphaelandassociates.com
Direct Office: (201) 537-7272

cc:      **VIA EMAIL & REGISTERED MAIL**

LiveOne, Inc.
Attn: Aaron Sullivan, CFO
269 S. Beverly Drive
P.O. Box 14500
Beverly Hills, CA 90212
Email: aaron@liveone.com

**<u>VIA EMAIL & REGISTERED MAIL</u>**

Kibler Fowler & Cave, LLP
Attn: John Fowler, Esq.
Attorneys for the Plaintiffs
11100 Santa Monica Blvd, Suite 360
Los Angeles, CA  90025
Email:  jfowler@kfc.law

Aaron Sullivan, CFO
LiveOne Inc.
June 25, 2024
Page 16

**<u>VIA EMAIL</u>**

The Liberty Company Insurance Brokers
Attn:  Shana Stalnaker
Email: <u>sstalnaker@libertycompany.com</u>

**<u>VIA EMAIL</u>**

The Liberty Company Insurance Brokers
Attn: Tami Van Ert
email: tvanert@libertycompany.com

**<u>VIA EMAIL</u>**

Old Republic Union Insurance Company
Attn: Paul Keane
Email: <u>PKeane1@oldrepublicands.com</u>

2480784.1

# EXHIBIT L

| | |
|---|---|
| **From:** | Tami Van Ert[/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=a0291a9d406e4580a5a0992fcdc5c237-Tami Van Er] |
| **Sent:** | Tue 7/18/2023 4:15:09 PM (UTC-07:00) |
| **To:** | Jonathan Axel[jaxel@libertycompany.com] |
| **Subject:** | FW: RE: LiveOne, Inc. - New Quotation |
| **Attachment:** | Quote-4122459.pdf |
| **Attachment:** | ADF9006_0523.pdf |
| **Attachment:** | specimen.pdf |
| **Attachment:** | CA Surplus Lines Forms + Instructions.pdf |
| **Attachment:** | LiveOne - Cover.pdf |

Hi Jon,

In case you wanted to review the quote from CRC.


**From:** Olivia Huckabee (NC) <ohuckabee@crcgroup.com>
**Sent:** Tuesday, July 18, 2023 2:12 PM
**To:** Tami Van Ert <tvanert@libertycompany.com>
**Cc:** Mike Mccall <mmccall@CRCGroup.com>
**Subject:** RE: RE: LiveOne, Inc. - New Quotation

Hi Tami,

Please see attached terms from Kinsale.
**Binding subjectivities:**
    • Completed and Signed ACORDs. Make sure to include inspection contact's name, email, and phone number.

- Completed and Signed Supplemental Application
- Completed and Signed TRIA Form
- Completed and Signed Surplus Lines Tax Form(s)
- 3-5 years of Loss runs or a No Known Loss Letter (must be dated within the last 30 days)
- Confirm Named Insured and Mailing/Physical Address on the application and quote are correct.
- Confirm if any Additional Insureds need to be added prior to binding.
- Please note, effective date cannot be backdated, but can be held for 5 business days until all subjectivities are provided to bind.

Please let me know if you have any questions. Thank you!
_____
From: Mike Mccall
Sent: Monday, July 17, 2023 12:11 PM
To: Olivia Huckabee (NC)

Subject: RE: RE: LiveOne, Inc. - New Quotation


Olivia,

Thanks.  Go ahead and try Kinsale.

Best regards,


**Michael McCall | CRC**
CA license # 0B60603 | # 0778135
Team Leader – LA Casualty Team 1
D: (213) 439-3414
C: (626) 221-6249
E: mmccall@crcgroup.com


View Our Team Page

LA Casualty Team 1 members:
**Jeff Coles** | Team Leader | D: (213) 439-3490 | C: (310) 704-3400 | E: jcoles@crcgroup.com
**Taylor Stanton** | Broker | D: (213) 439-3433 | C: (714) 454-1361 | E: tstanton@crcgroup.com
**Anne Manning** | Inside Broker | D: (213) 439-3425 | C: (818) 324-2944 | E: amanning@crcgroup.com
**Bianca Anderson |** Inside Broker | D: (213) 439-3415 | C: (626) 898-2440 | E:
banderson@crcgroup.com
**David Celis** | Inside Broker | D: (213) 439-3409 | C: (323) 399-6359 | E: dcelis@crcgroup.com
**Fred Khabbaz** | Inside Broker| D: (213) 439-3479 | C: (323) 363-8362 | E: fkhabbaz@crcgroup.com
**Neely Carrillo |** Inside Broker | D: (213) 439-3416 | C: (626) 665-5320 | E: ncarrillo@crcgroup.com
**Justin Gonzalez** | Inside Broker | D: (213) 439-3482 | E: jgonzalez@crcgroup.com
**Ashley Anderson** | Broker Assistant | D: (213) 439-3421 | E: aanderson@crcgroup.com
**Rose Bentley** | Technical Assistant | D: (213) 439-3431 | E: rbentley@crcgroup.com



515 S. Figueroa St., Suite 600
Los Angeles, CA 90071
CRCgroup.com

CRC | Placing You First

*Visit www.crcgroup.com/covid19 for all of the latest articles, podcasts, resources and videos related to the COVID-19 pandemic.*


**From:** Olivia Huckabee (NC) <ohuckabee@crcgroup.com>
**Sent:** Monday, July 17, 2023 9:03 AM
**To:** tvanert@libertycompany.com
**Cc:** Mike Mccall <mmccall@CRCGroup.com>; jaxel@libertycompany.com
**Subject:** RE: LiveOne, Inc. - New Quotation

Thank you! Unfortunately I am not going to have an option for this one. If Mike hasn't already

submitted, I can try Kinsale?

_____

From: Tami Van Ert
Sent: Friday, July 14, 2023 4:31 PM
To: Olivia Huckabee (NC)
Cc: Mike Mccall; Jonathan Axel
Subject: RE: LiveOne, Inc. - New Quotation

Hi Olivia,

Aidan founded Drumify/Splitmind which LiveOne Acquired.

**Tami Van Ert, (She/Her)**
**Account Executive, CA License #0E17885**
**The Liberty Company Insurance Brokers, CA License #0D79653**

5955 De Soto Ave, Suite 250, Woodland Hills, CA 91367
Office 818-643-7212 l Fax 866-835-6983
libertycompany.com | tvanert@libertycompany.com

• To send me a secure/encrypted email, please click HERE!



*Our **mission** is to promote **peace of mind** with great care.*

*We do this by building a culture based on our **core values** of **integrity, excellence, caring, kindness, fairness, teamwork, good feelings,** and **fun** . Our culture guides our daily practices and inspires our community to be their best in both their personal and professional lives.*

Coverage cannot be bound or changed via e-mail without written confirmation from your Agent.

PRIVILEGED AND CONFIDENTIAL INFORMATION: The information contained in this electronic transmission, and any documents

attached hereto, may contain confidential information that is legally privileged and confidential. The information is intended only for the use of the recipient(s) named above. If you have received this electronic message in error, please notify the sender and delete the electronic message. Any disclosure, copying, distribution or the taking of any action in reliance on the contents of the information received in error is strictly prohibited.

**From:** Tami Van Ert <tvanert@libertycompany.com>
**Sent:** Friday, July 14, 2023 1:09 PM
**To:** Olivia Huckabee (NC) <ohuckabee@crcgroup.com>
**Cc:** Mike Mccall <mmccall@CRCGroup.com>; Jonathan Axel <jaxel@libertycompany.com>
**Subject:** RE: LiveOne, Inc. - New Quotation

Hello Olivia,

This one is very tricky. The First Named insured is LiveOne, Inc. They have several entities, which I'm attaching. I am going to confirm regarding Aidan. I know he's an executive with Splitmind, DayOne, and Drumify, but I'll get more details.

It's not an Airbnb. They may be leasing it for studio time, and this would be the residents who would be staying there during the duration of the lease.

**From:** Olivia Huckabee (NC) <ohuckabee@crcgroup.com>
**Sent:** Friday, July 14, 2023 12:52 PM
**To:** Tami Van Ert <tvanert@libertycompany.com>
**Cc:** Mike Mccall <mmccall@CRCGroup.com>
**Subject:** RE: LiveOne, Inc. - New Quotation

This one is tricky, so is Aidan the insured? Will the other people staying for long periods of time be paying rent? Such as a Airbnb or long term tenant? Guessing they all share one space – kitchen, bathrooms, etc?

_____
From: Tami Van Ert
Sent: Thursday, July 13, 2023 6:03 PM
To: Olivia Huckabee (NC)
Cc: Mike Mccall
Subject: RE: LiveOne, Inc. - New Quotation

Hello Olivia,

I have received the following information from the insured.

    1. Who are the 5 individuals that will be living there? Are they employees or other tenants? The primary resident will be Aidan Crotinger -while other people will be staying for long periods of time (month at a time plus) there will be no other official residents. On a daily basis the property will be Aidan's primary home/office space for LiveOne corp and creative space for podcast studios/recording studios

2.  Lease expected to be signed 7/15
3.  Will you be leasing this out to others for events or is LiveOne the only one hosting events? What type of events will be held?  Potentially leasing out not for events but for studio time to other major labels and Lu koshers when they need studios. Separately charging people who are staying at the residents when they need somewhere to sleep

Please let me know if you have any other questions.
Thank you,
**Tami Van Ert, (She/Her)**
**Account Executive, CA License #0E17885**
**The Liberty Company Insurance Brokers, CA License #0D79653**

## COVID-19 Resource Center

5955 De Soto Ave, Suite 250, Woodland Hills, CA 91367
O 818-643-7212 l F 866-835-6983
libertycompany.com | tvanert@libertycompany.com
        • To send me a secure/encrypted email, please click HERE!

*Our **mission** is to promote **peace of mind** with great care.*

*We do this by building a culture based on our **core values** of **integrity, excellence, caring, kindness, fairness, teamwork, good feelings,** and **fun**. Our culture guides our daily practices and inspires our community to be their best in both their personal and professional lives.*

Coverage cannot be bound or changed via e-mail without written confirmation from your Agent. CA License #0D79653.

PRIVILEGED AND CONFIDENTIAL INFORMATION: The information contained in this electronic transmission, and any documents attached hereto, may contain confidential information that is legally privileged and confidential. The information is intended only for the use of the recipient(s) named above. If you have received this electronic message in error, please notify the sender and delete the electronic message. Any disclosure, copying, distribution or the taking of any action in reliance on the contents of the information received in error is strictly prohibited.

**From:** Olivia Huckabee (NC) <ohuckabee@crcgroup.com>
**Sent:** Monday, July 10, 2023 12:35 PM
**To:** Tami Van Ert <tvanert@libertycompany.com>
**Cc:** Mike Mccall <mmccall@CRCGroup.com>
**Subject:** RE: LiveOne, Inc. - New Quotation

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi Tami,

What kind of operation will be going on in the office/studio space? Are the employees of the business living in the apartment or other tenants? What type of events will be held here?

Thank you!

**Olivia Huckabee Stufflebean | CRC**
**Underwriter**
C | 704.618.8015
E | OHuckabee@crcgroup.com

214 N Tryon St, Suite 2300, Charlotte, NC 28202
CRCGroup.com
CRC | CRCOne

  

Visit www.crcgroup.com/covid19 for all of the latest articles, podcasts, resources and videos related to the COVID-19 pandemic.

_____

From: Mike Mccall
Sent: Friday, July 7, 2023 7:46 PM
To: CRCOneSubmits
Cc: Olivia Huckabee (NC)
Subject: FW: LiveOne, Inc. - New Quotation

Olivia,

Is this something your markets can consider?

Best regards,

**Michael McCall | CRC**
CA license # 0B60603 | # 0778135
Team Leader – LA Casualty Team 1
D: (213) 439-3414
C: (626) 221-6249
E: mmccall@crcgroup.com


View Our Team Page

LA Casualty Team 1 members:
**Jeff Coles** | Team Leader | D: (213) 439-3490 | C: (310) 704-3400 | E: jcoles@crcgroup.com
**Taylor Stanton** | Broker | D: (213) 439-3433 | C: (714) 454-1361 | E: tstanton@crcgroup.com
**Anne Manning** | Inside Broker | D: (213) 439-3425 | C: (818) 324-2944 | E: amanning@crcgroup.com
**Bianca Anderson |** Inside Broker | D: (213) 439-3415 | C: (626) 898-2440 | E:
banderson@crcgroup.com
**David Celis** | Inside Broker | D: (213) 439-3409 | C: (323) 399-6359 | E: dcelis@crcgroup.com
**Fred Khabbaz** | Inside Broker| D: (213) 439-3479 | C: (323) 363-8362 | E: fkhabbaz@crcgroup.com
**Neely Carrillo** | Inside Broker | D: (213) 439-3416 | C: (626) 665-5320 | E: ncarrillo@crcgroup.com
**Justin Gonzalez** | Inside Broker | D: (213) 439-3482 | E: jgonzalez@crcgroup.com
**Ashley Anderson** | Broker Assistant | D: (213) 439-3421 | E: aanderson@crcgroup.com
**Rose Bentley** | Technical Assistant | D: (213) 439-3431 | E: rbentley@crcgroup.com


515 S. Figueroa St., Suite 600
Los Angeles, CA 90071
CRCgroup.com

# CRC | Placing You First

*Visit www.crcgroup.com/covid19 for all of the latest articles, podcasts, resources and videos related to the COVID-19 pandemic.*


**From:** Tami Van Ert <tvanert@libertycompany.com>
**Sent:** Friday, July 7, 2023 4:33 PM
**To:** Mike Mccall <mmccall@CRCGroup.com>
**Cc:** Jonathan Axel <jaxel@libertycompany.com>
**Subject:** LiveOne, Inc. - New Quotation


**[* This email contains attachments or links from an unverified sender. DO NOT open attachments or click links without verifying the sender. *]**

Hello Michael,

We have a client that is getting ready to sign a lease agreement for a house in Beverly Hills.  They will be using it for office/studio space with separate living space for approximately 5 individuals.  There is also a pool.  They will be hosting small events on location occasionally also.

I'm attaching an Acord Application.  Would you please review and advise if you have any markets that

would write this?  They require a $2M GL Limit so I put the limits as $2M/$4M on the app.  They also have some Business Personal Property.

Please let me know if you have any questions.

Thank you!


**Tami Van Ert, (She/Her)**
**Account Executive, CA License #0E17885**
**The Liberty Company Insurance Brokers, CA License #0D79653**

5955 De Soto Ave, Suite 250, Woodland Hills, CA 91367
Office 818-643-7212 l Fax 866-835-6983
libertycompany.com | tvanert@libertycompany.com

- To send me a secure/encrypted email, please click HERE!


*Our **mission** is to promote **peace of mind** with great care.*

*We do this by building a culture based on our **core values** of **integrity, excellence, caring, kindness, fairness, teamwork, good feelings,** and **fun** . Our culture guides our daily practices and inspires our community to be their best in both their personal and professional lives.*


Coverage cannot be bound or changed via e-mail without written confirmation from your Agent.

PRIVILEGED AND CONFIDENTIAL INFORMATION: The information contained in this electronic transmission, and any documents attached hereto, may contain confidential information that is legally privileged and confidential. The information is intended only for the use of the recipient(s) named above. If you have received this electronic message in error, please notify the sender and delete the electronic message. Any disclosure, copying, distribution or the taking of any action in reliance on the contents of the information received in error is strictly prohibited.


NOTICE:  You cannot bind, alter or cancel coverage without speaking to an authorized representative of CRC Group. Coverage cannot be bound without written confirmation from an authorized representative of CRC Group.  This email and any files transmitted with it are not encrypted and may contain privileged or other confidential information and is intended solely for the use of the individual or entity to whom they are addressed.  If you are not the intended recipient or entity, or believe that you may have received this email in error, please reply to the sender indicating that fact and delete the copy you received. In addition, you should not print, copy, retransmit, disseminate, or otherwise use this information.  Thank you.

NOTICE:  You cannot bind, alter or cancel coverage without speaking to an authorized representative of CRC Group.  Coverage cannot be bound without written confirmation from an authorized representative of CRC Group.  This email and any files transmitted with it are not encrypted and may contain privileged or other confidential information and is intended solely for the use of the individual or entity to whom they are addressed.  If you are not the intended recipient or entity, or believe that you may have received this email in error, please reply to the sender indicating that fact and delete the copy you received. In addition, you should not print, copy, retransmit, disseminate, or otherwise use this information.  Thank you.

NOTICE:  You cannot bind, alter or cancel coverage without speaking to an authorized representative of CRC Group.  Coverage cannot be bound without written confirmation from an authorized representative of CRC Group.  This email and any files transmitted with it are not encrypted and may contain privileged or other confidential information and is intended solely for the use of the individual or entity to whom they are addressed.  If you are not the intended recipient or entity, or believe that you may have received this email in error, please reply to the sender indicating that fact and delete the copy you received. In addition, you should not print, copy, retransmit, disseminate, or otherwise use this information.  Thank you.

# EXHIBIT M

Morning how are you.

My guys are working today. I also got my cleaning girl there to give you hand.

Morning - I'm doin ok

Do me a favor turn of water fall please I want to repair tiles theirs

Ok

Mon, Dec 18 at 10:06 PM

What's up brother hope you're doing well. I think they painted. Also got the bathroom showers. Everything cleaned out for you guys today. The fans are working. Everything sounds like it was spotless. Let's try to keep the place clean so we don't have any issues. Keep me updated. Thank you.

Tue, Dec 19 at 8:44 AM

Thank you brother

Good morning my pleasure hope you're feeling better. Don't forget to invite me to the big party brother.

Of course

Grammy season is coming

iMessage

# EXHIBIT N







VIA UPS

July 3, 2024



Summitt Reprographics
2029 Century Park East
Suite 4420
Los Angeles, CA 90067



RE    *Michael Kibler, et al. vs Liveone, Inc.*
       Subpoena for production of Business Records
       Issued to BlueTriton Brands, Inc.
       Case # 24SMCV02209



Dear Customer Service Team:



This is in response to the above referenced subpoena issued to BlueTriton Brands, Inc. ("BlueTriton").

Enclosed in response to the above referenced subpoena is responsive document number 1. BlueTriton is mailing this record to you in accordance with your subpoena.



Thank you very much.

Sincerely,



Alda Braccia
Paralegal



w/enclosure









BlueTriton Brands, Inc.
900 Long Ridge Road, Building 2
Stamford, CT 06902-1138

Alda Braccia, Paralegal
Direct: 203-863-0451
alda.braccia@bluetriton.com

56707940519
Attn: Joshua Mikaili
516 N Beverly Dr
Beverly Hills CA                          90210

Billing Message:
BDR: 10*04*05                             dDay: 01
Service type: MRO
Last Delivery: 04/29/2024
Delivery Hours Availability:              Reverify
**Account Status: Active**
Delivery Dragged:

1

# EXHIBIT O

## Contract Search

Equipment Rental Contract 75394905

Customer Information

**Name:**  JOSHUA HALLBAUER

**Address:**  516 n Beverly dr
Beverly Hills, CA 90210

**Primary Phone:** (805) 217-7818

**Alternate Contact:** (248) 854-5276

**Email:**  Joshcocktai@gmail.com

**License:**  CA - (Show full info)

**Entry Method:**  Manual

**Birth Date:** (Show full info)

Entity Information

**Address:**  45418
UNITED MAILBOXES
8549 WILSHIRE BL
BEVERLY HILLS, CA
90211

**Phone:** (310) 652-7525

Rental Information

**Transaction:** InTown | **Status:** Receive | **Created Date:** 3/28/2024 9:42 AM | **Created by:** uhaul.com

Reservation

| Equipment | Rate | Coverage | Rate |
|---|---|---|---|
| TM | $19.95 | Safe move | $15.00 |

**Mileage Rate:** $1.09

**Pickup Date/Time:** 3/28/2024 3:13 PM
**Days/Hours requested:** 20 Hours 31 Minutes
**Rental City/State:** BEVERLY HILLS, CA
**Preferred Location:** 45418
**Assigned Location:** 45418

**Scheduled Date/Time:** 3/28/2024 3:13 PM
**Scheduling location:** 45418
**Scheduled by:**

Dispatch

| Equipment | Rate | Coverage | Rate |
|---|---|---|---|
| TM6758H | $19.95 | Safe move | $15.00 |

**Mileage Rate:** $1.09

**Dispatch Date/Time:** 3/28/2024 3:14 PM
**Due Date/Time:** 3/29/2024 11:45 AM
**Contract period:** 20 Hours 31 Minutes
**Rental City/State:** BEVERLY HILLS, CA
**Dispatch Location:** 45418

**Pickup odometer:**  103,931.0
**Pickup fuel level:**  5/16

Return

| Equipment |
|---|
| TM6758H |

**Mileage Rate:**  $1.09

**Return Date/Time:**  3/29/2024 3:31 PM
**Days/Hours used:**  1 Days 17 Minutes
**Total miles used:**  16
**Add'l miles used:**  0
**Rental City/State:**  BEVERLY HILLS, CA
**Return location:**  45418

**Return odometer:**  103,947.0
**Return fuel level:**  1/4

Payment Information

| Payment date | Payment Location | Transaction Type | Method of Payment | Auth Code | Pending\Hold Amount | Settled Amount | Balance Remaining | Receipts |
|---|---|---|---|---|---|---|---|---|
| 3/28/2024 9:42:36 AM | 621001 | PrePayment | AmericanExpress 378751AABCMOINC3055 | | | $0.00 | $0.00 | View |
| 3/28/2024 3:14:19 PM | 45418 | Rental | AmericanExpress 378751AABCMOINC3055 | 193619 | $97.62 | $0.00 | $0.00 | View |
| 3/29/2024 3:33:55 PM | 45418 | Return | AmericanExpress 378751AABCMOINC3055 | 184974 | | $28.05 | $0.00 | View |
| 3/29/2024 3:33:55 PM | 45418 | Return | AmericanExpress 378751AABCMOINC3055 | 193619 | | $97.62 | $0.00 | View |
| | | | | | $0.00 | $125.67 | $0.00 | |

Meaningful Assurance

**Drivers license:**
Number: (Show full info)
Entry Method: Manual
Expires: 04/26
IsLocal: 0

**Emergency Contact:**
First name: Sarah
Last name: Dabold
Phone: 2488545276
Relationship: Wife

**Previous Contract:**
Number: 96821396
Company name:

**Additional Contact:**

First name: john
Last name: smith
Phone: (248) 854-5276
Verified
Phone:
Not Verified
Address:
City:
State:
Zip:

**Authorized Driver:**

FirstName: JOSHUA
LastName: HALLBAUER
There are no media items for this Authorized Driver

## Media Items (1)

| Item | Location(Longitude/Latitude) | Uploader | Date Created | |
|---|---|---|---|---|
|  | | | 52dcb145-7dab-4a63-b161-d045809cbc02 | 03/29/2024 3:33 PM |

## Notes (6)

| Date | Note | Location | Entered by |
|---|---|---|---|
| 3/28/2024 3:14 PM | Customer was texted a Customer Confirm Access Link to 8052177818 | 45418 | 45418 |
| 3/28/2024 10:46 AM | Customer Handoff link was sent to this customer | 621001 | Unknown |
| 3/28/2024 9:42 AM | #1 Reservation Scheduled -- 100% Guaranteed | 45418 | uhaul.com |
| 3/28/2024 9:42 AM | Hours requested: 24 | 45418 | uhaul.com |
| 3/28/2024 9:42 AM | Customer prefers to be contacted by TEXTMESSAGE. | 45418 | uhaul.com |
| 3/28/2024 9:42 AM | Customer scheduled 45418 as their pickup location. Customer chose 3/28/2024 11:45 AM as their pickup time. | 45418 | uhaul.com |

# EXHIBIT P

**podcast**one                    Pricing

# PodcastOne Pro
## PRODUCTION PROFESSIONALS

- Podcast Hosting, Editing, and Distribution
- Production and Strategy
- Audio and Video Recording
- Marketing and Promotion

**GET STARTED**





# Polished, Professional Podcasts

Based in Beverly Hills, PodcastOne specializes in transforming podcasts into polished productions.

From in-studio video and audio recording to comprehensive podcast strategy, PodcastOne Pro offers fully customizable production packages for brands, professionals, or hobbyists.

GET QUOTE





## Our Services

**Audio & Video Recording**

**Podcast Hosting, Editing, & Distribution**

**Marketing and Promotion**

**Production & Strategy**

BOOK NOW

# Get Your Quote

PodcastOne Production is a fully customizable service. Our producers tailor the experience and price for your exact production needs. Plans start at $500.

Please select all that apply: (required)

In-Studio Audio       In-Studio Video       Podcast Hosting       Guest Booking

Remote Recording       Artwork Design       Social Assets       Marketing Promotion

Podcast Strategy       Video Graphics       Monetization / Sales

## Name (required)

First Name                                              Last Name

## Email (required)

## Message

SEND

**Branded Podcasts**

 

WATCH



## Location

516 N Beverly Dr

Beverly Hills, CA

90048

## Contact

pro@podcastone.com

podcastone.com

## PROOF OF SERVICE

**Kibler v. LiveOne, Inc., et al.**
**Case No. 24SMCV02209**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 11100 Santa Monica Blvd., Suite 360, Los Angeles, CA 90025.

On July 29, 2024, I served true copies of the following document(s) described as **VERIFIED FIRST AMENDED COMPLAINT FOR** on the interested parties in this action as follows:

### SEE ATTACHED SERVICE LIST

**BY ELECTRONIC SERVICE:** I electronically filed the document(s) with the Clerk of the Court by using the One Legal system. Participants in the case who are registered users will be served by the One Legal system. Participants in the case who are not registered users will be served by mail or by other means permitted by the court rules.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on July 29, 2024, at Los Angeles, California.

_____
Samantha C. Ahlheim

1

**SERVICE LIST**
**Kibler v. LiveOne, Inc., et al.**

2

**Case No. 24SMCV02209**

3    Teri T. Pham. Esq.                         Counsel for Defendant
     Enenstein Pham Glass & Rabat, LLP          LiveOne, Inc.;
4    3200 Bristol Street, Suite 500             Specially Appearing for Defendants Robert
     Costa Mesa, CA 92626                       Ellin and Joshua Hallbauer
5    Tel: (310) 899-2070
     E-Mail: tpham@epgrlawyers.com
6
     David Z. Ribakoff (SBN 162925)             Attorneys for Defendants
7    **RIBAKOFF LAW FIRM**                      Aidan Crotinger and Splitmind, LLC
     2029 Century Park East, Suite 400
8    Los Angeles, CA 90067
     Phone: (424) 281-2029
9    Fax: (310) 893-6768
     Email: david@ribakoff-law.com
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Kibler Fowler & Cave LLP

KF&C

11100 Santa Monica Boulevard
Suite 360
Los Angeles, California 90025

VERIFIED FIRST AMENDED COMPLAINT

EXHIBIT 2



**OLD REPUBLIC UNION INSURANCE COMPANY**

307 N. Michigan Avenue, Chicago, Illinois 60601 | T: 312.346.8100

# Commercial Policy



OLD REPUBLIC INSURANCE GROUP

INSURANCE IS PROVIDED BY
THE COMPANY DESIGNATED ON THE DECLARATION PAGE

**IN WITNESS WHEREOF,** we have caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless countersigned by our authorized representative.

**OLD REPUBLIC UNION INSURANCE COMPANY**
307 N. Michigan Avenue
Chicago, Illinois 60601

A Stock Company

This Policy is Non-participating With Regard to Paying Dividends to Policyholders.

*Secretary*

*President*

INTERLINE
ORU SL 00 80 04 21

# CALIFORNIA SURPLUS LINES NOTICE

**IMPORTANT NOTICE:**

1. **THE INSURANCE POLICY THAT YOU HAVE PURCHASED IS BEING ISSUED BY AN INSURER THAT IS NOT LICENSED BY THE STATE OF CALIFORNIA. THESE COMPANIES ARE CALLED "NONADMITTED" OR "SURPLUS LINE" INSURERS.**

2. **THE INSURER IS NOT SUBJECT TO THE FINANCIAL SOLVENCY REGULATION AND ENFORCEMENT THAT APPLY TO CALIFORNIA LICENSED INSURERS.**

3. **THE INSURER DOES NOT PARTICIPATE IN ANY OF THE INSURANCE GUARANTEE FUNDS CREATED BY CALIFORNIA LAW.  THEREFORE, THESE FUNDS WILL NOT PAY YOUR CLAIMS OR PROTECT YOUR ASSETS IF THE INSURER BECOMES INSOLVENT AND IS UNABLE TO MAKE PAYMENTS AS PROMISED.**

4. **THE INSURER SHOULD BE LICENSED EITHER AS A FOREIGN INSURER IN ANOTHER STATE IN THE UNITED STATES OR AS A NON-UNITED STATES (ALIEN) INSURER.  YOU SHOULD ASK QUESTIONS OF YOUR INSURANCE AGENT, BROKER, OR "SURPLUS LINE" BROKER OR CONTACT THE CALIFORNIA DEPARTMENT OF INSURANCE AT THE TOLL-FREE NUMBER 1-800-927-4357 OR INTERNET WEBSITE WWW.INSURANCE.CA.GOV.  ASK WHETHER OR NOT THE INSURER IS LICENSED AS A FOREIGN OR NON-UNITED STATES (ALIEN) INSURER AND FOR ADDITIONAL INFORMATION ABOUT THE INSURER.  YOU MAY ALSO VISIT THE NAIC'S INTERNET WEBSITE AT WWW.NAIC.ORG.**

   **THE NAIC--THE NATIONAL ASSOCIATION OF INSURANCE COMMISSIONERS--IS THE REGULATORY SUPPORT**

ORGANIZATION CREATED AND GOVERNED BY THE CHIEF
INSURANCE REGULATORS IN THE UNITED STATES.

5.  FOREIGN INSURERS SHOULD BE LICENSED BY A STATE IN
THE UNITED STATES AND YOU MAY CONTACT THAT
STATE'S DEPARTMENT OF INSURANCE TO OBTAIN MORE
INFORMATION ABOUT THAT INSURER.

YOU CAN FIND A LINK TO EACH STATE FROM THIS NAIC
INTERNET WEBSITE:

HTTPS://NAIC.ORG/STATE_WEB_MAP.HTM.

6.  FOR NON-UNITED STATES (ALIEN) INSURERS, THE INSURER
SHOULD BE LICENSED BY A COUNTRY OUTSIDE OF THE
UNITED STATES AND SHOULD BE ON THE NAIC'S
INTERNATIONAL INSURERS DEPARTMENT (IID) LISTING OF
APPROVED NONADMITTED NON-UNITED STATES INSURERS.
ASK YOUR AGENT, BROKER, OR "SURPLUS LINE" BROKER
TO OBTAIN MORE INFORMATION ABOUT THAT INSURER.

7.  CALIFORNIA MAINTAINS A "LIST OF APPROVED SURPLUS
LINE INSURERS (LASLI)."  ASK YOUR AGENT OR BROKER IF
THE INSURER IS ON THAT LIST, OR VIEW THAT LIST AT THE
INTERNET WEBSITE OF THE CALIFORNIA DEPARTMENT OF
INSURANCE:

WWW.INSURANCE.CA.GOV/01-CONSUMERS/120-
COMPANY/07-LASLI/LASLI.CFM.

8.  IF YOU, AS THE APPLICANT, REQUIRED THAT THE
INSURANCE POLICY YOU HAVE PURCHASED BE EFFECTIVE
IMMEDIATELY, EITHER BECAUSE EXISTING COVERAGE WAS
GOING TO LAPSE WITHIN TWO BUSINESS DAYS OR
BECAUSE YOU WERE REQUIRED TO HAVE COVERAGE
WITHIN TWO BUSINESS DAYS, AND YOU DID NOT RECEIVE
THIS DISCLOSURE FORM AND A REQUEST FOR YOUR
SIGNATURE UNTIL AFTER COVERAGE BECAME EFFECTIVE,
YOU HAVE THE RIGHT TO CANCEL THIS POLICY WITHIN FIVE
DAYS OF RECEIVING THIS DISCLOSURE.  IF YOU CANCEL

**COVERAGE, THE PREMIUM WILL BE PRORATED AND ANY BROKER'S FEE CHARGED FOR THIS INSURANCE WILL BE RETURNED TO YOU.**

**INTERLINE**
**ORU SL 01 34 04 21**

# CALIFORNIA SURPLUS LINES NOTICE

This insurance is issued pursuant to the California Insurance Code, Sections 1760 through 1780, and is placed in an insurer or insurers not holding a Certificate of Authority from or regulated by the California Insurance Commissioner.

# ★★★★ OLD REPUBLIC UNION INSURANCE COMPANY
★★★★

## OLD REPUBLIC UNION INSURANCE COMPANY
### 307 N. MICHIGAN AVENUE, CHICAGO, ILLINOIS 60601

## COMMERCIAL LINES POLICY - COMMON POLICY DECLARATIONS

**POLICY NUMBER:  ORB-PK-23-A01924-00**

**POLICY PERIOD:  FROM: 01-29-2024 TO: 01-29-2025**

(AT 12:01 A.M. STANDARD TIME AT YOUR MAILING ADDRESS SHOWN BELOW)

**INSURED NAME AND MAILING ADDRESS**

NAMED INSURED: LiveOne Inc

MAILING ADDRESS: 269 S. Beverly Dr, PO Box 14500

Beverly Hills, CA 90212

**PRODUCER NAME AND MAILING ADDRESS**

AGENT NAME: RT Specialty Hunt Valley Binding

MAILING ADDRESS: 10150 York RoadFifth Floor

Hunt Valley MD 21030

BUSINESS DESCRIPTION:  Recording Studio

FORMS OF BUSINESS:  ☒ Corporation  ☐ Limited Liability Corp (LLC) ☐ Individual  ☐ Partnership  ☐ Public Entity  ☐ Organization  Joint Venture ☐ Other:

☐ Auditable  ☒ Non-Auditable        Tax State: CA

Notice to Policyholder: This contract is issued, pursuant to Section 445 of the Illinois Insurance Code, by a company not authorized and licensed to transact business in Illinois and as such is not covered by the Illinois Insurance Guaranty Fund.

IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.  THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH A PREMIUM IS INDICATED.  *WHERE NO PREMIUM IS SHOWN, THERE IS NO COVERAGE.*THIS PREMIUM MAY BE SUBJECT TO ADJUSTMENT.

|  | Premium |
|---|---|
| GENERAL LIABILITY COVERAGE PART | $▓▓▓ |
| PROPERTY COVERAGE PART | $▓▓▓ |
| TERRORISM RISK INSURANCE | $▓▓▓ |
| **TOTAL ADVANCE PREMIUM (**(MINIMUM & DEPOSIT)**:** | $▓▓▓ |
| SURPLUS LINES TAX | $▓▓▓ |
| STAMPING FEE | $▓▓▓ |
| POLICY FEE | $0.00 |
| INSPECTION FEE | $0.00 |
| ADDITIONAL TAX | $0.00 |
| **POLICY TOTAL:** | $▓▓▓ |

**NO FLAT CANCELLATIONS** - FORMS AND ENDORSEMENTS MADE PART OF THIS POLICY AT TIME OF ISSUE. SEE SCHEDULES OF FORMS AND ENDORSEMENTS.

Countersigned:  Chicago, IL        By: _____

Countersigned Date: _____  Countersignature or Authorized Representative whichever is applicable.

THIS COMMON POLICY DECLARATION AND THE SUPPLEMENTAL DECLARATION(S), TOGETHER WITH THE COMMON POLICY CONDITIONS, COVERAGE PART(S), COVERAGE FORM(S) AND FORMS AND ENDORSEMENTS, IF ANY, COMPLETE THE ABOVE NUMBERED POLICY.



# SCHEDULE OF FORMS & ENDORSEMENTS

**NAMED INSURED**:  LiveOne Inc

**POLICY NUMBER:**    **ORB-PK-23-A01924-00**        **POLICY PERIOD: FROM:**    **01-29-2024  TO: 01-29-2025**

(AT 12:01 A.M. STANDARD TIME AT YOUR MAILING ADDRESS)

### LIST OF FORMS & ENDORSEMENTS ATTACHED TO THIS POLICY

## INTERLINE FORMS

| Form Number | Edition Date | Form Title |
|---|---|---|
| ORESJ01 | 11 21 | POLICY JACKET |
| ORUSL0080 | 04 21 | CA SURPLUS LINES NOTICE (POLICYHOLDERS) |
| ORUSL0134 | 04 21 | CALIFORNIA SURPLUS LINES NOTICE |
| ORESCD01 | | COMMERCIAL LINES POLICY - COMMON POLICY DECLARATIONS |
| ORESS001 | | SCHEDULE OF FORMS & ENDORSEMENTS |
| IL0017 | 11 98 | COMMON POLICY CONDITIONS |
| IL0021 | 09 08 | NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT (BROAD FORM) |
| IL0985 | 12 20 | DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT |
| ILN001 | 09 03 | FRAUD STATEMENT |
| ILP001 | 01 04 | U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL  (OFAC)  ADVISORY NOTICE TO POLICYHOLDERS |
| ORESCM001 | 12 22 | MINIMUM EARNED PREMIUM ENDORSEMENT |
| ORESCM002 | 12 22 | MINIMUM AND DEPOSIT PREMIUM ENDORSEMENT |
| IL0102 | 02 20 | CALIFORNIA CHANGES - ACTUAL CASH VALUE |
| IL0935 | 07 02 | EXCLUSION OF CERTAIN COMPUTER-RELATED LOSSES |
| IL0952 | 01 15 | CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM |
| ORESSL | 04 21 | SERVICE OF SUIT ENDORSEMENT |
| ORESC01 | 12 22 | CLAIM NOTICE |

## GENERAL LIABILITY FORMS

| Form Number | Edition Date | Form Title |
|---|---|---|
| CG3234 | 01 05 | CALIFORNIA CHANGES |
| ORESGLD01 | | COMMERCIAL GENERAL LIABILITY COVERAGE PART DECLARATION PAGE |
| CG0001 | 04 13 | COMMERCIAL GENERAL LIABILITY COVERAGE FORM |
| CG0300 | 01 96 | DEDUCTIBLE LIABILITY INSURANCE |
| DCTSCHEDULEFOR CG03000196 | | DCT SCHEDULE FOR CG 03 00 01 96 |
| CG2101 | 12 19 | EXCLUSION - ATHLETIC OR SPORTS PARTICIPANTS |
| CG2107 | 05 14 | EXCLUSION - ACCESS OR DISCLOSURE OF CONFIDENTIAL OR PERSONAL INFORMATION AND DATA-RELATED LIABILITY - LIMITED BODILY INJURY EXCEPTION NOT INCLUDED |
| CG2132 | 05 09 | COMMUNICABLE DISEASE EXCLUSION |
| CG2138 | 11 85 | EXCLUSION - PERSONAL AND ADVERTISING INJURY |
| CG2144 | 04 17 | LIMITATION OF COVERAGE TO DESIGNATED PREMISES, PROJECT OR OPERATION |

| CG2147 | 12 07 | EMPLOYMENT-RELATED PRACTICES EXCLUSION |
| CG2149 | 09 99 | TOTAL POLLUTION EXCLUSION ENDORSEMENT |
| CG2167 | 12 04 | FUNGI OR BACTERIA EXCLUSION |
| CG2170 | 01 15 | CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM |
| CG2186 | 12 04 | EXCLUSION - EXTERIOR INSULATION AND FINISH SYSTEMS |
| CG2230 | 07 98 | EXCLUSION - CORPORAL PUNISHMENT |
| CG2426 | 04 13 | AMENDMENT OF INSURED CONTRACT DEFINITION |
| CG4010 | 12 19 | EXCLUSION - CROSS SUITS LIABILITY |
| CG4014 | 12 20 | CANNABIS EXCLUSION |
| ORESCG002 | 12 22 | ANIMAL LIABILITY EXCLUSION |
| ORESCG003 | 12 22 | ASBESTOS OR ASBESTOS-RELATED DUST, LEAD, AND SILICA OR SILICA-RELATED DUST EXCLUSION |
| ORESCG004 | 12 22 | BED BUGS EXCLUSION |
| ORESCG005 | 12 22 | BODY OF WATER EXCLUSION |
| ORESCG007 | 12 22 | DISCRIMINATION EXCLUSION |
| ORESCG011 | 05 23 | SEXUAL ABUSE OR SEXUAL MOLESTATION EXCLUSION |
| ORESCG012 | 12 22 | SNOW OR ICE REMOVAL EXCLUSION |
| ORESCG013 | 12 22 | SWIMMING POOL EXCLUSION |
| ORESCG014 | 12 22 | TANNING DEVICES EXCLUSION |
| ORESCG016 | 08 23 | TRAMPOLINE EXCLUSION |
| ORESCG017 | 12 22 | PUNITIVE DAMAGES EXCLUSION |
| ORESCG019 | 12 22 | INDEPENDENT CONTRACTORS/SUBCONTRACTORS EXCLUSION |
| ORESCG020 | 12 22 | INJURY TO EMPLOYEES, WORKERS, OR INDEPENDENT CONTRACTORS/SUBCONTRACTORS EXCLUSION |
| ORESCG022 | 12 22 | PROFESSIONAL SERVICES EXCLUSION |
| ORESCG025 | 12 22 | TOTAL LIQUOR LIABILITY EXCLUSION |
| ORESCG028 | 12 22 | DESCRIBED RECREATIONAL HAZARDS EXCLUSION |
| ORESCG029 | 05 23 | ASSAULT OR BATTERY EXCLUSION |
| ORESCG031 | 12 22 | CLASSIFICATION LIMITATION |
| ORESCG033 | 12 22 | CONSTRUCTION OPERATIONS OR CONSTRUCTION RELATED OPERATIONS EXCLUSION WITH MAINTENANCE EXCEPTION |
| ORESCG047 | 12 22 | HABITABILITY EXCLUSION |
| ORESCG061 | 12 22 | RESIDENTIAL CONDOMINIUM CONVERSION EXCLUSION |
| ORESCG063 | 12 22 | CONTAMINATED DRYWALL EXCLUSION |
| ORESCG064 | 12 22 | AIRCRAFT PRODUCTS AND GROUNDING EXCLUSION |
| ORESCG065 | 08 23 | SUBSIDENCE EXCLUSION |
| ORESCG066 | 12 22 | FRACKING EXCLUSION |
| ORESCG069 | 12 22 | ELECTROMAGNETIC FIELD EXCLUSION |
| ORESCG041 | 04 23 | CYBER INCIDENT EXCLUSION |

## PROPERTY FORMS

| Form Number | Edition Date | Form Title |
| --- | --- | --- |
| ORESCPD01 | | COMMERCIAL PROPERTY COVERAGE PART DECLARATION PAGE |
| CP0010 | 10 12 | BUILDING AND PERSONAL PROPERTY  COVERAGE FORM |
| CP0090 | 07 88 | COMMERCIAL PROPERTY CONDITIONS |
| CP0140 | 07 06 | EXCLUSION OF LOSS DUE TO VIRUS OR BACTERIA |
| CP0411 | 09 17 | PROTECTIVE SAFEGUARDS |
| CP1010 | 10 12 | CAUSES OF LOSS - BASIC FORM |
| CP1075 | 12 20 | CYBER INCIDENT EXCLUSION |
| ORESEBDEC01 | 12 22 | COMMERCIAL PROPERTY COVERAGE PART EQUIPMENT BREAKDOWN COVERAGE SCHEDULE |
| ORESEB001 | 03 23 | EQUIPMENT BREAKDOWN COVERAGE (INCLUDING ELECTRONIC |

CIRCUITRY IMPAIRMENT)

MANUS-01                          ADDITIONAL NAMED INSURED(S)

IL 00 17 11 98

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

## A. Cancellation

**1.** The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

**2.** We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

**a.** 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

**b.** 30 days before the effective date of cancellation if we cancel for any other reason.

**3.** We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

**4.** Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

**5.** If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

**6.** If notice is mailed, proof of mailing will be sufficient proof of notice.

## B. Changes

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

## C. Examination Of Your Books And Records

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

## D. Inspections And Surveys

**1.** We have the right to:

**a.** Make inspections and surveys at any time;

**b.** Give you reports on the conditions we find; and

**c.** Recommend changes.

**2.** We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

**a.** Are safe or healthful; or

**b.** Comply with laws, regulations, codes or standards.

**3.** Paragraphs **1.** and **2.** of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

**4.** Paragraph **2.** of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

## E. Premiums

The first Named Insured shown in the Declarations:

**1.** Is responsible for the payment of all premiums; and

**2.** Will be the payee for any return premiums we pay.

## F. Transfer Of Your Rights And Duties Under This Policy

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

IL 00 21 09 08

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
### (Broad Form)

This endorsement modifies insurance provided under the following:

> COMMERCIAL AUTOMOBILE COVERAGE PART
> COMMERCIAL GENERAL LIABILITY COVERAGE PART
> FARM COVERAGE PART
> LIQUOR LIABILITY COVERAGE PART
> MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
> OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
> POLLUTION LIABILITY COVERAGE PART
> PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
> RAILROAD PROTECTIVE LIABILITY COVERAGE PART
> UNDERGROUND STORAGE TANK POLICY

**1.** The insurance does not apply:

**A.** Under any Liability Coverage, to "bodily injury" or "property damage":

**(1)** With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

**(2)** Resulting from the "hazardous properties" of "nuclear material" and with respect to which **(a)** any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or **(b)** the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

**B.** Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

**C.** Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material", if:

**(1)** The "nuclear material" **(a)** is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or **(b)** has been discharged or dispersed therefrom;

**(2)** The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured"; or

**(3)** The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion **(3)** applies only to "property damage" to such "nuclear facility" and any property thereat.

**2.** As used in this endorsement:

"Hazardous properties" includes radioactive, toxic or explosive properties.

"Nuclear material" means "source material", "special nuclear material" or "by-product material".

© ISO Properties, Inc., 2007

"Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

"Waste" means any waste material **(a)** containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and **(b)** resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

"Nuclear facility" means:

  **(a)** Any "nuclear reactor";

  **(b)** Any equipment or device designed or used for **(1)** separating the isotopes of uranium or plutonium, **(2)** processing or utilizing "spent fuel", or **(3)** handling, processing or packaging "waste";

  **(c)** Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

  **(d)** Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.

© ISO Properties, Inc., 2007 **IL 00 21 09 08** ☐

POLICY NUMBER: ORB-PK-23-A01924-00

IL 09 85 12 20

**THIS ENDORSEMENT IS ATTACHED TO AND MADE PART OF YOUR POLICY IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT. THIS ENDORSEMENT DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY.**

# DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT

**SCHEDULE**

| SCHEDULE – PART I |
|---|
| **Terrorism Premium (Certified Acts)**    $ 218 |
| **This premium is the total Certified Acts premium attributable to the following Coverage Part(s), Coverage Form(s) and/or Policy(ies):**<br>Commercial Property Coverage Part , Commercial General Liability Coverage Part |
| **Additional information, if any, concerning the terrorism premium:** |

| SCHEDULE – PART II |
|---|
| **Federal share of terrorism losses**    **80**    **%**<br>(Refer to Paragraph **B.** in this endorsement.) |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

**A. Disclosure Of Premium**

In accordance with the federal Terrorism Risk Insurance Act, we are required to provide you with a notice disclosing the portion of your premium, if any, attributable to coverage for terrorist acts certified under the Terrorism Risk Insurance Act. The portion of your premium attributable to such coverage is shown in the Schedule of this endorsement or in the policy Declarations.

**B. Disclosure Of Federal Participation In Payment Of Terrorism Losses**

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals a percentage (as shown in Part **II** of the Schedule of this endorsement or in the policy Declarations) of that portion of the amount of such insured losses that exceeds the applicable insurer retention. However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year, the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

**C. Cap On Insurer Participation In Payment Of Terrorism Losses**

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

IL N 001 09 03

# FRAUD STATEMENT

Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

IL P 001 01 04

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# MINIMUM EARNED PREMIUM ENDORSEMENT

This endorsement modifies insurance provided under this policy:

**SCHEDULE**

| Percentage | 25% |
|---|---|

*(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)*

The premium shown in the Declarations is the premium for the full policy period. If this policy is cancelled at the request of the first Named Insured for any reason or if we cancel for non-payment of premium, we shall retain the percentage of the policy premium shown in the Schedule.

All policy fees or inspection fees applicable to this policy will be fully earned and payable at policy inception. These fees will not be refundable.

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# MINIMUM AND DEPOSIT PREMIUM ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Paragraph **5.b. Premium Audit** of **SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS** is deleted and replaced by the following:

Premium shown in this Coverage Part as advance premium is both a deposit premium and a minimum premium for the full policy period. At the close of each audit period we will compute the earned premium for that period. If the earned premium is more than the advance premium, notice of the amount by which it exceeds the advance premium will be sent to the first Named Insured. If the earned premium is less than the advance premium, the advance premium will apply as the minimum premium and is non-refundable.

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

IL 01 02 02 20

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# CALIFORNIA CHANGES – ACTUAL CASH VALUE

This endorsement modifies insurance provided under the following:

CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
FARM COVERAGE PART
STANDARD PROPERTY POLICY

With respect to an "open policy", the following are added to any provision which uses the term actual cash value:

**A.** In the event of a partial or total loss to a building or structure, actual cash value is calculated as the lesser of the following:

  **1.** The amount it would cost to repair, rebuild or replace the property less a fair and reasonable deduction for physical depreciation of the components of the building or structure that are normally subject to repair or replacement during its useful life. Physical depreciation is based upon the condition of the property at the time of the loss; or

  **2.** The Limit of Insurance applicable to the property.

**B.** In the event of a partial or total loss to Covered Property other than a building or structure, actual cash value is calculated as the lesser of the following:

  **1.** The amount it would cost to repair or replace the property less a fair and reasonable deduction for physical depreciation, based on the condition of the property at the time of loss; or

  **2.** The Limit of Insurance applicable to the property.

**C.** An "open policy" is a policy under which the value of Covered Property is not fixed at policy inception, but is determined at the time of loss in accordance with policy provisions on valuation. The term "open policy" does not apply to Covered Property that is subject to an Agreed Value clause or similar clause that establishes an agreed value prior to loss, unless such clause has expired.

© Insurance Services Office, Inc., 2019

IL 09 35 07 02

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION OF CERTAIN COMPUTER-RELATED LOSSES

This endorsement modifies insurance provided under the following:

COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
STANDARD PROPERTY POLICY

**A.** We will not pay for loss ("loss") or damage caused directly or indirectly by the following. Such loss ("loss") or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss ("loss") or damage.

  **1.** The failure, malfunction or inadequacy of:

    **a.** Any of the following, whether belonging to any insured or to others:

      **(1)** Computer hardware, including micro-processors;

      **(2)** Computer application software;

      **(3)** Computer operating systems and related software;

      **(4)** Computer networks;

      **(5)** Microprocessors (computer chips) not part of any computer system; or

      **(6)** Any other computerized or electronic equipment or components; or

    **b.** Any other products, and any services, data or functions that directly or indirectly use or rely upon, in any manner, any of the items listed in Paragraph **A.1.a.** of this endorsement;

    due to the inability to correctly recognize, process, distinguish, interpret or accept one or more dates or times. An example is the inability of computer software to recognize the year 2000.

  **2.** Any advice, consultation, design, evaluation, inspection, installation, maintenance, repair, replacement or supervision provided or done by you or for you to determine, rectify or test for, any potential or actual problems described in Paragraph **A.1.** of this endorsement.

**B.** If an excluded Cause of Loss as described in Paragraph **A.** of this endorsement results:

  **1.** In a Covered Cause of Loss under the Crime and Fidelity Coverage Part, the Commercial Inland Marine Coverage Part or the Standard Property Policy; or

  **2.** Under the Commercial Property Coverage Part:

    **a.** In a "Specified Cause of Loss", or in elevator collision resulting from mechanical breakdown, under the Causes of Loss – Special Form; or

    **b.** In a Covered Cause of Loss under the Causes Of Loss – Basic Form or the Causes Of Loss – Broad Form;

we will pay only for the loss ("loss") or damage caused by such "Specified Cause of Loss", elevator collision, or Covered Cause of Loss.

**C.** We will not pay for repair, replacement or modification of any items in Paragraphs **A.1.a.** and **A.1.b.** of this endorsement to correct any deficiencies or change any features.

© ISO Properties, Inc.,  2001

IL 09 52 01 15

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

BOILER AND MACHINERY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART
STANDARD PROPERTY POLICY

**A. Cap On Certified Terrorism Losses**

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**1.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**2.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**B. Application Of Exclusions**

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Coverage Part or Policy, such as losses excluded by the Nuclear Hazard Exclusion or the War And Military Action Exclusion.

© Insurance Services Office, Inc., 2015

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# SERVICE OF SUIT ENDORSEMENT

This endorsement modifies insurance provided under all policies underwritten by Old Republic Union Insurance Company.

The following is added:

**ALL STATES (EXCEPT ILLINOIS)**

**Service of Suit**

Old Republic Union Insurance Company hereby designates the Superintendent of Insurance, Insurance Commissioner, Director of Insurance, or other officer specified by law, pursuant to the laws of the State where this policy is delivered, as its true and lawful attorney upon whom may be served any lawful process in any action, suit, or proceeding instituted in the State in which this policy is delivered, by or on behalf of, the insured or any beneficiary hereunder arising out of this contract of insurance.

For such service of process to be valid, it must state the name of the insured, Old Republic Union Insurance Company as the unauthorized insurer, and identify the contract of insurance to which the service of process pertains.

Further, service may also be made to:

Old Republic Union Insurance Company
C/O Secretary
307 N. Michigan Avenue
Chicago, Illinois 60601

**ILLINOIS**

**Service of Suit**

Old Republic Union Insurance Company hereby designates the Director of the Illinois Department of Insurance and his successor or successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the insured or any beneficiary hereunder arising out of this contract of insurance.

For such service of process to be valid, it must state the name of the insured, Old Republic Union Insurance Company as the unauthorized insurer, and identify the contract of insurance to which the service of process pertains.  The address of the Director of the Illinois Department of Insurance is:

Director of Insurance
Illinois Department of Insurance
320 W. Washington St., 4th Floor
Springfield, Illinois 62767-0001

Further, service may also be made to:

Old Republic Union Insurance Company
C/O Secretary
307 N. Michigan Avenue
Chicago, Illinois 60601

# ★ OLD REPUBLIC EXCESS & SURPLUS

**HOW TO REPORT A CLAIM**

In the event of a claim to which this policy may apply, you can contact Old Republic Excess & Surplus (ORE&S) by any of the following methods:

1) You can report the claim to your retailer.

2) You can reach out directly to Raphael & Associates, our Third Party Claims Administrator at the following:

   Phone: (800) 466-9165
   Fax: (888) 902-5701
   Email at ORESclaims@raphaelandassociates.com



3) You can also submit the claim directly to ORE&S at: ORESClaims@oldrepublicands.com.

**When submitting a claim, you will need to include the following:**

- The Declaration Page of your policy including the Policy Number and the Effective date.
- Your contact information including your name, phone number, and e-mail.
- Type and description of the loss, the loss location, and the date of loss.

Once all policy information has been secured and confirmed, a Claims Representative will attempt to contact you within (1) business day. The Claims Representative will be your point of contact throughout the entire claim process; however, if you have any questions and/or concerns, please do not hesitate to contact our Head of Claims:

**PAUL KEANE**
**HEAD OF CLAIMS | OLD REPUBLIC EXCESS & SURPLUS**
307 N Michigan Avenue, Suite 1318 | Chicago, IL 60601
O: 312-762-4081
pkeane@oldrepublic.com
www.oldrepublic.com

Please note that Coverage cannot be confirmed or discussed at the time when you first notify us of a loss. Your Policy will be subject to verification and confirmation with Old Republic Excess and Surplus.

ORES C-01 12 22

**COMMERCIAL GENERAL LIABILITY**
**CG 32 34 01 05**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# CALIFORNIA CHANGES

This endorsement modifies insurance provided under the following:

      COMMERCIAL GENERAL LIABILITY COVERAGE PART
      ELECTRONIC DATA LIABILITY COVERAGE PART
      LIQUOR LIABILITY COVERAGE PART
      OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
      POLLUTION LIABILITY COVERAGE PART
      PRODUCT WITHDRAWAL COVERAGE PART
      PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
      UNDERGROUND STORAGE TANK POLICY

The term "spouse" is replaced by the following:

Spouse or registered domestic partner under California law.

        © ISO Properties, Inc., 2004        


# OLD REPUBLIC UNION INSURANCE COMPANY

## COMMERCIAL GENERAL LIABILITY COVERAGE PART DECLARATION PAGE

**NAMED INSURED**: LiveOne Inc                ☐Extension of Declarations is attached
**POLICY NUMBER: ORB-PK-23-A01924-00**        **POLICY PERIOD:  FROM:  01-29-2024 TO: 01-29-2025**
                                              (AT 12:01 A.M. STANDARD TIME AT YOUR MAILING ADDRESS SHOWN BELOW)

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

**LIMITS OF INSURANCE:**

| General Aggregate Limit (Other Than Products/Completed Operations) | $2,000,000 |
|---|---|
| Products/Completed Operations Aggregate Limit | $2,000,000 |
| Personal and Advertising Injury | $0 Any One Person or Organization |
| Each Occurrence Limit | $1,000,000 |
| Damage to Premises Rented to You Limit | $100,000 Any One Premises |
| Medical Expense Limit | $5,000 Any One Person |

**DEDUCTIBLES:**

| | DEDUCTIBLE |
|---|---|
| Combined Bodily Injury and Property Damage Deductible | $500 Per Occurrence |

**RETROACTIVE DATE (CG 00 02 ONLY):**

| This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" which occurs before the Retroactive Date, if any, shown here:  NONE |
|---|

**BUSINESS DESCRIPTION AND LOCATION OF PREMISES:**
Additional locations (if any) will be shown on form ORES GLDE-01, Commercial General Liability Coverage Part Declarations Extensions

| BUSINESS DESCRIPTION: Recording Studio | ☐ Location address is same as mailing address. |
|---|---|
| **Prem.1** | **516 N Beverly Dr, PO Box 14500, Beverly Hills, CA 90210** |

| CLASS CODE | CLASS DESCRIPTION | BASIS | EXPOSURE | RATE | | ADVANCE PREMIUM |
|---|---|---|---|---|---|---|
| | | | | **Premises** | **Products** | |
| 60010 | Apartment Buildings | Units | 1 | 1,031.803 | INCL | $1,032.00 |
| 47103 | Recording Studios | Area | 5,969 | 859.841 | INCL | $5,132.00 |
| 48925-01 | Swimming Pools - Dwellings | Units | 1 | 750.000 | INCL | $750.00 |

| POLICY IS AUDITABLE: ☐APPLICABLE | TOTAL PREMIUM FOR THIS COVERAGE PART | $6,914.00 |
|---|---|---|
| LOCATION OF JOB SITE (IF Designated Projects are to be Scheduled): | | |

**GENERAL LIABILITY COVERAGES AND LIMITATION:**

| ADDITIONAL FORM | LIMIT OF INSURANCE | DEDUCTIBLE | PREMIUM |
|---|---|---|---|
| Limitation Of Coverage To Designated Premises Project or Operation | | | $0 |
| Exclusion - Personal and Advertising Injury Endorsement | | | $0 |

**GENERAL LIABILITY TOTAL PREMIUM:**

| Minimum Earned Premium 25% | TOTAL PREMIUM | $6,914.00 |
|---|---|---|
| (Minimum & Deposit) | TRIA PREMIUM | $207.00 |
| | TOTAL PREMIUM WITH TRIA | $7,121.00 |

**SCHEDULE OF FORMS & ENDORSEMENTS:**
Forms and Endorsements applying to this Coverage Part and made part of this policy at time of issue are listed under Schedule of Forms and Endorsements – Form ORES S-001

THESE DECLARATIONS ARE PART OF THE POLICY DECLARATIONS CONTAINING THE NAME OF THE INSURED AND THE POLICY PERIOD.

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section **II** – Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **V** – Definitions.

## SECTION I – COVERAGES

## COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section **III** – Limits Of Insurance; and

**(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C.**

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B.**

**b.** This insurance applies to "bodily injury" and "property damage" only if:

**(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

**(2)** The "bodily injury" or "property damage" occurs during the policy period; and

**(3)** Prior to the policy period, no insured listed under Paragraph **1.** of Section **II** – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

**c.** "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph **1.** of Section **II** – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

**d.** "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1.** of Section **II** – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

**(1)** Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

**(2)** Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

**(3)** Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

**e.** Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

© Insurance Services Office, Inc., 2012

## 2. Exclusions

This insurance does not apply to:

### a. Expected Or Intended Injury

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

### b. Contractual Liability

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

**(1)** That the insured would have in the absence of the contract or agreement; or

**(2)** Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorneys' fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

    **(a)** Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

    **(b)** Such attorneys' fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

### c. Liquor Liability

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

**(1)** Causing or contributing to the intoxication of any person;

**(2)** The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

**(3)** Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in:

    **(a)** The supervision, hiring, employment, training or monitoring of others by that insured; or

    **(b)** Providing or failing to provide transportation with respect to any person that may be under the influence of alcohol;

if the "occurrence" which caused the "bodily injury" or "property damage", involved that which is described in Paragraph **(1)**, **(2)** or **(3)** above.

However, this exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages. For the purposes of this exclusion, permitting a person to bring alcoholic beverages on your premises, for consumption on your premises, whether or not a fee is charged or a license is required for such activity, is not by itself considered the business of selling, serving or furnishing alcoholic beverages.

### d. Workers' Compensation And Similar Laws

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

### e. Employer's Liability

"Bodily injury" to:

**(1)** An "employee" of the insured arising out of and in the course of:

    **(a)** Employment by the insured; or

    **(b)** Performing duties related to the conduct of the insured's business; or

**(2)** The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **(1)** above.

This exclusion applies whether the insured may be liable as an employer or in any other capacity and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

© Insurance Services Office, Inc., 2012

**f. Pollution**

**(1)** "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

**(a)** At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

**(i)** "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests;

**(ii)** "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

**(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

**(b)** At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

**(c)** Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

**(i)** Any insured; or

**(ii)** Any person or organization for whom you may be legally responsible; or

**(d)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

**(i)** "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

**(ii)** "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

**(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

**(e)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

**(2)** Any loss, cost or expense arising out of any:

**(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(b)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

**g. Aircraft, Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

**(1)** A watercraft while ashore on premises you own or rent;

**(2)** A watercraft you do not own that is:

**(a)** Less than 26 feet long; and

**(b)** Not being used to carry persons or property for a charge;

**(3)** Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

**(4)** Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

**(5)** "Bodily injury" or "property damage" arising out of:

**(a)** The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged; or

**(b)** The operation of any of the machinery or equipment listed in Paragraph **f.(2)** or **f.(3)** of the definition of "mobile equipment".

**h. Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

**(1)** The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

**(2)** The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

**i. War**

"Bodily injury" or "property damage", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**j. Damage To Property**

"Property damage" to:

**(1)** Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

**(2)** Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

**(3)** Property loaned to you;

**(4)** Personal property in the care, custody or control of the insured;

**(5)** That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

**(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs **(1)**, **(3)** and **(4)** of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of seven or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section **III** – Limits Of Insurance.

Paragraph **(2)** of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs **(3)**, **(4)**, **(5)** and **(6)** of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

**k. Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l. Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m. Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n. Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**(1)** "Your product";

**(2)** "Your work"; or

**(3)** "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**o. Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

**p. Electronic Data**

Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

However, this exclusion does not apply to liability for damages because of "bodily injury".

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**q. Recording And Distribution Of Material Or Information In Violation Of Law**

"Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

**(3)** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

**(4)** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

Exclusions **c.** through **n.** do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section **III** – Limits Of Insurance.

**COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY**

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section **III** – Limits Of Insurance; and

**(2)** Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C.**

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B.**

**b.** This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

**2. Exclusions**

This insurance does not apply to:

**a. Knowing Violation Of Rights Of Another**

"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

**b. Material Published With Knowledge Of Falsity**

"Personal and advertising injury" arising out of oral or written publication, in any manner, of material, if done by or at the direction of the insured with knowledge of its falsity.

**c. Material Published Prior To Policy Period**

"Personal and advertising injury" arising out of oral or written publication, in any manner, of material whose first publication took place before the beginning of the policy period.

**d. Criminal Acts**

"Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

**e. Contractual Liability**

"Personal and advertising injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

**f. Breach Of Contract**

"Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

**g. Quality Or Performance Of Goods – Failure To Conform To Statements**

"Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

**h. Wrong Description Of Prices**

"Personal and advertising injury" arising out of the wrong description of the price of goods, products or services stated in your "advertisement".

**i. Infringement Of Copyright, Patent, Trademark Or Trade Secret**

"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement".

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

**j. Insureds In Media And Internet Type Businesses**

"Personal and advertising injury" committed by an insured whose business is:

**(1)** Advertising, broadcasting, publishing or telecasting;

**(2)** Designing or determining content of web sites for others; or

**(3)** An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs **14.a., b.** and **c.** of "personal and advertising injury" under the Definitions section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

**k. Electronic Chatrooms Or Bulletin Boards**

"Personal and advertising injury" arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

**l. Unauthorized Use Of Another's Name Or Product**

"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

**m. Pollution**

"Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**n. Pollution-related**

Any loss, cost or expense arising out of any:

**(1)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(2)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

**o. War**

"Personal and advertising injury", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**p. Recording And Distribution Of Material Or Information In Violation Of Law**

"Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

**(3)** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

**(4)** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

**COVERAGE C – MEDICAL PAYMENTS**

**1. Insuring Agreement**

**a.** We will pay medical expenses as described below for "bodily injury" caused by an accident:

**(1)** On premises you own or rent;

**(2)** On ways next to premises you own or rent; or

**(3)** Because of your operations;

provided that:

**(a)** The accident takes place in the "coverage territory" and during the policy period;

**(b)** The expenses are incurred and reported to us within one year of the date of the accident; and

**(c)** The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

**b.** We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

**(1)** First aid administered at the time of an accident;

**(2)** Necessary medical, surgical, X-ray and dental services, including prosthetic devices; and

**(3)** Necessary ambulance, hospital, professional nursing and funeral services.

**2. Exclusions**

We will not pay expenses for "bodily injury":

**a. Any Insured**

To any insured, except "volunteer workers".

**b. Hired Person**

To a person hired to do work for or on behalf of any insured or a tenant of any insured.

**c. Injury On Normally Occupied Premises**

To a person injured on that part of premises you own or rent that the person normally occupies.

**d. Workers' Compensation And Similar Laws**

To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

**e. Athletics Activities**

To a person injured while practicing, instructing or participating in any physical exercises or games, sports, or athletic contests.

**f. Products-Completed Operations Hazard**

Included within the "products-completed operations hazard".

**g. Coverage A Exclusions**

Excluded under Coverage **A**.

**SUPPLEMENTARY PAYMENTS – COVERAGES A AND B**

**1.** We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

**a.** All expenses we incur.

**b.** Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

**c.** The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

**d.** All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

**e.** All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

**f.** Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

g. All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

2. If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

a. The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

b. This insurance applies to such liability assumed by the insured;

c. The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

d. The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

e. The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

f. The indemnitee:

(1) Agrees in writing to:

(a) Cooperate with us in the investigation, settlement or defense of the "suit";

(b) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

(c) Notify any other insurer whose coverage is available to the indemnitee; and

(d) Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

(2) Provides us with written authorization to:

(a) Obtain records and other information related to the "suit"; and

(b) Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph **2.b.(2)** of Section **I** – Coverage **A** – Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when we have used up the applicable limit of insurance in the payment of judgments or settlements or the conditions set forth above, or the terms of the agreement described in Paragraph **f.** above, are no longer met.

**SECTION II – WHO IS AN INSURED**

1. If you are designated in the Declarations as:

a. An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

b. A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

c. A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

d. An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

e. A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

**2.** Each of the following is also an insured:

**a.** Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

**(1)** "Bodily injury" or "personal and advertising injury":

**(a)** To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

**(b)** To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph **(1)(a)** above;

**(c)** For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraph **(1)(a)** or **(b)** above; or

**(d)** Arising out of his or her providing or failing to provide professional health care services.

**(2)** "Property damage" to property:

**(a)** Owned, occupied or used by; or

**(b)** Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by;

you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

**b.** Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

**c.** Any person or organization having proper temporary custody of your property if you die, but only:

**(1)** With respect to liability arising out of the maintenance or use of that property; and

**(2)** Until your legal representative has been appointed.

**d.** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

**3.** Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

**a.** Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

**b.** Coverage **A** does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

**c.** Coverage **B** does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

**SECTION III – LIMITS OF INSURANCE**

**1.** The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

**a.** Insureds;

**b.** Claims made or "suits" brought; or

**c.** Persons or organizations making claims or bringing "suits".

**2.** The General Aggregate Limit is the most we will pay for the sum of:

**a.** Medical expenses under Coverage **C;**

**b.** Damages under Coverage **A,** except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

**c.** Damages under Coverage **B.**

**3.** The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage **A** for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

**4.** Subject to Paragraph **2.** above, the Personal And Advertising Injury Limit is the most we will pay under Coverage **B** for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

**5.** Subject to Paragraph **2.** or **3.** above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

  **a.** Damages under Coverage **A;** and

  **b.** Medical expenses under Coverage **C**

because of all "bodily injury" and "property damage" arising out of any one "occurrence".

**6.** Subject to Paragraph **5.** above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage **A** for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, while rented to you or temporarily occupied by you with permission of the owner.

**7.** Subject to Paragraph **5.** above, the Medical Expense Limit is the most we will pay under Coverage **C** for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

## SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS

**1. Bankruptcy**

  Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

**2. Duties In The Event Of Occurrence, Offense, Claim Or Suit**

  **a.** You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

  **(1)** How, when and where the "occurrence" or offense took place;

  **(2)** The names and addresses of any injured persons and witnesses; and

  **(3)** The nature and location of any injury or damage arising out of the "occurrence" or offense.

  **b.** If a claim is made or "suit" is brought against any insured, you must:

  **(1)** Immediately record the specifics of the claim or "suit" and the date received; and

  **(2)** Notify us as soon as practicable.

  You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

  **c.** You and any other involved insured must:

  **(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

  **(2)** Authorize us to obtain records and other information;

  **(3)** Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

  **(4)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

  **d.** No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

**3. Legal Action Against Us**

  No person or organization has a right under this Coverage Part:

  **a.** To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

  **b.** To sue us on this Coverage Part unless all of its terms have been fully complied with.

  A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

**4. Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages **A** or **B** of this Coverage Part, our obligations are limited as follows:

**a. Primary Insurance**

This insurance is primary except when Paragraph **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in Paragraph **c.** below.

**b. Excess Insurance**

**(1)** This insurance is excess over:

**(a)** Any of the other insurance, whether primary, excess, contingent or on any other basis:

**(i)** That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

**(ii)** That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

**(iii)** That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

**(iv)** If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion **g.** of Section **I** – Coverage **A** – Bodily Injury And Property Damage Liability.

**(b)** Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured.

**(2)** When this insurance is excess, we will have no duty under Coverages **A** or **B** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

**(3)** When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

**(a)** The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

**(b)** The total of all deductible and self-insured amounts under all that other insurance.

**(4)** We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**c. Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**5. Premium Audit**

**a.** We will compute all premiums for this Coverage Part in accordance with our rules and rates.

**b.** Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

**c.** The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**6. Representations**

By accepting this policy, you agree:

**a.** The statements in the Declarations are accurate and complete;

**b.** Those statements are based upon representations you made to us; and

**c.** We have issued this policy in reliance upon your representations.

**7. Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

**a.** As if each Named Insured were the only Named Insured; and

**b.** Separately to each insured against whom claim is made or "suit" is brought.

**8. Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**9. When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

## SECTION V – DEFINITIONS

**1.** "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

**a.** Notices that are published include material placed on the Internet or on similar electronic means of communication; and

**b.** Regarding web sites, only that part of a web site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

**2.** "Auto" means:

**a.** A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or

**b.** Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.

However, "auto" does not include "mobile equipment".

**3.** "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

**4.** "Coverage territory" means:

**a.** The United States of America (including its territories and possessions), Puerto Rico and Canada;

**b.** International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in Paragraph **a.** above; or

**c.** All other parts of the world if the injury or damage arises out of:

**(1)** Goods or products made or sold by you in the territory described in Paragraph **a.** above;

**(2)** The activities of a person whose home is in the territory described in Paragraph **a.** above, but is away for a short time on your business; or

**(3)** "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication;

provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in Paragraph **a.** above or in a settlement we agree to.

**5.** "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

**6.** "Executive officer" means a person holding any of the officer positions created by your charter, constitution, bylaws or any other similar governing document.

**7.** "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

**8.** "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

**a.** It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

**b.** You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

 © Insurance Services Office, Inc., 2012

9. "Insured contract" means:

a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

b. A sidetrack agreement;

c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

e. An elevator maintenance agreement;

f. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph **f.** does not include that part of any contract or agreement:

(1) That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

(2) That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

(a) Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

(b) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

(3) Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in **(2)** above and supervisory, inspection, architectural or engineering activities.

10. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

11. "Loading or unloading" means the handling of property:

a. After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

b. While it is in or on an aircraft, watercraft or "auto"; or

c. While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

12. "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

a. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

b. Vehicles maintained for use solely on or next to premises you own or rent;

c. Vehicles that travel on crawler treads;

d. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

(1) Power cranes, shovels, loaders, diggers or drills; or

(2) Road construction or resurfacing equipment such as graders, scrapers or rollers;

e. Vehicles not described in Paragraph **a., b., c.** or **d.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

(1) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

(2) Cherry pickers and similar devices used to raise or lower workers;

f. Vehicles not described in Paragraph **a., b., c.** or **d.** above maintained primarily for purposes other than the transportation of persons or cargo.

   © Insurance Services Office, Inc., 2012

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

**(1)** Equipment designed primarily for:

    **(a)** Snow removal;

    **(b)** Road maintenance, but not construction or resurfacing; or

    **(c)** Street cleaning;

**(2)** Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

**(3)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include any land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

**13.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

**14.** "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

**a.** False arrest, detention or imprisonment;

**b.** Malicious prosecution;

**c.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

**d.** Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

**e.** Oral or written publication, in any manner, of material that violates a person's right of privacy;

**f.** The use of another's advertising idea in your "advertisement"; or

**g.** Infringing upon another's copyright, trade dress or slogan in your "advertisement".

**15.** "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**16.** "Products-completed operations hazard":

**a.** Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

**(1)** Products that are still in your physical possession; or

**(2)** Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

    **(a)** When all of the work called for in your contract has been completed.

    **(b)** When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

    **(c)** When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

**b.** Does not include "bodily injury" or "property damage" arising out of:

**(1)** The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

**(2)** The existence of tools, uninstalled equipment or abandoned or unused materials; or

**(3)** Products or operations for which the classification, listed in the Declarations or in a policy Schedule, states that products-completed operations are subject to the General Aggregate Limit.

**17.** "Property damage" means:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**18.** "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

**a.** An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

**b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

**19.** "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

**20.** "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

**21.** "Your product":

**a.** Means:

**(1)** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

**(a)** You;

**(b)** Others trading under your name; or

**(c)** A person or organization whose business or assets you have acquired; and

**(2)** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

**b.** Includes:

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

**(2)** The providing of or failure to provide warnings or instructions.

**c.** Does not include vending machines or other property rented to or located for the use of others but not sold.

**22.** "Your work":

**a.** Means:

**(1)** Work or operations performed by you or on your behalf; and

**(2)** Materials, parts or equipment furnished in connection with such work or operations.

**b.** Includes:

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

**(2)** The providing of or failure to provide warnings or instructions.

POLICY NUMBER: ORB-PK-23-A01924-00

**COMMERCIAL GENERAL LIABILITY**
**CG 03 00 01 96**

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# DEDUCTIBLE LIABILITY INSURANCE

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

### SCHEDULE

| Coverage | Amount and Basis of Deductible | |
|---|---|---|
| | PER CLAIM   or | PER OCCURRENCE |
| Bodily Injury Liability | $ | $ |
| OR | | |
| Property Damage Liability | $ | $ |
| OR | | |
| Bodily Injury Liability and/or Property Damage Liability Combined | $ | $ |

* See DCTSCHEDULEFORCG03000196 for Schedule Info

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

**APPLICATION OF ENDORSEMENT** (Enter below any limitations on the application of this endorsement. If no limitation is entered, the deductibles apply to damages for all "bodily injury" and "property damage", however caused):

**A.** Our obligation under the Bodily Injury Liability and Property Damage Liability Coverages to pay damages on your behalf applies only to the amount of damages in excess of any deductible amounts stated in the Schedule above as applicable to such coverages.

**B.** You may select a deductible amount on either a per claim or a per "occurrence" basis. Your selected deductible applies to the coverage option and to the basis of the deductible indicated by the placement of the deductible amount in the Schedule above. The deductible amount stated in the Schedule above applies as follows:

**1. PER CLAIM BASIS.** If the deductible amount indicated in the Schedule above is on a per claim basis, that deductible applies as follows:

  **a.** Under Bodily Injury Liability Coverage, to all damages sustained by any one person because of "bodily injury";

  **b.** Under Property Damage Liability Coverage, to all damages sustained by any one person because of "property damage"; or

  **c.** Under Bodily Injury Liability and/or Property Damage Liability Coverage Combined, to all damages sustained by any one person because of:

    **(1)** "Bodily injury";

    **(2)** "Property damage"; or

    **(3)** "Bodily injury" and "property damage" combined

as the result of any one "occurrence".

If damages are claimed for care, loss of services or death resulting at any time from "bodily injury", a separate deductible amount will be applied to each person making a claim for such damages.

With respect to "property damage", person includes an organization.

**CG 03 00 01 96**

Copyright, Insurance Services Office, Inc.,  1994

□

**2. PER OCCURRENCE BASIS.** If the deductible amount indicated in the Schedule above is on a "per occurrence" basis, that deductible amount applies as follows:

**a.** Under Bodily Injury Liability Coverage, to all damages because of "bodily injury";

**b.** Under Property Damage Liability Coverage, to all damages because of "property damage"; or

**c.** Under Bodily Injury Liability and/or Property Damage Liability Coverage Combined, to all damages because of:

**(1)** "Bodily injury";

**(2)** "Property damage"; or

**(3)** "Bodily injury" and "property damage" combined

as the result of any one "occurrence", regardless of the number of persons or organizations who sustain damages because of that "occurrence".

**C.** The terms of this insurance, including those with respect to:

**1.** Our right and duty to defend the insured against any "suits" seeking those damages; and

**2.** Your duties in the event of an "occurrence", claim, or "suit"

apply irrespective of the application of the deductible amount.

**D.** We may pay any part or all of the deductible amount to effect settlement of any claim or "suit" and, upon notification of the action taken, you shall promptly reimburse us for such part of the deductible amount as has been paid by us.

POLICY NUMBER:   ORB-PK-23-A01924-00

**COMMERCIAL GENERAL LIABILITY**
**DCT SCHEDULE FOR CG 03 00 01 96**

# DEDUCTIBLE LIABILITY INSURANCE

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**SCHEDULE**

**Coverage**  Policywide

| | Amount and Basis of Deductible | | | |
|---|---|---|---|---|
| | **PER CLAIM** | or | **PER OCCURRENCE** | |
| | Premises | Products | Premises | Products |
| Bodily Injury Liability/Property Damage | | | BI    $500 PD Combined | BI Combined PD Combined |

Class Code(s) With Deductible

Location 1  [60010] Apartment Buildings

Location 1  [47103] Recording Studios

Location 1  [48925-01] Swimming Pools - Dwellings

POLICY NUMBER: ORB-PK-23-A01924-00

COMMERCIAL GENERAL LIABILITY
CG 21 01 12 19

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – ATHLETIC OR SPORTS PARTICIPANTS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| Description Of Operations: |
| --- |
|  |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

The following is added to Paragraph **2. Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability:**

With respect to any operations shown in the Schedule, this insurance does not apply to "bodily injury" to any person arising out of practicing for or participating in any sports or athletic contest or exhibition that you sponsor.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" involved practicing for or participating in any sports or athletic contest or exhibition that you sponsor.

**CG 21 01 12 19**                    © Insurance Services Office, Inc., 2018                    **Page 1 of 1**

COMMERCIAL GENERAL LIABILITY
CG 21 07 05 14

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – ACCESS OR DISCLOSURE OF CONFIDENTIAL OR PERSONAL INFORMATION AND DATA-RELATED LIABILITY – LIMITED BODILY INJURY EXCEPTION NOT INCLUDED

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** Exclusion **2.p.** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** is replaced by the following:

**2. Exclusions**

This insurance does not apply to:

**p. Access Or Disclosure Of Confidential Or Personal Information And Data-related Liability**

Damages arising out of:

**(1)** Any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information; or

**(2)** The loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of that which is described in Paragraph **(1)** or **(2)** above.

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**B.** The following is added to Paragraph **2. Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

**2. Exclusions**

This insurance does not apply to:

**Access Or Disclosure Of Confidential Or Personal Information**

"Personal and advertising injury" arising out of any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of any access to or disclosure of any person's or organization's confidential or personal information.

© Insurance Services Office, Inc., 2013

COMMERCIAL GENERAL LIABILITY
CG 21 32 05 09

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# COMMUNICABLE DISEASE EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2. Exclusions** of Section **I – Coverage A – Bodily Injury And Property Damage Liability:**

**2. Exclusions**

This insurance does not apply to:

**Communicable Disease**

"Bodily injury" or "property damage" arising out of the actual or alleged transmission of a communicable disease.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the:

**a.** Supervising, hiring, employing, training or monitoring of others that may be infected with and spread a communicable disease;

**b.** Testing for a communicable disease;

**c.** Failure to prevent the spread of the disease; or

**d.** Failure to report the disease to authorities.

**B.** The following exclusion is added to Paragraph **2. Exclusions** of Section **I – Coverage B – Personal And Advertising Injury Liability:**

**2. Exclusions**

This insurance does not apply to:

**Communicable Disease**

"Personal and advertising injury" arising out of the actual or alleged transmission of a communicable disease.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the:

**a.** Supervising, hiring, employing, training or monitoring of others that may be infected with and spread a communicable disease;

**b.** Testing for a communicable disease;

**c.** Failure to prevent the spread of the disease; or

**d.** Failure to report the disease to authorities.

**COMMERCIAL GENERAL LIABILITY**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – PERSONAL AND ADVERTISING INJURY

This endorsement modifies insurance provided under the following:

   COMMERCIAL GENERAL LIABILITY COVERAGE PART.

COVERAGE B (Section I) does not apply and none of the references to it in the Coverage Part apply.

POLICY NUMBER: ORB-PK-23-A01924-00

**COMMERCIAL GENERAL LIABILITY**
**CG 21 44 04 17**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# LIMITATION OF COVERAGE TO DESIGNATED PREMISES, PROJECT OR OPERATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| |
|---|
| **Premises:** |
| |
| **Project Or Operation:** |
| |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

**A.** If this endorsement is attached to Commercial General Liability Coverage Form **CG 00 01**, the provisions under this Paragraph **A.** apply:

**1.** Paragraph **1.b.** under **Section I – Coverage A – Bodily Injury And Property Damage Liability** is replaced by the following:

**b.** This insurance applies to "bodily injury" and "property damage" caused by an "occurrence" that takes place in the "coverage territory" only if:

**(1)** The "bodily injury" or "property damage":

**(a)** Occurs on the premises shown in the Schedule or the grounds and structures appurtenant to those premises; or

**(b)** Arises out of the project or operation shown in the Schedule;

**(2)** The "bodily injury" or "property damage" occurs during the policy period; and

**(3)** Prior to the policy period, no insured listed under Paragraph **1.** of Section II – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

**2.** Paragraph **1.b.** under **Section I – Coverage B – Personal And Advertising Injury Liability** is replaced by the following:

**b.** This insurance applies to "personal and advertising injury" caused by an offense committed in the "coverage territory" but only if:

**(1)** The offense arises out of your business:

**(a)** Performed on the premises shown in the Schedule; or

**(b)** In connection with the project or operation shown in the Schedule; and

**(2)** The offense was committed during the policy period.

However, with respect to Paragraph **1.b.(1)(a)** of this Insuring Agreement, if the "personal and advertising injury" is caused by:

**(1)** False arrest, detention or imprisonment; or

**(2)** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

then such offense must arise out of your business performed on the premises shown in the Schedule and the offense must have been committed on the premises shown in the Schedule or the grounds and structures appurtenant to those premises.

**3.** Paragraph **1.a.** under **Section I – Coverage C – Medical Payments** is replaced by the following:

**a.** We will pay medical expenses as described below for "bodily injury" caused by an accident that takes place in the "coverage territory" if the "bodily injury":

**(1)** Occurs on the premises shown in the Schedule or the grounds and structures appurtenant to those premises; or

**(2)** Arises out of the project or operation shown in the Schedule;

provided that:

**(a)** The accident takes place during the policy period;

**(b)** The expenses are incurred and reported to us within one year of the date of the accident; and

**(c)** The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

**B.** If this endorsement is attached to Commercial General Liability Coverage Form **CG 00 02,** the provisions under this Paragraph **B.** apply:

**1.** Paragraph **1.b.** under **Section I – Coverage A – Bodily Injury And Property Damage Liability** is replaced by the following:

**b.** This insurance applies to "bodily injury" and "property damage" caused by an "occurrence" that takes place in the "coverage territory" only if:

**(1)** The "bodily injury" or "property damage":

**(a)** Occurs on the premises shown in the Schedule or the grounds and structures appurtenant to those premises; or

**(b)** Arises out of the project or operation shown in the Schedule;

**(2)** The "bodily injury" or "property damage" did not occur before the Retroactive Date, if any, shown in the Declarations or after the end of the policy period; and

**(3)** A claim for damages because of the "bodily injury" or "property damage" is first made against any insured, in accordance with Paragraph **1.c.** of this Insuring Agreement, during the policy period or any Extended Reporting Period we provide under Section **V** – Extended Reporting Periods.

**2.** Paragraph **1.b.** under **Section I – Coverage B – Personal And Advertising Injury Liability** is replaced by the following:

**b.** This insurance applies to "personal and advertising injury" caused by an offense committed in the "coverage territory" but only if:

**(1)** The offense arises out of your business:

**(a)** Performed on the premises shown in the Schedule; or

**(b)** In connection with the project or operation shown in the Schedule;

**(2)** The offense was not committed before the Retroactive Date, if any, shown in the Declarations or after the end of the policy period; and

 © Insurance Services Office, Inc., 2016 **CG 21 44 04 17**

**(3)** A claim for damages because of the "personal and advertising injury" is first made against any insured, in accordance with Paragraph **1.c.** of this Insuring Agreement, during the policy period or any Extended Reporting Period we provide under Section **V –** Extended Reporting Periods.

However, with respect to Paragraph **1.b.(1)(a)** of this Insuring Agreement, if the "personal and advertising injury" is caused by:

**(1)** False arrest, detention or imprisonment; or

**(2)** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

then such offense must arise out of your business performed on the premises shown in the Schedule and the offense must have been committed on the premises shown in the Schedule or the grounds and structures appurtenant to those premises.

**3.** Paragraph **1.a.** under **Section I – Coverage C – Medical Payments** is replaced by the following:

**a.** We will pay medical expenses as described below for "bodily injury" caused by an accident that takes place in the "coverage territory" if the "bodily injury":

**(1)** Occurs on the premises shown in the Schedule or the grounds and structures appurtenant to those premises; or

**(2)** Arises out of the project or operation shown in the Schedule;

provided that:

**(a)** The accident takes place during the policy period;

**(b)** The expenses are incurred and reported to us within one year of the date of the accident; and

**(c)** The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

 © Insurance Services Office, Inc., 2016

**COMMERCIAL GENERAL LIABILITY**
**CG 21 47 12 07**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EMPLOYMENT-RELATED PRACTICES EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2., Exclusions** of Section **I – Coverage A – Bodily Injury And Property Damage Liability:**

This insurance does not apply to:

"Bodily injury" to:

**(1)** A person arising out of any:

   **(a)** Refusal to employ that person;

   **(b)** Termination of that person's employment; or

   **(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in Paragraphs **(a)**, **(b),** or **(c)** above is directed.

This exclusion applies:

**(1)** Whether the injury-causing event described in Paragraphs **(a)**, **(b)** or **(c)** above occurs before employment, during employment or after employment of that person;

**(2)** Whether the insured may be liable as an employer or in any other capacity; and

**(3)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**B.** The following exclusion is added to Paragraph **2., Exclusions** of Section **I – Coverage B – Personal And Advertising Injury Liability:**

This insurance does not apply to:

"Personal and advertising injury" to:

**(1)** A person arising out of any:

   **(a)** Refusal to employ that person;

   **(b)** Termination of that person's employment; or

   **(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "personal and advertising injury" to that person at whom any of the employment-related practices described in Paragraphs **(a), (b),** or **(c)** above is directed.

This exclusion applies:

**(1)** Whether the injury-causing event described in Paragraphs **(a)**, **(b)** or **(c)** above occurs before employment, during employment or after employment of that person;

**(2)** Whether the insured may be liable as an employer or in any other capacity; and

**(3)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

COMMERCIAL GENERAL LIABILITY
CG 21 49 09 99

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# TOTAL POLLUTION EXCLUSION ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Exclusion **f.** under Paragraph **2., Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** is replaced by the following:

This insurance does not apply to:

**f. Pollution**

**(1)** "Bodily injury" or "property damage" which would not have occurred in whole or in part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**(2)** Any loss, cost or expense arising out of any:

**(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants"; or

**(b)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of,  "pollutants".

COMMERCIAL GENERAL LIABILITY
CG 21 67 12 04

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# FUNGI OR BACTERIA EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2. Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability:**

**2. Exclusions**

This insurance does not apply to:

**Fungi Or Bacteria**

**a.** "Bodily injury" or "property damage" which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

**b.** Any loss, cost or expenses arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

This exclusion does not apply to any "fungi" or bacteria that are, are on, or are contained in, a good or product intended for bodily consumption.

**B.** The following exclusion is added to Paragraph **2. Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

**2. Exclusions**

This insurance does not apply to:

**Fungi Or Bacteria**

**a.** "Personal and advertising injury" which would not have taken place, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury.

**b.** Any loss, cost or expense arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

**C.** The following definition is added to the **Definitions** Section:

"Fungi" means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi.

COMMERCIAL GENERAL LIABILITY
CG 21 70 01 15

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

**A.** If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**1.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**2.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**B.** The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for injury or damage that is otherwise excluded under this Coverage Part.

COMMERCIAL GENERAL LIABILITY
CG 21 86 12 04

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – EXTERIOR INSULATION AND FINISH SYSTEMS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of, caused by, or attributable to, whether in whole or in part, the following:

**1.** The design, manufacture, construction, fabrication, preparation, distribution and sale, installation, application, maintenance or repair, including remodeling, service, correction or replacement, of any "exterior insulation and finish system" or any part thereof, or any substantially similar system or any part thereof, including the application or use of conditioners, primers, accessories, flashings, coatings, caulking or sealants in connection with such a system; or

**2.** "Your product" or "your work" with respect to any exterior component, fixture or feature of any structure if an "exterior insulation and finish system", or any substantially similar system, is used on the part of that structure containing that component, fixture or feature.

**B.** The following definition is added to the **Definitions** Section:

"Exterior insulation and finish system" means a non-load bearing exterior cladding or finish system, and all component parts therein, used on any part of any structure, and consisting of:

**1.** A rigid or semi-rigid insulation board made of expanded polystyrene and other materials;

**2.** The adhesive and/or mechanical fasteners used to attach the insulation board to the substrate;

**3.** A reinforced or unreinforced base coat;

**4.** A finish coat providing surface texture to which color may be added; and

**5.** Any flashing, caulking or sealant used with the system for any purpose.

COMMERCIAL GENERAL LIABILITY
**CG 22 30 07 98**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – CORPORAL PUNISHMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is added to Paragraph **2., Exclusions** of **Section I** – **Coverage A – Bodily Injury And Property Damage Liability** and Paragraph **2., Exclusions** of **Section I** – **Coverage B – Personal And Advertising Injury Liability:**

This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" to your student arising out of any corporal punishment administered by or at the direction of any insured.

COMMERCIAL GENERAL LIABILITY
CG 24 26 04 13

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# AMENDMENT OF INSURED CONTRACT DEFINITION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

The definition of "insured contract" in the **Definitions** section is replaced by the following:

"Insured contract" means:

**a.** A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

**b.** A sidetrack agreement;

**c.** Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

**d.** An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

**e.** An elevator maintenance agreement;

**f.** That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization, provided the "bodily injury" or "property damage" is caused, in whole or in part, by you or by those acting on your behalf. However, such part of a contract or agreement shall only be considered an "insured contract" to the extent your assumption of the tort liability is permitted by law. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph **f.** does not include that part of any contract or agreement:

**(1)** That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

**(2)** That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

**(a)** Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

**(b)** Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

**(3)** Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in **(2)** above and supervisory, inspection, architectural or engineering activities.

© Insurance Services Office, Inc., 2012

COMMERCIAL GENERAL LIABILITY
CG 40 10 12 19

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – CROSS SUITS LIABILITY

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2. Exclusions** of **Section I – Coverages – Coverage A – Bodily Injury And Property Damage Liability:**

This insurance does not apply to:

**Cross Suits**

Any claim made or "suit" brought by any Named Insured under this Policy against another Named Insured under this Policy for damages because of "bodily injury" or "property damage".

**B.** The following is added to Paragraph **2. Exclusions** of **Section I – Coverages – Coverage B – Personal And Advertising Injury Liability:**

This insurance does not apply to:

**Cross Suits**

Any claim made or "suit" brought by any Named Insured under this Policy against another Named Insured under this Policy for damages because of "personal and advertising injury".

COMMERCIAL GENERAL LIABILITY
CG 40 14 12 20

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# CANNABIS EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**A.** The following exclusion is added:

This insurance does not apply to:

**1.** "Bodily injury", "property damage" or "personal and advertising injury" arising out of:

   **a.** The design, cultivation, manufacture, storage, processing, packaging, handling, testing, distribution, sale, serving, furnishing, possession or disposal of "cannabis"; or

   **b.** The actual, alleged, threatened or suspected inhalation, ingestion, absorption or consumption of, contact with, exposure to, existence of, or presence of "cannabis"; or

**2.** "Property damage" to "cannabis".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage", or the offense which caused the "personal and advertising injury", involved that which is described in Paragraph **A.1.** or **A.2.** above.

However, Paragraph **A.1.b.** does not apply to "bodily injury" or "property damage" arising out of the actual, alleged, threatened or suspected inhalation, ingestion, absorption or consumption of, or contact with, "cannabis" by:

   **(1)** An insured; or

   **(2)** Any other person for whom you are legally responsible;

but only if the "bodily injury" or "property damage" does not arise out of your selling, serving or furnishing of "cannabis" to any person described above.

**B.** The exclusion in Paragraph **A.** does not apply to "personal and advertising injury" arising out of the following offenses:

**1.** False arrest, detention or imprisonment; or

**2.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor.

**C.** The following definition is added to the **Definitions** section:

"Cannabis":

**1.** Means:

Any good or product that consists of or contains any amount of Tetrahydrocannabinol (THC) or any other cannabinoid, regardless of whether any such THC or cannabinoid is natural or synthetic.

**2.** Paragraph **C.1.** above includes, but is not limited to, any of the following containing such THC or cannabinoid:

   **a.** Any plant of the genus Cannabis L., or any part thereof, such as seeds, stems, flowers, stalks and roots; or

   **b.** Any compound, by-product, extract, derivative, mixture or combination, such as:

     **(1)** Resin, oil or wax;

     **(2)** Hash or hemp; or

     **(3)** Infused liquid or edible cannabis;

     whether or not derived from any plant or part of any plant set forth in Paragraph **C.2.a.**

 © Insurance Services Office, Inc., 2020

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ANIMAL LIABILITY EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is added to Paragraph **2. Exclusions** of **SECTION I – COVERAGES**, **COVERAGE A - BODILY INJURY AND PROPERTY DAMAGE LIABILITY** and **COVERAGE B - PERSONAL AND ADVERTISING INJURY LIABILITY**:

This insurance does not apply to:

**Animal Liability**

"Bodily injury", "property damage", or "personal or advertising injury" arising out of or caused by any animal regardless of whether the animal is owned by, in the care of, or on the premises of any insured.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by any insured.

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ASBESTOS OR ASBESTOS-RELATED DUST, LEAD, AND SILICA OR SILICA-RELATED DUST EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusions are added to Paragraph **2. Exclusions** of **SECTION I – COVERAGES**, **COVERAGE A - BODILY INJURY AND PROPERTY DAMAGE LIABILITY** and **COVERAGE B – PERSONAL OR ADVERTISING INJURY LIABILITY PAYMENTS**:

    **2. Exclusions**

        This insurance does not apply to:

        **a. Asbestos**

           **(1)** "Bodily injury", "property damage", or "personal or advertising injury" arising, in whole or in part, out of:

               **(a)** The actual or alleged presence, inhalation, ingestion, or prolonged physical exposure to asbestos or asbestos-related dust or goods or products containing asbestos or asbestos-related dust;

               **(b)** The manufacture, sale, distribution, handling, use, installation, containment, storage, transportation, existence, presence, emanation, emission, release, absorption, or transmission of or exposure to asbestos or asbestos-related dust;

               **(c)** Any supervision, instructions, recommendations, notices, warnings or advice given or which should have been given in connection with asbestos or asbestos-related dust; or

               **(d)** The removal of asbestos or asbestos-related dust from any good, product, or structure.

           **(2)** Any loss, cost or expenses arising out of any request, demand, order or statutory or regulatory requirement that any insured or any other person or entity abate, test for, sample, mitigate, monitor, clean up, remove, contain, treat, detoxify, neutralize, remediate or dispose of, or in any way respond to, or assess the effects of asbestos or asbestos-related dust.

           **(3)** Any claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to or assessing the effects of asbestos or asbestos-related dust.

        **b. Lead**

           **(1)** "Bodily injury", "property damage", or "personal or advertising injury arising, in whole or in part, out of plumbism and saturnism (lead poisoning) or the actual, alleged, threatened or suspected inhalation of, or ingestion, inhalation, absorption, manufacture, use, sale, installation, removal, distribution of, exposure to, or presence of, lead in any form or any product containing lead.

           **(2)** Any loss, cost or expenses arising out of any request, demand, order or statutory or regulatory requirement that any insured or any other person or entity abate, test for, sample, mitigate, monitor, clean up, remove, contain, encapsulate, treat, detoxify, neutralize, remediate or dispose of, or in any way respond to, or assess the effects of lead, including the cost of remedial investigations.

           **(3)** Any claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to or assessing the effects of lead.

**c. Silica or Silica-Related Dust**

**(1)** "Bodily injury", "property damage", or "personal or advertising injury arising, in whole or in part, out of the actual, alleged, threatened or suspected contact with, inhalation of, ingestion of, contact with, exposure to, existence of, or presence of "silica" or "silica-related dust", in any form, or any product.

**(2)** Any loss, cost or expenses arising, in whole or in part out of any request, demand, order or statutory or regulatory requirement that any insured or any other person or entity to abate, test for, sample, mitigate, monitor, clean up, remove, contain, treat, detoxify, neutralize, remediate or dispose of, or in any way respond to, or assess the effects of "silica" or "silica-related dust".

**(3)** Any claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to or assessing the effects of "silica" or "silica-related dust".

**B.** The following definition are added to the **Definitions** Section:

**1.** "Silica" means silicon dioxide (occurring in crystalline, amorphous and impure forms), silica particles, silica dust or silica compounds.

**2.** "Silica-related dust" means a mixture or combination of silica and other dust or particles.

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# BED BUGS EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2. Exclusions** of **SECTION I – COVERAGES**, **COVERAGE A - BODILY INJURY AND PROPERTY DAMAGE LIABILITY** and **SECTION I – COVERAGES, COVERAGE B - PERSONAL AND ADVERTISING INJURY LIABILITY**:

This insurance does not apply to:

**Bed Bugs**

**1.** "Bodily injury", "property damage", or "personal or advertising injury" arising out of:

    **a.** The presence or infestation of "bed bugs";

    **b.** The failure to maintain any premises free from "bed bugs" or restore any premises to a safe, sanitary, healthy, habitable or tenantable condition;

    **c.** Failure to prevent or minimize the spread of "bed bugs; or

    **d.** Any odor, fume, particle or material discharged from, released from, or generated by "bed bugs" or from any means utilized for the prevention of or treatment for any "bed bugs" infestation.

**2.** Any loss cost or expense arising out of:

    **(a)** Any request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, exterminate, remediate, contain, treat, replace, detoxify or neutralize, or in any way respond to, the actual or potential presence of "bed bugs"; or

    **(b)** Any claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, exterminating, remediating, treating, replacing, detoxifying or neutralizing, or in responding to, or assessing the actual or potential presence of "bed bugs".

    **(c)** The removal, clean up, disposal, or extermination of "bed bugs" or materials infested by "bed bugs";

    This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervising, hiring, employing, training or monitoring of others.

**B.** The following definition is added to **Section V- Definitions**:

"Bed bugs" means all parasitic insects of the Cimicidae family and their eggs, larvae, and pupae including, but not limited to, cimex lectularius and cimex hemipterus that feed on the blood of human beings.

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# BODY OF WATER EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2. Exclusions** of **SECTION I – COVERAGES**, **COVERAGE A - BODILY INJURY AND PROPERTY DAMAGE LIABILITY** and **COVERAGE B - PERSONAL AND ADVERTISING INJURY LIABILITY**:

This insurance does not apply to:

**Body Of Water**

"Bodily injury", "property damage", or "personal or advertising injury" arising out of any "body of water" regardless of whether:

**1.** The "body of water" is in the care, custody, or control of any insured;

**2.** The injury or damage arises out of the ownership, maintenance, or use of the "body of water", with or without permission.

This exclusion applies:

**1.** Even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by any insured: or

**2.** The rendering of or failure to render aid, medical, or otherwise, to any person.

**B.** The following definition is added to the Definitions Section:

"Body of water" means any accumulation of water whether it is:

**1.** Artificial, naturally occurring by nature, or an expanded part of a water course; or

**2.** Irregular, intermittent, prolonged, temporary, or seasonal.

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# DISCRIMINATION EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is added to Paragraph **2. Exclusions** of **SECTION I – COVERAGES**, **COVERAGE A - BODILY INJURY AND PROPERTY DAMAGE LIABILITY** and **COVERAGE B - PERSONAL AND ADVERTISING INJURY LIABILITY**:

This insurance does not apply to:

**Discrimination**

"Bodily injury", "property damage", or "personal or advertising injury" arising out of the actual, alleged, or threatened act or omission of discrimination, whether intentional or unintentional, based upon, but not limited to, a person's age, gender, sexual orientation or preference, marital or parental status, race, creed, religion, nationality or natural origin, illness, handicap, mental capabilities or condition, physical capabilities, characteristics or condition, or any other protected class under a federal, state or local statute, ordinance, rule, ordinance or regulation.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by any insured.

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

POLICY NUMBER: ORB-PK-23-A01924-00

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# SEXUAL ABUSE OR SEXUAL MOLESTATION EXCLUSION

This endorsement modifies insurance provided under the following:

> COMMERCIAL GENERAL LIABILITY COVERAGE PART
> LIQUOR LIABILITY COVERAGE PART
> OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART — COVERAGE FOR OPERATIONS OF DESIGNATED CONTRACTOR

**SCHEDULE**

| Description and Location of  Premise(s): |
|---|
| Primary Location, 516 N Beverly Dr, PO Box 14500, Beverly Hills, CA 90210 |

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

**A.** The following exclusion is added to Paragraph **2. Exclusions** of **SECTION I – COVERAGES, COVERAGE A - BODILY INJURY AND PROPERTY DAMAGE LIABILITY,** under the Commercial General Liability Coverage Form, under the Owners And Contractors Protective Liability Coverage Form, and with respects to **SECTION I – LIQUOR LIABILITY COVERAGE** under the Liquor Liability Coverage Form.

This insurance does not apply to:

**Sexual Abuse or Sexual Molestation**

"Injury or damage" arising out of:

**1.** The actual, alleged, or threatened "sexual abuse or sexual molestation" of any person committed by anyone;

**2.** Any claim or "suit" against you or any insured alleging the failure to protect any person or failure to maintain a safe premises arising out of any act or event described in paragraph **1.** above at any premise(s) shown in the Schedule above.

**3.** The negligent:

**a.** Employment;

**b.** Investigation;

**c.** Supervision;

**d.** Reporting to the proper authorities, or failure to so report; or

**e.** Retention;

of a person for whom you or any insured is or ever was legally responsible and whose conduct would be excluded by Paragraph **1.** above, regardless of whether or not it is alleged to be negligent, reckless, knowing, intentional, fraudulent, oppressive, malicious, or otherwise.

**C.** The following exclusion is added to Paragraph **2. Exclusions** of **SECTION I – COVERAGES, COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY** under the Commercial General Liability Coverage Form.

This insurance does not apply to:

**Sexual Abuse or Sexual Molestation**

"Personal and advertising injury" arising out of:

**POLICY NUMBER: ORB-PK-23-A01924-00**

**1.** The actual, alleged, or threatened "sexual abuse or sexual molestation" of any person committed by anyone;

**2.** Any claim or "suit" against you or any insured alleging the failure to protect any person or failure to maintain a safe premises arising out of any act or event described in paragraph **1.** above at any premise(s) shown in the Schedule above.

**3.** The negligent:

**a.** Employment;

**b.** Investigation;

**c.** Supervision;

**d.** Reporting to the proper authorities, or failure to so report; or

**e.** Retention;

of a person for whom you or any insured is or ever was legally responsible and whose conduct would be excluded by Paragraph **1.** above, regardless of whether or not it is alleged to be negligent, reckless, knowing, intentional, fraudulent, oppressive, malicious, or otherwise.

**D.** The following definition is added to the **Definitions** Section:

**1.** "Injury or damage" means any injury or damage covered under any Coverage Part to which this endorsement applies, and includes damage arising out of any "bodily injury", "property damage", "personal and advertising injury", or "injury".

**2**. "Sexual abuse or sexual molestation" means:

**a.** Any sexual behavior, sexual conduct or misconduct, sexual assault, or sexual battery: or

**b.** Any physical abuse or mental abuse, including, but not limited to, negligent or intentional infliction of physical, emotional, or psychological harm.

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# SNOW OR ICE REMOVAL EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2. Exclusions** of **SECTION I – COVERAGES**, **COVERAGE A - BODILY INJURY AND PROPERTY DAMAGE LIABILITY** and **COVERAGE B - PERSONAL AND ADVERTISING INJURY LIABILITY**:

This insurance does not apply to:

**Snow Or Ice Removal**

"Bodily injury", "property damage", or "personal or advertising injury" arising out of "snow or ice removal activities" by any insured or on behalf of any insured.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by any insured.

**B.** The following definition is added to the **Definitions** Section:

"Snow or ice removal activities" means snow plowing, snow blowing, or snow or ice clearing, shoveling, sanding, salting, or deicing by any means or methods whether ongoing or completed.

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# SWIMMING POOL EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2. Exclusions** of **SECTION I – COVERAGES**, **COVERAGE A - BODILY INJURY AND PROPERTY DAMAGE LIABILITY** and **COVERAGE B - PERSONAL AND ADVERTISING INJURY LIABILITY**:

This insurance does not apply to:

**Swimming Pool**

"Bodily injury", "property damage", or "personal or advertising injury" arising out of the ownership, maintenance, operation, or use of a "swimming pool", with or without permission.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by any insured.

**B.** The following definition is added to the **Definitions** Section:

"Swimming pool" means any:

**1.** Below ground or above ground swimming pool, whether permanent or portable, including diving boards and slides;

**2.** Hot tub and fountain;

**3.** Spa; or

**4.** Pool equipment and surrounding deck.

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# TANNING DEVICES EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2. Exclusions** under **SECTION I – COVERAGES**, **COVERAGE A - BODILY INJURY AND PROPERTY DAMAGE LIABILITY, COVERAGE B - PERSONAL AND ADVERTISING INJURY LIABILITY**, and **COVERAGE C. MEDICAL PAYMENTS**:

This insurance does not apply to:

**Tanning Devices**

"Bodily injury", "property damage" or "personal and advertising injury" arising, directly or indirectly, out of:

**1.** The ownership, maintenance, or use of any "tanning device", whether rented, leased, hired, loaned, borrowed or entrusted to others or provided to another by any insured;

**2.** Any harmful health hazards, conditions, effects or cosmetic side effects of a "tanning device";

**3.** The providing of or failure to provide any service, advice, instructions or warnings related to a "tanning device"; or

**4.** Violation of any statute or regulation in connection with paragraph **1.**, **2.**, **or 3.** above.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury", "property damage", medical expenses, or the offense which caused the "personal and advertising injury", involved the rendering of or failure to render aid, medical or otherwise, by any insured, to any person, out of that which is described in Paragraphs **1.**, **2.**, **3.**, **or 4.** above.

**B.** The following definition is added to the **Definitions** Section:

"Tanning device":

**1.** Means:

    **a.** Any tanning bed, tanning booth, or any other tanning apparatus or irradiating device;

    **b.** Any spray tanning bed, spray tanning booth, or spray tanning tent; or

    **c.** Any other artificial method, treatment, service, or process of exposing the skin to ultraviolet radiation to produce a cosmetic tan.

**2.** Includes:

    **a.** Tanning components, equipment, parts or accessories; or

    **b.** Lotions, spray-on tanning solutions or other products;

    in connection with paragraph **1.** above.

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# TRAMPOLINE EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is added to Paragraph **2. Exclusions** of **SECTION I – COVERAGES**, **COVERAGE A - BODILY INJURY AND PROPERTY DAMAGE LIABILITY** and **COVERAGE B – PERSONAL AND ADVERTISING INJURY**:

This insurance does not apply to:

**Trampoline**

 "Bodily injury", "property damage", or "personal and advertising injury" arising out of:

**1.** The use of any trampoline by any person on premises owned or rented by any insured; or

**2.** The ownership, use, entrustment, loaning, or rental of a trampoline by any insured.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or  "property damage, or the offense which caused the "personal and advertising injury", involved the rendering of or failure to render aid, medical or otherwise, by any insured, to any person, out of that which is described in Paragraph **1.** or **2.** above.

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# PUNITIVE OR EXEMPLARY DAMAGES EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART – COVERAGE FOR OPERATIONS OF DESIGNATED CONTRACTOR

**A.** Paragraph **C.** of this endorsement is added to Paragraph **2. Exclusions** of **SECTION I – COVERAGES, COVERAGE A - BODILY INJURY AND PROPERTY DAMAGE LIABILITY** and **COVERAGE B - PERSONAL AND ADVERTISING INJURY LIABILITY** under the Commercial General Liability Coverage Form.

**B.** Paragraph **C.** of this endorsement is added to Paragraph **2. Exclusions** of **SECTION I – COVERAGES – PRODUCTS/COMPLETED OPERATIONS – BODILY INJURY AND PROPERTY DAMAGE LIABILITY** under the Products/Completed Operations Coverage Form, **2. Exclusions** of **SECTION I – LIQUOR LIABILITY COVERAGE** under the Liquor Liability Coverage Form, and **2. Exclusions** of **SECTION I – COVERAGES, BODILY INJURY AND PROPERTY DAMAGE LIABILITY** under the Owners And Contractors Protective Liability Coverage Form.

**C.** This insurance does not apply to:

**Punitive Or Exemplary Damages**

Damages, claims, or "suits" for "punitive or exemplary damages". If a "suit" is brought against any insured for a claim falling within coverage provided under this policy seeking both compensatory and "punitive or exemplary damages", we shall have the duty to defend such "suit", however, we shall not have an obligation to pay for any costs, interest, or damages attributed to "punitive or exemplary damages".

**D.** The following definition is added to the **DEFINITIONS** Sections:

"Punitive damages or exemplary damages" means those damages imposed to punish a wrongdoer and to deter others from similar conduct, including, but not limited to, fines, penalties, or liquidated damages, or any damages awarded pursuant to statute in the form of double, treble, or other multiple damages in excess of compensatory damages.

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# INDEPENDENT CONTRACTORS OR SUBCONTRACTORS EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is added to Paragraph **2. Exclusions** under **SECTION I – COVERAGES**, **COVERAGE A - BODILY INJURY AND PROPERTY DAMAGE LIABILITY** and **SECTION I – COVERAGES, COVERAGE B - PERSONAL AND ADVERTISING INJURY LIABILITY**:

This insurance does not apply to:

**Independent Contractors/Subcontractors**

"Bodily injury", "property damage", or "personal or advertising injury" arising out of work or operations performed by any independent contractors or subcontractors for you or any insured.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# INJURY TO EMPLOYEES, WORKERS, OR INDEPENDENT CONTRACTORS/SUBCONTRACTORS EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion replaces Paragraph **e. Employer's liability**, of **2. Exclusions** of **SECTION I – COVERAGES**, **COVERAGE A - BODILY INJURY AND PROPERTY DAMAGE LIABILITY**:

This insurance does not apply to:

**Injury To Employees, Workers, Or Independent Contractors/Subcontractors**

"Bodily injury" to:

**1.** Any "employee", "temporary worker", "volunteer worker", casual worker, or independent contractors/subcontractors of any insured working on behalf of any insured or any tenant of any insured, that arises out of and in the course of:

  **a.** Employment by any insured; or

  **b.** Performing duties related to the conduct of any insured's business; or

**2.** The spouse, child, parent, brother, sister, or any other family member of any "employee", "temporary worker", "volunteer worker", casual worker, or independent contractors/subcontractors as a consequence of Paragraph **1.** above.

This exclusion applies whether any insured may be liable as an employer or in any other capacity and to any obligation, even if assumed in a written contract or written agreement to share damages with or repay someone else who must pay damages because of the injury.

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# PROFESSIONAL SERVICES EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is added to Paragraph **2. Exclusions** of **SECTION I – COVERAGES**, **COVERAGE A - BODILY INJURY AND PROPERTY DAMAGE LIABILITY** and **COVERAGE B – PERSONAL AND ADVERTISING INJURY**:

This insurance does not apply to:

**Professional Services**

"Bodily injury", "property damage", or "personal and advertising injury" due to the rendering of or failure to render any professional service.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury", "property damage", or the offense which caused the "personal and advertising injury", involved the rendering of or failure to render any professional service.

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# TOTAL LIQUOR LIABILITY EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SECTION I – COVERAGES**, **COVERAGE A - BODILY INJURY AND PROPERTY DAMAGE LIABILITY**, **2. Exclusions,** paragraph **c. Liquor Liability** is replaced with the following:

This insurance does not apply to:

**LIQUOR LIABILITY**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

**(1)** Causing or contributing to the intoxication of any person;

**(2)** The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

**(3)** Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in:

**(a)** The supervision, hiring, employment, training or monitoring of others by that insured; or

**(b)** Providing or failing to provide transportation with respect to any person that may be under the influence of alcohol;

if the "occurrence" which caused the "bodily injury" or "property damage", involved that which is described in Paragraph **(1), (2)** or **(3)** above.

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# DESCRIBED HAZARDS EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is added to Paragraph **2. Exclusions** of **SECTION I – COVERAGES**, **COVERAGE A - BODILY INJURY AND PROPERTY DAMAGE LIABILITY** and **COVERAGE B - PERSONAL AND ADVERTISING INJURY LIABILITY:**

This insurance does not apply to:

**Described Hazards**

"Bodily injury", "property damage", or "personal and advertising injury" arising out of any:

1. Dunk tanks or splash tower water dunk games;
2. Rock climbing walls or structures, rope climbing, zip lining;
3. Ski or tram lifts;
4. Inflatables, mechanical or non-mechanical amusement devices;
5. Obstacle courses;
6. Carnivals, circuses with animals, or petting zoos;
7. Animal rides, equestrians, rider of saddle animals, or horse drawn hayrides;
8. Diving boards, scuba diving, snorkeling, water surfing, skiing or tubing;
9. White water rafting, parasailing, or jet skiing;
10. Snow tubing, skiing, or snowboarding;
11. Archery, axe throwing or paint balling;
12. Skateboarding, roller or ice skating;
13. Sky diving, bungee jumping, or aerial events;
14. Helicopters, airplanes, jet suits, or balloon rides;
15. All-terrain vehicles, snowmobiles, motor vehicle races or competitions;
16. Heavy metal, hard rock, rap or hip-hop concerts; or
17. Contests involving alcohol drinking or eating.

This exclusion applies even if claims allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by any insured.

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

**POLICY NUMBER: ORB-PK-23-A01924-00**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ASSAULT OR BATTERY EXCLUSION

This endorsement modifies insurance provided under the following:

> COMMERCIAL GENERAL LIABILITY COVERAGE PART
> LIQUOR LIABILITY COVERAGE PART
> OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART — COVERAGE FOR OPERATIONS OF DESIGNATED CONTRACTOR

**SCHEDULE**

| |
|---|
| **Description and Location of  Premise(s):** |
| Primary Location, 516 N Beverly Dr, PO Box 14500, Beverly Hills, CA 90210 |

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

**A.** Paragraph **B.** of this endorsement replaces exclusion **a. Expected Or Intended Injury** of **2. Exclusions** of **SECTION I – COVERAGES**, **COVERAGE A - BODILY INJURY AND PROPERTY DAMAGE LIABILITY**, under the Commercial General Liability Coverage Form, under the Owners And Contractors Protective Liability Coverage Form, and with respects to **SECTION I – LIQUOR LIABILITY COVERAGE** under the Liquor Liability Coverage Form.

**B.** This insurance does not apply to:

**Assault Or Battery**

  **1.** "Injury or damage" expected or intended from the standpoint of the insured;

  **2.** "Injury or damage" arising out of:

    **(a)** Any actual, alleged, threatened or attempted assault or battery committed or attempted by any insured or any other person;

    **(b)** Any act, failure to act, error or omission in connection with prevention or suppression of assault or battery;

    **(c)** The failure to provide adequate security, maintain a safe environment, or safe premises to any person injured in an assault or battery;

    **(d)** The rendering of or failure to render aid, secure treatment, or notify emergency personnel;

    **(e)** The actual or threatened assault or battery whether caused by, or at the instigation or direction of any insured, his employees, patrons or any other person; or

    **(f)** Any actual, alleged, threatened or attempted verbal or physical altercation, physical assault or physical battery committed, or any act, failure to act, error or omission in connection with prevention or suppression thereof

  at any premise(s) shown in the Schedule above.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, retention, training or monitoring of others by any insured.

**C.** The following exclusion is added to **2. Exclusions** of **SECTION I – COVERAGES, COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY** under the Commercial General Liability Coverage Form.

This insurance does not apply to:

**Assault Or Battery**

  **1.** "Personal and advertising injury" expected or intended from the standpoint of the insured;

  **2.** "Personal or advertising injury" arising out of:

    **(a)** Any assault or battery committed or attempted by any insured or any other person;

© 2022, Old Republic Excess & Surplus

**POLICY NUMBER: ORB-PK-23-A01924-00**

    **(b)** Any act, failure to act, error or omission in connection with prevention or suppression of assault or battery;

    **(c)** The failure to provide adequate security, maintain a safe environment, or safe premises to any person injured in an assault or battery;

    **(d)** The rendering of or failure to render aid, secure treatment, or notify emergency personnel;

    **(e)** The actual or threatened assault or battery whether caused by or at the instigation or direction of any insured, his employees, patrons or any other person; or

    **(f)** Any actual, alleged, threatened or attempted verbal or physical altercation, physical assault or physical battery committed, or any act, failure to act, error or omission in connection with prevention or suppression thereof

at any premise(s) shown in the Schedule above.

We shall have no duty to defend you or any insured against any loss, claim, or "suit" seeking damages for any "injury or damage" excluded by this endorsement.

**D.** The following definition is added to the **Definitions** Section of this policy:

"Injury or damage" means any injury or damage covered under any Coverage Part to which this endorsement applies, and includes damage arising out of any "bodily injury", "property damage", "personal and advertising injury", or "injury".

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CLASSIFICATION LIMITATION

Coverage under this policy is specifically limited to those operations described by the classification(s) listed in the Commercial General Liability Coverage Part Declarations. This policy does not apply to any operations not specifically listed in the Commercial General Liability Coverage Part Declarations or added by endorsement.

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CONSTRUCTION OR CONSTRUCTION RELATED OPERATIONS EXCLUSION WITH MAINTENANCE EXCEPTION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is added to Paragraph **2. Exclusions** of **Section I - Coverage A - Bodily Injury And Property Damage Liability** and **Coverage B - Personal And Advertising Injury Liability**:

This insurance does not apply to:

**Construction or Construction Related Operations**

"Bodily injury", "property damage", or "personal and advertising injury" arising out of any construction or construction related operations of any kind that are performed by you or on your behalf and whether the operations are performed for any insured or for any other person or organization.

This exclusion applies:

**1.** Regardless of whether the described operations are ongoing, completed or in any other stage when the loss occurs; and

**2.** Even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured.

However, this exclusion does not apply to service, maintenance, or repairs to existing buildings or structures or "your work" or the work of any insured that was part of the original construction of the buildings or structures.

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# HABITABILITY EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.**  The following exclusion is added to Paragraph **2. Exclusions** of **SECTION I – COVERAGES**, **COVERAGE A - BODILY INJURY AND PROPERTY DAMAGE LIABILITY** and **COVERAGE B – PERSONAL AND ADVERTISING INJURY**:

This insurance does not apply to:

**Habitability**

1.  "Bodily injury", "property damage", or "personal and advertising injury" arising out violation(s) of any law involving or related to "habitability", including, but not limited to, claims arising out of the alleged or actual violation or breach of any of the following:

    **a.**  Civil Codes;

    **b.**  Health and Safety Codes;

    **c.**  Housing and Urban Development laws, ordinances, or statutes;

    **d.**  Rent stabilization laws, measures, ordinances, or statutes;

    **e.**  Federal, State, or local Section 8 (government subsidized housing) programs;

    **f.**  Americans with Disabilities Act;

    **g.**  Administrative rules or regulations or orders pertaining to any of the foregoing, including, but not limited to those promulgated by local municipalities;

    **h.**  Common law or statutory law; or

    **i.**  A lease, rental agreement, contract, warranty or covenant, whether written or oral, involving any duty to maintain "habitability" of any premises.

2.  Failure to respond to or comply with any federal, state, municipal, or local order or directive to correct conditions at or near premises in violation of any of Paragraph **1.** above.

    This exclusion applies:

    1.  To any obligation to share damages with or indemnify or repay someone else who must pay damages because of "property damage" or injury arising from any matter to which this exclusion applies; and

    2.  Even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured.

**B.**  We shall have no duty to defend any claims, proceedings, or "suits" in any way arising out of coverage excluded by this endorsement.

**C.**  The following definition is added to the **Definitions** Section:

"Habitability" means a room, dwelling, or premises designed, constructed, controlled, managed, operated or maintained by any insured in a safe living environment and fit for occupancy by human beings in a sanitary, habitable or tenantable condition.

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# RESIDENTIAL CONDOMINIUM CONVERSION EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2. Exclusions** of **SECTION I – COVERAGES**, **COVERAGE A - BODILY INJURY AND PROPERTY DAMAGE LIABILITY** and **COVERAGE B – PERSONAL AND ADVERTISING INJURY**:

This insurance does not apply to:

**Residential Condominium Conversion**

"Bodily injury", "property damage", or "personal and advertising injury" arising out of, or related to, "your work" or "your product" within the products-completed hazard to any building, development, or project that is converted or subsequently converted, reconstructed, remodeled, or altered to a "residential condominium" development.

**B.** The following definition is added to the **Definitions** Section:

"Residential condominium" includes condominium(s), condominium conversions, cooperative(s), townhome(s), time share(s), row house(s), or "mixed use" property. However, it does not include military barracks, dormitory buildings, hotels, motels, nursing homes, assisted living facilities.

"Mixed use" means building(s) or a group of buildings which have a mix of "residential condominium" and commercial or "residential condominium" and industrial uses.

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CONTAMINATED DRYWALL EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2. Exclusions** of **SECTION I – COVERAGES**, **COVERAGE A - BODILY INJURY AND PROPERTY DAMAGE LIABILITY** under the Commercial General Liability Coverage Form and to Paragraph **2. Exclusions** of **SECTION I – COVERAGES**, **COVERAGE A - BODILY INJURY AND PROPERTY DAMAGE LIABILITY** under the Owners and Contractors Protective Liability Coverage Form and under the Products/Completed Operations Liability Coverage Form.

This insurance does not apply to:

**Contaminated Drywall**

**1.** "Bodily injury" or "property damage" arising out of:

    **a.** The actual, alleged or threatened contact with, exposure to, or discharge, dispersal, seepage, migration, release, escape, inhalation, ingestion, existence, or presence of "contaminated drywall"; or

    **b.** The manufacture, distribution, sale, installation, or use of "contaminated drywall".

**2.** Any loss, cost or expense arising out of:

    **a.** Any request, demand, order or statutory or regulatory requirement that any insured or others abate, test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, remediate or dispose of, or in any way respond to, or assess the effects of one or more "contaminated drywall"; or

    **b.** Any claim or "suit" by or on behalf of a governmental authority for damages because of abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of "contaminated drywall".

**B.** The following exclusion is added to Paragraph **2. Exclusions** of **SECTION I – COVERAGES**, **COVERAGE B - PERSONAL AND ADVERTISING INJURY LIABILITY** under the Commercial General Liability Coverage Form:

This insurance does not apply to:

**Contaminated Drywall**

**1.** "Personal and advertising injury" arising out of:

    **a.** The actual, alleged or threatened contact with, exposure to, or discharge, dispersal, seepage, migration, release, escape, inhalation, ingestion, existence, or presence of "contaminated drywall"; or

    **b.** The manufacture, distribution, sale, installation, or use of "contaminated drywall".

**2.** Any loss, cost or expense arising out of:

    **a.** Any request, demand, order or statutory or regulatory requirement that any insured or others abate, test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, remediate or dispose of, or in any way respond to, or assess the effects of one or more "contaminated drywall"; or

    **b.** Any claim or "suit" by or on behalf of a governmental authority for damages because of abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of "contaminated drywall".

**C.** The following definition is added to the **DEFINITIONS** Section:

"Contaminated Drywall" means any drywall, wallboard, gypsum board, or plasterboard that:

**1.** Emits gases, vapors, or fumes; or

**2.** Contains or that is made of, or with, any toxic, noxious, hazardous, irritating or corrosive substance(s) or contaminant.

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# AIRCRAFT PRODUCTS AND GROUNDING EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2. Exclusions** of **SECTION I – COVERAGES**, **COVERAGE A - BODILY INJURY AND PROPERTY DAMAGE LIABILITY** and **COVERAGE B - PERSONAL AND ADVERTISING INJURY LIABILITY**:

This insurance does not apply to:

**Aircraft Products and Grounding**

"Bodily injury", "property damage", or "personal and advertising injury" arising out of any "aircraft product" or the "grounding" of any aircraft.

**B.** For the purposes of this exclusion, the following definitions are added to the **DEFINITIONS** Section:

  **1.** "Aircraft product" means:

    **a.** Aircraft including manned aircraft or manned aerial vehicles, including any missile or spacecraft, and any ground support or control equipment used therewith;

    **b.** Any article or part installed in an aircraft or any ground handling tools or equipment or used in connection therewith;

    **c.** Any product used at an airport for the purpose of guidance, navigation, or direction of an aircraft;

    **d.** Plans, specifications, opinions, surveys, designs, recommendations or advice relating to any article or part installed in or used in connection with an aircraft or any ground support or control equipment; or

    **e.** Training aids, instructions, or manuals, blueprints, engineering other data or advice relating to operating, inspecting, maintaining, repairing or re-building, servicing and labor of an aircraft or any ground support or control equipment.

  **2.** "Grounding" means the complete and continuous withdrawal at or about the same time of one or more aircrafts including ground support and ground control equipment from all flight operations due to an airworthiness directive or mandatory order from any civil airworthiness authority or agency, because of an existing, alleged or suspected existence of any defect, fault or condition affecting the safe operation of such aircraft.

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# SUBSIDENCE EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusions is added to Paragraph **2. Exclusions** of **SECTION I – COVERAGES**, **COVERAGE A - BODILY INJURY AND PROPERTY DAMAGE LIABILITY** and **COVERAGE B - PERSONAL AND ADVERTISING INJURY LIABILITY:**

This insurance does not apply to:

**Subsidence**

"Bodily injury", "property damage", or "personal and advertising injury" arising out of "subsidence" that is:

**1.** Caused by or alleged to have been caused by; or

**2.** Aggravated by or alleged to have been aggravated by;

"your work" or work performed by any insured or on behalf of any insured.

**B.** The following definition is added to the **DEFINITIONS** Section:

"Subsidence" means caving, shifting, eroding, settling, sinking, rising, titling, shifting, or any other movement of land, earth, or mud, including soil conditions which cause settling, cracking or other disarrangement of foundations or other parts of realty, regardless of whether such movement is naturally occurring or is man-made. Soil conditions include contraction, expansion, freezing, thawing, erosion, improperly compacted soil and the action of water under the ground surface.

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# FRACKING EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS COVERAGE PART
OWNER AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM – COVERAGE FOR OPERATIONS OF DESIGNATED CONTRACTOR

**A.** Paragraph **B.** of this endorsement is added to Paragraph **2. Exclusions** of **SECTION I – COVERAGES**, **COVERAGE A - BODILY INJURY AND PROPERTY DAMAGE LIABILITY** under the Commercial General Liability Coverage Form, of **SECTION I – COVERAGES – PRODUCTS/COMPLETED OPERATIONS – BODILY INJURY AND PROPERTY DAMAGE LIABILITY** under the Products/Completed Operations Coverage Form and of **SECTION I – COVERAGES, BODILY INJURY AND PROPERTY DAMAGE LIABILITY** under the Owners And Contractors Protective Liability Coverage Form.

**B.** This insurance does not apply to:

**Fracking**

**1.** "Bodily injury" or "property damage" arising out of:

    **a.** "Fracking" operations involving substances under pressure being pumped underground with the objective of creating fractures in geologic formations to facilitate the release and extraction of hydrocarbons, including, but not limited to, oil or natural gas.

    **b.** The actual, alleged, threatened or suspected contact with, exposure to, existence of, or presence of any "flowback" or the handling, transporting, storage, release or disposal of any "flowback" by any insured or by any other person or organization.

    **c.** Earth or land movement, in any direction, arising out of any of the operations or activities described in **B.1.a** above; or

**2.** Any loss, cost, or expense arising out of:

    **a.** The abating, containing, testing, treating, monitoring, mitigating, remediating, disposing of, or in and way responding to or assessing the effects of **B.1.a.,b. or c.** above.

    **b.** Any request, demand, order, or statutory or regulatory requirement that any insured or others test for, monitor, or in any way respond to, or assess the effects of such actual, alleged, or threatened damage out of **B.1.a.b.** or **c**. above.

**3.** Any claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to or assessing the effects of **B.1.a.b** or **c**. above.

**C.** The following exclusion is added to Paragraph **2. Exclusions** of **SECTION I – COVERAGES**, **COVERAGE B - PERSONAL AND ADVERTISING INJURY LIABILITY** under the Commercial General Liability Coverage Form:

This insurance does not apply to:

**Fracking**

**1.** "Personal and advertising injury" arising out of:

    **a.** "Fracking" operations involving substances under pressure being pumped underground with the objective of creating fractures in geologic formations to facilitate the release and extraction of hydrocarbons, including, but not limited to, oil or natural gas. Such operations include, but are not limited to, "hydraulic fracturing" or "gas fracturing";

    **b.** The actual, alleged, threatened or suspected contact with, exposure to, existence of, or presence of any "flowback" or the handling, transporting, storage, release or disposal of any "flowback" by any insured or by any other person or organization.

    **c.**  Earth or land movement, in any direction, arising out of any of the operations or activities described in **C.1.a** above; or

**2.**  Any loss, cost, or expense arising out of:

    **a**.  The abating, containing, testing, treating, monitoring, mitigating, remediating, disposing of, or in and way responding to or assessing the effects of **C.1.a.,b. or c.** above.

    **b**.  Any request, demand, order, or statutory or regulatory requirement that any insured or others test for, monitor, or in any way respond to, or assess the effects of such actual, alleged, or threatened damage out of **C.1.a.b.** or **c.** above.

**3.**  Any claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to or assessing the effects of **C.1.a.b.** or **c.** above.

**D.**  The following definitions are added to the **Definitions** Section:

**1.**  "Flowback" means any substance containing returned "fracking" process fluids, including, but not limited to water, proppants, "fracking" fluid additives and any hydrocarbon compounds, salts, conventional pollutants, organics, metals, and naturally occurring radioactive material brought to, or collected on, the surface with the water after fracturing operations are completed.

**2.**  "Fracking Operations" means:

    **1.**  Means the waterless process by which propane gel and proppants are injected at high pressure into underground geologic formations to create fractures, to facilitate the release and extraction of natural gas; or

    **2.**  The process by which water, sand, proppants, chemicals, or other liquids, materials, fluid additives or substances are injected at high pressure into underground geologic formations to create fractures to facilitate the release and extraction of any hydrocarbons including, but not limited to, oil or natural gas.


**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

© 2022, Old Republic Excess & Surplus

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ELECTROMAGNETIC FIELDS EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2. Exclusions** of **SECTION I – COVERAGES**, **COVERAGE A - BODILY INJURY AND PROPERTY DAMAGE LIABILITY** under the Commercial General Liability Coverage Form, and to **SECTION I – COVERAGES**, **COVERAGE A - BODILY INJURY AND PROPERTY DAMAGE LIABILITY** under the Owners and Contractors Protective Liability Coverage Form and under the Products/Completed Operations Liability Coverage Form.

This insurance does not apply to:

**Electromagnetic Fields**

**1.** "Bodily injury" or "property damage"  arising out of the actual, alleged, or threatened exposure to, presence of, contact with, release of, escape of, or discharge of "electromagnetic fields" whether naturally occurring from the earth or artificially generated from electromagnetic sources or equipment.

**2.** Any loss, cost or expenses arising out of:

    **a.** Any request, demand, order or statutory or regulatory requirement that any insured or any other person or entity abate, test for, sample, mitigate, monitor, clean up, remove, contain, treat, detoxify, neutralize, remediate or dispose of, or in any way respond to, or assess the effects of "electromagnetic fields".

    **b.** Any claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to or assessing the effects of "electromagnetic fields".

**B.** The following exclusion is added to Paragraph **2. Exclusions** of **SECTION I – COVERAGES**, **COVERAGE B – PERSONAL AND ADVERTISING INJURY** under the Commercial General Liability Coverage Form:

This insurance does not apply to:

**Electromagnetic Fields**

**1.** "Personal and advertising injury" arising out of the actual, alleged, or threatened exposure to, presence of, contact with, release of, escape of, or discharge of "electromagnetic fields" whether naturally occurring from the earth or artificially generated from electromagnetic sources or equipment.

**2.** Any loss, cost or expenses arising out of:

    **a.** Any request, demand, order or statutory or regulatory requirement that any insured or any other person or entity abate, test for, sample, mitigate, monitor, clean up, remove, contain, treat, detoxify, neutralize, remediate or dispose of, or in any way respond to, or assess the effects of "electromagnetic fields".

    **b.** Any claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to or assessing the effects of "electromagnetic fields".

**C.** The following definition is added to the **DEFINITIONS** Section:

"Electromagnetic fields" means electrical, magnetic or electromagnetic energy, electromagnetic radiation, waves, fields or forces generated, produced, distributed, transmitted, or maintained by charges, currents, frequencies, energy or forces that possess a definite amount of electromagnetic energy.

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CYBER INCIDENT EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2. Exclusions** of **SECTION I – COVERAGES**, **COVERAGE A - BODILY INJURY AND PROPERTY DAMAGE LIABILITY,** and Paragraph **2. Exclusions** of **SECTION I-COVERAGES, COVERAGE B - PERSONAL AND ADVERTISING INJURY LIABILITY**:

This insurance does not apply to:

**Cyber Incident**

"Bodily injury", "property damage", or "personal or advertising injury" arising out of a "cyber incident".

This exclusion applies even if damages are claimed for notification costs, credit or identity monitoring expenses, forensic expenses, public relations expenses, data restoration expenses, extortion expenses or any other similar cost or expense incurred by you or others arising out of a "cyber incident."

**B.** For the purposes of this endorsement, the following definition is added to the **Definitions** Section:

"Cyber incident" means any:

**1.** Unauthorized access to or use, damage to, disruption of, or loss of use, of any computer system.

**2.** Malicious code, virus or any other harmful code that is directed at, enacted upon or introduced into any computer system and is designed to access, alter, corrupt, damage, delete, destroy, disrupt, encrypt, exploit, use or prevent or restrict access to or the use of any part of any computer system or otherwise disrupt its normal functioning or operation.

**3.** Denial of service attack which disrupts, prevents or restricts access to or use of any computer system, or otherwise disrupts its normal functioning or operation.

**4.** Denial of access to or service of, interruption of service, degradation, loss of use, alteration, failure, destruction, corruption, or impairment, of a computer system.

**5.** Transfer, payment or delivery of money or any form of currency, including virtual currency, in response to a fraudulent instruction or demand.

**6.** Demand for a ransom payment in money, or any form of currency, including virtual currency, or property or services, made in connection with the actual or threatened perpetuation of paragraphs **1.** through **5.** above.

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**



# OLD REPUBLIC UNION INSURANCE COMPANY

## COMMERCIAL PROPERTY COVERAGE PART DECLARATION PAGE

**NAMED INSURED:** LiveOne Inc                    ☐ Extension of Declarations is attached
**POLICY NUMBER: ORB-PK-23-A01924-00**          **POLICY PERIOD:  FROM: 01-29-2024 TO: 01-29-2025**

(AT 12:01 A.M. STANDARD TIME AT YOUR MAILING ADDRESS SHOWN BELOW)

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

**SCHEDULE OF LOCATIONS:** Additional locations (if any) will be shown on form ORES CPDE-01, Commercial Property Coverage Part Declarations Extensions.

| Prem.1 | Bldg.1 | 516 N Beverly Dr, PO Box 14500, Beverly Hills,CA 90210 | Const:Frame | PC: 4 |
|---|---|---|---|---|

**BUILDING LEVEL COVERAGES:**

| Coverage | Premium |
|---|---|
| Equipment Breakdown | $11.00 |

**PERSONAL PROPERTY**

| Coverage | Cause of Loss | Valuation | Limit | Co-Insurance | Rate | Premium |
|---|---|---|---|---|---|---|
| Personal Property | Basic | Replacement Cost | $100,000 | 80% | 0.351 | $351.00 |

**DEDUCTIBLES:**

| Prem. # | Building # | AOP | Theft | Water | Vandalism | Minimum Wind Or Hail | Named Storm | Sprinkler |
|---|---|---|---|---|---|---|---|---|
| 1 | 1 | $1,000 | | | | | | |

**WARRANTIES:**

| Operational Smoke Detectors | P-9 |
|---|---|

**PROPERTY TOTAL PREMIUM:**

| Minimum Earned Premium 25% | TOTAL PREMIUM | $362.00 |
|---|---|---|
| | TRIA PREMIUM | $11.00 |
| | TOTAL PREMIUM WITH TRIA | $373.00 |

**SCHEDULE OF FORMS & ENDORSEMENTS:**
Forms and Endorsements applying to this Coverage Part and made part of this policy at time of issue are listed under Schedule of Forms and Endorsements – Form ORES S-001

THESE DECLARATIONS ARE PART OF THE POLICY DECLARATIONS CONTAINING THE NAME OF THE INSURED AND THE POLICY PERIOD.

**COMMERCIAL PROPERTY**
**CP 00 10 10 12**

# BUILDING AND PERSONAL PROPERTY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy, the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **H.** Definitions.

## A. Coverage

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

### 1. Covered Property

Covered Property, as used in this Coverage Part, means the type of property described in this section, **A.1.**, and limited in **A.2.** Property Not Covered, if a Limit Of Insurance is shown in the Declarations for that type of property.

**a. Building,** meaning the building or structure described in the Declarations, including:

**(1)** Completed additions;

**(2)** Fixtures, including outdoor fixtures;

**(3)** Permanently installed:

**(a)** Machinery; and

**(b)** Equipment;

**(4)** Personal property owned by you that is used to maintain or service the building or structure or its premises, including:

**(a)** Fire-extinguishing equipment;

**(b)** Outdoor furniture;

**(c)** Floor coverings; and

**(d)** Appliances used for refrigerating, ventilating, cooking, dishwashing or laundering;

**(5)** If not covered by other insurance:

**(a)** Additions under construction, alterations and repairs to the building or structure;

**(b)** Materials, equipment, supplies and temporary structures, on or within 100 feet of the described premises, used for making additions, alterations or repairs to the building or structure.

**b. Your Business Personal Property** consists of the following property located in or on the building or structure described in the Declarations or in the open (or in a vehicle) within 100 feet of the building or structure or within 100 feet of the premises described in the Declarations, whichever distance is greater:

**(1)** Furniture and fixtures;

**(2)** Machinery and equipment;

**(3)** "Stock";

**(4)** All other personal property owned by you and used in your business;

**(5)** Labor, materials or services furnished or arranged by you on personal property of others;

**(6)** Your use interest as tenant in improvements and betterments. Improvements and betterments are fixtures, alterations, installations or additions:

**(a)** Made a part of the building or structure you occupy but do not own; and

**(b)** You acquired or made at your expense but cannot legally remove;

**(7)** Leased personal property for which you have a contractual responsibility to insure, unless otherwise provided for under Personal Property Of Others.

**c. Personal Property Of Others** that is:

**(1)** In your care, custody or control; and

**(2)** Located in or on the building or structure described in the Declarations or in the open (or in a vehicle) within 100 feet of the building or structure or within 100 feet of the premises described in the Declarations, whichever distance is greater.

However, our payment for loss of or damage to personal property of others will only be for the account of the owner of the property.

**2. Property Not Covered**

Covered Property does not include:

**a.** Accounts, bills, currency, food stamps or other evidences of debt, money, notes or securities. Lottery tickets held for sale are not securities;

**b.** Animals, unless owned by others and boarded by you, or if owned by you, only as "stock" while inside of buildings;

**c.** Automobiles held for sale;

**d.** Bridges, roadways, walks, patios or other paved surfaces;

**e.** Contraband, or property in the course of illegal transportation or trade;

**f.** The cost of excavations, grading, backfilling or filling;

**g.** Foundations of buildings, structures, machinery or boilers if their foundations are below:

   **(1)** The lowest basement floor; or

   **(2)** The surface of the ground, if there is no basement;

**h.** Land (including land on which the property is located), water, growing crops or lawns (other than lawns which are part of a vegetated roof);

**i.** Personal property while airborne or waterborne;

**j.** Bulkheads, pilings, piers, wharves or docks;

**k.** Property that is covered under another coverage form of this or any other policy in which it is more specifically described, except for the excess of the amount due (whether you can collect on it or not) from that other insurance;

**l.** Retaining walls that are not part of a building;

**m.** Underground pipes, flues or drains;

**n.** Electronic data, except as provided under the Additional Coverage, Electronic Data. Electronic data means information, facts or computer programs stored as or on, created or used on, or transmitted to or from computer software (including systems and applications software), on hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other repositories of computer software which are used with electronically controlled equipment. The term computer programs, referred to in the foregoing description of electronic data, means a set of related electronic instructions which direct the operations and functions of a computer or device connected to it, which enable the computer or device to receive, process, store, retrieve or send data. This paragraph, **n.,** does not apply to your "stock" of prepackaged software, or to electronic data which is integrated in and operates or controls the building's elevator, lighting, heating, ventilation, air conditioning or security system;

**o.** The cost to replace or restore the information on valuable papers and records, including those which exist as electronic data. Valuable papers and records include but are not limited to proprietary information, books of account, deeds, manuscripts, abstracts, drawings and card index systems. Refer to the Coverage Extension for Valuable Papers And Records (Other Than Electronic Data) for limited coverage for valuable papers and records other than those which exist as electronic data;

**p.** Vehicles or self-propelled machines (including aircraft or watercraft) that:

   **(1)** Are licensed for use on public roads; or

   **(2)** Are operated principally away from the described premises.

   This paragraph does not apply to:

      **(a)** Vehicles or self-propelled machines or autos you manufacture, process or warehouse;

© Insurance Services Office, Inc., 2011

**(b)** Vehicles or self-propelled machines, other than autos, you hold for sale;

**(c)** Rowboats or canoes out of water at the described premises; or

**(d)** Trailers, but only to the extent provided for in the Coverage Extension for Non-owned Detached Trailers; or

**q.** The following property while outside of buildings:

**(1)** Grain, hay, straw or other crops;

**(2)** Fences, radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers, trees, shrubs or plants (other than trees, shrubs or plants which are "stock" or are part of a vegetated roof), all except as provided in the Coverage Extensions.

**3. Covered Causes Of Loss**

See applicable Causes Of Loss form as shown in the Declarations.

**4. Additional Coverages**

**a. Debris Removal**

**(1)** Subject to Paragraphs **(2)**, **(3)** and **(4)**, we will pay your expense to remove debris of Covered Property and other debris that is on the described premises, when such debris is caused by or results from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date of direct physical loss or damage.

**(2)** Debris Removal does not apply to costs to:

**(a)** Remove debris of property of yours that is not insured under this policy, or property in your possession that is not Covered Property;

**(b)** Remove debris of property owned by or leased to the landlord of the building where your described premises are located, unless you have a contractual responsibility to insure such property and it is insured under this policy;

**(c)** Remove any property that is Property Not Covered, including property addressed under the Outdoor Property Coverage Extension;

**(d)** Remove property of others of a type that would not be Covered Property under this Coverage Form;

**(e)** Remove deposits of mud or earth from the grounds of the described premises;

**(f)** Extract "pollutants" from land or water; or

**(g)** Remove, restore or replace polluted land or water.

**(3)** Subject to the exceptions in Paragraph **(4)**, the following provisions apply:

**(a)** The most we will pay for the total of direct physical loss or damage plus debris removal expense is the Limit of Insurance applicable to the Covered Property that has sustained loss or damage.

**(b)** Subject to **(a)** above, the amount we will pay for debris removal expense is limited to 25% of the sum of the deductible plus the amount that we pay for direct physical loss or damage to the Covered Property that has sustained loss or damage. However, if no Covered Property has sustained direct physical loss or damage, the most we will pay for removal of debris of other property (if such removal is covered under this Additional Coverage) is $5,000 at each location.

**(4)** We will pay up to an additional $25,000 for debris removal expense, for each location, in any one occurrence of physical loss or damage to Covered Property, if one or both of the following circumstances apply:

**(a)** The total of the actual debris removal expense plus the amount we pay for direct physical loss or damage exceeds the Limit of Insurance on the Covered Property that has sustained loss or damage.

**(b)** The actual debris removal expense exceeds 25% of the sum of the deductible plus the amount that we pay for direct physical loss or damage to the Covered Property that has sustained loss or damage.

 © Insurance Services Office, Inc., 2011

Therefore, if **(4)(a)** and/or **(4)(b)** applies, our total payment for direct physical loss or damage and debris removal expense may reach but will never exceed the Limit of Insurance on the Covered Property that has sustained loss or damage, plus $25,000.

**(5) Examples**

The following examples assume that there is no Coinsurance penalty.

**Example 1**

| | |
|---|---|
| Limit of Insurance: | $ 90,000 |
| Amount of Deductible: | $ 500 |
| Amount of Loss: | $ 50,000 |
| Amount of Loss Payable: | $ 49,500 |
| | ($50,000 – $500) |
| Debris Removal Expense: | $ 10,000 |
| Debris Removal Expense Payable: | $ 10,000 |
| ($10,000 is 20% of $50,000.) | |

The debris removal expense is less than 25% of the sum of the loss payable plus the deductible. The sum of the loss payable and the debris removal expense ($49,500 + $10,000 = $59,500) is less than the Limit of Insurance. Therefore, the full amount of debris removal expense is payable in accordance with the terms of Paragraph **(3)**.

**Example 2**

| | |
|---|---|
| Limit of Insurance: | $ 90,000 |
| Amount of Deductible: | $ 500 |
| Amount of Loss: | $ 80,000 |
| Amount of Loss Payable: | $ 79,500 |
| | ($80,000 – $500) |
| Debris Removal Expense: | $ 40,000 |
| Debris Removal Expense Payable | |
| Basic Amount: | $ 10,500 |
| Additional Amount: | $ 25,000 |

The basic amount payable for debris removal expense under the terms of Paragraph **(3)** is calculated as follows: $80,000 ($79,500 + $500) x .25 = $20,000, capped at $10,500. The cap applies because the sum of the loss payable ($79,500) and the basic amount payable for debris removal expense ($10,500) cannot exceed the Limit of Insurance ($90,000).

The additional amount payable for debris removal expense is provided in accordance with the terms of Paragraph **(4)**, because the debris removal expense ($40,000) exceeds 25% of the loss payable plus the deductible ($40,000 is 50% of $80,000), and because the sum of the loss payable and debris removal expense ($79,500 + $40,000 = $119,500) would exceed the Limit of Insurance ($90,000). The additional amount of covered debris removal expense is $25,000, the maximum payable under Paragraph **(4)**. Thus, the total payable for debris removal expense in this example is $35,500; $4,500 of the debris removal expense is not covered.

**b. Preservation Of Property**

If it is necessary to move Covered Property from the described premises to preserve it from loss or damage by a Covered Cause of Loss, we will pay for any direct physical loss or damage to that property:

**(1)** While it is being moved or while temporarily stored at another location; and

**(2)** Only if the loss or damage occurs within 30 days after the property is first moved.

**c. Fire Department Service Charge**

When the fire department is called to save or protect Covered Property from a Covered Cause of Loss, we will pay up to $1,000 for service at each premises described in the Declarations, unless a higher limit is shown in the Declarations. Such limit is the most we will pay regardless of the number of responding fire departments or fire units, and regardless of the number or type of services performed.

This Additional Coverage applies to your liability for fire department service charges:

**(1)** Assumed by contract or agreement prior to loss; or

**(2)** Required by local ordinance.

No Deductible applies to this Additional Coverage.

 © Insurance Services Office, Inc., 2011

**d. Pollutant Clean-up And Removal**

We will pay your expense to extract "pollutants" from land or water at the described premises if the discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused by or results from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date on which the Covered Cause of Loss occurs.

This Additional Coverage does not apply to costs to test for, monitor or assess the existence, concentration or effects of "pollutants". But we will pay for testing which is performed in the course of extracting the "pollutants" from the land or water.

The most we will pay under this Additional Coverage for each described premises is $10,000 for the sum of all covered expenses arising out of Covered Causes of Loss occurring during each separate 12-month period of this policy.

**e. Increased Cost Of Construction**

**(1)** This Additional Coverage applies only to buildings to which the Replacement Cost Optional Coverage applies.

**(2)** In the event of damage by a Covered Cause of Loss to a building that is Covered Property, we will pay the increased costs incurred to comply with the minimum standards of an ordinance or law in the course of repair, rebuilding or replacement of damaged parts of that property, subject to the limitations stated in **e.(3)** through **e.(9)** of this Additional Coverage.

**(3)** The ordinance or law referred to in **e.(2)** of this Additional Coverage is an ordinance or law that regulates the construction or repair of buildings or establishes zoning or land use requirements at the described premises and is in force at the time of loss.

**(4)** Under this Additional Coverage, we will not pay any costs due to an ordinance or law that:

**(a)** You were required to comply with before the loss, even when the building was undamaged; and

**(b)** You failed to comply with.

**(5)** Under this Additional Coverage, we will not pay for:

**(a)** The enforcement of or compliance with any ordinance or law which requires demolition, repair, replacement, reconstruction, remodeling or remediation of property due to contamination by "pollutants" or due to the presence, growth, proliferation, spread or any activity of "fungus", wet or dry rot or bacteria; or

**(b)** Any costs associated with the enforcement of or compliance with an ordinance or law which requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants", "fungus", wet or dry rot or bacteria.

**(6)** The most we will pay under this Additional Coverage, for each described building insured under this Coverage Form, is $10,000 or 5% of the Limit of Insurance applicable to that building, whichever is less. If a damaged building is covered under a blanket Limit of Insurance which applies to more than one building or item of property, then the most we will pay under this Additional Coverage, for that damaged building, is the lesser of $10,000 or 5% times the value of the damaged building as of the time of loss times the applicable Coinsurance percentage.

The amount payable under this Additional Coverage is additional insurance.

**(7)** With respect to this Additional Coverage:

**(a)** We will not pay for the Increased Cost of Construction:

**(i)** Until the property is actually repaired or replaced at the same or another premises; and

**(ii)** Unless the repair or replacement is made as soon as reasonably possible after the loss or damage, not to exceed two years. We may extend this period in writing during the two years.

**(b)** If the building is repaired or replaced at the same premises, or if you elect to rebuild at another premises, the most we will pay for the Increased Cost of Construction, subject to the provisions of **e.(6)** of this Additional Coverage, is the increased cost of construction at the same premises.

**(c)** If the ordinance or law requires relocation to another premises, the most we will pay for the Increased Cost of Construction, subject to the provisions of **e.(6)** of this Additional Coverage, is the increased cost of construction at the new premises.

**(8)** This Additional Coverage is not subject to the terms of the Ordinance Or Law Exclusion to the extent that such Exclusion would conflict with the provisions of this Additional Coverage.

**(9)** The costs addressed in the Loss Payment and Valuation Conditions and the Replacement Cost Optional Coverage, in this Coverage Form, do not include the increased cost attributable to enforcement of or compliance with an ordinance or law. The amount payable under this Additional Coverage, as stated in **e.(6)** of this Additional Coverage, is not subject to such limitation.

**f.  Electronic Data**

**(1)** Under this Additional Coverage, electronic data has the meaning described under Property Not Covered, Electronic Data. This Additional Coverage does not apply to your "stock" of prepackaged software, or to electronic data which is integrated in and operates or controls the building's elevator, lighting, heating, ventilation, air conditioning or security system.

**(2)** Subject to the provisions of this Additional Coverage, we will pay for the cost to replace or restore electronic data which has been destroyed or corrupted by a Covered Cause of Loss. To the extent that electronic data is not replaced or restored, the loss will be valued at the cost of replacement of the media on which the electronic data was stored, with blank media of substantially identical type.

**(3)** The Covered Causes of Loss applicable to Your Business Personal Property apply to this Additional Coverage, Electronic Data, subject to the following:

**(a)** If the Causes Of Loss – Special Form applies, coverage under this Additional Coverage, Electronic Data, is limited to the "specified causes of loss" as defined in that form and Collapse as set forth in that form.

**(b)** If the Causes Of Loss – Broad Form applies, coverage under this Additional Coverage, Electronic Data, includes Collapse as set forth in that form.

**(c)** If the Causes Of Loss form is endorsed to add a Covered Cause of Loss, the additional Covered Cause of Loss does not apply to the coverage provided under this Additional Coverage, Electronic Data.

**(d)** The Covered Causes of Loss include a virus, harmful code or similar instruction introduced into or enacted on a computer system (including electronic data) or a network to which it is connected, designed to damage or destroy any part of the system or disrupt its normal operation. But there is no coverage for loss or damage caused by or resulting from manipulation of a computer system (including electronic data) by any employee, including a temporary or leased employee, or by an entity retained by you or for you to inspect, design, install, modify, maintain, repair or replace that system.

© Insurance Services Office, Inc., 2011

**(4)** The most we will pay under this Additional Coverage, Electronic Data, is $2,500 (unless a higher limit is shown in the Declarations) for all loss or damage sustained in any one policy year, regardless of the number of occurrences of loss or damage or the number of premises, locations or computer systems involved. If loss payment on the first occurrence does not exhaust this amount, then the balance is available for subsequent loss or damage sustained in but not after that policy year. With respect to an occurrence which begins in one policy year and continues or results in additional loss or damage in a subsequent policy year(s), all loss or damage is deemed to be sustained in the policy year in which the occurrence began.

**5. Coverage Extensions**

Except as otherwise provided, the following Extensions apply to property located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of the described premises.

If a Coinsurance percentage of 80% or more, or a Value Reporting period symbol, is shown in the Declarations, you may extend the insurance provided by this Coverage Part as follows:

**a. Newly Acquired Or Constructed Property**

**(1) Buildings**

If this policy covers Building, you may extend that insurance to apply to:

**(a)** Your new buildings while being built on the described premises; and

**(b)** Buildings you acquire at locations, other than the described premises, intended for:

**(i)** Similar use as the building described in the Declarations; or

**(ii)** Use as a warehouse.

The most we will pay for loss or damage under this Extension is $250,000 at each building.

**(2) Your Business Personal Property**

**(a)** If this policy covers Your Business Personal Property, you may extend that insurance to apply to:

**(i)** Business personal property, including such property that you newly acquire, at any location you acquire other than at fairs, trade shows or exhibitions; or

**(ii)** Business personal property, including such property that you newly acquire, located at your newly constructed or acquired buildings at the location described in the Declarations.

The most we will pay for loss or damage under this Extension is $100,000 at each building.

**(b)** This Extension does not apply to:

**(i)** Personal property of others that is temporarily in your possession in the course of installing or performing work on such property; or

**(ii)** Personal property of others that is temporarily in your possession in the course of your manufacturing or wholesaling activities.

**(3) Period Of Coverage**

With respect to insurance provided under this Coverage Extension for Newly Acquired Or Constructed Property, coverage will end when any of the following first occurs:

**(a)** This policy expires;

**(b)** 30 days expire after you acquire the property or begin construction of that part of the building that would qualify as covered property; or

**(c)** You report values to us.

We will charge you additional premium for values reported from the date you acquire the property or begin construction of that part of the building that would qualify as covered property.

**b. Personal Effects And Property Of Others**

You may extend the insurance that applies to Your Business Personal Property to apply to:

**(1)** Personal effects owned by you, your officers, your partners or members, your managers or your employees. This Extension does not apply to loss or damage by theft.

**(2)** Personal property of others in your care, custody or control.

The most we will pay for loss or damage under this Extension is $2,500 at each described premises. Our payment for loss of or damage to personal property of others will only be for the account of the owner of the property.

**c. Valuable Papers And Records (Other Than Electronic Data)**

**(1)** You may extend the insurance that applies to Your Business Personal Property to apply to the cost to replace or restore the lost information on valuable papers and records for which duplicates do not exist. But this Extension does not apply to valuable papers and records which exist as electronic data. Electronic data has the meaning described under Property Not Covered, Electronic Data.

**(2)** If the Causes Of Loss – Special Form applies, coverage under this Extension is limited to the "specified causes of loss" as defined in that form and Collapse as set forth in that form.

**(3)** If the Causes Of Loss – Broad Form applies, coverage under this Extension includes Collapse as set forth in that form.

**(4)** Under this Extension, the most we will pay to replace or restore the lost information is $2,500 at each described premises, unless a higher limit is shown in the Declarations. Such amount is additional insurance. We will also pay for the cost of blank material for reproducing the records (whether or not duplicates exist) and (when there is a duplicate) for the cost of labor to transcribe or copy the records. The costs of blank material and labor are subject to the applicable Limit of Insurance on Your Business Personal Property and, therefore, coverage of such costs is not additional insurance.

**d. Property Off-premises**

**(1)** You may extend the insurance provided by this Coverage Form to apply to your Covered Property while it is away from the described premises, if it is:

**(a)** Temporarily at a location you do not own, lease or operate;

**(b)** In storage at a location you lease, provided the lease was executed after the beginning of the current policy term; or

**(c)** At any fair, trade show or exhibition.

**(2)** This Extension does not apply to property:

**(a)** In or on a vehicle; or

**(b)** In the care, custody or control of your salespersons, unless the property is in such care, custody or control at a fair, trade show or exhibition.

**(3)** The most we will pay for loss or damage under this Extension is $10,000.

**e. Outdoor Property**

You may extend the insurance provided by this Coverage Form to apply to your outdoor fences, radio and television antennas (including satellite dishes), trees, shrubs and plants (other than trees, shrubs or plants which are "stock" or are part of a vegetated roof), including debris removal expense, caused by or resulting from any of the following causes of loss if they are Covered Causes of Loss:

**(1)** Fire;

**(2)** Lightning;

**(3)** Explosion;

**(4)** Riot or Civil Commotion; or

**(5)** Aircraft.

The most we will pay for loss or damage under this Extension is $1,000, but not more than $250 for any one tree, shrub or plant. These limits apply to any one occurrence, regardless of the types or number of items lost or damaged in that occurrence.

© Insurance Services Office, Inc., 2011

Subject to all aforementioned terms and limitations of coverage, this Coverage Extension includes the expense of removing from the described premises the debris of trees, shrubs and plants which are the property of others, except in the situation in which you are a tenant and such property is owned by the landlord of the described premises.

**f. Non-owned Detached Trailers**

**(1)** You may extend the insurance that applies to Your Business Personal Property to apply to loss or damage to trailers that you do not own, provided that:

**(a)** The trailer is used in your business;

**(b)** The trailer is in your care, custody or control at the premises described in the Declarations; and

**(c)** You have a contractual responsibility to pay for loss or damage to the trailer.

**(2)** We will not pay for any loss or damage that occurs:

**(a)** While the trailer is attached to any motor vehicle or motorized conveyance, whether or not the motor vehicle or motorized conveyance is in motion;

**(b)** During hitching or unhitching operations, or when a trailer becomes accidentally unhitched from a motor vehicle or motorized conveyance.

**(3)** The most we will pay for loss or damage under this Extension is $5,000, unless a higher limit is shown in the Declarations.

**(4)** This insurance is excess over the amount due (whether you can collect on it or not) from any other insurance covering such property.

**g. Business Personal Property Temporarily In Portable Storage Units**

**(1)** You may extend the insurance that applies to Your Business Personal Property to apply to such property while temporarily stored in a portable storage unit (including a detached trailer) located within 100 feet of the building or structure described in the Declarations or within 100 feet of the premises described in the Declarations, whichever distance is greater.

**(2)** If the applicable Covered Causes of Loss form or endorsement contains a limitation or exclusion concerning loss or damage from sand, dust, sleet, snow, ice or rain to property in a structure, such limitation or exclusion also applies to property in a portable storage unit.

**(3)** Coverage under this Extension:

**(a)** Will end 90 days after the business personal property has been placed in the storage unit;

**(b)** Does not apply if the storage unit itself has been in use at the described premises for more than 90 consecutive days, even if the business personal property has been stored there for 90 or fewer days as of the time of loss or damage.

**(4)** Under this Extension, the most we will pay for the total of all loss or damage to business personal property is $10,000 (unless a higher limit is indicated in the Declarations for such Extension) regardless of the number of storage units. Such limit is part of, not in addition to, the applicable Limit of Insurance on Your Business Personal Property. Therefore, payment under this Extension will not increase the applicable Limit of Insurance on Your Business Personal Property.

**(5)** This Extension does not apply to loss or damage otherwise covered under this Coverage Form or any endorsement to this Coverage Form or policy, and does not apply to loss or damage to the storage unit itself.

Each of these Extensions is additional insurance unless otherwise indicated. The Additional Condition, Coinsurance, does not apply to these Extensions.

**B. Exclusions And Limitations**

See applicable Causes Of Loss form as shown in the Declarations.

**C. Limits Of Insurance**

The most we will pay for loss or damage in any one occurrence is the applicable Limit Of Insurance shown in the Declarations.

The most we will pay for loss or damage to outdoor signs, whether or not the sign is attached to a building, is $2,500 per sign in any one occurrence.

The amounts of insurance stated in the following Additional Coverages apply in accordance with the terms of such coverages and are separate from the Limit(s) Of Insurance shown in the Declarations for any other coverage:

**1.** Fire Department Service Charge;

**2.** Pollutant Clean-up And Removal;

**3.** Increased Cost Of Construction; and

**4.** Electronic Data.

Payments under the Preservation Of Property Additional Coverage will not increase the applicable Limit of Insurance.

**D. Deductible**

In any one occurrence of loss or damage (hereinafter referred to as loss), we will first reduce the amount of loss if required by the Coinsurance Condition or the Agreed Value Optional Coverage. If the adjusted amount of loss is less than or equal to the Deductible, we will not pay for that loss. If the adjusted amount of loss exceeds the Deductible, we will then subtract the Deductible from the adjusted amount of loss and will pay the resulting amount or the Limit of Insurance, whichever is less.

When the occurrence involves loss to more than one item of Covered Property and separate Limits of Insurance apply, the losses will not be combined in determining application of the Deductible. But the Deductible will be applied only once per occurrence.

**Example 1**

(This example assumes there is no Coinsurance penalty.)

| | |
|---|---:|
| Deductible: | $ 250 |
| Limit of Insurance – Building 1: | $ 60,000 |
| Limit of Insurance – Building 2: | $ 80,000 |
| Loss to Building 1: | $ 60,100 |
| Loss to Building 2: | $ 90,000 |

The amount of loss to Building 1 ($60,100) is less than the sum ($60,250) of the Limit of Insurance applicable to Building 1 plus the Deductible.

The Deductible will be subtracted from the amount of loss in calculating the loss payable for Building 1:

| | |
|---:|---|
| $ 60,100 | |
| − 250 | |
| $ 59,850 | Loss Payable – Building 1 |

The Deductible applies once per occurrence and therefore is not subtracted in determining the amount of loss payable for Building 2. Loss payable for Building 2 is the Limit of Insurance of $80,000.

Total amount of loss payable:

$59,850 + $80,000 = $139,850

**Example 2**

(This example, too, assumes there is no Coinsurance penalty.)

The Deductible and Limits of Insurance are the same as those in Example 1.

| | |
|---|---:|
| Loss to Building 1: | $ 70,000 |
| (Exceeds Limit of Insurance plus Deductible) | |
| Loss to Building 2: | $ 90,000 |
| (Exceeds Limit of Insurance plus Deductible) | |
| Loss Payable – Building 1: | $ 60,000 |
| (Limit of Insurance) | |
| Loss Payable – Building 2: | $ 80,000 |
| (Limit of Insurance) | |
| Total amount of loss payable: | $ 140,000 |

**E. Loss Conditions**

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions:

**1. Abandonment**

There can be no abandonment of any property to us.

**2. Appraisal**

If we and you disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

**a.** Pay its chosen appraiser; and

**b.** Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

**3. Duties In The Event Of Loss Or Damage**

**a.** You must see that the following are done in the event of loss or damage to Covered Property:

**(1)** Notify the police if a law may have been broken.

**(2)** Give us prompt notice of the loss or damage. Include a description of the property involved.

**(3)** As soon as possible, give us a description of how, when and where the loss or damage occurred.

**(4)** Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

**(5)** At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed.

**(6)** As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

Also, permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

**(7)** Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

**(8)** Cooperate with us in the investigation or settlement of the claim.

**b.** We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

**4. Loss Payment**

**a.** In the event of loss or damage covered by this Coverage Form, at our option, we will either:

**(1)** Pay the value of lost or damaged property;

**(2)** Pay the cost of repairing or replacing the lost or damaged property, subject to **b.** below;

**(3)** Take all or any part of the property at an agreed or appraised value; or

**(4)** Repair, rebuild or replace the property with other property of like kind and quality, subject to **b.** below.

We will determine the value of lost or damaged property, or the cost of its repair or replacement, in accordance with the applicable terms of the Valuation Condition in this Coverage Form or any applicable provision which amends or supersedes the Valuation Condition.

**b.** The cost to repair, rebuild or replace does not include the increased cost attributable to enforcement of or compliance with any ordinance or law regulating the construction, use or repair of any property.

**c.** We will give notice of our intentions within 30 days after we receive the sworn proof of loss.

**d.** We will not pay you more than your financial interest in the Covered Property.

**e.** We may adjust losses with the owners of lost or damaged property if other than you. If we pay the owners, such payments will satisfy your claims against us for the owners' property. We will not pay the owners more than their financial interest in the Covered Property.

**f.** We may elect to defend you against suits arising from claims of owners of property. We will do this at our expense.

**g.** We will pay for covered loss or damage within 30 days after we receive the sworn proof of loss, if you have complied with all of the terms of this Coverage Part, and:

**(1)** We have reached agreement with you on the amount of loss; or

**(2)** An appraisal award has been made.

**h.** A party wall is a wall that separates and is common to adjoining buildings that are owned by different parties. In settling covered losses involving a party wall, we will pay a proportion of the loss to the party wall based on your interest in the wall in proportion to the interest of the owner of the adjoining building. However, if you elect to repair or replace your building and the owner of the adjoining building elects not to repair or replace that building, we will pay you the full value of the loss to the party wall, subject to all applicable policy provisions including Limits of Insurance, the Valuation and Coinsurance Conditions and all other provisions of this Loss Payment Condition. Our payment under the provisions of this paragraph does not alter any right of subrogation we may have against any entity, including the owner or insurer of the adjoining building, and does not alter the terms of the Transfer Of Rights Of Recovery Against Others To Us Condition in this policy.

**5. Recovered Property**

If either you or we recover any property after loss settlement, that party must give the other prompt notice. At your option, the property will be returned to you. You must then return to us the amount we paid to you for the property. We will pay recovery expenses and the expenses to repair the recovered property, subject to the Limit of Insurance.

**6. Vacancy**

**a. Description Of Terms**

**(1)** As used in this Vacancy Condition, the term building and the term vacant have the meanings set forth in **(1)(a)** and **(1)(b)** below:

**(a)** When this policy is issued to a tenant, and with respect to that tenant's interest in Covered Property, building means the unit or suite rented or leased to the tenant. Such building is vacant when it does not contain enough business personal property to conduct customary operations.

**(b)** When this policy is issued to the owner or general lessee of a building, building means the entire building. Such building is vacant unless at least 31% of its total square footage is:

**(i)** Rented to a lessee or sublessee and used by the lessee or sublessee to conduct its customary operations; and/or

**(ii)** Used by the building owner to conduct customary operations.

**(2)** Buildings under construction or renovation are not considered vacant.

**b. Vacancy Provisions**

If the building where loss or damage occurs has been vacant for more than 60 consecutive days before that loss or damage occurs:

**(1)** We will not pay for any loss or damage caused by any of the following, even if they are Covered Causes of Loss:

**(a)** Vandalism;

**(b)** Sprinkler leakage, unless you have protected the system against freezing;

**(c)** Building glass breakage;

**(d)** Water damage;

**(e)** Theft; or

**(f)** Attempted theft.

**(2)** With respect to Covered Causes of Loss other than those listed in **b.(1)(a)** through **b.(1)(f)** above, we will reduce the amount we would otherwise pay for the loss or damage by 15%.

**7. Valuation**

We will determine the value of Covered Property in the event of loss or damage as follows:

**a.** At actual cash value as of the time of loss or damage, except as provided in **b., c., d.** and **e.** below.

**b.** If the Limit of Insurance for Building satisfies the Additional Condition, Coinsurance, and the cost to repair or replace the damaged building property is $2,500 or less, we will pay the cost of building repairs or replacement.

 © Insurance Services Office, Inc., 2011 CP 00 10 10 12

The cost of building repairs or replacement does not include the increased cost attributable to enforcement of or compliance with any ordinance or law regulating the construction, use or repair of any property.

However, the following property will be valued at the actual cash value, even when attached to the building:

**(1)** Awnings or floor coverings;

**(2)** Appliances for refrigerating, ventilating, cooking, dishwashing or laundering; or

**(3)** Outdoor equipment or furniture.

**c.** "Stock" you have sold but not delivered at the selling price less discounts and expenses you otherwise would have had.

**d.** Glass at the cost of replacement with safety-glazing material if required by law.

**e.** Tenants' Improvements and Betterments at:

**(1)** Actual cash value of the lost or damaged property if you make repairs promptly.

**(2)** A proportion of your original cost if you do not make repairs promptly. We will determine the proportionate value as follows:

**(a)** Multiply the original cost by the number of days from the loss or damage to the expiration of the lease; and

**(b)** Divide the amount determined in **(a)** above by the number of days from the installation of improvements to the expiration of the lease.

If your lease contains a renewal option, the expiration of the renewal option period will replace the expiration of the lease in this procedure.

**(3)** Nothing if others pay for repairs or replacement.

**F. Additional Conditions**

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions:

**1. Coinsurance**

If a Coinsurance percentage is shown in the Declarations, the following condition applies:

**a.** We will not pay the full amount of any loss if the value of Covered Property at the time of loss times the Coinsurance percentage shown for it in the Declarations is greater than the Limit of Insurance for the property.

Instead, we will determine the most we will pay using the following steps:

**(1)** Multiply the value of Covered Property at the time of loss by the Coinsurance percentage;

**(2)** Divide the Limit of Insurance of the property by the figure determined in Step **(1);**

**(3)** Multiply the total amount of loss, before the application of any deductible, by the figure determined in Step **(2);** and

**(4)** Subtract the deductible from the figure determined in Step **(3).**

We will pay the amount determined in Step **(4)** or the Limit of Insurance, whichever is less. For the remainder, you will either have to rely on other insurance or absorb the loss yourself.

**Example 1 (Underinsurance)**

| When: | | |
|---|---|---|
| The value of the property is: | $ 250,000 |
| The Coinsurance percentage for it is: | 80% |
| The Limit of Insurance for it is: | $ 100,000 |
| The Deductible is: | $ 250 |
| The amount of loss is: | $ 40,000 |

Step **(1):** $250,000 x 80% = $200,000

(the minimum amount of insurance to meet your Coinsurance requirements)

Step **(2):** $100,000 ÷ $200,000 = .50

Step **(3):** $40,000 x .50 = $20,000

Step **(4):** $20,000 – $250 = $19,750

We will pay no more than $19,750. The remaining $20,250 is not covered.

**Example 2 (Adequate Insurance)**

| When: | | |
|---|---|---|
| The value of the property is: | $ 250,000 |
| The Coinsurance percentage for it is: | 80% |
| The Limit of Insurance for it is: | $ 200,000 |
| The Deductible is: | $ 250 |
| The amount of loss is: | $ 40,000 |

The minimum amount of insurance to meet your Coinsurance requirement is $200,000 ($250,000 x 80%). Therefore, the Limit of Insurance in this example is adequate, and no penalty applies. We will pay no more than $39,750 ($40,000 amount of loss minus the deductible of $250).

**b.** If one Limit of Insurance applies to two or more separate items, this condition will apply to the total of all property to which the limit applies.

**Example 3**

When:  The value of the property is:

| | |
|---|---|
| Building at Location 1: | $  75,000 |
| Building at Location 2: | $ 100,000 |
| Personal Property at Location 2: | $  75,000 |
| | $ 250,000 |
| The Coinsurance percentage for it is: | 90% |
| The Limit of Insurance for Buildings and Personal Property at Locations 1 and 2 is: | $ 180,000 |
| The Deductible is: | $   1,000 |
| The amount of loss is: | |
| Building at Location 2: | $  30,000 |
| Personal Property at Location 2: | $  20,000 |
| | $  50,000 |

Step **(1):**  $250,000 x 90% = $225,000

(the minimum amount of insurance to meet your Coinsurance requirements and to avoid the penalty shown below)

Step **(2):**  $180,000 ÷ $225,000 = .80

Step **(3):**  $50,000 x .80 = $40,000

Step **(4):**  $40,000 – $1,000 = $39,000

We will pay no more than $39,000. The remaining $11,000 is not covered.

**2. Mortgageholders**

**a.** The term mortgageholder includes trustee.

**b.** We will pay for covered loss of or damage to buildings or structures to each mortgageholder shown in the Declarations in their order of precedence, as interests may appear.

**c.** The mortgageholder has the right to receive loss payment even if the mortgageholder has started foreclosure or similar action on the building or structure.

**d.** If we deny your claim because of your acts or because you have failed to comply with the terms of this Coverage Part, the mortgageholder will still have the right to receive loss payment if the mortgageholder:

**(1)** Pays any premium due under this Coverage Part at our request if you have failed to do so;

**(2)** Submits a signed, sworn proof of loss within 60 days after receiving notice from us of your failure to do so; and

**(3)** Has notified us of any change in ownership, occupancy or substantial change in risk known to the mortgageholder.

All of the terms of this Coverage Part will then apply directly to the mortgageholder.

**e.** If we pay the mortgageholder for any loss or damage and deny payment to you because of your acts or because you have failed to comply with the terms of this Coverage Part:

**(1)** The mortgageholder's rights under the mortgage will be transferred to us to the extent of the amount we pay; and

**(2)** The mortgageholder's right to recover the full amount of the mortgageholder's claim will not be impaired.

At our option, we may pay to the mortgageholder the whole principal on the mortgage plus any accrued interest. In this event, your mortgage and note will be transferred to us and you will pay your remaining mortgage debt to us.

**f.** If we cancel this policy, we will give written notice to the mortgageholder at least:

**(1)** 10 days before the effective date of cancellation if we cancel for your nonpayment of premium; or

**(2)** 30 days before the effective date of cancellation if we cancel for any other reason.

**g.** If we elect not to renew this policy, we will give written notice to the mortgageholder at least 10 days before the expiration date of this policy.

**G. Optional Coverages**

If shown as applicable in the Declarations, the following Optional Coverages apply separately to each item:

**1. Agreed Value**

**a.** The Additional Condition, Coinsurance, does not apply to Covered Property to which this Optional Coverage applies. We will pay no more for loss of or damage to that property than the proportion that the Limit of Insurance under this Coverage Part for the property bears to the Agreed Value shown for it in the Declarations.

© Insurance Services Office, Inc., 2011

**b.** If the expiration date for this Optional Coverage shown in the Declarations is not extended, the Additional Condition, Coinsurance, is reinstated and this Optional Coverage expires.

**c.** The terms of this Optional Coverage apply only to loss or damage that occurs:

**(1)** On or after the effective date of this Optional Coverage; and

**(2)** Before the Agreed Value expiration date shown in the Declarations or the policy expiration date, whichever occurs first.

**2. Inflation Guard**

**a.** The Limit of Insurance for property to which this Optional Coverage applies will automatically increase by the annual percentage shown in the Declarations.

**b.** The amount of increase will be:

**(1)** The Limit of Insurance that applied on the most recent of the policy inception date, the policy anniversary date, or any other policy change amending the Limit of Insurance, times

**(2)** The percentage of annual increase shown in the Declarations, expressed as a decimal (example: 8% is .08), times

**(3)** The number of days since the beginning of the current policy year or the effective date of the most recent policy change amending the Limit of Insurance, divided by 365.

**Example**

| If: | The applicable Limit of Insurance is: | $ 100,000 |
|---|---|---|
| | The annual percentage increase is: | 8% |
| | The number of days since the beginning of the policy year (or last policy change) is: | 146 |
| | The amount of increase is: $100,000 x .08 x 146 ÷ 365 = | $ 3,200 |

**3. Replacement Cost**

**a.** Replacement Cost (without deduction for depreciation) replaces Actual Cash Value in the Valuation Loss Condition of this Coverage Form.

**b.** This Optional Coverage does not apply to:

**(1)** Personal property of others;

**(2)** Contents of a residence;

**(3)** Works of art, antiques or rare articles, including etchings, pictures, statuary, marbles, bronzes, porcelains and bric-a-brac; or

**(4)** "Stock", unless the Including "Stock" option is shown in the Declarations.

Under the terms of this Replacement Cost Optional Coverage, tenants' improvements and betterments are not considered to be the personal property of others.

**c.** You may make a claim for loss or damage covered by this insurance on an actual cash value basis instead of on a replacement cost basis. In the event you elect to have loss or damage settled on an actual cash value basis, you may still make a claim for the additional coverage this Optional Coverage provides if you notify us of your intent to do so within 180 days after the loss or damage.

**d.** We will not pay on a replacement cost basis for any loss or damage:

**(1)** Until the lost or damaged property is actually repaired or replaced; and

**(2)** Unless the repair or replacement is made as soon as reasonably possible after the loss or damage.

With respect to tenants' improvements and betterments, the following also apply:

**(3)** If the conditions in **d.(1)** and **d.(2)** above are not met, the value of tenants' improvements and betterments will be determined as a proportion of your original cost, as set forth in the Valuation Loss Condition of this Coverage Form; and

**(4)** We will not pay for loss or damage to tenants' improvements and betterments if others pay for repairs or replacement.

**e.** We will not pay more for loss or damage on a replacement cost basis than the least of **(1)**, **(2)** or **(3)**, subject to **f.** below:

**(1)** The Limit of Insurance applicable to the lost or damaged property;

**(2)** The cost to replace the lost or damaged property with other property:

**(a)** Of comparable material and quality; and

**(b)** Used for the same purpose; or

**(3)** The amount actually spent that is necessary to repair or replace the lost or damaged property.

If a building is rebuilt at a new premises, the cost described in **e.(2)** above is limited to the cost which would have been incurred if the building had been rebuilt at the original premises.

**f.** The cost of repair or replacement does not include the increased cost attributable to enforcement of or compliance with any ordinance or law regulating the construction, use or repair of any property.

**4. Extension Of Replacement Cost To Personal Property Of Others**

**a.** If the Replacement Cost Optional Coverage is shown as applicable in the Declarations, then this Extension may also be shown as applicable. If the Declarations show this Extension as applicable, then Paragraph **3.b.(1)** of the Replacement Cost Optional Coverage is deleted and all other provisions of the Replacement Cost Optional Coverage apply to replacement cost on personal property of others.

**b.** With respect to replacement cost on the personal property of others, the following limitation applies:

If an item(s) of personal property of others is subject to a written contract which governs your liability for loss or damage to that item(s), then valuation of that item(s) will be based on the amount for which you are liable under such contract, but not to exceed the lesser of the replacement cost of the property or the applicable Limit of Insurance.

**H. Definitions**

**1.** "Fungus" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi.

**2.** "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**3.** "Stock" means merchandise held in storage or for sale, raw materials and in-process or finished goods, including supplies used in their packing or shipping.

© Insurance Services Office, Inc., 2011

# COMMERCIAL PROPERTY CONDITIONS

This Coverage Part is subject to the following conditions, the Common Policy Conditions and applicable Loss Conditions and Additional Conditions in Commercial Property Coverage Forms.

## A. CONCEALMENT, MISREPRESENTATION OR FRAUD

This Coverage Part is void in any case of fraud by you as it relates to this Coverage Part at any time. It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning:

**1.** This Coverage Part;

**2.** The Covered Property;

**3.** Your interest in the Covered Property; or

**4.** A claim under this Coverage Part.

## B. CONTROL OF PROPERTY

Any act or neglect of any person other than you beyond your direction or control will not affect this insurance.

The breach of any condition of this Coverage Part at any one or more locations will not affect coverage at any location where, at the time of loss or damage, the breach of condition does not exist.

## C. INSURANCE UNDER TWO OR MORE COVERAGES

If two or more of this policy's coverages apply to the same loss or damage, we will not pay more than the actual amount of the loss or damage.

## D. LEGAL ACTION AGAINST US

No one may bring a legal action against us under this Coverage Part unless:

**1.** There has been full compliance with all of the terms of this Coverage Part; and

**2.** The action is brought within 2 years after the date on which the direct physical loss or damage occurred.

## E. LIBERALIZATION

If we adopt any revision that would broaden the coverage under this Coverage Part without additional premium within 45 days prior to or during the policy period, the broadened coverage will immediately apply to this Coverage Part.

## F. NO BENEFIT TO BAILEE

No person or organization, other than you, having custody of Covered Property will benefit from this insurance.

## G. OTHER INSURANCE

**1.** You may have other insurance subject to the same plan, terms, conditions and provisions as the insurance under this Coverage Part. If you do, we will pay our share of the covered loss or damage. Our share is the proportion that the applicable Limit of Insurance under this Coverage Part bears to the Limits of Insurance of all insurance covering on the same basis.

**2.** If there is other insurance covering the same loss or damage, other than that described in 1. above, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not. But we will not pay more than the applicable Limit of Insurance.

## H. POLICY PERIOD, COVERAGE TERRITORY

Under this Coverage Part:

**1.** We cover loss or damage commencing:

    **a.** During the policy period shown in the Declarations; and

    **b.** Within the coverage territory.

**2.** The coverage territory is:

    **a.** The United States of America (including its territories and possessions);

    **b.** Puerto Rico; and

    **c.** Canada.

**I. TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US**

If any person or organization to or for whom we make payment under this Coverage Part has rights to recover damages from another, those rights are transferred to us to the extent of our payment. That person or organization must do everything necessary to secure our rights and must do nothing after loss to impair them. But you may waive your rights against another party in writing:

1. Prior to a loss to your Covered Property or Covered Income.

2. After a loss to your Covered Property or Covered Income only if, at time of loss, that party is one of the following:

   a. Someone insured by this insurance;

   b. A business firm:

      (1) Owned or controlled by you; or

      (2) That owns or controls you; or

   c. Your tenant.

This will not restrict your insurance.

     Copyright, ISO Commercial Risk Services, Inc., 1983, 1987     **CP 00 90 07 88**    □

COMMERCIAL PROPERTY
CP 01 40 07 06

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION OF LOSS DUE TO VIRUS OR BACTERIA

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART
STANDARD PROPERTY POLICY

**A.** The exclusion set forth in Paragraph **B.** applies to all coverage under all forms and endorsements that comprise this Coverage Part or Policy, including but not limited to forms or endorsements that cover property damage to buildings or personal property and forms or endorsements that cover business income, extra expense or action of civil authority.

**B.** We will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease.

However, this exclusion does not apply to loss or damage caused by or resulting from "fungus", wet rot or dry rot. Such loss or damage is addressed in a separate exclusion in this Coverage Part or Policy.

**C.** With respect to any loss or damage subject to the exclusion in Paragraph **B.,** such exclusion supersedes any exclusion relating to "pollutants".

**D.** The following provisions in this Coverage Part or Policy are hereby amended to remove reference to bacteria:

   **1.** Exclusion of "Fungus", Wet Rot, Dry Rot And Bacteria; and

   **2.** Additional Coverage – Limited Coverage for "Fungus", Wet Rot, Dry Rot And Bacteria, including any endorsement increasing the scope or amount of coverage.

**E.** The terms of the exclusion in Paragraph **B.,** or the inapplicability of this exclusion to a particular loss, do not serve to create coverage for any loss that would otherwise be excluded under this Coverage Part or Policy.

POLICY NUMBER: ORB-PK-23-A01924-00

**COMMERCIAL PROPERTY**
**CP 04 11 09 17**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# PROTECTIVE SAFEGUARDS

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART
STANDARD PROPERTY POLICY

**SCHEDULE**

| Premises Number | Building Number | Protective Safeguards Symbols Applicable |
|---|---|---|
| 1 | 1 | P-9 |
| | | |
| | | |

| Describe Any "P-9": |
|---|
| Operational Smoke Detectors |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A.** The following is added to the Commercial Property Conditions:

**Protective Safeguards**

As a condition of this insurance, you are required to:

**1.** Maintain the protective safeguards listed in the Schedule, and over which you have control, in complete working order;

**2.** Actively engage and maintain in the "on" position at all times any automatic fire alarm or other automatic system listed in the Schedule; and

**3.** Notify us if you know of any suspension of or impairment in any protective safeguard listed in the Schedule.

However, if part of an Automatic Sprinkler System or Automatic Commercial Cooking Exhaust And Extinguishing System is shut off due to breakage, leakage, freezing conditions or opening of sprinkler heads, notification to us will not be necessary if you can restore full protection within 48 hours.

**B.** The following is added to the **Exclusions** section of:

Causes Of Loss – Basic Form

Causes Of Loss – Broad Form

Causes Of Loss – Special Form

Mortgageholders Errors And Omissions Coverage Form

Standard Property Policy

We will not pay for loss or damage caused by or resulting from fire if, prior to the fire, you failed to comply with any condition set forth in Paragraph **A.**

**C.** The protective safeguards to which this endorsement applies are identified by the following symbols:

**"P-1" Automatic Sprinkler System,** including related supervisory services.

Automatic Sprinkler System means:

**a.** Any automatic fire protective or extinguishing system, including connected:

**(1)** Sprinklers and discharge nozzles;

**(2)** Ducts, pipes, valves and fittings;

**(3)** Tanks, their component parts and supports; and

**(4)** Pumps and private fire protection mains.

**b.** When supplied from an automatic fire protective system:

**(1)** Non-automatic fire protective systems; and

**(2)** Hydrants, standpipes and outlets.

**"P-2" Automatic Fire Alarm,** protecting the entire building, that is:

**a.** Connected to a central station; or

**b.** Reporting to a public or private fire alarm station.

**"P-3" Security Service,** with a recording system or watch clock, making hourly rounds covering the entire building, when the premises are not in actual operation.

**"P-4" Service Contract** with a privately owned fire department providing fire protection service to the described premises.

**"P-5" Automatic Commercial Cooking Exhaust And Extinguishing System** installed on cooking appliances and having the following components:

**a.** Hood;

**b.** Grease removal device;

**c.** Duct system; and

**d.** Wet chemical fire extinguishing equipment.

**"P-9",** the protective system described in the Schedule.

COMMERCIAL PROPERTY
CP 10 10 10 12

# CAUSES OF LOSS – BASIC FORM

Words and phrases that appear in quotation marks have special meaning. Refer to Section **E.** Definitions.

**A. Covered Causes Of Loss**

When Basic is shown in the Declarations, Covered Causes Of Loss means the following:

**1.** Fire.

**2.** Lightning.

**3.** Explosion, including the explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass. This cause of loss does not include loss or damage by:

  **a.** Rupture, bursting or operation of pressure-relief devices; or

  **b.** Rupture or bursting due to expansion or swelling of the contents of any building or structure, caused by or resulting from water.

**4.** Windstorm or Hail, but not including:

  **a.** Frost or cold weather;

  **b.** Ice (other than hail), snow or sleet, whether driven by wind or not;

  **c.** Loss or damage to the interior of any building or structure, or the property inside the building or structure, caused by rain, snow, sand or dust, whether driven by wind or not, unless the building or structure first sustains wind or hail damage to its roof or walls through which the rain, snow, sand or dust enters; or

  **d.** Loss or damage by hail to lawns, trees, shrubs or plants which are part of a vegetated roof.

**5.** Smoke causing sudden and accidental loss or damage. This cause of loss does not include smoke from agricultural smudging or industrial operations.

**6.** Aircraft or Vehicles, meaning only physical contact of an aircraft, a spacecraft, a self-propelled missile, a vehicle or an object thrown up by a vehicle with the described property or with the building or structure containing the described property. This cause of loss includes loss or damage by objects falling from aircraft.

We will not pay for loss or damage caused by or resulting from vehicles you own or which are operated in the course of your business.

**7.** Riot or Civil Commotion, including:

  **a.** Acts of striking employees while occupying the described premises; and

  **b.** Looting occurring at the time and place of a riot or civil commotion.

**8.** Vandalism, meaning willful and malicious damage to, or destruction of, the described property.

We will not pay for loss or damage caused by or resulting from theft, except for building damage caused by the breaking in or exiting of burglars.

**9.** Sprinkler Leakage, meaning leakage or discharge of any substance from an Automatic Sprinkler System, including collapse of a tank that is part of the system.

If the building or structure containing the Automatic Sprinkler System is Covered Property, we will also pay the cost to:

  **a.** Repair or replace damaged parts of the Automatic Sprinkler System if the damage:

    **(1)** Results in sprinkler leakage; or

    **(2)** Is directly caused by freezing.

  **b.** Tear out and replace any part of the building or structure to repair damage to the Automatic Sprinkler System that has resulted in sprinkler leakage.

Automatic Sprinkler System means:

  **(1)** Any automatic fire-protective or extinguishing system, including connected:

    **(a)** Sprinklers and discharge nozzles;

    **(b)** Ducts, pipes, valves and fittings;

    **(c)** Tanks, their component parts and supports; and

    **(d)** Pumps and private fire protection mains.

  **(2)** When supplied from an automatic fire-protective system:

    **(a)** Non-automatic fire-protective systems; and

    **(b)** Hydrants, standpipes and outlets.

© Insurance Services Office, Inc., 2011

10. Sinkhole Collapse, meaning loss or damage caused by the sudden sinking or collapse of land into underground empty spaces created by the action of water on limestone or dolomite. This cause of loss does not include:

   a. The cost of filling sinkholes; or

   b. Sinking or collapse of land into man-made underground cavities.

11. Volcanic Action, meaning direct loss or damage resulting from the eruption of a volcano when the loss or damage is caused by:

   a. Airborne volcanic blast or airborne shock waves;

   b. Ash, dust or particulate matter; or

   c. Lava flow.

   With respect to coverage for Volcanic Action as set forth in **11.a.**, **11.b.** and **11.c.**, all volcanic eruptions that occur within any 168-hour period will constitute a single occurrence.

   This cause of loss does not include the cost to remove ash, dust or particulate matter that does not cause direct physical loss or damage to the described property.

## B. Exclusions

1. We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

   **a. Ordinance Or Law**

   The enforcement of or compliance with any ordinance or law:

   (1) Regulating the construction, use or repair of any property; or

   (2) Requiring the tearing down of any property, including the cost of removing its debris.

   This exclusion, Ordinance Or Law, applies whether the loss results from:

   (a) An ordinance or law that is enforced even if the property has not been damaged; or

   (b) The increased costs incurred to comply with an ordinance or law in the course of construction, repair, renovation, remodeling or demolition of property, or removal of its debris, following a physical loss to that property.

**b. Earth Movement**

   (1) Earthquake, including tremors and aftershocks and any earth sinking, rising or shifting related to such event;

   (2) Landslide, including any earth sinking, rising or shifting related to such event;

   (3) Mine subsidence, meaning subsidence of a man-made mine, whether or not mining activity has ceased;

   (4) Earth sinking (other than sinkhole collapse), rising or shifting including soil conditions which cause settling, cracking or other disarrangement of foundations or other parts of realty. Soil conditions include contraction, expansion, freezing, thawing, erosion, improperly compacted soil and the action of water under the ground surface.

   But if Earth Movement, as described in **b.(1)** through **(4)** above, results in fire or explosion, we will pay for the loss or damage caused by that fire or explosion.

   (5) Volcanic eruption, explosion or effusion. But if volcanic eruption, explosion or effusion results in fire or Volcanic Action, we will pay for the loss or damage caused by that fire or Volcanic Action.

   This exclusion applies regardless of whether any of the above, in Paragraphs **(1)** through **(5)**, is caused by an act of nature or is otherwise caused.

**c. Governmental Action**

   Seizure or destruction of property by order of governmental authority.

   But we will pay for loss or damage caused by or resulting from acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread, if the fire would be covered under this Coverage Part.

**d. Nuclear Hazard**

   Nuclear reaction or radiation, or radioactive contamination, however caused.

   But if nuclear reaction or radiation, or radioactive contamination, results in fire, we will pay for the loss or damage caused by that fire.

  © Insurance Services Office, Inc., 2011  CP 10 10 10 12

**e. Utility Services**

The failure of power, communication, water or other utility service supplied to the described premises, however caused, if the failure:

**(1)** Originates away from the described premises; or

**(2)** Originates at the described premises, but only if such failure involves equipment used to supply the utility service to the described premises from a source away from the described premises.

Failure of any utility service includes lack of sufficient capacity and reduction in supply.

Loss or damage caused by a surge of power is also excluded, if the surge would not have occurred but for an event causing a failure of power.

But if the failure or surge of power, or the failure of communication, water or other utility service, results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

Communication services include but are not limited to service relating to Internet access or access to any electronic, cellular or satellite network.

**f. War And Military Action**

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**g. Water**

**(1)** Flood, surface water, waves (including tidal wave and tsunami), tides, tidal water, overflow of any body of water, or spray from any of these, all whether or not driven by wind (including storm surge);

**(2)** Mudslide or mudflow;

**(3)** Water that backs up or overflows or is otherwise discharged from a sewer, drain, sump, sump pump or related equipment;

**(4)** Water under the ground surface pressing on, or flowing or seeping through:

**(a)** Foundations, walls, floors or paved surfaces;

**(b)** Basements, whether paved or not; or

**(c)** Doors, windows or other openings; or

**(5)** Waterborne material carried or otherwise moved by any of the water referred to in Paragraph **(1)**, **(3)** or **(4)**, or material carried or otherwise moved by mudslide or mudflow.

This exclusion applies regardless of whether any of the above, in Paragraphs **(1)** through **(5)**, is caused by an act of nature or is otherwise caused. An example of a situation to which this exclusion applies is the situation where a dam, levee, seawall or other boundary or containment system fails in whole or in part, for any reason, to contain the water.

But if any of the above, in Paragraphs **(1)** through **(5)**, results in fire, explosion or sprinkler leakage, we will pay for the loss or damage caused by that fire, explosion or sprinkler leakage (if sprinkler leakage is a Covered Cause of Loss).

**h. "Fungus", Wet Rot, Dry Rot And Bacteria**

Presence, growth, proliferation, spread or any activity of "fungus", wet or dry rot or bacteria.

But if "fungus", wet or dry rot or bacteria result in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

This exclusion does not apply:

**(1)** When "fungus", wet or dry rot or bacteria result from fire or lightning; or

**(2)** To the extent that coverage is provided in the Additional Coverage, Limited Coverage For "Fungus", Wet Rot, Dry Rot And Bacteria, with respect to loss or damage by a cause of loss other than fire or lightning.

Exclusions **B.1.a.** through **B.1.h.** apply whether or not the loss event results in widespread damage or affects a substantial area.

**2.** We will not pay for loss or damage caused by or resulting from:

**a.** Artificially generated electrical, magnetic or electromagnetic energy that damages, disturbs, disrupts or otherwise interferes with any:

**(1)** Electrical or electronic wire, device, appliance, system or network; or

**(2)** Device, appliance, system or network utilizing cellular or satellite technology.

For the purpose of this exclusion, electrical, magnetic or electromagnetic energy includes but is not limited to:

**(a)** Electrical current, including arcing;

**(b)** Electrical charge produced or conducted by a magnetic or electromagnetic field;

**(c)** Pulse of electromagnetic energy; or

**(d)** Electromagnetic waves or microwaves.

But if fire results, we will pay for the loss or damage caused by that fire.

**b.** Rupture or bursting of water pipes (other than Automatic Sprinkler Systems) unless caused by a Covered Cause of Loss.

**c.** Leakage or discharge of water or steam from any part of a system or appliance containing water or steam (other than an Automatic Sprinkler System), unless the leakage or discharge occurs because the system or appliance was damaged by a Covered Cause of Loss. But we will not pay for loss or damage caused by or resulting from continuous or repeated seepage or leakage of water, or the presence or condensation of humidity, moisture or vapor, that occurs over a period of 14 days or more.

**d.** Explosion of steam boilers, steam pipes, steam engines or steam turbines owned or leased by you, or operated under your control.

But if explosion of steam boilers, steam pipes, steam engines or steam turbines results in fire or combustion explosion, we will pay for the loss or damage caused by that fire or combustion explosion.

**e.** Mechanical breakdown, including rupture or bursting caused by centrifugal force.

But if mechanical breakdown results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

**f.** Neglect of an insured to use all reasonable means to save and preserve property from further damage at and after the time of loss.

**3. Special Exclusions**

The following provisions apply only to the specified Coverage Forms:

**a. Business Income (And Extra Expense) Coverage Form, Business Income (Without Extra Expense) Coverage Form, Or Extra Expense Coverage Form**

We will not pay for:

**(1)** Any loss caused by or resulting from:

**(a)** Damage or destruction of "finished stock"; or

**(b)** The time required to reproduce "finished stock".

This exclusion does not apply to Extra Expense.

**(2)** Any loss caused by or resulting from direct physical loss or damage to radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers.

**(3)** Any increase of loss caused by or resulting from:

**(a)** Delay in rebuilding, repairing or replacing the property or resuming "operations", due to interference at the location of the rebuilding, repair or replacement by strikers or other persons; or

**(b)** Suspension, lapse or cancellation of any license, lease or contract. But if the suspension, lapse or cancellation is directly caused by the "suspension" of "operations", we will cover such loss that affects your Business Income during the "period of restoration" and any extension of the "period of restoration" in accordance with the terms of the Extended Business Income Additional Coverage and the Extended Period Of Indemnity Optional Coverage or any variation of these.

**(4)** Any Extra Expense caused by or resulting from suspension, lapse or cancellation of any license, lease or contract beyond the "period of restoration".

**(5)** Any other consequential loss.

© Insurance Services Office, Inc., 2011

**b. Leasehold Interest Coverage Form**

(1) Paragraph **B.1.a.,** Ordinance Or Law, does not apply to insurance under this Coverage Form.

(2) We will not pay for any loss caused by:

    (a) Your cancelling the lease;

    (b) The suspension, lapse or cancellation of any license; or

    (c) Any other consequential loss.

**c. Legal Liability Coverage Form**

(1) The following exclusions do not apply to insurance under this Coverage Form:

    (a) Paragraph **B.1.a.** Ordinance Or Law;

    (b) Paragraph **B.1.c.** Governmental Action;

    (c) Paragraph **B.1.d.** Nuclear Hazard;

    (d) Paragraph **B.1.e.** Utility Services; and

    (e) Paragraph **B.1.f.** War And Military Action.

(2) The following additional exclusions apply to insurance under this Coverage Form:

    **(a) Contractual Liability**

    We will not defend any claim or "suit", or pay damages that you are legally liable to pay, solely by reason of your assumption of liability in a contract or agreement. But this exclusion does not apply to a written lease agreement in which you have assumed liability for building damage resulting from an actual or attempted burglary or robbery, provided that:

        **(i)** Your assumption of liability was executed prior to the accident; and

        **(ii)** The building is Covered Property under this Coverage Form.

    **(b) Nuclear Hazard**

    We will not defend any claim or "suit", or pay any damages, loss, expense or obligation, resulting from nuclear reaction or radiation, or radioactive contamination, however caused.

**C. Additional Coverage – Limited Coverage For "Fungus", Wet Rot, Dry Rot And Bacteria**

1. The coverage described in **C.2.** and **C.6.** only applies when the "fungus", wet or dry rot or bacteria are the result of one or more of the following causes that occur during the policy period and only if all reasonable means were used to save and preserve the property from further damage at the time of and after that occurrence:

    **a.** A Covered Cause of Loss other than fire or lightning; or

    **b.** Flood, if the Flood Coverage Endorsement applies to the affected premises.

This Additional Coverage does not apply to lawns, trees, shrubs or plants which are part of a vegetated roof.

2. We will pay for loss or damage by "fungus", wet or dry rot or bacteria. As used in this Limited Coverage, the term loss or damage means:

    **a.** Direct physical loss or damage to Covered Property caused by "fungus", wet or dry rot or bacteria, including the cost of removal of the "fungus", wet or dry rot or bacteria;

    **b.** The cost to tear out and replace any part of the building or other property as needed to gain access to the "fungus", wet or dry rot or bacteria; and

    **c.** The cost of testing performed after removal, repair, replacement or restoration of the damaged property is completed, provided there is a reason to believe that "fungus", wet or dry rot or bacteria are present.

3. The coverage described under **C.2.** of this Limited Coverage is limited to $15,000. Regardless of the number of claims, this limit is the most we will pay for the total of all loss or damage arising out of all occurrences of Covered Causes of Loss (other than fire or lightning) and Flood which take place in a 12-month period (starting with the beginning of the present annual policy period). With respect to a particular occurrence of loss which results in "fungus", wet or dry rot or bacteria, we will not pay more than a total of $15,000 even if the "fungus", wet or dry rot or bacteria continue to be present or active, or recur, in a later policy period.

**4.** The coverage provided under this Limited Coverage does not increase the applicable Limit of Insurance on any Covered Property. If a particular occurrence results in loss or damage by "fungus", wet or dry rot or bacteria, and other loss or damage, we will not pay more, for the total of all loss or damage, than the applicable Limit of Insurance on the affected Covered Property.

If there is covered loss or damage to Covered Property, not caused by "fungus", wet or dry rot or bacteria, loss payment will not be limited by the terms of this Limited Coverage, except to the extent that "fungus", wet or dry rot or bacteria cause an increase in the loss. Any such increase in the loss will be subject to the terms of this Limited Coverage.

**5.** The terms of this Limited Coverage do not increase or reduce the coverage provided under Paragraph **b.** of Covered Causes Of Loss **9.** Sprinkler Leakage.

**6.** The following, **6.a.** or **6.b.,** applies only if Business Income and/or Extra Expense Coverage applies to the described premises and only if the "suspension" of "operations" satisfies all terms and conditions of the applicable Business Income and/or Extra Expense Coverage Form:

    **a.** If the loss which resulted in "fungus", wet or dry rot or bacteria does not in itself necessitate a "suspension" of "operations", but such "suspension" is necessary due to loss or damage to property caused by "fungus", wet or dry rot or bacteria, then our payment under Business Income and/or Extra Expense is limited to the amount of loss and/or expense sustained in a period of not more than 30 days. The days need not be consecutive.

    **b.** If a covered "suspension" of "operations" was caused by loss or damage other than "fungus", wet or dry rot or bacteria but remediation of "fungus", wet or dry rot or bacteria prolongs the "period of restoration", we will pay for loss and/or expense sustained during the delay (regardless of when such a delay occurs during the "period of restoration"), but such coverage is limited to 30 days. The days need not be consecutive.

**D. Limitation**

We will pay for loss of animals only if they are killed or their destruction is made necessary.

**E. Definitions**

"Fungus" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi.

© Insurance Services Office, Inc., 2011

COMMERCIAL PROPERTY
CP 10 75 12 20

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# CYBER INCIDENT EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART
STANDARD PROPERTY POLICY

**A.** The following exclusion is added to Paragraph **B. Exclusions:**

We will not pay for loss or damage caused directly or indirectly by the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

**Cyber Incident**

**1.** Unauthorized access to or use of any computer system (including electronic data).

**2.** Malicious code, virus or any other harmful code that is directed at, enacted upon or introduced into any computer system (including electronic data) and is designed to access, alter, corrupt, damage, delete, destroy, disrupt, encrypt, exploit, use or prevent or restrict access to or the use of any part of any computer system (including electronic data) or otherwise disrupt its normal functioning or operation.

**3.** Denial of service attack which disrupts, prevents or restricts access to or use of any computer system, or otherwise disrupts its normal functioning or operation.

**B. Exceptions And Limitations**

**1. Fire Or Explosion**

If a cyber incident as described in Paragraphs **A.1.** through **A.3.** of this exclusion results in fire or explosion, we will pay for the loss or damage caused by that fire or explosion.

**2. Additional Coverage**

The exclusion in Paragraph **A.** does not apply to the extent that coverage is provided in the:

**a.** Additional Coverage – Electronic Data; or

**b.** Additional Coverage – Interruption Of Computer Operations.

**3. Electronic Commerce Endorsement**

The exclusion in Paragraph **A.** does not apply to the Electronic Commerce (E-Commerce) endorsement when attached to your policy.

**C. Vandalism**

The following is added to Vandalism, if Vandalism coverage is not otherwise excluded under the Standard Property Policy or the Causes Of Loss – Basic, Broad or Special Forms and if applicable to the premises described in the Declarations:

Vandalism does not include a cyber incident as described in Paragraph **A.**

## COMMERCIAL PROPERTY COVERAGE PART
## EQUIPMENT BREAKDOWN COVERAGE SCHEDULE

*Equipment Breakdown is subject to the Limits of Insurance shown in the Declarations except as specifically shown below.*

*These coverages apply to all locations covered on the policy, unless otherwise specified.*

| Coverages | Limits |
|---|---|
| **Equipment Breakdown Limit** | Follows Property Limit |
| Business Income | Follows Property Limit |
| Extra Expense | Follows Property Limit |
| Data Restoration | $25,000 |
| Expediting Expenses | $25,000 |
| Future Loss Avoidance | $10,000 or 10% of our Eligible Payment, whichever is less |
| Green | $25,000 |
| Hazardous Substances | $25,000 |
| Mobile Robots | $50,000 |
| Off Premises Equipment Breakdown | Follows Property Limit |
| Public Relations | $25,000 |
| Resultant Damage to Animals | $25,000 |

Service Interruption – Coverage Options (check one)

    [X ]  Follows Applicable Coverage Limit
    [ ]  $_____ Applies only to Business Income and Extra Expense coverages. Data Restoration and Spoilage and Consequential Damage are subject to the applicable sublimits shown in the Equipment Breakdown Coverage endorsement or "schedule".

Spoilage and Consequential Damage          $

    Refrigerant Contamination – Coverage Options (check one)
    [ ]  Included in Spoilage and Consequential Damage Limit
    [X ]  $100,000

**Deductibles**

| Combined, All Coverages | Follows AOP |
|---|---|

Direct Coverages

ORES EBDEC-01 12 22    © 2021, The Hartford Steam Boiler Inspection and Insurance Company.    Page **1** of **1**
All rights reserved.

| | |
|---|---|
| Indirect Coverages | $ <br> *or* _____ *hrs.* <br> *or* _____ *times ADV* |
| Spoilage and Consequential Damage | $ <br> *or* ____% *of loss,* $ ____ *minimum* |

**Other Conditions**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●

ORES EBDEC-01 12 22    © 2021, The Hartford Steam Boiler Inspection and Insurance Company. All rights reserved.    Page **2** of **2**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EQUIPMENT BREAKDOWN COVERAGE (INCLUDING ELECTRONIC CIRCUITRY IMPAIRMENT)

This endorsement modifies insurance provided under the following:

BUILDING AND PERSONAL PROPERTY COVERAGE FORM
CONDOMINIUM ASSOCIATION COVERAGE FORM
CONDOMINIUM COMMERCIAL UNIT-OWNERS COVERAGE FORM
CAUSES OF LOSS—BASIC FORM
CAUSES OF LOSS—BROAD FORM
CAUSES OF LOSS—SPECIAL FORM

**A.** The following is added as an **Additional Coverage** to the Causes of Loss—Basic Form, Broad Form or Special Form.

**Additional Coverage – Equipment Breakdown**

Additional Coverage Equipment Breakdown as described and limited below is included in the term Covered Cause of Loss. Without an "accident" or "electronic circuitry impairment", there is no Equipment Breakdown Coverage.

**1.** We will pay for direct physical damage to Covered Property that is the direct result of an "accident" or "electronic circuitry impairment". We will consider "electronic circuitry impairment" to be physical damage to "covered equipment".

**2.** The following coverages also apply to the direct result of an "accident" or "electronic circuitry impairment", unless otherwise shown in a "schedule". These coverages do not provide additional amounts of insurance.

    **a. Business Income and Extra Expense**

        **(1)** Any insurance provided under the coverage part to which this Equipment Breakdown Coverage endorsement is attached for Business Income or Extra Expense is extended to the coverage provided by this endorsement. However, if a deductible is shown in a "schedule", then with respect to this endorsement only, the "period of restoration" will begin immediately after the "accident" or "electronic circuitry impairment" and the deductible shown in the "schedule" will apply.

        **(2)** The most we will pay under this Business Income and Extra Expense coverage is the applicable limit for Business Income and Extra Expense, unless otherwise shown in a "schedule".

    **b. Data Restoration**

        **(1)** We will pay for your reasonable and necessary cost to research, replace and restore lost "data".

        **(2)** The most we will pay under this Data Restoration coverage is $25,000, unless otherwise shown in a "schedule". This amount includes the actual loss of Business Income you sustain and necessary Extra Expense you incur, if shown as covered.

    **c. Expediting Expenses**

        **(1)** With respect to your damaged Covered Property, we will pay the reasonable and necessary extra cost to:

            **(a)** Make temporary repairs; and

            **(b)** Expedite permanent repairs or replacement.

        **(2)** The most we will pay under this Expediting Expenses coverage is $25,000, unless otherwise shown in a "schedule".

**d. Future Loss Avoidance**

**(1)** This coverage only applies if you have received payment under this Equipment Breakdown Coverage for an "accident" or "electronic circuitry impairment" that occurred on the premises of a covered location.

**(2)** We will pay your costs to purchase and install Protective Equipment at the location of the loss as follows:

**(a)** Electrical surge protection or single-phase Protective Equipment; or

**(b)** Other Protective Equipment if we agree that such equipment would reasonably reduce the likelihood of a future "accident" or "electronic circuitry impairment" similar to the one for which you have received payment from us. We will not unreasonably withhold such agreement.

**(3)** As used in this coverage, Protective Equipment means a permanently installed physical device with the principal function of safeguarding one or more pieces of "covered equipment" from physical damage.

**(4)** We must receive your invoices for any purchase and installation costs no later than 180 days after the date you receive the payment for the loss from us.

**(5)** With respect to any "one equipment breakdown", the most we will pay is the lesser of the following:

**(a)** 10% of our Eligible Payment to you prior to any payment under this Future Loss Avoidance coverage; or

**(b)** $10,000.

**(6)** As used in this coverage, Eligible Payment means our total payment to you not including the following:

**(a)** Any deductible or coinsurance amount; or

**(b)** Any payment made after this policy has been cancelled or non-renewed.

**e. Green**

**(1)** With respect to Covered Property, we will pay your additional cost to:

**(a)** Repair damaged property using equipment, materials and service firms required or recommended by a "recognized environmental standards program", if repair is the least expensive option;

**(b)** Replace damaged property using equipment, materials and service firms required or recommended by a "recognized environmental standards program", if replacement is the least expensive option;

**(c)** Dispose of damaged property or equipment, if practicable, through a recycling process; and

**(d)** Flush out reconstructed space with up to 100% outside air using new filtration media.

**(2)** With respect to any building that is Covered Property and was, at the time of the "accident" or "electronic circuitry impairment" certified by a "recognized environmental standards program", we will pay your additional cost:

**(a)** To prevent a lapse of such certification;

**(b)** To reinstate the certification or replace it with an equivalent certification;

**(c)** For an engineer authorized by a "recognized environmental standards program" to oversee the repair or replacement of the damaged Covered Property; and

**(d)** For a Professional Engineer to commission or recommission your damaged mechanical, electrical or electronic building systems.

**(3)** As used in this coverage, additional costs mean those beyond what would have been payable under this Equipment Breakdown Coverage in the absence of this Green coverage.

**(4)** This Green coverage is subject to the following provisions:

**(a)** This coverage applies in addition to any coverage that may apply under the Environmental, Safety and Efficiency Improvements condition of this endorsement or any other applicable coverage.

**(b)** This coverage only applies to Covered Property that must be repaired or replaced as a direct result of an "accident" or "electronic circuitry impairment".

**(c)** This coverage does not apply to any Covered Property to which "actual cash value" applies.

**(5)** The most we will pay under this Green coverage is $25,000, unless otherwise shown in a "schedule". This amount includes the actual loss of Business Income you sustain and necessary Extra Expense you incur, if shown as covered.

**f. Hazardous Substances**

**(1)** We will pay your additional cost to repair or replace Covered Property because of contamination by a "hazardous substance". This includes the additional expenses to clean up or dispose of such property. As used in this coverage, additional costs mean those beyond what would have been payable under this Equipment Breakdown Coverage had no "hazardous substance" been involved.

**(2)** This coverage does not apply to testing, clean up or disposal of land, water or any other property that is not Covered Property.

**(3)** This does not include contamination of "perishable goods" by refrigerant, including, but not limited to, ammonia, which is addressed in Refrigerant Contamination, **2.m.(2)** below.

**(4)** The most we will pay under this Hazardous Substances coverage is $25,000, unless otherwise shown in a "schedule". This amount includes the actual loss of Business Income you sustain and necessary Extra Expense you incur, if shown as covered.

**g. Mobile Robots**

**(1)** We will pay for physical damage to Covered Property from an "accident" or "electronic circuitry impairment" when the "covered equipment" is a "mobile robot".

**(2)** The most we will pay under this Mobile Robots coverage is $50,000, unless otherwise shown in a "schedule". This amount includes Spoilage and Consequential Damage, Data Restoration, and the actual loss of Business Income you sustain and necessary Extra Expense you incur, if shown as covered.

**h. Off Premises Equipment Breakdown**

**(1)** We will pay for physical damage to portable "covered equipment" that, at the time of the "accident" or "electronic circuitry impairment", is not at a covered location.

**(2)** We will also pay for your reasonable and necessary cost to research, replace and restore lost "data" contained within portable "covered equipment" as described in **(1)** above. This amount may not exceed the limit applicable to Data Restoration coverage.

**(3)** With respect to this Off Premises Equipment Breakdown coverage only, the "accident" or "electronic circuitry impairment" may occur anywhere in the world except within any country on which the United States has imposed sanctions, embargoes or similar restrictions on the provision of insurance.

**(4)** The most we will pay under this Off Premises Equipment Breakdown coverage is the Property Off Premises limit shown in your policy, unless otherwise shown in a "schedule". Our payment under this coverage includes:

**(a)** The actual loss of Business Income you sustain and necessary Extra Expense you incur, if shown as covered; and

**(b)** Data Restoration as described in **(2)** above.

**i. Public Relations**

**(1)** This coverage only applies if you have sustained an actual loss of Business Income covered under this endorsement.

**(2)** We will pay for your reasonable costs for professional services to create and disseminate communications, when the need for such communications arises directly from the interruption of your business. This communication must be directed to one or more of the following:

**(a)** The media;

**(b)** The public; or

**(c)** Your customers, clients or members.

**(3)** Such costs must be incurred during the "period of restoration" or up to 30 days after the "period of restoration" has ended.

**(4)** The most we will pay under this Public Relations coverage is $25,000.

**j. Resultant Damage to Animals**

All rights reserved.

   (1)  Any insurance provided under the coverage part to which this Equipment Breakdown Coverage endorsement is attached for "animals" is extended to the coverage provided by this endorsement.

   (2)  The most we will pay under this Resultant Damage to Animals coverage is $25,000. This amount includes the actual loss of Business Income and necessary Extra Expense you incur, if shown as covered.

**k.  Resultant Loss from a Cyber Event**

Coverage is extended to an "accident" or "electronic circuitry impairment" caused by or resulting from a "cyber event" that causes direct physical damage to "covered equipment" at a covered location.

**l.  Service Interruption**

   (1)  Any insurance provided for Business Income, Extra Expense, Data Restoration or Spoilage and Consequential Damage is extended to apply to your loss, damage or expense caused by a failure or disruption of service. The failure or disruption of service must be caused by an "accident" or "electronic circuitry impairment" to equipment, including overhead transmission lines, that is owned by a utility, landlord, a landlord's utility or other supplier who provides you with any of the following services: electrical power, waste disposal, air conditioning, refrigeration, heating, natural gas, compressed air, water, steam, internet access, telecommunications services, "cloud or outsourced computing services", wide area networks or data transmission. The equipment must meet the definition of "covered equipment" except that it is not Covered Property.

   (2)  "Cloud or outsourced computing services" must be provided by a professional provider with whom you have a contract. With respect to this Service Interruption coverage only, the "accident" or "electronic circuitry impairment" to the equipment of a provider of "cloud or outsourced computing services" may occur anywhere in the world except within any country on which the United States has imposed sanctions, embargoes or similar restrictions on the provision of insurance.

   (3)  With respect to the Data Restoration portion of this Service Interruption coverage, coverage will also apply to "data" stored in the equipment of a provider of "cloud or outsourced computing services".

   (4)  Unless otherwise shown in a "schedule", Service Interruption coverage will not apply unless the failure or disruption of service exceeds 24 hours immediately following the "accident" or "electronic circuitry impairment". If the interruption exceeds 24 hours, coverage will begin at the time of the interruption and the applicable deductible will apply.

   (5)  The most we will pay in any "one equipment breakdown" under this Service Interruption coverage is the applicable limit for Business Income, Extra Expense, Data Restoration or Spoilage and Consequential Damage. However, if a limit is shown in a "schedule" for Service Interruption, that limit will apply to Business Income and Extra Expense loss under this coverage.

**m.  Spoilage and Consequential Damage**

   (1)  We will pay for physical damage to "perishable goods" due to "spoilage and consequential damage".

   (2)  Refrigerant Contamination

We will also pay for physical damage to "perishable goods" due to contamination from the release of refrigerant, including, but not limited to, ammonia. If a separate limit is indicated for Refrigerant Contamination, this amount is part of, and not in addition to, your Spoilage and Consequential Damage limit.

   (3)  We will also pay any necessary expenses you incur to reduce the amount of loss under this Spoilage and Consequential Damage coverage. However, we will not pay more than the amount that would otherwise have been payable under this Spoilage and Consequential Damage coverage.

   (4)  The most we will pay under this Spoilage and Consequential Damage coverage is $25,000, unless otherwise shown in a "schedule".

**3.  EQUIPMENT BREAKDOWN EXCLUSIONS**

All exclusions in the applicable Causes of Loss form apply except as modified below and to the extent that coverage is specifically provided by this endorsement.  Exclusions listed in this endorsement apply regardless of cause.

If any cyber incident exclusion is made a part of this policy, such exclusion will not apply to the extent coverage is provided in **A.2.k. Resultant Loss From a Cyber Event**.

**a.**  With respect to coverage under this endorsement, the following exclusions are modified:

 © 2021, The Hartford Steam Boiler Inspection and Insurance Company. All rights reserved.

**(1)** If the Causes of Loss—Basic Form or Causes of Loss—Broad Form applies, the following is added to Exclusion **B.2.**:

Wear and tear, corrosion, depletion, deterioration, erosion, settling or other gradually developing conditions. However, if an "accident" or "electronic circuitry impairment" results, we will pay for the resulting loss, damage or expense caused by that "accident" or "electronic circuitry impairment".

**(2)** If the Causes of Loss—Special Form applies, with respect to this endorsement only, the last paragraph of Exclusion **B.2.d.** is deleted and replaced with the following:

But if a cause of loss that is excluded and listed in **B.2.d.(1)** through **(7)** results in an "accident" or "electronic circuitry impairment", we will pay for the resulting loss, damage or expense caused by that "accident" or "electronic circuitry impairment".

**b.** With respect to coverage under this endorsement, the following exclusions are added:

**(1)** We will not pay for loss, damage or expense caused by any of the following causes of loss, whether directly or indirectly. This exclusion applies even if the excluded cause of loss was the result of an "accident" or "electronic circuitry impairment":

**(a)** Fire, including smoke from a fire.

**(b)** Explosion of gas or unconsumed fuel within the furnace of any boiler or fired vessel or within the passages from that furnace to the atmosphere.

**(c)** Any other explosion, except as specifically covered under this endorsement.

**(d)** Any earth movement. This includes, but is not limited to, earthquake, earth sinking, landslide, sinkhole collapse, subsidence, tsunami or volcanic action.

**(e)** Flood; mudslide or mudflow; overflow of any body of water; storm surge; tidal waves; tides; surface water; water that discharges, overflows or backs up from a drain, sump or sewer; waves; or spray associated with any of the foregoing; all whether or not caused by or involving wind.

However, if electrical "covered equipment" requires drying out because of the above, we will pay for the amount you actually expend to dry out such equipment, subject to the applicable Limit of Insurance and deductible for Building or Business Personal Property, whichever applies. We will not pay more than the "actual cash value" of the affected electrical "covered equipment". We will not pay to replace such equipment or for any other direct or indirect loss, damage or expense.

**(f)** Vandalism, meaning a malicious act that causes damage or destruction. However, this exclusion does not apply to a "cyber event" to the extent coverage is provided in **A.2.k.** (Resultant Loss from a Cyber Event coverage).

**(g)** Any "cyber event", except as specifically provided in **A.2.k.** (Resultant Loss from a Cyber Event coverage).

**(h)** Your failure to use all reasonable means to protect Covered Property from damage following an "accident" or "electronic circuitry impairment".

**(i)** Freeze caused by cold weather, except as specifically provided under **A.2.m.** Spoilage and Consequential Damage coverage.

**(j)** Discharge of molten material from equipment, including the heat from such discharged material.

**(2)** We will not pay for loss, damage or expense caused directly or indirectly by any condition or event listed in **(a)** through **(e)** below, without regard to whether such condition or event is normal and expected or unusual and unexpected. However, if a condition or event that is listed in **(a)** through **(e)** below results in an "accident" or "electronic circuitry impairment" and no other exclusion applies, we will pay only for the loss, damage or expense that is a direct result of and solely attributable to the "accident" or "electronic circuitry impairment".

**(a)** Any defect, error or shortcoming in design or installation;

**(b)** Any undercapacity, underperformance, failure to perform as expected or failure to perform as designed;

**(c)** Any defect, programming error, programming limitation, loss of "data", loss of access, loss of use, loss of functionality or other condition within or involving "data" or "media" of any kind;

**(d)** Contamination by a "hazardous substance";

**(e)** Any condition, including, but not limited to, misalignment, miscalibration or tripping off-line, which can be corrected by:

    **i.** Resetting, tightening, adjusting or cleaning;

    **ii.** Normal maintenance, including, but not limited, to replacing expendable parts, recharging batteries or cleaning;

    **iii.** Rebooting, reloading or updating software or firmware; or

    **iv.** Providing necessary power or supply.

**(3)** We will not pay for an "accident" or "electronic circuitry impairment" caused by or resulting from any of the following causes of loss:

**(a)** Lightning.

**(b)** Windstorm or hail. However, this exclusion does not apply when:

    **i.** "Covered equipment" located within a structure or building suffers an "accident" or "electronic circuitry impairment" that results from wind-blown dust, rain, sand or snow; and

    **ii.** The structure or building did not first sustain wind or hail damage to its roof or walls through which the dust, rain, sand or snow entered.

**(c)** Collision or any physical contact caused by or involving a "vehicle" or "mobile robot".

**(d)** Smoke, riot or civil commotion, sprinkler leakage or elevator collision.

**(e)** Weight of snow, ice or sleet.

**(f)** Collapse.

**(g)** Falling objects. However, this exclusion does not apply to:

    **i.** Property located outside the walls of a structure or building; or

    **ii.** Loss or damage to property located within a structure or building, unless a falling object first damages the roof or exterior wall of the structure or building.

**(h)** A hydrostatic, pneumatic or gas pressure test of any boiler or pressure vessel, or an electrical insulation breakdown test of any type of electrical equipment.

**(i)** Any means, whether or not successful, intended to extinguish a fire. This includes, but is not limited to, the spraying of water.

**(4)** With respect to Business Income, Extra Expense and Service Interruption coverages, we will also not pay for:

**(a)** Loss caused by your failure to use due diligence and dispatch and any and all reasonable means to resume business; or

**(b)** Any increase in loss resulting from an agreement between you and your customer, supplier or contractor.

**(5)** We will not pay for loss, damage or expense caused directly or indirectly by the following, whether or not caused by or resulting from an "accident" or "electronic circuitry impairment": Any mold, fungus, mildew or yeast, including any spores or toxins created or produced by or emanating from such mold, fungus, mildew or yeast. This includes, but is not limited to, costs arising from clean-up, remediation, containment, removal or abatement of such mold, fungus, mildew, yeast, spores or toxins. However, this exclusion does not apply to "spoilage and consequential damage" of personal property that is "perishable goods", to the extent that such "spoilage and consequential damage" is covered under Spoilage and Consequential Damage coverage.

**(6)** Except as specifically provided under **A.2.b. Data Restoration** or **A.2.j. Resultant Damage to Animals**, we will not pay for loss, damage or expense caused directly or indirectly by the following, whether or not caused by or resulting from an "accident" or "electronic circuitry impairment":

**(a)** Physical loss or damage to "animals";

**(b)** Loss, interruption or compromise of any research, test or study involving "animals"; or

**(c)** Loss of income or extra expense resulting from (a) or (b) above.

**(7)** We will not pay for loss or damage to any of the following, whether or not caused by an "accident" or "electronic circuitry impairment":

 © 2021, The Hartford Steam Boiler Inspection and Insurance Company. All rights reserved.

    **(a)** Catalysts or molecular sieves;

    **(b)** Artifacts, fossils, relics or any rare items of cultural, historical or scientific interest; or

    **(c)** Biological samples or materials, including, but not limited to, organs, tissues or blood.

**(8)** We will not pay for "spoilage and consequential damage" to any "perishable goods" with respect to Off Premises Equipment Breakdown coverage.

**(9)** With respect to Off Premises Equipment Breakdown and Service Interruption coverage provided by this endorsement, and any Dependent Properties or Civil Authority coverages provided by the policy, we will not pay for any direct or indirect loss, damage or expense caused by or resulting from a "cyber event".

**c.** Exclusions **b.(3)(a)** through **(g)** above do not apply if:

    **(1)** The excluded cause of loss occurs away from any covered location and causes an electrical surge or other electrical disturbance;

    **(2)** Such surge or disturbance is transmitted through utility service transmission lines to the covered location and results in an "accident" or "electronic circuitry impairment"; and

    **(3)** The loss, damage or expense caused by such surge or disturbance is not covered elsewhere under the policy.

**d.** Any cause of loss set forth in exclusion b.(3)(e) through (g) above that is not a Covered Cause of Loss in this coverage part will be excluded only as respects Service Interruption coverage.

**4. EQUIPMENT BREAKDOWN DEFINITIONS**

The following definitions are added with respect to this endorsement only:

**a.** "Accident" means a fortuitous event that causes direct physical damage to "covered equipment". The event must be one of the following:

    **(1)** Mechanical breakdown, including physical damage caused by centrifugal force. As used in this definition, Mechanical Breakdown means an occurrence involving one or more moving parts of machinery that causes such machinery to operate improperly or to cease operating.

    **(2)** Artificially generated electrical current, including electrical arcing, that damages electrical devices, appliances or wires.

    **(3)** Explosion, other than combustion explosion, of steam boilers, steam engines, steam piping or steam turbines.

    **(4)** Sudden physical damage not otherwise excluded occurring inside:

        **(a)** Steam boilers, steam engines, steam piping or steam turbines; or

        **(b)** Hot water boilers or other equipment used to heat water.

    **(5)** Bursting, cracking or splitting. However, this does not include any bursting, cracking or splitting associated with an explosion, unless such explosion is an "accident" as defined in **(3)** above.

**b.** "Actual cash value" means the replacement cost for parts, equipment or other property, less Depreciation. However, the "actual cash value" will not be less than 25% of the actual replacement cost.

As used in this definition, Depreciation means the ratio of the age of the property at the time of loss to its expected useful life.

Depreciation will not be applied to labor or other costs necessary to complete the repair or replacement.

**c.** "Animal" means a creature of the kingdom Animalia. This includes, but is not limited to, amphibians, birds, fish, insects, mammals, reptiles, and worms.

**d.** "Boilers and vessels"

    **(1)** Boilers;

    **(2)** Piping, valves or fittings that:

        **(a)** Convey steam; or

        **(b)** Are part of a closed loop system connected to a boiler.

    **(3)** Condensate tanks; and

**(4)** Fired or unfired vessels which, during normal usage, operate under vacuum or pressure, other than the weight of contents.

This term does not appear elsewhere in this endorsement, but may appear in a "schedule".

**e.** "Buried vessels or piping"

**(1)** "Buried vessels or piping" means any piping, valve, fitting or vessel that is buried or encased in the earth, concrete or other material, whether above or below grade, or in an enclosure which does not allow access for inspection and repair. Such equipment will be considered "buried vessels or piping" if any portion is buried or encased, whether or not the entire piece of equipment is buried or encased and whether or not the equipment is connected to other equipment that is not buried or encased.

**(2)** None of the following are "buried vessels or piping":

**(a)** Any piping, valve, fitting, or vessel within a building. However, such equipment will not be considered within a building if it is partly or entirely beneath the building's foundation.

**(b)** Any piping, valve, fitting, or vessel within a tunnel through which people can pass and that connects two or more buildings.

**(c)** Any piping, valve or fitting that is part of a closed loop geothermal system.

**(d)** A pressure vessel used as the cylinder of a hydraulic elevator.

**f.** "Cloud or outsourced computing services" means professional, on-demand, self-service data storage or data processing services provided through the internet or over telecommunications lines. This includes services known as IaaS (infrastructure as a service), PaaS (platform as a service), SaaS (software as a service) and NaaS (network as a service). This includes business models known as public clouds, community clouds and hybrid clouds. "Cloud or outsourced computing services" include private clouds if such services are owned and operated by a third party.

**g.** "Covered equipment"

**(1)** Unless otherwise shown in a "schedule", "covered equipment" means Covered Property:

**(a)** That generates, transmits or utilizes energy; or

**(b)** Which, during normal usage, operates under vacuum or pressure, other than the weight of its contents.

"Covered equipment" may utilize conventional design and technology or new or newly commercialized design and technology.

**(2)** None of the following is "covered equipment":

**(a)** Structures, including, but not limited to, the structural portions of buildings, towers or scaffolding.

**(b)** Foundations.

**(c)** Cabinets, compartments, conduits or ductwork.

**(d)** Insulating or refractory materials or glass linings.

**(e)** Dies, patterns or forms.

**(f)** "Buried vessels or piping".

**(g)** Waste, drainage or sewer piping.

**(h)** Piping, valves or fittings forming a part of a sprinkler or fire suppression system.

**(i)** Piping, valves or fittings used to convey water. However, the following is "covered equipment":

**i.** Piping, valves or fittings that are part of a closed loop connected to a boiler or a refrigeration or air conditioning system; and

**ii.** Valve actuators.

**(j)** "Vehicles" or equipment mounted on a "vehicle".

**(k)** Satellites, spacecraft or any equipment mounted on a satellite or spacecraft.

**(l)** Draglines, excavation or construction equipment.

**(m)** Equipment manufactured by you for sale.

**(n)** Equipment of others that you modify, maintain or test as a professional service.

(o) "Data".

h. "Cyber event" means a hostile, illegal or transgressive act committed through electronic systems. This includes, but is not limited to, hacking, a denial of service attack or the deployment of malware. However, this does not include any such act committed as an act of war, whether or not officially declared.

i. "Data" means information or instructions stored in digital code capable of being processed by machinery.

j. "Electrical distribution equipment"

(1) "Electrical distribution equipment" means the following "covered equipment" when used to distribute electricity to connected equipment:

(a) Electrical wires, cables, busbars and busways;

(b) Electrical connectors, breakers, fuses, switches and motor control centers;

(c) Electrical usage monitors and power quality devices; and

(d) Electrical transformers.

(2) None of the following is "electrical distribution equipment": equipment that is part of or within a machine or apparatus, if such machine or apparatus is serving a function other than the distribution of electricity.

This term does not appear elsewhere in this endorsement, but may appear in a "schedule".

k. "Electrical distribution equipment other than transformers"

(1) "Electrical distribution equipment other than transformers" means the following "covered equipment" when used to distribute electricity to connected equipment:

(a) Electrical wires, cables, busbars and busways;

(b) Electrical connectors, breakers, fuses, switches and motor control centers; and

(c) Electrical usage monitors and power quality devices.

(2) None of the following is "electrical distribution equipment other than transformers":

(a) Equipment that is part of or within a machine or apparatus, if such machine or apparatus is serving a function other than the distribution of electricity; or

(b) Electrical transformers.

This term does not appear elsewhere in this endorsement, but may appear in a "schedule".

l. "Electrical generating equipment"

(1) "Electrical generating equipment" means equipment which converts any other form of energy into electricity. This includes, but is not limited to, the following:

(a) Boilers used primarily to provide steam for one or more turbine-generator units;

(b) Turbine-generators (including steam, gas, water or wind turbines);

(c) Engine-generators;

(d) Fuel cells or other alternative electrical generating equipment;

(e) Electrical transformers, switchgear and power lines used to convey the generated electricity; and

(f) Associated equipment necessary for the operation of any of the equipment listed in (a) through (e) above.

(2) None of the following is "Electrical generating equipment":

(a) Elevator or hoist motors that generate electricity when releasing cable; or

(b) Equipment intended to generate electricity solely on an emergency, back-up basis.

This term does not appear elsewhere in this endorsement, but may appear in a "schedule".

m. "Electronic circuitry impairment"

(1) "Electronic circuitry impairment" means a fortuitous event involving Electronic Circuitry within "covered equipment" that causes the "covered equipment" to suddenly lose its ability to function as it had been functioning immediately before such event. This definition is subject to the conditions specified in (2) and (3) below.

All rights reserved.

**(2)** We will determine that the reasonable and appropriate remedy to restore such "covered equipment's" ability to function is the replacement of one or more Electronic Circuitry components of the "covered equipment".

**(3)** None of the following is an "electronic circuitry impairment":

**(a)** Any condition caused by or related to:

**i.** Incompatibility of the "covered equipment" with any software or equipment installed, introduced or networked within the prior 30 days; or

**ii.** Insufficient size, capability or capacity of the "covered equipment".

**(b)** Exposure to adverse environmental conditions, including, but not limited to, change in temperature or humidity, unless such conditions result in an observable loss of functionality. Loss of warranty will not be considered an observable loss of functionality.

**(4)** As used in this definition, Electronic Circuitry means microelectronic components, including, but not limited to, circuit boards, integrated circuits, computer chips and disk drives.

**n.** "Excavation costs"

**(1)** "Excavation costs" means the additional cost to repair or replace Covered Property because of the need to dig a hole, trench or tunnel. This includes the costs to dig and refill the hole, trench or tunnel. This also includes the costs to repair damage to roads, walkways, landscaping or other property caused by such excavation.

**(2)** "Excavation costs" include the actual loss of Business Income you sustain and necessary Extra Expense you incur, if shown as covered.

This term does not appear elsewhere in this endorsement, but may appear in a "schedule".

**o.** "Hazardous substance" means any substance that is dangerous or harmful to health or has been declared by a governmental agency to be dangerous or harmful to health.

**p.** "Media" means material on which "data" is recorded, such as flash drives, hard disks, magnetic tapes, optical disks or solid-state drives.

**q.** "Medical equipment" means the following equipment when used for any medical specialty, including veterinary services:

**(1)** "Medical imaging equipment";

**(2)** Laboratory or therapeutic equipment; and

**(3)** Any other equipment used to:

**(a)** Cure, diagnose, mitigate, monitor, prevent or treat disease; or

**(b)** Affect the structure or appearance of the body.

This term does not appear elsewhere in this endorsement, but may appear in a "schedule".

**r.** "Medical imaging equipment" means scanning or imaging equipment used to diagnose or monitor disease or other conditions. This includes, but is not limited to, CT, MRI, PET, ultrasound and x-ray devices. This includes such equipment used for all medical specialties, including veterinary services.

This term does not appear elsewhere in this endorsement, but may appear in a "schedule".

**s.** "Mobile Robot"

**(1)** "Mobile robot" means "covered equipment" that is:

**(a)** Able to move about under its own power; and

**(b)** Used solely within a structure or building.

**(2)** "Mobile robot" does not mean any equipment that is

**(a)** Directed or steered by a human driver who is on or in such equipment;

**(b)** Used to transport people;

**(c)** Used in or under water or other liquid;

**(d)** Used within tanks or piping; or

**(e)** A drone or other airborne device.

**t.** "One equipment breakdown" means all "accidents" and "electronic circuitry impairments" occurring at the same time from the same event. If an "accident" or "electronic circuitry impairment" causes other "accidents" or "electronic circuitry impairments", all will be considered "one equipment breakdown".

**u.** "Perishable goods" means any Covered Property that is personal property, other than "animals", subject to deterioration or impairment as a result of a change in conditions, including, but not limited to, temperature, humidity or pressure.

**v.** "Production machinery" means any machine or apparatus that processes or produces a product intended for eventual sale. This includes all component parts of such machine or apparatus and any other equipment used exclusively with such machine or apparatus. However, "production machinery" does not mean any boiler or fired or unfired pressure vessel.

This term does not appear elsewhere in this endorsement, but may appear in a "schedule".

**w.** "Recognized environmental standards program" means one of the following:

**(1)** The United States Environmental Protection Agency ENERGY STAR® program;

**(2)** The U.S. Green Building Council LEED® program;

**(3)** The Green Building Initiative GREEN GLOBES® program; or

**(4)** Any nationally or internationally recognized environmental standards program designed to achieve energy savings and related objectives of the type included in the programs listed above.

**x.** "Schedule" means the Equipment Breakdown Coverage Schedule.

**y.** "Spoilage and consequential damage" means any detrimental change in physical state. This includes, but is not limited to:

**(1)** Thawing of frozen goods;

**(2)** Warming of refrigerated goods;

**(3)** Freezing of fresh goods;

**(4)** Solidification of liquid or molten material; and

**(5)** Chemical reactions to material in process.

**z.** "Vehicle"

**(1)** "Vehicle" means, with respect to this endorsement only, any machine or apparatus that is used for transportation or is able to move about under its own power, even if it is solely used within a structure or building. "Vehicle" includes, but is not limited to, any car, truck, bus, trailer, train, aircraft, drone, watercraft, forklift, bulldozer, tractor or harvester.

**(2)** None of the following is a "vehicle":

**(a)** Any property at a covered location that, for at least 24 consecutive hours, has been stationary, installed and receiving electrical power from a power source that is external to such property. However, a battery-propelled machine or apparatus that requires periodic recharging is considered a "vehicle" and not subject to this exception.

**(b)** Any "mobile robot".

**B.** With respect to this endorsement only, the Building and Personal Property Coverage Form, the Condominium Association Coverage Form, the Commercial Unit-Owners Coverage Form, the Commercial Property Conditions and Common Policy Conditions are modified as follows.

**1. EQUIPMENT BREAKDOWN LIMITS OF INSURANCE**

Any payment made under this Equipment Breakdown Coverage will not be increased if multiple insureds are shown in the Declarations or if you are comprised of more than one legal entity.

**a.** The most we will pay for loss, damage or expense arising from any "one equipment breakdown" is the applicable Limit of Insurance in the Declarations, unless otherwise shown in a "schedule". Coverage provided under this endorsement does not provide an additional amount of insurance.

**b.** Loss arising from any "one equipment breakdown" may continue to be present or recur in a later policy period. In such a case, the most we will pay for all loss, damage or expense arising out of any "one equipment breakdown" is the coverage limit at the time of the "accident" or "electronic circuitry impairment".

 © 2021, The Hartford Steam Boiler Inspection and Insurance Company. All rights reserved.

    **c.** If two or more coverage limits apply to the same loss or portion of a loss, we will pay only the smallest of the applicable limits for that loss or portion of that loss.

**2. EQUIPMENT BREAKDOWN DEDUCTIBLE**

The deductible in the Declarations applies unless a separate Equipment Breakdown deductible is shown in a "schedule". If a separate Equipment Breakdown deductible is shown, the following applies.

Only as regards Equipment Breakdown Coverage, provision **D. DEDUCTIBLE** is deleted and replaced with the following:

**a. Deductibles for Each Coverage**

    **(1)** Unless the "schedule" indicates that your deductible is combined for all coverages, multiple deductibles may apply to any "one equipment breakdown".

    **(2)** We will not pay for loss, damage or expense under any coverage until the amount of the covered loss, damage or expense exceeds the deductible amount indicated for that coverage in the "schedule". We will then pay the amount of loss, damage or expense in excess of the applicable deductible amount, subject to the applicable limit.

    **(3)** If deductibles vary by type of "covered equipment" and more than one type of "covered equipment" is involved in any "one equipment breakdown", only the highest deductible for each coverage will apply.

**b. Direct and Indirect Coverages**

    **(1)** Direct Coverages Deductibles and Indirect Coverages Deductibles may be indicated in the "schedule".

    **(2)** Unless more specifically indicated in the "schedule":

        **(a)** Direct Coverages Deductibles apply to all loss, damage or expense covered by this Equipment Breakdown Coverage with the exception of Business Income and Extra Expense loss, regardless of where such Business Income and Extra Expense coverage is provided in this Equipment Breakdown Coverage; and

        **(b)** Indirect Coverages Deductibles apply to Business Income and Extra Expense loss, regardless of where such coverage is provided in this Equipment Breakdown Coverage.

**c. Application of Deductibles**

    **(1) Dollar Deductibles**

    We will not pay for loss, damage or expense resulting from any "one equipment breakdown" until the amount of loss, damage or expense exceeds the applicable deductible shown in the "schedule". We will then pay the amount of loss, damage or expense in excess of the applicable deductible or deductibles, up to the applicable Limit of Insurance.

    **(2) Time Deductible**

    If a time deductible is shown in the "schedule", we will not be liable for any loss occurring during the specified number of hours or days immediately following the "accident" or "electronic circuitry impairment". If a time deductible is expressed in days, each day will mean twenty-four consecutive hours.

    **(3) Multiple of Average Daily Value (ADV)**

    If a deductible is expressed as a number times ADV, that amount will be calculated as follows:

    The ADV (Average Daily Value) will be the Business Income (as defined in any Business Income coverage that is part of this policy) that would have been earned during the period of interruption of business had no "accident" or "electronic circuitry impairment" occurred, divided by the number of working days in that period. No reduction will be made for the Business Income not being earned, or in the number of working days, because of the "accident" or "electronic circuitry impairment" or any other scheduled or unscheduled shutdowns during the period of interruption. The ADV applies to the Business Income value of the entire location, whether or not the loss affects the entire location. If more than one location is included in the valuation of the loss, the ADV will be the combined value of all affected locations. For purposes of this calculation, the period of interruption may not extend beyond the "period of restoration". The number indicated in the "schedule" will be multiplied by the ADV as determined above. The result will be used as the applicable deductible.

    **(4) Percentage of Loss Deductibles**

If a deductible is expressed as a percentage of loss, we will not be liable for the indicated percentage of the gross amount of loss, damage or expense (prior to any applicable deductible) insured under the coverage that is applicable. If the dollar amount of such percentage is less than the indicated minimum deductible, the minimum deductible will be the applicable deductible.

**(5) Horsepower Deductibles**

If a deductible is expressed as a function of horsepower, the indicated amount per horsepower will be multiplied by the horsepower rating of the applicable "covered equipment". The resulting amount will apply as a Dollar Deductible. If the resulting amount is less than the indicated Minimum Deductible, the Minimum Deductible will be the applicable deductible. If the "covered equipment" is an air conditioning or refrigeration system, the indicated amount per horsepower will be multiplied by the horsepower rating of the system's largest motor or compressor. If systems or components are rated in tonnage of cooling capacity, each ton of rated capacity will be converted to horsepower in accordance with the following chart:

| Horsepower Equivalent Per One Ton of Rated Cooling Capacity | |
|---|---|
| Centrifugal Compressor System | 0.7 hp |
| Hermetic Scroll Compressor System | 1.0 hp |
| Reciprocating Compressor System | 1.5 hp |
| Screw Compressor System | 1.5 hp |
| All Other Systems | 4.7 hp |

## 3. EQUIPMENT BREAKDOWN CONDITIONS

**a.** The following conditions are in addition to the Conditions in the Building and Personal Property Coverage Form, the Condominium Association Coverage Form, the Condominium Commercial Unit-Owners Coverage Form, the Commercial Property Conditions and the Common Policy Conditions.

**(1) Jurisdictional Inspections**

If any property that is "covered equipment" under this endorsement requires inspection to comply with state or municipal boiler and pressure vessel regulations, we agree to perform such inspection on your behalf. We do not warrant that conditions are safe or healthful.

**(2) Suspension**

Any of our representatives may immediately suspend the insurance against loss from an "accident" or "electronic circuitry impairment" to any "covered equipment" that is found to be in a dangerous condition or exposed to a dangerous condition. They may do this by mailing or delivering a written notice of suspension to:

**(a)** Your address most recently known to us; or

**(b)** The address where the applicable "covered equipment" is located.

The only way we may reinstate insurance is by issuing an endorsement for that "covered equipment".

We will refund the premium applicable to the suspended "covered equipment", prorated for the period of suspension. However, the suspension will be effective immediately even if we have not yet offered or made a refund.

**b.** With respect to this endorsement only, the Valuation Condition in the Building and Personal Property Coverage Form, the Condominium Association Coverage Form and the Condominium Commercial Unit-Owners Coverage Form is deleted and replaced with the following:

Valuation

We will determine the value of Covered Property as follows**:**

**(1)** Except as specified otherwise**,** our payment for damaged Covered Property will be the least expensive of:

**(a)** The cost to repair the damaged property;

**(b)** The cost to replace the damaged property on the same site; or

**(c)** The amount you actually spend that is necessary to replace or repair the damaged property.

**(2)** The amount of our payment will be based on the most cost-effective means to replace the function, capacity and remaining useful life of the damaged property. This may include the use of generic, used or reconditioned parts, equipment or property. This will not include costs to research or correct defects, errors or shortcomings in the design or installation of the Covered Property.

**(3)** Except as described in (4) below, you must pay the extra cost of replacing damaged property with property of a better kind or quality or of a different size or capacity.

**(4)** Environmental, Safety and Efficiency Improvements

If "covered equipment" requires replacement due to an "accident" or "electronic circuitry impairment", we will pay your additional cost to replace with equipment that is better for the environment, safer for people or more energy or water efficient than the equipment being replaced. However, we will not pay to increase the size or capacity of the equipment and we will not pay more than 150% of what the cost would have been to replace with like kind and quality. This provision does not apply to any property to which "actual cash value" applies and does not increase any of the applicable limits.

**(5)** Consequential Loss to Undamaged Stock

Our payment for damaged Covered Property will include compensation for undamaged stock that loses market value or requires additional expense because of the damage to the Covered Property.

**(6)** The following property will be valued on an "actual cash value" basis:

**(a)** Any property that does not serve a useful or necessary function for you;

**(b)** Any Covered Property that you do not repair or replace within 24 months after the date of the "accident" or "electronic circuitry impairment"; and

**(c)** Any Covered Property for which "actual cash value" coverage is specified in a "schedule".

**(7)** If any one of the following conditions is met, property held for sale by you will be valued at the sales price as if no loss or damage had occurred, less any discounts and expenses that otherwise would have applied:

**(a)** The property was manufactured by you;

**(b)** The sales price of the property is less than the replacement cost of the property; or

**(c)** You are unable to replace the property before its anticipated sale.

**(8)** Except as specifically provided for under Data Restoration coverage, "data" and "media" will be valued on the following basis:

**(a)** For mass-produced and commercially available software, at the replacement cost.

**(b)** For all other "data" and "media", at the cost of blank "media" for reproducing the records. We will not pay for "data" representing financial records based on the face value of such records.

**ALL OTHER PROVISIONS OF THIS POLICY APPLY.**

POLICY NUMBER: ORB-PK-23-A01924-00

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL NAMED INSURED(S)

Named Insured: LiveOne Inc

The named insured is hereby amended to include the following:

Slacker Inc.
PodcastOne, Inc
LiveXLive, Corp.
Splitminds LLC
Drumify LLC

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

MANUS-01                                                                 Page **1** of **1**